## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ALAN EUGENE MILLER, | |
| *Plaintiff*, | Civil Action: 2:24-cv-197 |
| v. | **CAPITAL CASE** |
| STEVE MARSHALL, in his official capacity as Attorney General, State of Alabama, | **ON FEB. 21, 2024, THE STATE FILED A MOTION IN THE ALABAMA SUPREME COURT FOR AN EXECUTION WARRANT** |
| KAY IVEY, Governor of the State of Alabama, | |
| JOHN Q. HAMM, In his official capacity as Commissioner, Alabama Department of Corrections, | |
| TERRY RAYBON, in his official capacity as Warden, Holman Correctional Facility, | |
| *Defendants*. | |

## COMPLAINT

1.     In the past year and a half, the State of Alabama has botched at least four executions: Joe Nathan James (lethal injection), Alan Miller (lethal injection), Kenneth Smith (lethal injection), and Kenneth Smith again (nitrogen hypoxia). Plaintiff Alan Miller survived his execution attempt, and gave public accounts of the physical and mental pain he suffered, and the incompetency he witnessed.

2.     Rather than address these failures, the State of Alabama has attempted to maintain secrecy and avoid public scrutiny, in part by misrepresenting what happened in these botched executions. Mr. Miller's account of events contradicts Defendants' misrepresentations, and Defendants are silencing him by seeking his execution in a manner that deviates from their pattern and practice in selecting inmates for execution. This is unlawful retaliation against Mr. Miller's

exercise of his First Amendment right to free speech, and a violation of his Fourteenth Amendment right to equal protection under the law. Moreover, Alabama is evidently unable to carry out a nitrogen hypoxia execution without cruelly superadding pain and disgrace, and prolonging death. This is a violation of Mr. Miller's Eighth Amendment right to be free from cruel and unusual punishments.

## **PARTIES**

### *Alan Miller*

3.     Plaintiff Alan Eugene Miller is a United States citizen and a resident of the State of Alabama. He is an inmate sentenced to death under Defendants' supervision. At all relevant times, Mr. Miller has been and continues to be incarcerated at the Holman Correctional Facility in Atmore, Alabama ("Holman").

4.     Mr. Miller is obese, and receives a diabetic food tray at Holman. Mr. Miller has asthmatic bronchitis, and has had trouble with asthma since childhood. Mr. Miller often suffers from shortness of breath and labored breathing. Mr. Miller may have other medical conditions of which he is unaware, due to the limitations of medical treatment at Holman.

### *Steve Marshall*

5.     Defendant Steve Marshall, Attorney General for the State of Alabama, is sued in his official capacity. At all relevant times, Defendant Marshall has been acting under color of law and as the agent and official representative of the Attorney General's Office. Defendant Marshall is an elected official.

6.     Defendant Marshall has the power, authority, and obligation to implement, interpret, and enforce Alabama state law, including Ala. Code § 15-18-82.1, the Alabama Constitution, and the U.S. Constitution.

7. To the extent Defendant Marshall has the authority to initiate the execution process by identifying the individuals for whom he moves to set an execution date, he must do so in a constitutional manner. Defendant Marshall has the obligation and responsibility to withdraw motions to set an execution date that are unconstitutional, including when the conditions of the proposed execution are unconstitutional. He also has the obligation and responsibility to ensure that the Alabama Department of Corrections ("ADOC") complies with all state and federal law, including federal court orders, before and during an execution.

*Kay Ivey*

8. Defendant Kay Ivey, the Governor of Alabama at all times relevant to this Complaint, is sued in her official capacity. She is an elected official.

9. In 2022, after a series of botched lethal injection executions, Governor Ivey ordered that ADOC undertake a "top-to-bottom review of the state's execution process." Ex. 1, Press Release, Governor Ivey Orders Top-to-Bottom Review of Execution Protocol for Victims' Sake (Nov. 21, 2022). During this "review," Governor Ivey petitioned the Alabama Supreme Court to amend Alabama Rule of Appellate Procedure 8(d)(1) to change the amount of time available for ADOC to attempt an execution from one day to an unlimited period of time to be dictated by the Governor. *See* Ex. 2. The Alabama Supreme Court granted her request. *See* Ala. R. App. P. 8(d)(1). Under the newly amended Alabama Rule of Appellate Procedure Rule 8(d)(1), Defendant Ivey is responsible for setting the "time frame" under which an inmate's sentence of death shall be carried out by the Commissioner of ADOC.

10. When the Alabama Supreme Court presumably grants the State's motion to set an execution warrant for Mr. Miller, the decision regarding Mr. Miller's execution "time frame" will rest solely with Defendant Ivey.

*Terry Raybon*

11.     Defendant Terry Raybon, Warden of the Holman Correctional Facility, is sued in his official capacity. Defendant Raybon has been acting under color of law and as the agent and official representative of the Holman Correctional Facility and ADOC.

12.     Defendant Raybon is the statutory executioner of all Holman death row inmates. *See* Ala. Code § 15-18-82(c).

13.     Defendant Raybon plays a central role in each execution that takes place in the State of Alabama. *See* Ex. 3, August 2023 Alabama Execution Procedures. Defendant Raybon organizes the execution team. *Id.* at 5. He is responsible for ensuring on the night of an execution that the execution does not violate any court order or order from the Governor's office. *See id*. at 15. Defendant Raybon reads the death warrant to the inmate being executed, and administers the nitrogen. *See id.* at 16. Defendant Raybon administers the nitrogen hypoxia system during the execution. *Id*. at 14.

14.     Defendant Raybon is responsible for implementing ADOC policies and procedures governing executions, managing the preparations for an execution, and supervising the execution site during the execution. Defendant Raybon also is responsible for protecting the constitutional rights of all persons incarcerated at the Holman Correctional Facility.

*John Q. Hamm*

15.     Defendant John Q. Hamm, Commissioner of the ADOC, is sued in his official capacity. At all relevant times, Defendant Hamm has been acting under the color of law and as the agent and official representative of ADOC, pursuant to ADOC's official policies and procedures.

16.     ADOC is the state agency charged with the incarceration, care, custody, and treatment of all state prisoners, including prisoners sentenced to death. Ala. Code § 14-1-1.2.

17.     Defendant Hamm is the alternate statutory executioner of all death row inmates at Holman. *See* Ala. Code § 15-18-82(c) ("In the event of the death or disability or absence of both the Warden and Deputy, the executioner shall be that person appointed by the Commissioner of the Department of Corrections."). Moreover, Defendant Hamm is statutorily charged with providing the materials necessary to execute death row inmates. *See* Ala. Code § 15-18-82(b) ("It shall be the duty of the Department of Corrections of this State to provide the necessary facilities, instruments, and accommodations to carry out the execution.").

18.     Defendant Hamm must be present at Holman for each execution, and Defendant Hamm is responsible for maintaining an open telephone line to Defendant Ivey and Defendant Marshall. *See* Ex. 3, 2023 Alabama Execution Procedures at 15.

19.     Defendant Hamm is responsible for ensuring all prisoners committed to the custody of ADOC are treated in accordance with the U.S. Constitution. He is also responsible for the development and implementation of the protocol and procedures governing the execution of death-sentenced inmates in Alabama.

20.     Defendant Hamm has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced inmates in Alabama. Furthermore, Defendant Hamm has the ability (and obligation) to remedy problems that arise due to ADOC's lack of adequate procedures.

21.     Defendant Hamm has the authority to call off an execution that has gone awry.

## JURISDICTION AND VENUE

22.     Mr. Miller's claims arise under the Constitution and the laws of the United States. This court has federal question jurisdiction over those claims arising under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331, 1343.

23.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 57 and 65. The federal rights asserted by Mr. Miller are enforceable under 42 U.S.C. § 1983.

24.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

25.     No administrative grievance is available at Holman Correctional Facility for Mr. Miller to challenge the way in which Defendants have unlawfully retaliated against him for exercising his First Amendment rights, and seek to execute him via a method that will superadd unnecessary pain and suffering.

## FACTUAL ALLEGATIONS

### A.  MR. MILLER ELECTS NITROGEN HYPOXIA

26.     When the State of Alabama created a statutory right for death row inmates to elect death by lethal gas ("nitrogen hypoxia") instead of death by lethal injection, Mr. Miller elected nitrogen hypoxia as his method of execution, in accordance with all the requirements of the state law that gave him that right. *See* Ala. Code § 15-18-82.1(b).

27.     On April 19, 2022, the Attorney General moved the Alabama Supreme Court to set an execution date for Mr. Miller. Based on the understanding that the State intended to execute him by lethal injection, Mr. Miller filed an opposition brief, attesting in a sworn affidavit that he timely submitted the nitrogen hypoxia election form in accordance with Ala. Code § 15-18-82.1(b). The State responded to Mr. Miller's opposition with an affidavit by Holman Warden Terry Raybon, stating that he could not find a record of Miller's election form. On July 18, 2022, the Alabama Supreme Court granted the State's motion, over Chief Justice Parker's dissent, setting Mr. Miller's execution for September 22, 2022.

28.     Following the Alabama Supreme Court's order, Mr. Miller swiftly filed a lawsuit in the U.S. District Court for the Middle District of Alabama, bringing claims against ADOC

Commissioner John Hamm, Holman Warden Terry Raybon, and Attorney General Steve Marshall. *See* Complaint, *Miller v. Hamm*, No. 22-cv-00506-RAH (M.D. Ala. Aug. 22, 2022), Dkt. 1. Mr. Miller alleged that executing him by lethal injection would violate his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution because he had timely elected nitrogen hypoxia under state law.

29.     On September 1, 2022, Miller moved for a preliminary injunction to enjoin the State from executing him by any method other than nitrogen hypoxia. On September 12, 2022, the District Court held a day-long evidentiary hearing on the single factual question that underpinned Miller's complaint at the time: Was it substantially likely that Miller timely elected nitrogen hypoxia as his method of execution? The District Court, in its role as a fact finder evaluating the strength of the evidence and the credibility of Miller's live in-court testimony, found that it is substantially likely that Miller elected nitrogen hypoxia. The District Court entered a preliminary injunction prohibiting the State from executing Miller by any method other than nitrogen hypoxia. *See* Mem. Op., *Miller*, 22-cv-00506-RAH (Sept. 19, 2022), Dkt. 62.

30.     On September 20, 2022, the State appealed the District Court's decision to the Eleventh Circuit. *See Miller v. Comm'r, Ala. Dept. of Corr.*, No. 22-13136-P (11th Cir. Sept. 20, 2022). On the same day, the State filed a "Motion to Stay Pending Appeal" in the District Court, and an "Emergency Motion to Stay Preliminary Injunction" in the Eleventh Circuit. *Miller*, No. 22-13136-P (11th Cir. Sept. 20, 2022), Dkts. 67, 72

31.     Neither the District Court nor the Eleventh Circuit were persuaded by the State's arguments. The District Court denied the State's Motion to Stay Pending Appeal on September 21, 2022, and the Eleventh Circuit denied the State's Emergency Motion to Stay Preliminary Injunction on September 22, 2022. The State did not appeal the Eleventh Circuit's ruling.

32.     Instead, on the date scheduled for Mr. Miller's execution, September 22, 2022, at 4:30 p.m., the State filed in the U.S. Supreme Court an "Emergency Application to Vacate Preliminary Injunction." *See Hamm v. Miller*, No. 22A258 (U.S. Sept. 22, 2022). Mr. Miller filed an Opposition to the State's Emergency Application. Around 9:00 p.m. on September 22, the U.S. Supreme Court issued a two-sentence ruling on a 5-4 basis: "The application to vacate injunction presented to Justice Thomas and by him referred to the Court is granted. The September 19, 2022 order of the United States District Court for the Middle District of Alabama is vacated." *Hamm v. Miller*, No. 22A258, 143 S. Ct. 50, 50 (2022). The Supreme Court never issued any opinion or explanation of its decision.

33.     Importantly, the decision of the U.S. Supreme Court left undisturbed the factual finding of the District Court as to whether Mr. Miller timely elected nitrogen hypoxia. *Miller v. Hamm*, No. 2:22-cv-00506-RAH, Mem. Op., Dkt. 62 at 41 ("[T]he Court concludes that, on this record as it currently exists, it is substantially likely that Miller timely elected nitrogen hypoxia.").

**B.  ALABAMA BOTCHES ITS ATTEMPT TO EXECUTE MR. MILLER**

34.     It is difficult to overstate the mental and physical anguish that Mr. Miller experienced on the night of September 22 into the early morning hours of September 23.

35.     On September 22, 2022, around 9:00 p.m., the State proceeded with Mr. Miller's execution by lethal injection. The State knew medical professionals have great difficulty accessing Mr. Miller's veins because Mr. Miller had testified in the District Court proceedings about the difficulty Holman staff often experienced accessing his veins to draw blood. *See* Evidentiary Hr'g Tr. at 92:19-95:16, *Miller*, 22-cv-00506-RAH (Sept. 15, 2022), Dkt. 58. The State also knew that Mr. Miller weighs 351 pounds, and that accessing veins on a person that size is challenging even to qualified anesthesiologists.

36.     Nevertheless, around 9:55 p.m., ADOC correctional officers escorted Mr. Miller to the execution chamber. Present in the chamber were the dozen or so guards who escorted Mr. Miller from his cell, two other ADOC employees, a white female in business attire, and a white male in a suit. Mr. Miller knows the names of most of the ADOC personnel who were present at his execution attempt, but will not publicly discuss those names absent a court order, pursuant to a settlement agreement he entered into with the State of Alabama.

37.     One of the guards asked Mr. Miller to lay down on the execution gurney, which he did without resistance. Around 10:15 p.m., the guards began to strap Mr. Miller down to the gurney, pictured below.



38.     A captain inspected the straps on Mr. Miller's body and seemed to approve that they were appropriately placed.

39.     Mr. Miller then heard the doors to the execution chamber open, and saw two men wearing medical scrubs walk in. Neither man identified himself or explained whether he had any sort of medical credentials. One of the men was pushing a rolling cart that appeared to contain medical supplies. Because ADOC refuses to identify these men, Mr. Miller must refer to them herein by the color of the scrubs they were wearing.

40.     The first man, "Green Scrubs," tied a torniquet on Mr. Miller's right bicep, and began slapping Mr. Miller's inner right arm inside his elbow. The slapping went on for long periods of time as Green Scrubs tried and tried to find a vein. The tourniquets were tied extremely tightly and caused Mr. Miller pain. At the same time, the second man, "Aqua Scrubs," punctured Mr. Miller's right elbow pit in multiple different points trying to find a vein. Mr. Miller could feel the needle being injected into his skin, and then turned in various directions, as Aqua Scrubs tried to place the needle inside a vein. This process was painful and traumatic for Mr. Miller. After one of the needle punctures on his arm, Mr. Miller told the men in scrubs that what they had just done was "excruciating" for him. No one responded.

41.     Defendants chose to allow Mr. Miller's execution to continue despite their knowledge of the great difficulty the men in scrubs were having with accessing Mr. Miller's veins, and despite their knowledge of the fact that Mr. Miller was suffering greatly from their attempts to set an IV.

42.     Eventually, after repeated attempts, the men in scrubs abandoned their efforts to find a vein in Mr. Miller's right elbow pit and moved to Mr. Miller's right hand. But after multiple painful attempts, that also proved unsuccessful, the men proceeded to carry out the same failed

tasks on Mr. Miller's left hand, left arm, right foot (in which a needle struck one of Mr. Miller's nerves), and then right hand again.

43.     At some point Aqua and Green Scrubs became so desperate to puncture Mr. Miller that they decided to split up and each began working on puncturing different parts of Mr. Miller's body.

44.     Eventually, after around an hour had passed, a new man in scrubs entered the execution chamber, wearing navy scrubs. "Navy Scrubs" is a white man, heavyset, wearing glasses, who appeared to be in his sixties.

45.     Navy Scrubs walked around Mr. Miller's body and examined all the puncture sites that Green and Aqua Scrubs had made. Navy Scrubs then moved up to Mr. Miller's head and started feeling and slapping the skin on his neck. Mr. Miller physically recoiled out of intense fear of the men trying to insert a needle in his neck. Mr. Miller asked urgently whether the men were going to try to insert a needle into his neck; all refused to answer him.

46.     Very soon after Mr. Miller recoiled from Navy Scrubs, there was a loud knock on the window-pane that borders the execution chamber and the State's observation room. Mr. Miller could see state employees observing his execution from this observation room. All three men in scrubs left the execution chamber after hearing this knock on the window.

47.     The guards who were still in the execution chamber with Mr. Miller placed a large strap across his chest. An officer began operating a foot pump at the base of the execution gurney, which gradually raised the gurney from a horizontal to vertical position. Mr. Miller was strapped into the gurney by his arms, feet, and chest, and was left hanging vertically from the gurney. No one explained to Mr. Miller why he was being raised into a vertical position or why the men in scrubs had left the room. Mr. Miller said to the officer and the captain that the position he was

hanging in was "giving [him] hell," his elbows, arms and back were in pain, and that his foot was "killing [him]." Mr. Miller noticed that the clock on the wall said 11:40 p.m.

48.     Mr. Miller believes that he was left hanging vertically from the execution gurney for about 20 minutes. He experienced a lot of pain while left hanging: in his many puncture wounds, particularly in his right foot, which was throbbing with pain; and in his arms, chest, and neck, from having been extended into a painful stress position for 90 minutes. Mr. Miller felt nauseous, disoriented, confused, and fearful about whether he was about to be killed, and was deeply disturbed by his view of state employees silently staring at him from the observation room while he was hanging vertically from the gurney. Blood was leaking from some of Mr. Miller's wounds.

49.     Suddenly, without warning, and immediately before midnight, an ADOC employee appeared by Mr. Miller's head, and said, "Your execution has been postponed."

50.     One of the guards in the execution chamber then slammed the execution gurney back into a horizontal position, while Mr. Miller was still strapped to it.

51.     A sergeant then approached Mr. Miller and explained that the ADOC employee was wrong, that the execution had not been "postponed," but was in fact truly over, as the time had passed midnight and Mr. Miller's death warrant had expired.

52.     The guards in the execution chamber asked Mr. Miller to get off the table. Mr. Miller's arms were so stiff and painful from having been extended above his head for 90-plus minutes that he was not able to bend them on his own. Mr. Miller had to ask one of the guards to bend his arms for him. Mr. Miller was not able to get off the table immediately, and had to try to restore circulation to his limbs himself.

53.     The large group of guards reentered the execution chamber and handcuffed Mr. Miller. They took Mr. Miller to the medical unit, where a Holman nurse wiped the blood off of Mr. Miller's body. The nurse also wrote up a quick "body chart" exam of Mr. Miller's vitals. Mr. Miller told the nurse that his right foot in particular was in great pain from the punctures. The nurse did not offer any medical assistance for Mr. Miller's physical and psychological pain.

54.     Mr. Miller was later returned to the execution holding cell. He was in a deep state of shock and post-traumatic stress. Mr. Miller curled into a fetal position on the cot in the execution holding cell for most of the early morning hours of September 23.

55.     On the morning of September 23, Mr. Miller sought, and the District Court granted, a written order requiring Defendants to "make immediate efforts to locate and preserve all evidence related to the attempted execution of Mr. Miller." Order, *Miller v. Hamm,* No. 2:22- cv-00506-RAH (M.D. Ala. Sept. 19, 2022), Dkt. 76 at 2. The order specifically required Defendants to preserve "[a]ll communications relating to the attempted execution," retain "[a]ll medical charts, reports, and notes that were prepared . . . or otherwise used," and store all medical materials or equipment that were employed in furtherance of the execution. *Id.*

56.     On September 24, one of Mr. Miller's attorneys and a non-ADOC physician returned to Holman, in order for the physician to assess Mr. Miller's injuries from the failed execution. The following photos reflect some of the puncture wounds on Mr. Miller's body following the botched execution.





57.     In the aftermath of the failed execution, Mr. Miller has had intense psychological symptoms. He sometimes goes into a "twilight mode" where he loses track of time and dissociates from reality. He experiences intrusive thoughts of the execution, even when he is trying not to think about the execution. He has been dwelling on thoughts of being stabbed with needles. He twitches or taps his hands together to try to calm down, and he has great difficulty sleeping.

58.     Since the botched execution, Mr. Miller has not felt comfortable extending his arms away from his body. Doing so gives him flashbacks to the execution, when his arms were painfully strapped down and punctured repeatedly with needles. Before the botched execution, Mr. Miller used to sit next to his fellow inmates to watch a movie together from a shared set of headphones. When sharing headphones, Mr. Miller would sometimes extend an arm around a friend's shoulders. He can no longer extend an arm around a friend due to the intensity of the flashbacks. Mr. Miller often keeps his arms and hands curled up tight on his chest.

59.     The pain Mr. Miller experienced during his execution reminded him of the physical abuse he suffered as a child at the hands of his father. While on the execution gurney, Mr. Miller immediately associated the pain he was feeling to the pain inflicted on him by his father's beatings. That association continues to this day.

60.     Mr. Miller's sleep has been greatly disturbed since the failed execution. He often does not sleep more than a few hours at night. He suffers from many intrusive thoughts of the execution at night.

61.     Mr. Miller often thinks about Kenneth Smith, and Mr. Smith's recent execution caused Mr. Miller increased anxiety. Mr. Miller had talked to Mr. Smith more after the State botched both of their executions because they had gone through the same thing and understood each other in a way that other people could not.

62.     On October 4, 2022, Defendant Marshall filed a motion in the Alabama Supreme Court requesting that court set an *expedited* second date to attempt to execute Mr. Miller via lethal injection.

63.     On October 12, 2022, Mr. Miller filed a Second Amended Complaint in the District Court. *Miller*, No. 22-cv-00506-RAH (Oct. 12, 2022), Dkt. 85. The Second Amended Complaint

detailed the events surrounding Defendants' botched execution and added claims relating to those events.

64.     The District Court held a status and scheduling hearing the next day. During that hearing, counsel for Mr. Miller informed the District Court that Mr. Miller had served discovery on October 7, 2022, but Defendants had not yet provided counsel with any response as to their position regarding discovery.

65.     On October 17, 2022, Mr. Miller filed a motion of expedited discovery. *Id.*, Dkt. 90.

66.     The District Court ordered the State to produce discovery, including all physical evidence and medical equipment related to the State's failed execution attempt, and answers to all of Miller's interrogatories (which answers will include the date by which the State will be ready to proceed with nitrogen hypoxia executions) by October 27, 2022. *Id.*, Dkt. 98 at 12.

67.     On October 27, 2022, the same day that Defendants were required to respond to certain discovery requests, Defendants filed their motion seeking a protective order. *Id.*, Dkt. 102.

68.     On November 4, 2022, the District Court issued an opinion and order granting in part and denying in part Defendants' motion to dismiss. Also on November 4, the Court ordered the parties to confer and develop a discovery plan to be filed no later than November 14, 2022. *Id.*, Dkt. 110.

69.     On November 9, 2022, the Court held a hearing on Defendants' motion for a protective order. At that hearing, the District Court said to the attorneys for the Defendants, among other things, "I'm inclined to require you to give them some names, and in particular those who were on the IV team. I think that's fair. I think that's legitimate. I think they have the right to

determine whether the individuals who are attempting to access the veins are qualified to do it, and are there problems with those particular individuals doing that." *Id.*, Dkt. 118 at 39:15-20.

70.     On November 10, 2022, the Court ordered Defendants to submit an unredacted version of the ADOC's current lethal injection execution protocol and ordered the parties to participate in their Rule 26(f) planning meeting on or before November 10, 2022.

71.     On November 11, 2022, Defendants tendered a settlement agreement to Mr. Miller.

72.     The State's settlement agreement with Mr. Miller explicitly states that by entering into the settlement agreement, Mr. Miller did not waive his right to challenge any future nitrogen hypoxia protocol, or method of nitrogen hypoxia execution, that the State may devise.

73.     Additionally, as part of the settlement agreement, the State agreed to maintain all physical and written evidence concerning Mr. Miller's litigation, including contemporaneous communications about the State's botched execution attempt of Mr. Miller. The full list of evidence that Defendants were required to retain pursuant to the Settlement Agreement can be found in the Court's Order Regarding Access to Mr. Miller and Preservation of Evidence. Order, *Miller v. Hamm*, No. 2:22-cv-00506-RAH (M.D. Ala.), Dkt. 76 (ordering Defendants to preserve all contemporaneous evidence and communications surrounding Mr. Miller's botched execution).

## C.  ALABAMA SELECTS A FAULTY MASK FOR NITROGEN HYPOXIA EXECUTIONS

74.     Not long ago, the State claimed it would make an effort to ensure that the mask it used for nitrogen hypoxia executions fit appropriately on the face of the man to be executed. *See* Hr'g Tr. at 7:12-15, *Miller v. Hamm*, No. 2:22-cv-00506-RAH (M.D. Ala. Sept. 12, 2022), Dkt. 58 (Assistant Attorney General James Houts states, "[W]e asked Mr. Miller during his deposition as a planning precaution whether he would agree to have correctional officials ***fit a [gas] mask to his face to make sure it was the appropriate size***.") (emphasis added); *id.* at 192:10-20 (Assistant

Attorney General James Houts states that in a nitrogen hypoxia execution, the State "can [] fit [the inmate's] face for the mask, make sure the mask fits properly . . ." and opined that "if your Eighth Amendment concern is whether the mask fits properly, will vent carbon dioxide to prevent hypercania,[1] for example . . . Well, we'll fit the mask. Let's see how that mask fits and make sure.").

75.     Oddly, the State has since changed course, and now refuses to check the size of the mask against the person being executed to see if a tight seal can be achieved based on that person's physical characteristics.

76.     The mask that the State selected to carry out nitrogen hypoxia executions is an industrial safety air respirator mask. Public news reporting has established that the manufacturer of the mask is Allegro Industries. On information and belief, the State purchased the Allegro mask from MSC Industrial Supply Co., based in St. Louis, Missouri.

77.     The State confirmed that the Allegro respirator mask has "a rubber seal that goes from the forehead around his face and down to the chin." *See* Ex. 4, Oral Arg. Tr. at 46:21-23, *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 24-10095 (11th Cir. Jan. 19, 2024). The mask holds approximately 1.4 liters of air, and ADOC claims to use a flow rate of 70 liters of nitrogen per minute in its executions. *See id*. at 55:16-57:8. The State claimed that this flow rate would mean the condemned man would intake more than a liter of nitrogen per minute, which would result in "very swift unconsciousness and then ultimately death." *Id.* at 57:8-12; *see also id*. at 63:6-8 (arguing that Mr. Smith would be unconscious in "a matter of seconds, not minutes").

---

[1] Acute hypercania is the sudden buildup of carbon dioxide in the blood. Acute hypercania can cause seizures.

78.     Ms. Stewart-Riley, who was the warden at Holman Correctional Facility when Alabama permitted nitrogen hypoxia as a means of execution, said that the protocol doesn't call for an airtight seal. When further questioned, she reiterated, "We do not have to have an airtight seal." Commissioner Hamm also noted that he was not aware that the mask needed to be airtight. The State reiterated this position in oral arguments at the Eleventh Circuit. *See id.* at 43:15-44:3 (counsel for the State acknowledges that Allegro's manual "recommend[s]" an airtight seal, but in defiance of that manufacturer recommendation, ADOC's position is that the mask does *not* need an airtight seal). The State also refuses to perform a negative pressure test on the person to be executed, to check if the mask allows in oxygen. *See id*. at 48:10-21. Indeed, the consent form that the State requires of spiritual advisors attending nitrogen hypoxia executions explicitly contemplates that nitrogen may leak from the mask. *See* Ex. 7, Acknowledgement of Spiritual Advisor (Nitrogen Hypoxia).

79.     Rather than test the mask on the person to be executed, the State instead tested its Allegro respirator mask on seven attorneys for the State: Assistant Attorneys General Lauren Simpson, Alana Cammack, Audrey Jordan, Thomas Govan, Cameron Ball, Jasper Roberts, and James Houts. *See Smith v. Hamm,* No. 2:23-cv-00656-RAH (M.D. Ala. Dec. 15, 2023), Dkt. 52.

80.     Rather unsurprisingly, these lawyers—whose job it is to defend the State against method of execution claims—all submitted affidavits in the State's favor, reporting that they found the State's mask to achieve a tight seal on their individual faces. The 11th Circuit noted that this evidence had at best "limited" relevance. *See Smith v. Comm'r, Ala. Dep't of Corr.*, No. 24-10095, 2024 WL 266027, at *8 n.5 (11th Cir. Jan. 24, 2024) ("We note that this evidence has limited relevance given the vastly different circumstances the condemned faces—a second execution, by

a novel method, through the use of an inert gas."), *cert. denied sub nom. Smith v. Hamm*, 144 S. Ct. 414 (2024).

81.     The State has admitted that the mask it uses for its nitrogen hypoxia executions is "one size fits all"—that is, the State does not have different masks for different sized faces and heads, but instead relies on a mask that is designed to fit an average sized face and head. Mr. Miller is not average sized. He is 5' 10" and weighs approximately 350 pounds, making him significantly larger than the average person for whom the mask was designed. This significantly increases the risk that the mask will not fit correctly and that outside air will leak into the mask during Mr. Miller's execution attempt.

82.     Additionally, in Mr. Smith's litigation, the State admitted it was making unwritten alterations and additions to its execution protocol without formally disclosing them to Mr. Smith or the Court. *See* Ex. 5, Hr'g Tr. at 177:8-78:14, *Smith v. Hamm*, No. 2:23-cv-00656-RAH (M.D. Ala. Dec. 20, 2023), Dkt. 67 (Warden Stewart-Riley states ADOC has "some things . . . that's not in the protocol . . . some things are not mentioned," and confirms that ADOC has not "written any of this down anywhere"). Some of these unwritten aspects of the protocol were added in response to ADOC's training in the lead up to Mr. Smith's execution, *see id.*, indicating that ADOC is building this plane while flying it.

83.     Despite the obvious failures in Mr. Smith's execution, the State of Alabama has made no written changes to its execution protocol.

84.     Additionally, Defendants refuse to disclose whether they are using medical grade or a lesser, industrial grade nitrogen in their executions. Nitrogen gas has different purity grades for different uses. Nitrogen that is used in industrial processes is not intended for human inhalation, and its impurities may cause superadded pain and suffering in a nitrogen hypoxia execution.

Additionally, medical and industrial grade nitrogen gas have different control levels in the amount of humidity (water vapor) in the gas. When medical-grade oxygen is given to a human being in any significant amount, it is humidified, which results in increased tolerance of the gas by the cells in a person's airway, and decreases the discomfort of the person receiving the gas.

85.     The use of non-medical grade gas can have a significant impact on a person, like Mr. Miller, with a reactive airway disease such as asthma. Medical professionals do not use industrial grade gases on humans.

86.     The three top nitrogen gas producers in the United States recently banned Defendants from using their nitrogen gas products in executions. *See* The Guardian, *Three top nitrogen gas manufacturers in US bar products from use in executions* (March 10, 2024), https://www.theguardian.com/us-news/2024/mar/10/nitrogan-gas-manufacturers-bar-executions-alabama ("Air Products said that it had established 'prohibited end uses for our products, which includes the use of any of our industrial gas products for the intentional killing of any person (including nitrogen hypoxia)'.").

87.     Prior to filing this lawsuit, Mr. Miller asked the Attorney General's office to provide him with an unredacted version of the execution protocol that will govern during his execution. The Attorney General's office refused to do so. Among other expedited discovery Mr. Miller will seek in this case, Mr. Miller will immediately request an unredacted copy of the protocol that the State intends to use for Mr. Miller's deposition.

## D. ALABAMA BOTCHES THE NITROGEN HYPOXIA EXECUTION OF KENNETH SMITH, AND TRIES TO COVER IT UP

88.     On August 25, 2023, Defendant Marshall moved in the Alabama Supreme Court for an execution warrant to execute Kenneth Smith by nitrogen hypoxia. The State sought to carry out the first nitrogen hypoxia execution in the known history of the world.

89.     Prior to Mr. Smith's execution, Defendants had a clear narrative of how their nitrogen hypoxia execution would go: a few breaths of nitrogen via the mask would render the inmate instantly unconscious, resulting in death soon after. At Mr. Smith's Preliminary Injunction Hearing, the State said, "[the respirator] will deliver pure nitrogen to Mr. Smith, that he will quickly lose consciousness and will die shortly thereafter." *See* Ex. 5, Hr'g Tr. at 29:23-30:1, *Smith v. Hamm,* 23-cv-00656-RAH (M.D. Ala. Dec. 20, 2023), Dkt. 67.

90.     The Attorney General represented to the U.S. Supreme Court that it would take a "few seconds between when gas enters the mask and [Smith] loses consciousness." Opp. to Appl. For Stay of Execution, *Smith v. Hamm*, No. 23-6562, 2024 WL 328718, at *2 (U.S. Jan. 25, 2024).

91.     Mike Sennett, the son of the victim in the Smith case, reported, "We were told by some people that worked [for the State] that he'd take two or three breaths and he'd be out and gone." *See* New York Times, *A Select Few Witnessed Alabama's Nitrogen Execution. This is What They Saw* (Feb. 1, 2024)*, https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html?unlocked_article_code=1.SE0.vZfx.0KJK88JKlhzv&bgrp=g&smid=url-share.*

92.     The State predicted that "ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask, cause unconsciousness within seconds, and cause death within minutes." Defs.' Post-Hearing Br. in Opp. to Mot. for Prelim. Inj., *Smith v. Hamm*, No. 23-cv-00656-RAH (M.D. Ala. Dec. 29, 2023), Dkt. 66 at 12. According to the State, "Within seconds, Smith will have no available oxygen to breathe inside the mask. That will render him unconscious and cause death." *Id*. at 13. "In all likelihood, hypoxia will cause unconsciousness in a matter of seconds, rendering Smith unable to feel pain." *Id*. at 15.

93.     Before Mr. Smith's execution, the State asserted that "the State will use a mask tightly sealed by five separate straps." Defs' Mot. to Dismiss & Resp. to Mot. for Prelim. Inj., *Smith v. Hamm,* 23-cv-00656-RAH (M.D. Ala.), Dkt. 39 at 58. The State further asserted, "In design and in practice, the mask demonstrates no substantial risk of becoming loose or dislodged." *Id*. The State also asserted, "It is possible that an insignificant amount of nitrogen, which is likely to be pumped into the mask at a rapid rate, could escape despite the mask's tight seal. But it does not follow that there is a substantial risk that the outside air would infiltrate the mask in a meaningful quantity." *Id.* at 60. The State predicted, "Even if outside air could infiltrate the mask, despite its tight seal, that air would be quickly replaced by pure nitrogen being mechanically pumped into the mask." *Id*.

94.     Prior to Mr. Smith's execution, the State argued that Mr. Smith's "claim that mere movement or speaking will pose a substantial risk of oxygen infiltration is facially implausible" Defs.' Reply to Pl. Resp. to Mot. to Dismiss, *Smith v. Hamm*, No. 23-cv-00656-RAH (M.D. Ala. Dec. 15, 2023), Dkt. 50 at 9. The State described as "***absurd***" Mr. Smith's allegation that "the entrapment of any *oxygen* into the mask would cause 'the painful sensation of suffocation.'" *Id*. (first emphases added). The State went so far as to describe Smith's lawsuit as "present[ing] a highly speculative parade of horribles." Defs.' Resp. to Mot. to Strike, *Smith v. Hamm*, No. 23-cv-00656-RAH (M.D. Ala.), Dkt. 57 at 3.

95.     In addressing the possibility that Mr. Smith might vomit during the execution, the State itself recognized before Smith's execution "the critical fact here is the time to unconsciousness." Defs.' Resp. to Pl. Emergency Mot. to Suppl. R., *Smith v. Hamm*, No. 23-cv-00656-RAH (M.D. Ala. Jan. 22, 2024), Dkt. 82 at 9. The State asserted that its method will "***ensur[e] unconsciousness in seconds***" and "Smith will be ***unconscious in under one minute***

*(and probably much sooner)*." *Id.* (emphasis added); *see also* Ex. 4, Oral Arg. Tr. at 53:2-18,
*Smith v. Ala., Dep't of Corr.*, No. 24-10095 (11th Cir. Jan. 19, 2024) (counsel for the State predicts
that nitrogen hypoxia will result in "unconsciousness within under a minute" and death "within
just a few minutes," with "no indication of any suffering or pain").

96.     Indeed, the State promised its nitrogen hypoxia method would deliver "the most
painless and humane method of execution known to man." *See id.* at 41:18-20.

97.     In reality, and as Mr. Smith predicted, the execution went very differently.

98.     The State of Alabama executed Mr. Smith on January 25, 2024.

99.     First, Defendant Hamm admitted that Mr. Smith's execution was delayed by 45
minutes because of a "'hiccup on the EKG lines' that was providing a good reading." *See*
Washington Post, *Alabama puts Kenneth Smith to death in first execution with nitrogen gas,* (Jan.
26, 2024), *https://www.washingtonpost.com/nation/2024/01/25/alabama-execution-nitrogen-gas-
kenneth-smith/.* This immediately raises a red flag, as ADOC relies on the EKG line to determine
when death by nitrogen hypoxia has occurred. ADOC's struggle to place EKG leads and receive
accurate EKG readings, and its decision to forge ahead with Mr. Smith's execution in spite of that
difficulty, indicates its nitrogen hypoxia protocol rests on an unreliable foundation. ADOC did not
explain if the issue with the EKG line was a personnel issue, an equipment problem, or both.

100.    Once Mr. Smith was strapped to the gurney in the execution chamber, witnesses
were allowed into the witness rooms adjoining the execution chamber. The gas mask was strapped
to Mr. Smith's face, and tubing led from the mask on his face through a hole in the execution
chamber wall behind the gurney. The gas tanks were stored in the room on the other side of that
wall.

101.    On information and belief, the following people were in the execution chamber with Mr. Smith: his spiritual advisor Reverend Jeff Hood, ADOC Warden Cynthia Stewart-Riley, ADOC Captain Brandon McKenzie (who serves as the Execution Team Captain), and one other ADOC guard whose name is presently unknown to Mr. Miller. Mr. Smith was asked if he wanted to make his final statement. He indicated he did, and one of the ADOC employees removed the valve from the left side of the Allegro respirator mask that was strapped to Mr. Smith's face. The ADOC employee held a microphone up to the open mask valve while Mr. Smith gave his final words. Mr. Smith's statement sounded muffled under the mask and it was difficult to understand the entirety of the message.

102.    Defendant Warden Raybon read Mr. Smith's execution warrant and Defendant Governor Ivey's letter stating the time frame for Mr. Smith's execution chamber. Defendant Raybon and Warden Stewart-Riley then left the execution chamber. An ADOC employee replaced the valve on the mask, and from the room adjoining the execution chamber, Defendant Raybon started the flow of the nitrogen gas.

103.    Mr. Smith began violently seizing. His legs locked together (with no bend at the knee) and flew up and down, repeatedly slamming down forcefully on the gurney. Mr. Smith's head convulsed on and off the gurney. Mr. Smith was breathing heavily and gasping. This process went on for several minutes. Captain McKenzie appeared concerned by what was happening to Mr. Smith, and in violation of ADOC's execution protocol, moved close to Mr. Smith's head before 15 minutes had passed since the gas had started to flow. *See* Ex. 3 at 17. Captain McKenzie appeared to inspect that the mask was still on Mr. Smith's face. He then stepped back. Mr. Smith's violent seizures eventually stopped and there was a period of minutes where he was gasping for

breath under the mask. Sometime later, Captain McKenzie and the other ADOC guard in the execution chamber closed the curtains, and the witnesses were escorted out of Holman prison.

104.    This account is confirmed by multiple independent sources who witnessed the execution. Journalists who were permitted to watch the execution from the witness room reported that for several minutes, Mr. Smith was violently shaking and thrashing on the gurney. Marty Roney from the Montgomery Advertiser, described what he saw: "Smith writhed and convulsed on the gurney. He took deep breaths, his body shaking violently with his eyes rolling in the back of his head… Smith clenched his fists, his legs shook… He seemed to be gasping for air. The gurney shook several times." *See* Unilad, *Disturbing final words of inmate put to death by new controversial Death Row execution* (Jan. 26, 2024), https://www.unilad.com/news/us-news/kenneth-smith-executed-death-row-final-words-767534-20240126.

105.    Mr. Roney's account is in accord with journalist Lee Hedgepeth's account, who witnessed Smith "thrashing against the straps, his whole body and head violently jerking back and forth for several minutes." Mr. Hedgepeth stated that after the thrashing stopped, Smith continued to gasp for air for several minutes as "his body lifted against the restraints." Per Mr. Hedgepeth, it was not until **ten minutes after** Mr. Smith's first reaction to the nitrogen gas that "Smith made his last visible effort to breathe." *See* Tread, *'Never Alone': The suffocation of Kenneth Eugene Smith* (Jan. 26, 2024), *https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth.*

106.    One journalist, who had seen four other executions in Alabama, stated, "I've never seen such a violent execution or such a violent reaction to the means of execution." *See* MSNBC, *Alabama's attorney general shares a grim prediction about executions with nitrogen gas* (Jan. 29, 2024), video available online at https://www.msnbc.com/the-reidout/reidout-blog/alabama-execution-nitrogen-gas-steve-marshall-rcna136262.

107.    According to Reuters, five journalists who served as media witnesses to Mr. Smith's execution "said he remained conscious for several minutes after the nitrogen flowed, and then began shaking and writhing on the gurney for about two minutes." *See* Reuters, *Alabama will help bring nitrogen asphyxiation executions to other states* (Jan. 27, 2024), *https://www.reuters.com/world/us/alabama-will-help-bring-nitrogen-asphyxiation-executions-other-states-2024-01-26/#:~:text=Executioners%20strapped%20a%20commercial%20industrial,a%20canister%20of%20pure%20nitrogen.*

108.    The son of the victim in the Smith case, Mike Sennett, who had been told Mr. Smith would be ***"out and gone" after two or three breaths***—reported, "That ain't what happened." *See* New York Times, *A Select Few Witnessed Alabama's Nitrogen Execution. This is What They Saw* (Feb. 1, 2024), *https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html?unlocked_article_code=1.SE0.vZfx.0KJK88JKlhzv&bgrp=g&smid=url-share.* Mr. Sennet reported, "After about two or three breaths, that's when the struggling started." *Id.* What Mr. Sennett witnessed was disturbing. He said, "With all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again."

109.    Mr. Smith's attorney, Robert Grass, was present at his execution and his written statement to the Kansas legislature confirms the other witnesses' reports. According to Mr. Grass, Mr. Smith "appeared to be having convulsions or seizures. His eyes rolled up. His legs moved violently up and down several times. His head thrust forward and back to the gurney several times. He clenched his fists and his arms and body strained against the gurney restraints." *See* Ex. 6, Statement of Robert Grass to the Kansas Legislature. Though witnesses were not permitted to have watches with them in the observation room, Mr. Grass confirmed the writhing lasted for

"minutes—not seconds," and Mr. Smith appeared to continue gasping for air for at least five more minutes after that.

110.    Mr. Smith's spiritual advisor, Reverend Jeff Hood, was in the execution chamber with Mr. Smith throughout the execution. Mr. Hood "saw every horrific second before, during and after the curtains closed," and summarized the execution as "[no]thing short of torture[.]" *See* USA Today, *I witnessed Alabama execute a man using nitrogen gas* (Feb. 19, 2024), *https://www.usatoday.com/story/opinion/2024/02/19/alabama-execution-nitrogen-gas-witness-cruel-torture/72616304007/.* Reverend Hood described the horror he witnessed as the gas began to flow: "His chest moved up and down with gusto. He was clearly trying to breathe." *Id.* Mr. Hood reported that Mr. Smith's convulsions were "shaking the entire gurney. I had never seen something so violent. Kenny's muscles went from tensed up to looking like they were going to combust. Veins spider-webbed in every direction . . . Saliva, mucus and other substances shot out of his mouth. The concoction of body fluids all started drizzling down the inside of the mask. Back and forth … back and forth … back and forth Kenny kept heaving. We had been told by Alabama officials that the gas would kill Kenny in seconds, but the execution was now going on for minutes. Kenny was very much still conscious. I could see the horror in his eyes. In fact, I'll never forget it." *See id.*

111.    What Mr. Smith experienced was consistent with a report commissioned by the State of Oklahoma on the dangers of an ill-fitting mask in a nitrogen hypoxia execution attempt. The report was produced by Defendants during Mr. Smith's litigation, indicating they relied on it when developing their nitrogen hypoxia execution protocol. Oklahoma's report noted:

> When masks were placed over the face (instead of using bags of helium over the head) it has been reported some problems have occurred. This is typically a result of the mask not sealing tightly to the face, resulting in a small amount of oxygen being inhaled by the individual. This extends the time to become unconscious and

extends the time to death. This may result in purposeless movements by the decedent.

Pl. Supp. Br. in Supp. of Mot. for Prelim. Inj., *Smith v. Hamm*, No. 23-cv-00656-RAH (M.D. Ala. Dec. 29, 2023), Dkt. 65 at 30 (citing Copeland, M., et al., *Nitrogen Induced Hypoxia as a Form of Capital Punishment* (https://dpic-cdn.org/production/legacy/Copeland%20Report_Nitrogen-Hypoxia.pdf).

112.   Faced with the public and well-reported fact of Mr. Smith's prolonged death, Defendants acted as if everything had gone according to plan. They stuck to their pre-determined narrative about the execution going well.

- Defendant Marshall stated, "[T]onight's events show that the dire predictions of activists and the media were as speculative as Smith's claims." *See* Marshall, *Alabama Attorney General Steve Marshall Statement on the Execution of Murderer Kenneth Smith by Nitrogen Hypoxia* (Jan. 25, 2024), https://www.alabamaag.gov/alabama-attorney-general-steve-marshall-statement-on-the-execution-of-murderer-kenneth-smith-by-nitrogen-hypoxia/.

- Defendant Marshall stated, "What occurred last night was textbook." *See* CBS News, *Nitrogen gas execution was 'textbook' and will be used again, Alabama attorney general says* (Jan. 26, 2024), *https://www..cbsnews.com/news/nitrogen-gas-execution-alabama-kenneth-eugene-smith-attorney-general/.*

- Defendant Hamm said that the "involuntary movement" and "agonal breathing" was "all expected and is in the side effects that we've seen or researched on nitrogen hypoxia. So, nothing was out of the ordinary of what we were expecting." *See* New York Times, *A Select Few Witnessed Alabama's Nitrogen Execution. This is What They Saw* (Feb. 1, 2024), *https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html?unlocked_article_code=1.SE0.vZfx.0KJK88JKlhzv&bgrp=g&smid=url-share.*

113.   Defendant Marshall's basis for calling Mr. Smith's execution "textbook" is particularly suspect in light of the fact that, following Mr. Smith's execution, Defendant Marshall stated, "There's no specific time that we can identify for [when] the nitrogen began to flow and so identifying that time no one can do." *See* ABC News, *First nitrogen gas execution in US has*

*happened, but did it go as expected?* (Jan. 26, 2024), *https://abcnews.go.com/US/alabama-attorney-general-believes-nitrogen-gas-executions-place/story?id=106704615.*

114.    Defendant Marshall claimed that Mr. Smith's execution was "entirely consistent with how it was planned from the beginning." *See* ABC News, *First nitrogen gas execution in US has happened, but did it go as expected?* (Jan. 26, 2024), https://abcnews.go.com/US/alabama-attorney-general-believes-nitrogen-gas-executions-place/story?id=106704615.

115.    Notably, the State refused to provide any discovery in Mr. Smith's litigation concerning any research the State did to prepare for using nitrogen hypoxia, even though Mr. Smith attempted to discover information on the development of the protocol. Mr. Smith's violent movements and apparent suffering demonstrate why that information is necessary. The State never disclosed in the Smith litigation that it expected violent movements, even though that information would have been extremely important to the District Court's evaluation of whether the mask was likely to be dislodged.

116.    Mr. Smith had alleged that, if the mask became dislodged or was insufficiently sealed, oxygen could infiltrate inside the mask, thereby increasing the time to unconsciousness and increasing the risk of dire consequences, including the painful sensation of suffocation.

117.    Consistent with Mr. Smith's predictions as to what would happen if the mask did not retain its seal and oxygen infiltrated the mask, witnesses to Mr. Smith's execution described how Mr. Smith's body moved violently, and it took much longer than expected for Mr. Smith to reach unconsciousness and death.

### E.  ALABAMA EMPHASIZES THE IMPORTANCE OF CHRONOLOGICAL ORDER IN EXECUTIONS

118.    Defendant Marshall has publicly stated that "Justice delayed is justice denied." *See* WSFA12, *'Justice delayed is justice denied,' Alabama AG says on execution halt* (Dec. 5, 2022),

https://www.wsfa.com/2022/12/05/justice-delayed-is-justice-denied-alabama-ag-says-execution-halt/.

119.   Defendant Marshall claims to have sole responsibility for initiating the execution process by filing a motion in the Alabama Supreme Court requesting the issuance of an execution warrant. Defendant Marshall has a pattern and practice of filing such a motion for a person who has been sentenced to death after that person's conventional appeals have been exhausted.

120.   Defendant Marshall claims to have sole responsibility for determining the order in which to present motions for execution warrants to the Alabama Supreme Court. Defendant Marshall has a pattern and practice of employing a "first in, first out" methodology based on the date in which a person's conventional appeals have been exhausted, subject to the availability of the method of execution elected by the person sentenced to death.

121.   Defendant Marshall has a list of persons who have been sentenced to death in Alabama who elected nitrogen hypoxia and whose conventional appeals have been exhausted.

122.   This list was made public in part, with the names of the persons sentenced to death redacted. *See* Pl. Supp. Br. in Support of Mot. for Prelim. Inj., *Smith v. Hamm*, No. 2:23-cv-00656 (M.D. Ala. Dec. 29, 2023), Dkt. 65 at 16.

**CONFIDENTIAL**

List of Alabama Death Row Inmates who have elected nitrogen hypoxia and whose
conventional appeals are exhausted.

| Inmate | Date Appeals Exhausted |
|---|---|
|  | 10/3/2011 |
| | 6/18/2012 |
| | 11/6/2012 |
| | 1/14/2013 |
| | 3/25/2013 |
| | 10/7/2013 |
| | 3/24/2014 |
| | 1/23/2017 |
| | 3/19/2018 |
| | 10/1/2018 |
| | 10/1/2018 |
| | 5/13/2019 |
| | 2/24/2020 |
| | 12/16/2020 |
| | 5/17/2021 |
| | 6/15/2021 |
| | 10/4/2021 |
| | 10/4/2021 |
| | 2/22/2022 |
| | 3/21/2022 |
| | 5/1/2023 |

123.    The names on the list are in chronological order according to the date in which each person's conventional appeals were exhausted.

124.    Mr. Miller's conventional appeals were exhausted on October 4, 2021. Mr. Miller is included on Defendant Marshall's list of people who elected nitrogen hypoxia and whose conventional appeals are exhausted. At least 16 people are listed before Mr. Miller on Defendant Marshall's list.

125.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on October 3, 2011 (hereinafter Person A). More than twelve years have elapsed since Person A exhausted his conventional appeals. On information and belief, the Attorney General previously sought an execution date for

Person A. On February 22, 2012, the Alabama Supreme Court set an execution date for Person A of April 12, 2012, but the execution did not proceed on that date. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person A since the State finalized its nitrogen hypoxia protocol.

126.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on June 18, 2012 (hereinafter Person B). More than eleven years have elapsed since Person B exhausted his conventional appeals. On information and belief, the Attorney General previously sought an execution date for Person B in 2014. The Alabama Supreme Court set an execution date of June 18, 2015, but the execution did not proceed on that date. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person B since the State finalized its nitrogen hypoxia protocol.

127.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on November 6, 2012 (hereinafter Person C). More than eleven years have elapsed since Person C exhausted his conventional appeals. On information and belief, the Alabama Attorney General filed a motion to set an execution date for Person C on September 11, 2014, and the Alabama Supreme Court set an execution date of April 16, 2015. The execution did not proceed on that date. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant Person C since the State finalized its nitrogen hypoxia protocol.

128.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on January 14, 2013 (hereinafter Person D). More than eleven years have elapsed since Person D exhausted his conventional

appeals. On information and belief, the Attorney General previously sought an execution date for Person D on September 11, 2014. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person D since the State finalized its nitrogen hypoxia protocol.

129.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on March 25, 2013 (hereinafter Person E). Almost eleven years have elapsed since Person E exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person E since the State finalized its nitrogen hypoxia protocol.

130.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on October 7, 2013 (hereinafter Person F). More than ten years have elapsed since Person F exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person F since the State finalized its nitrogen hypoxia protocol.

131.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on March 24, 2014 (hereinafter Person G). Almost ten years have elapsed since Person G exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person G since the State finalized its nitrogen hypoxia protocol.

132.     According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on January 23, 2017 (hereinafter Person H). More than seven years have elapsed since Person H exhausted his conventional appeals.

On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person H since the State finalized its nitrogen hypoxia protocol.

133.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on March 19, 2018 (hereinafter Person I). Almost six years have elapsed since Person I exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person I since the State finalized its nitrogen hypoxia protocol.

134.    According to Defendant Marshall's list, two people on Alabama's death row who elected nitrogen hypoxia exhausted their conventional appeals on October 1, 2018 (hereinafter Person J and Person K). More than five years have elapsed since Persons J and K exhausted their conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person J or Person K since the State finalized its nitrogen hypoxia protocol.

135.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on May 13, 2019 (hereinafter Person L). Almost five years have elapsed since Person L exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person L since the State finalized its nitrogen hypoxia protocol.

136.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on February 24, 2020 (hereinafter Person M). Almost four years have elapsed since Person M exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person M since the State finalized its nitrogen hypoxia protocol.

137.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on December 16, 2020 (hereinafter Person N). More than three years have elapsed since Person M exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person M since the State finalized its nitrogen hypoxia protocol.

138.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on May 17, 2021 (hereinafter Person O). Almost three years have elapsed since Person O exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person O since the State finalized its nitrogen hypoxia protocol.

139.    According to Defendant Marshall's list, a person on Alabama's death row who elected nitrogen hypoxia exhausted his conventional appeals on June 15, 2021 (hereinafter Person P). Almost three years have elapsed since Person P exhausted his conventional appeals. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court to issue an execution warrant for Person P since the State finalized its nitrogen hypoxia protocol.

140.    In 2014, the Alabama Attorney General sought execution warrants for Demetrius Frazier, Anthony Boyd, David Lee Roberts, Robin Dion Myers, and Gregory Hunt. *See* AL.com, *Alabama would change lethal injection method to execute 5 inmates* (Oct. 3, 2015), *https://www.al.com/news/birmingham/2015/10/alabama_would_change_lethal_in.html?TB_ifra me=true&width=921.6&height=921.6.* Their executions did not proceed at that time due to litigation over lethal injection. When nitrogen hypoxia became statutorily available in Alabama in 2018, Frazier, Boyd, Roberts, Myers, and Hunt elected to be executed by nitrogen hypoxia. On information and belief, Defendant Marshall has not moved the Alabama Supreme Court for

issuance of an execution warrant for Frazier, Boyd, Roberts, Myers, or Hunt since the State finalized its nitrogen hypoxia protocol, even though their conventional appeals were exhausted before Mr. Miller's and even though the Attorney General previously sought execution dates for them.

141.    After nitrogen hypoxia became statutorily available in Alabama in 2018, the Attorney General did not move for execution warrants for anyone who it believed had elected to be executed by nitrogen hypoxia and whose conventional appeals were exhausted, based on the unavailability of a nitrogen hypoxia protocol. The State's nitrogen hypoxia protocol became public in August 2023. Thus, all executions in Alabama by nitrogen hypoxia from 2018 through 2023 were delayed by the State's multi-year failure to develop a protocol to employ that method of execution. During the time period in which a nitrogen hypoxia protocol was not available, the State made no attempt to execute persons who elected for execution by nitrogen hypoxia, even though the statute would have permitted the State to do so. *See* Ala. Code § 15-18-82.1.

142.    On February 21, 2024, Defendant Marshall filed a motion for an execution warrant for Mr. Miller in the Alabama Supreme Court. Defendant Marshall had no legitimate reason to seek the execution of Mr. Miller before seeking execution warrants for the 16 people who also elected nitrogen hypoxia and whose conventional appeals are also exhausted.

143.    In spite of his belief that "justice delayed is justice denied" and his possession of a list of persons who elected nitrogen hypoxia and whose conventional appeals were exhausted before Mr. Smith and Mr. Miller, Defendant Marshall moved the Alabama Supreme Court for execution warrants for Mr. Smith and Mr. Miller before anyone else on the list.

144.    Both Mr. Smith and Mr. Miller made public statements about the State's failed attempts to execute them. Both Mr. Smith and Mr. Miller publicly criticized Alabama officials,

including Defendant Marshall, following the State's failed attempts to execute them. Both Mr. Smith and Mr. Miller provided detailed public accounts of the State's failed attempts to execute them. Those accounts described how the execution team tried and failed to establish intravenous access.

145.    Both Mr. Smith and Mr. Miller sued State officials following their failed execution attempts and sought discovery in litigation to expose the State's failures.

146.    The press reported on Mr. Miller's lawsuit and on Mr. Miller's statements about the State's failed attempt to execute him. For the most part, the press coverage of the failed attempt to execute Mr. Miller painted the State and its officials, Defendants, in an unfavorable light.

147.    As a result of the failed attempts to execute Mr. Miller and Mr. Smith, there was public pressure on Alabama officials to halt all execution attempts.

148.    In response to this spate of botched executions, Governor Ivey asked Attorney General Marshall on November 21, 2022, to withdraw then-pending motions in the Alabama Supreme Court for the execution date of Mr. Miller, and further requested that the Attorney General not move for any new execution dates for any other death row inmates. Ex. 1, Press Release, *Governor Ivey Orders Top-to-Bottom Review of Execution Protocol for Victims' Sake* (Nov. 21, 2022).

149.    Governor Ivey then ordered that ADOC undertake a "top-to-bottom review of the state's execution process." The ADOC Commissioner immediately agreed, stating that in his review, "[e]verything is on the table – from our legal strategy in dealing with last minute appeals, to how we train and prepare, to the order and timing of events on execution day, to the personnel and equipment involved." *See* AL.com, *Gov. Kay Ivey Orders Moratorium on Executions in*

*Alabama* (Nov. 22, 2023), https://www.al.com/news/2022/11/gov-kay-ivey-orders-moratorium-on-executions-in-alabama.html.

150.    Unfortunately, the subsequent review was shrouded in extreme secrecy, conducted by ADOC rather than an external, independent investigatory body,[2] and, based on all available evidence, was utterly perfunctory. Even before the investigation commenced, Governor Ivey made clear that she did not think that ADOC bore any responsibility for the botched executions. Instead, she stated her belief that "legal tactics and criminals hijacking the system [we]re at play here." *Id.*

151.    Defendant Marshall likewise publicly blamed Mr. Miller and his legal team for the State's failed execution attempt. *See* WVTM 13, *Alabama Attorney General says there is no execution moratorium* (Dec. 5, 2022), https://www.wvtm13.com/article/alabama-attorney-general-execution-review-procedures/42159559#.

152.    In fact, and contrary to Defendants' public statements, the State's failure to execute Mr. Miller by lethal injection was the result of the incompetence of the execution team employed by the State. Both Mr. Smith and Mr. Miller witnessed firsthand and described publicly how the execution team was incapable of successfully establishing intravenous access.

---

[2] Among the states that practice the death penalty, Alabama stands alone in its decision to investigate itself, with no transparency or accountability regarding the findings of the investigation. For example, the State of Tennessee appointed a former U.S. Attorney to investigate its injection protocol after failures to test lethal drugs. *See* Office of the Governor of Tennessee, *Gov. Lee Calls for Independent Review Following Smith Reprieve* (May 2, 2022), https://www.tn.gov/governor/news/2022/5/2/gov--lee-calls-for-independent-review-following-smith-reprieve.html. In another state—Arizona—the Governor halted all executions in February 2023, acknowledging that Arizona has a "history of mismanaged executions," and appointed a retired U.S. magistrate judge to conduct an independent investigation into the Arizona Department of Correction's lethal injection and gas chamber protocols. *See* Office of the Governor of Arizona, *Gov. Hobbs Appoints Judge David Duncan as Death Penalty Independent Review Commissioner* (Feb. 24, 2023), https://azgovernor.gov/office-arizona-governor/news/2023/02/governor-hobbs-appoints-judge-david-duncan-death-penalty.

153.    In fact, following the investigation of the State's execution process, the State replaced the entire IV team. According to the Attorney General, "As a result of ADOC's review, '[n]one of the members of the current IV team were involved in the previous three execution attempts.'" Defendants-Appellee's Br. at 11, *Barber v. Governor of Ala.*, No. 23-1224 (11th Cir. July 16, 2023), Dkt. 22. Because Mr. Miller was not permitted to learn the names of the members of the IV team involved in his botched execution, he was unable to ask them if the State ignored the IV team's recommendations or failed to give the IV team what they needed in order to perform their execution-related tasks competently.

154.    The details of the failed execution attempts are embarrassing to State officials, including Defendant Marshall. Defendant Marshall has gone to great lengths to avoid public disclosure of additional information about the failed execution attempts. For example, Defendant Marshall changed his litigation position concerning the availability of nitrogen hypoxia as to Mr. Smith in order to avoid disclosing in discovery information about ADOC's failed attempt to execute Mr. Smith by lethal injection.

155.    By moving for execution warrants for Mr. Smith and Mr. Miller out of order, Defendant Marshall is able to silence the only two witnesses to the entirety of the failed execution attempts who are not employed by the State—Mr. Smith and Mr. Miller. Defendant Marshall has moved for an execution warrant for Mr. Miller ahead of Persons A through Person O in retaliation for Mr. Miller's public account of his failed execution attempt.

## CAUSES OF ACTION

### COUNT ONE: VIOLATION OF MR. MILLER'S RIGHT TO FREEDOM OF SPEECH AND TO PETITION THE GOVERNMENT UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION (AGAINST ALL DEFENDANTS)

156.    Mr. Miller repeats and realleges paragraphs 1 through 154 as though fully set forth herein.

157.    The First Amendment to the U.S. Constitution, as applicable to the State through incorporation into the due process clause of the Fourteenth Amendment, provides in relevant part, "Congress shall make no law . . . abridging the freedom of speech . . . or the right . . . to petition the Government for a redress of grievances."

158.    "The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Warren v. DeSantis*, 90 F.4th 1115, 1127 (11th Cir. 2024). Speech on matters of public concern is at the heart of First Amendment protection.

159.    Mr. Miller's public statements and lawsuit about his failed execution are activities protected by the First Amendment.

160.    Defendant Marshall claims to have sole authority and responsibility over selecting persons for execution. Defendant Marshall initiates the execution process by moving for an execution warrant in the Alabama Supreme Court. Defendant Ivey is then responsible for setting the execution timeframe. Defendant Ivey has previously instructed Defendant Marshall about whose execution dates to move for, and when.  Defendants Hamm and Raybon are responsible for carrying out the execution, and each has the authority (and obligation) to stop an unlawful execution from taking place.

161.    On information and belief, Defendants consult with each other about which death row inmate should next be executed, and when.

162.    On information and belief, Defendant Marshall had personal knowledge that sixteen persons who elected for nitrogen hypoxia exhausted their conventional appeals before Mr. Miller.

163.    On information and belief, all Defendants had personal knowledge of Mr. Miller's detailed public account and lawsuit concerning the State's failed execution attempt of him.

164.    Defendant Marshall has a pattern and practice of employing a "first in, first out" methodology based on the date in which a person's conventional appeals have been exhausted, subject to the availability of the method of execution elected by the person sentenced to death.

165.    Defendant Marshall deviated from that pattern and practice by selecting Mr. Miller for execution before any of the sixteen persons who also elected for nitrogen hypoxia and whose conventional appeals were exhausted before Mr. Miller's.

166.    Defendant Marshall took an adverse action against Mr. Miller by selecting Mr. Miller for execution before any of the sixteen persons who also elected for nitrogen hypoxia and whose conventional appeals were exhausted before Mr. Miller's. This adverse action will deter other inmates from engaging in similar protected speech for fear of being executed much sooner than they would under Defendant Marshall's "first in, first out" pattern and practice.

167.    Defendant Marshall selected Mr. Miller for execution in a manner that deviated from his pattern and practice in retaliation for Mr. Miller's public statements and lawsuit about the State's failed attempt to execute him.

168.    Defendants Ivey and Marshall are elected officials, and Defendant Hamm is a political appointee. All three derive a political benefit from silencing Mr. Miller, who made public statements and filed a lawsuit about the State's failed attempt to execute him. While Defendant Raybon is not an elected official or a political appointee, he serves at the pleasure of Defendant Hamm. And Defendant Raybon was publicly humiliated by his failed attempt to execute Mr. Miller in September of 2022.

169.     Mr. Miller's exercise of his right to free speech, including his public statements and lawsuit, was the motivating factor for Defendant Marshall to select Mr. Miller for execution ahead of the sixteen people who also elected nitrogen hypoxia and whose conventional appeals were exhausted. And it is the motivating factor for state actors Ivey, Hamm and Raybon, to carry out that execution.

### COUNT TWO: VIOLATION OF MR. MILLER'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT (AGAINST ALL DEFENDANTS)

170.     Mr. Miller repeats and realleges paragraphs 1 through 168 as though fully set forth herein.

171.     Pursuant to the Fourteenth Amendment of the U.S. Constitution, Mr. Miller is entitled to equal protection under the law. The Fourteenth Amendment provides, in relevant part, that "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

172.     Mr. Miller elected to be executed by nitrogen hypoxia.

173.     Defendant Marshall's list of persons who have elected nitrogen hypoxia and whose conventional appeals are exhausted includes Mr. Miller.

174.     Mr. Miller is similarly situated to the sixteen people who elected nitrogen hypoxia and whose conventional appeals were exhausted before Mr. Miller's appeals were exhausted.

175.     Defendant Marshall claims to have sole authority and responsibility for initiating the execution process by filing a motion in the Alabama Supreme Court seeking an execution warrant. Defendant Marshall claims to have sole authority and responsibility for determining the order in which motions seeking execution warrants will be filed.

176.     Defendant Ivey has the sole authority to set the time frame for executions in Alabama. Defendants Hamm and Raybon have the authority to carry out executions, and each has the authority (and obligation) to stop an unlawful execution from taking place.

177.     On information and belief, Defendants consult with each other about which death row inmate should next be executed, and when.

178.     Defendant Marshall has a pattern and practice of moving the Alabama Supreme Court for an execution warrant for a person who has been sentenced to death after the person has exhausted his conventional appeals. Defendant Marshall has a pattern and practice of employing a "first in, first out" methodology that is subject to the availability of the method of execution.

179.     Defendant Marshall has not moved the Alabama Supreme Court for execution warrants for Persons A through P, even though they elected nitrogen hypoxia and their conventional appeals were exhausted before Mr. Miller's conventional appeals were exhausted.

180.     Defendant Marshall moved for an execution warrant for Mr. Miller on February 21, 2024.

181.     Defendants are treating Mr. Miller disparately from other similarly situated persons who elected to be executed by nitrogen hypoxia and whose conventional appeals have been exhausted.

182.     Defendants have no rational reason related to a legitimate government interest for treating Mr. Miller disparately from other similarly situated persons.

183.     Mr. Miller has a right to be treated the same as other persons who elected nitrogen hypoxia whose conventional appeals have been exhausted.

184.     Mr. Miller will suffer irreparable harm in the absence of an injunction.

**COUNT THREE: VIOLATION OF MR. MILLER'S RIGHT TO BE FREE FROM
CRUEL AND UNUSUAL PUNISHMENTS UNDER THE EIGHTH AMENDMENT
(AGAINST ALL DEFENDANTS)**

185.     Mr. Miller repeats and realleges paragraphs 1 through 154 as though fully set forth

herein.

186.     The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const.

amend. VIII.

187.     The U.S. Supreme Court has previously described punishments to be

unconstitutionally cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S.

436, 447 (1890), or when they "involve the unnecessary and wanton infliction of pain," *Rhodes v.

Chapman*, 452 U.S. 337, 346 (1981). The Eighth Amendment forbids "forms of punishment that

intensified the sentence of death with a (cruel) "'superadd[ition]'" of "'terror, pain, or disgrace.'"

*Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).

188.     What Defendants did to Mr. Smith does not fall within this society's standards for

a constitutional execution. Mr. Smith was conscious for at least several minutes during his

execution. His entire body—including his head—convulsed and seized violently, heaving against

the straps with enough force to move the gurney. *See* USA Today, *I witnessed Alabama execute a

man    using    nitrogen    gas*    (Feb.    19,    2024),

https://www.usatoday.com/story/opinion/2024/02/19/alabama-execution-nitrogen-gas-witness-

cruel-torture/72616304007/. That was followed by several minutes of gasping for air. At least one

witness saw Smith retching inside the mask. The prolonged time to unconsciousness in Alabama's

nitrogen hypoxia executions results in superadded severe pain and disgrace.

189.     Defendants are intentionally pursuing the same method of nitrogen hypoxia

execution that just caused unnecessary pain and suffering, superadded disgrace, and a prolonged

death for Mr. Smith. Feasible and alternative methods of execution exist that would reduce risk of superadded pain during Mr. Miller's execution.

190.    Instead of implementing the Protocol as it currently exists, ADOC should provide a trained medical professional in the execution room to administer the nitrogen and hold the mask against Mr. Miller's face.

191.    Mr. Miller does not challenge execution by nitrogen hypoxia, generally. In fact, he sued in 2022 for his right to elect execution by nitrogen hypoxia. Rather, he requests ADOC implement a nitrogen hypoxia protocol that will not cause him unnecessary pain and suffering.

192.    Defendants have decided to conceal what they knows about what went wrong in Mr. Smith's nitrogen hypoxia execution. On information and belief, Defendants do this intentionally in order to make it harder for litigants to assert the constitutionally-required "available alternative" method of execution. The strategy is simple: if Defendants keep secret the details of its nitrogen hypoxia executions, and if Defendants keep secret what caused Mr. Smith's pain and suffering on the gurney, no one will be able to identify what specifically the State needs to do differently in the next nitrogen hypoxia execution.

193.    Despite Defendants' attempts to thwart judicial review of its executions, an alternative method of nitrogen hypoxia execution is available that is feasible, readily implemented, and will significantly reduce a substantial risk of severe pain. The alternative method consists of: (1) using a mask that fits Mr. Miller's face and creates an airtight seal; (2) using a medical professional, rather than unqualified correctional officers, to place the mask on Mr. Miller's face, and hold it in place if necessary; (3) using a medical professional, rather than unqualified correctional officers, to supervise the nitrogen flow rate during the execution; (4) having a medical professional, rather than unqualified correctional officers, present during the execution attempt,

who can respond if the execution goes awry as Mr. Smith's did; (5) using medical grade nitrogen; and (6) using a sedative or tranquilizing medication in pill form before administering the nitrogen gas, to reduce thrashing movements that could further dislodge the mask.

194.    Defendants' current attempts to execute Mr. Miller via the same method that resulted in Mr. Smith's botched execution on January 25, 2024 violate Mr. Miller's right under the U.S. Constitution to be free from the infliction of cruel or unusual punishment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

195.    Permit expedited discovery in this case, including depositions and evidence of what transpired in Mr. Smith's nitrogen hypoxia execution, and depositions and evidence regarding Defendants' contemporaneous reactions to Mr. Miller's botched execution attempt. Expedited discovery is necessary in light of Defendants' attempt to execute Mr. Miller, and to prevent spoliation of evidence by Defendants;

196.    Enter an injunction ordering Defendants to cease their unlawful retaliation against Mr. Miller, prohibiting Defendants from executing Mr. Miller prematurely, and requiring Defendants to move for his nitrogen hypoxia execution date following the same chronological order they use for other inmates who elected that method of execution;

197.    Enter a declaratory judgment that:

       a.    Executing Mr. Miller next is a violation of his rights under the First Amendment to the United States Constitution.

       b.    Executing Mr. Miller next is a violation of his rights under the Fourteenth Amendment to the United States Constitution; and

   c.   Executing Mr. Miller via the same method used in the execution of
        Mr. Smith is a violation of Mr. Miller's rights under the Eighth
        Amendment to the United States Supreme Court.

198.   Such other and further legal and equitable relief as this Court deems just, and proper.


Dated: March 29, 2024                          Respectfully submitted,


                                               /s/ *J. Bradley Robertson*
                                               J. Bradley Robertson
                                               Danner Kline
                                               Bradley Arant Boult Cummings LLP
                                               One Federal Plaza
                                               1819 5th Ave. N.,
                                               Birmingham, AL 35203
                                               Tel: (205) 521-8188
                                               Fax: (205) 488-6188
                                               Email: brobertson@bradley.com
                                               Email: dkline@bradley.com

                                               Rachel C. Bramblett (*Pro Hac Vice* pending)
                                               Bradley Arant Boult Cummings LLP
                                               Promenade Tower, 20th Floor
                                               1230 Peachtree St. NE
                                               Atlanta, Georgia 30309
                                               Tel: (404) 868-2100
                                               Email: rbramblett@bradley.com

                                               Daniel J. Neppl
                                               Kelly Huggins
                                               Mara E. Klebaner
                                               Stephen Spector
                                               SIDLEY AUSTIN LLP
                                               One South Dearborn
                                               Chicago, IL 60603
                                               Tel: (312) 853-7000
                                               Fax: (312) 853-7036
                                               Email: dneppl@sidley.com
                                               Email: khuggins@sidley.com
                                               Email: mklebaner@sidley.com

Email: sspector@sidley.com

*Attorneys for Plaintiff Alan Eugene Miller*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 29, 2024, I served a copy of the foregoing via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to all counsel of record.

/s/ *J. Bradley Robertson*
J. Bradley Robertson