# Exhibit 4

Page 1

1

2

3

4

5                    KENNETH EUGENE SMITH

6                          vs.

7    ALABAMA DEPARTMENT OF CORRECTIONS, COMMISSIONER

8

9                    AUDIO TRANSCRIPTION

10

11

12

13

14

15

16

17

18

19

20

21    (Transcription of an audio recording by Angela

22    D. Richey, Court Reporter, ACCR No. 281)

23                        -oOo-

1          MR. THOMAS:  Hear ye, hear ye, hear

2     ye.  The United States Court of Appeals

3     for the 11th Circuit is now open according

4     to law, God save the United States and

5     this honorable Court.

6          JUDGE WILSON:  Good afternoon.  This

7     is Judge Charles Wilson.  And I am joined

8     by Judge Jill Pryor and Judge Britt Grant.

9     And we are here for oral argument in

10    Kenneth Eugene Smith versus the

11    Commissioner of the Alabama Department of

12    Corrections and the Warden of the Holman

13    Correctional Facility.

14          Robert Grass is here for the

15    appellate, Smith.  Edmund Gerard LeCour,

16    Jr. is here for the Commissioner.  And I

17    would advise you, counsel, that Mr. Thomas

18    is the courtroom deputy, and he will

19    advise you when you have two minutes left

20    for your argument.  I understand that

21    Mr. Grass has reserved three minutes for a

22    rebuttal argument.

23          So with those comments, I think we're

1     ready to proceed.  Mr. Grass, you may

2     begin your argument.

3          MR. GRASS:  Thank you, Your Honor.

4     Good afternoon, and may it please the

5     Courts.  In six days, the Alabama

6     Department of Corrections plans to attempt

7     to execute Kenny Smith under unprecedented

8     circumstances.  This will be the

9     department's second attempt to execute

10    Mr. Smith.  As far as we are aware, that

11    has occurred only once before in 1947.

12    And this time, the department plans to

13    attempt the first effort nitrogen hypoxia

14    execution.

15        The department plans to do that, even

16    though Mr. Smith will not have exhausted a

17    post conviction appeal challenging the

18    constitutionality of the second attempt to

19    execute him and even though the

20    department's untested procedures for

21    accomplishing the nozzle method of

22    nitrogen hypoxia executions expose

23    Mr. Smith to substantial harm relative to

Page 4

1          feasible and available alternatives.

2               I plan to talk this afternoon about

3          two of Mr. Smith's claims.  The first is

4          Mr. Smith's 14th Amendment equal

5          protection claim, that he is being treated

6          differently from similar situated contempt

7          people subject to execution by nitrogen

8          because the department is planning to

9          execute Mr. Smith before he has exhausted

10         his appeals, while 20 other condemned

11         people have exhausted theirs already.

12              The second claim is Mr. Smith's

13         Eighth Amendment claim that department

14         plan to use the procedures in its protocol

15         for accomplishing Mr. Smith's execution by

16         nitrogen hypoxia would constitute cruel

17         and unusual punishment.

18              The District Court committed legal

19         error when it dismissed Mr. Smith's 14th

20         Amendment equal protection claim, and it

21         abused its discretion when it denied

22         Mr. Smith's preliminary injunction motion

23         on his Eighth Amendment claim.  Both

1     errors require reversal.

2         I'll begin by talking about the

3     District Court's dismissal of Mr. Smith's

4     equal protection claim for lack of article

5     3 standing, which the District Court made

6     without with the benefit of briefing by

7     the parties.  The standing elements of

8     injuries and retraceability are not

9     contested here.  The District Court's

10    holding turns on its determination that

11    Mr. Smith's injury is not fairly traceable

12    to challenge conduct of the defendant's,

13    the commissioner of the department and the

14    ward of Holman.

15        The District Court's determination is

16    flawed for two reasons.  First, the

17    District Court defined Mr. Smith's injury

18    retrospectively rather than prospectively.

19    Mr. Smith's injury is the imminent threat

20    of execution while an appeal from his

21    state conviction petition is pending.

22    That is the prospective injury.  If

23    Mr. Smith's execution is permitted to

1        proceed next week, defendants will be

2        responsible for it because they are the

3        State officials tasked with carrying it

4        out.

5             The District Court's second flaw is

6        that it conflated Mr. Smith's injury with

7        the right he's asserting.  The law is

8        settled that Mr. Smith need not

9        demonstrate a connection between the

10       injury he claims and the rights being

11       asserted.  That principle derives from the

12       due power decision of the United States

13       Supreme Court.  And I think it's

14       appropriate to briefly discuss the facts

15       in that case because I think they are

16       analogous to our facts.  They are --

17            JUDGE GRANT:  This is -- this is

18       Judge Graham.  Sorry to interrupt.  I know

19       it's difficult on the phone.  Before you

20       left your first point, I wanted to ask you

21       a question about that, and that is:  Is it

22       -- is it that the -- the defendants that

23       were sued have the legal right to not

1      carry out this execution absent an order

2      from the Court?  Could they chose in some

3      way based on their conception of an equal

4      protection violation or any reason not to

5      do so, or are they obligated to move

6      forward with the execution procedures?

7              MR. GRASS:  Your Honor, I think that

8      they are obligated to move forward in

9      light of the Alabama -- the death warrant

10     that the Alabama Supreme Court issued.  I

11     do not believe that they have discretion

12     themselves to make a determination that

13     the equal protection violation should

14     forestall the execution.

15             JUDGE GRANT:  Then, I guess why

16     wouldn't it be --

17             JUDGE PRYOR:  Is it --

18             JUDGE GRANT:  -- the Attorney General

19     -- go ahead, Judge Pryor.

20             THE COURT:  Oh, no.  I was going to

21     say does it -- does it matter whether they

22     have discretion, or is the traceability

23     question addressed to whether the District

Page 8

```
 1      Court could rectify the injury by
 2      enjoining those defendants?
 3           MR. GRASS:  Well, I think that's
 4      exactly right, Judge Pryor.  And your
 5      question goes to addressability.  The
 6      defendants, that is the commissioner and
 7      the warden, are the only ones who can
 8      redress Mr. Smith's injury.  A -- an
 9      injunction directed to the Attorney
10      General would not redress Mr. Smith's
11      injury because the Attorney General's not
12      responsible for carrying out the
13      execution.  And this Court has --
14           JUDGE GRANT:  Okay.  So the --
15           MR. GRASS:  I'm sorry.  Go ahead.
16           JUDGE GRANT:  Sorry.  But the
17      traceability question is a causal
18      relationship, right?
19           MR. GRASS:  Correct.
20           And so the traceability question,
21      going back to due power, Your Honor, there
22      you had plaintiffs suing a nuclear power
23      plant alleging environmental injury to
```

Page 9

1       their property, and they challenged the

2       constitutionality of a federal statute,

3       which they contended permitted the power

4       plant to be built in the first place.  But

5       the power plant itself had no causal

6       connection to the enactment of the

7       legislation, and the Supreme Court,

8       nevertheless, held that the plaintiffs had

9       standing to assert their claim against the

10      power plants because their injury was

11      connected to the conduct of the power

12      plant, even if the power plant's conduct

13      was not causally connected to their

14      asserted rights; that is, the

15      constitutionally -- or lack of

16      constitutionality of the underlying

17      legislation.

18           And due power, that principle also

19      explains why inmates in federal habeas

20      proceedings have standing to sue their

21      jailers for alleged unlawful detention,

22      even though their jailers have nothing to

23      do with the underlying reasons why the

Page 10

```
 1      detention is unlawful.

 2          So if there is a federal habeas claim

 3      and the allegation is that the inmate

 4      received ineffective assistance of

 5      counsel, you can, nevertheless, sue your

 6      jailer because your injury is that you're

 7      being unlawfully detained, even though

 8      your jailer has nothing to do with the

 9      alleged rendering of ineffective

10      assistance, and that same principle

11      applies here.

12          Mr. Smith's injury is the imminent

13      execution, which if it goes forward, will

14      moot his pending appeal, and defendants

15      are the State officials who are going to

16      impose that injury if the execution is

17      permitted to proceed.  So his injury --

18      Mr. Smith's injury, that is, is fairly

19      traceable to the defendants' challenged

20      conduct.  And in any event, Mr. Smith has

21      standing, even if you trace defendant's

22      conduct retrospectively to the decision in

23      August to move for authority to execute
```

1      him.

2           As the District Court, and as the

3      defendants argue, that he did correctly,

4      defendants' conduct is implicated in the

5      decision to move for authority to execute

6      Mr. Smith in August, and that is what

7      Mr. Smith alleged and also, what the

8      evidence in the record establishes -- and

9      that evidence, at least on that portion of

10     the case, is really not disputed by the

11     defendants.

12          So the defendants were parties to

13     Mr. Smith's then pending action

14     challenging the department's then stated

15     intention to attempt to execute Mr. Smith

16     a second time by lethal injection.  And

17     the purpose, we have alleged and we think

18     we have established for selecting

19     Mr. Smith when the department did for

20     execution by nitrogen hypoxia even though

21     he has an appeal pending, was to moot the

22     litigation and, thereby, spare the

23     defendants of discovery and the disclosure

Page 12

1      of information that the department does

2      not want subject to public scrutiny.

3           And when they moved in August --

4      they, being the defendants, moved in

5      August to dismiss Mr. Smith's then pending

6      litigation, they represented in a pleading

7      submitted by their counsel, the Attorney

8      General, that Commissioner Hamm had

9      decided Mr. Smith would be subject to

10     nitrogen hypoxia, not lethal injection.

11          So they, themselves, represented that

12     this was a decision by Commissioner Hamm.

13     And when the Attorney General filed the

14     motion seeking to execute Mr. Smith in the

15     Alabama Supreme Court, he did that to

16     effectuate the Commissioner's

17     determination, and he did that to obtain

18     authorization under Rule -- Alabama Rule

19     of Appellate Procedure AP1 towards the,

20     quote, Commissioner of the Department of

21     Corrections to carry out the inmate's

22     sentence of death with a time frame set by

23     the Governor.

1         So we think the District Court got

2     the analysis wrong for the two reasons

3     we've explained, got the standing analysis

4     wrong, that is.

5         JUDGE GRANT:  Can I back you up for a

6     moment?  You did litigate this issue in

7     front of the Alabama Supreme Court, right,

8     at the time that it was making that

9     decision?

10        MR. GRASS:  We objected to issuance

11    of a death warrant on the ground that

12    Mr. Smith's equal protection rights would

13    be violated if he were -- because he had a

14    pending appeal.

15        JUDGE GRANT:  So from a -- from a

16    Rooker-Feldman perspective, would it -- is

17    it appropriate for a Circuit Court to

18    review the District Court's judgment

19    related to your action, or would it have

20    been more appropriate for you to seek

21    review in the United States Supreme Court

22    of the Alabama Supreme Court order setting

23    his execution?

1           MR. GRASS:  Your Honor, the

2       Rooker-Feldman doctrine doesn't apply

3       here.  That's what the District Court

4       found, and we think the District Court got

5       that right.  And that is -- our argument

6       is basically based on Your Honor's

7       decision in Bare versus Campbell where

8       Your Honor pounds the District Court

9       should keep one thing in mind when

10      Rooker-Feldman is raised.  It will almost

11      never apply.  And the reason that Your

12      Honor found that --

13           JUDGE GRANT:  No argument there.

14           MR. GRASS:  The -- the basis to Your

15      Honor's decision there was that

16      Rooker-Feldman is not intended to deprive

17      the District Courts of subject matter over

18      a claim simply because the party attempts

19      to litigate in Federal Court a matter

20      previously litigated in State Court.  And

21      Your Honor made clear in your opinion that

22      there may have been some confusion in the

23      law previously where Courts were applying

1     a standard that suggested if claims were

2     inextricably intertwined that the

3     Rocker-Feldman doctrine would apply.  And

4     in our view our reading of Your Honor's

5     opinion, the -- your opinion disabused

6     District Courts within the 11th Circuit of

7     applying that standard.  And we think

8     absent that standard that there's no basis

9     for a finding that the Rooker-Feldman

10    applies under these circumstances.

11        And we also cited in our brief --

12    it's District Court decision, but Powell

13    versus Thomas, which we think is

14    consistent with Your Honor's decision in

15    Bare, where the petitioner there made the

16    same argument in the Federal Court as he

17    had made to the Alabama Supreme Court

18    regarding an -- in opposition to the

19    motion to -- for authorization for

20    execution.

21        There, the issue was, I believe, was

22    the protocol was inadequate and in

23    violation of the Eighth Amendment, and

Page 16

1          apparently, it made the exact same claim

2          to both Courts.  And the Court there said

3          that he's still -- that the Rooker-Feldman

4          doctrine did not apply.  And so we don't

5          think there's any basis to apply the

6          Rooker-Feldman doctrine here.

7                 JUDGE GRANT:  I guess my question was

8          -- and I'm -- I -- I definitely obviously

9          concur in the importance of not having an

10         expansive view of Rooker-Feldman.  My

11         concern here is whether possibility this

12         might be in the rare set of circumstances

13         where it could apply, if what we're being

14         asked to do is overturn essentially the

15         Alabama Supreme Court's decision that this

16         execution could go forward even given the

17         equal protection violation, or whether

18         we're being asked to separately review --

19         review something other than effectively

20         that order from the Alabama Supreme Court.

21         Do you see the distinction that I'm trying

22         to raise between the two?

23                 MR. GRASS:  Well, we're not asking

Page 17

1     for review of the Alabama Supreme Court's

2     order, and it's not even clear what the

3     Alabama Supreme Court's order means.

4     Well, it's clear in the sense that they

5     issued a death warrant.

6          JUDGE GRANT:  Right.

7          MR. GRASS:  But aside from it --

8     aside from the death warrant, there's no

9     explanation of what they did, what they

10    considered exactly.  And there's no -- the

11    proceeding in the Alabama Supreme Court is

12    an unusual one, at least in terms of

13    litigation, in the sense that there's no

14    opportunity for fact development.  There's

15    no opportunity to argue your case orally

16    before the Alabama Supreme Court.  And so

17    we think our claim is a separate claim for

18    violation of the United States

19    Constitution, which is properly presented

20    to the District Court in this case and can

21    proceed through this Court and, if it's

22    appropriate, the United States Supreme

23    Court.

1           JUDGE GRANT:  Do you think you --
2      well, I'll ask a question on this, and
3      then I'll let you move on.  I know you
4      have got a lot of things to cover.  Do you
5      think that you could have sought
6      certiorari over the death warrant or not?
7           MR. GRASS:  Well, your Honor, we did
8      -- we have sought certiorari in the
9      underlying State Court petition.
10      Yesterday, we filed the petition for
11      certiorari.  That raises the issue that we
12      want to -- that we claim will not be able
13      to pursue through its full habeas course,
14      and so we have done that.  Whether we
15      could file a petition for -- directly from
16      the death warrant, I think is an open
17      question.
18           In the past, we have filed petitions
19      from Alabama Supreme Court decisions
20      denying motion to stay an execution, but I
21      think those are somewhat different
22      procedural situations that don't
23      necessarily apply to the issuance of the

```
 1      death warrant.

 2              JUDGE GRANT:  Thank you.

 3              MR. GRASS:  We --

 4              JUDGE WILSON:  You want to move on to

 5      the Eighth Amendment claim?

 6              MR. GRASS:  Yes, Your Honor, I will.

 7              So addressing the Eighth Amendment

 8      claim and the District Court's

 9      determination that we didn't establish the

10      likelihood of success on the merits, I'd

11      like to start with some preliminary issues

12      for context.

13              The department took five years to

14      develop its nitrogen hypoxia protocol.  By

15      contrast, on August 25th, 2023, all on the

16      same day, Mr. Smith was informed that he

17      was subject to execution by nitrogen

18      hypoxia for the first time, informed that

19      the State was, on that same day, moving

20      for authority to execute him and provided

21      with a heavily redacted copy of the

22      protocol for doing so.

23              On November 8th, Governor Ivey
```

Page 20

1      scheduled Mr. Smith's execution for

2      January 25th ensuring that there would be

3      a truncated period to resolve any

4      challenge to the newly released protocol

5      for the first ever nitrogen hypoxia

6      execution with limited discovery on an

7      expedited basis.

8           During that limited discovery,

9      defendants refused to produce any

10     information predating the adoption of the

11     protocol on August 25th, and the District

12     Court failed to rule on Mr. Smith's motion

13     to compel production of that information.

14          And I say this, not to suggest that

15     the Eighth amendment standard should

16     change because execution by nitrogen

17     hypoxia has never been attempted before,

18     but to suggest that the department's

19     protocol for accomplishing that for the

20     first time ever deserved more scrutiny

21     that it's received to date.

22          I also want to make clear, because

23     it's a pervasive theme in the defendant's

Page 21

1     brief, that Mr. Smith has not walked away

2     from his allegation in previous litigation

3     that nitrogen hypoxia is a feasible and

4     available method of execution, his

5     challenges to the procedures and the

6     department's protocol for doing that, and

7     he did not receive those procedures until

8     August 25th and did not receive an

9     un-redacted copy of those procedures until

10    late November.

11         Those procedures expose Mr. Smith to

12    a substantial risk of serious harm for two

13    reasons arising from the department's

14    decision to use a mask to deliver nitrogen

15    to Mr. Smith instead of other available

16    alternatives.

17         First, using a mask entails the risk

18    of entrainment of oxygen which can result

19    in delaying unconsciousness, a persistent

20    vegetative state or a stroke.  Second --

21         JUDGE WILSON:  So, counsel, this is

22    Judge Wilson.  My understanding is that

23    it's not your argument that nitrogen

```
 1         hypoxia in and of itself would provide
 2         cruel and unusual punishment, but the
 3         manner in which it will be carried out
 4         will cause cruel and unusual punishment.
 5         Is that your argument?
 6              MR. GRASS:  That's exactly right,
 7         Judge Wilson.  Our --
 8              JUDGE WILSON:  Okay.  This is a
 9         method of execution that he chose himself.
10         And so --
11              MR. GRASS:  Correct.
12              JUDGE WILSON:  -- the Supreme Court
13         has said several times that you are not
14         entitled to a painless execution, but the
15         constitution is violated if the execution
16         in and of itself is cruel and unusual.  So
17         I guess what my concern is that are you
18         able to point to any findings of fact by
19         the District Court and its order that are
20         sufficient to establish that the -- that
21         the carrying out of this execution by
22         nitrogen hypoxia is cruel and -- is
23         clearly erroneous?
```

Page 23

```
 1              MR. GRASS:  Yes, Your Honor, I think
 2         I can.  And the issue with the District
 3         Court's ruling, in our view, is not so
 4         much what he found, but what he didn't
 5         address.  And let me explain.  I think
 6         there are certain facts here that are
 7         undisputed.  It's undisputed that a person
 8         exposed to an oxygen deficient environment
 9         can be left in a persistent vegetative
10         state or experience a stroke.  It's also
11         undisputed that face masks are subject to
12         leakage for a variety of reasons.
13         Therefore, it's critical that the face
14         masks used in Mr. Smith's execution will
15         be airtight so that the oxygen cannot
16         penetrate the mask in an amount that might
17         cause him serious injury short of death.
18              Now, defendants and the District
19         Court say that the masks that the
20         defendants have obtained for use in
21         Mr. Smith's execution will not leak in a
22         manner that exposes Mr. Smith to danger.
23         The problem, in our view, is that that is
```

Page 24

1        directly contrary to what the manufacturer

2        itself says in the user's manual that

3        accompanies this equipment.  And among

4        other things, the manufacturer says that

5        the respirator must be properly fit to the

6        individual, that it may not provide a

7        satisfactory face feel for individuals --

8            MR. THOMAS:  Counsel?

9            MR. GRASS:  Yes.

10           MR. THOMAS:  Counsel, two minutes.

11           MR. GRASS:  Thank you.  That it may

12       not provide a satisfactory face feel for

13       individuals who have certain physical

14       characteristics and that an unsatisfactory

15       face feel may reveal in leakage which

16       dangerously reduces respiratory

17       protection.

18           And so the manufacturer says if

19       you're going to wear this mask, you need

20       to do a certain test, the negative

21       pressure seal test to ensure that the mask

22       is sealed.  And if you cannot

23       satisfactorily perform a negative pressure

Page 25

```
 1        test, do not enter the contaminated area.

 2             Now, the department has no intention

 3        of performing that test at all.  And so

 4        instead it says it's going to rely on the

 5        flow of nitrogen to push out any oxygen

 6        should it penetrate the mask, but the

 7        user's manual expressively states that the

 8        positive pressure of air in the respirator

 9        does not reduce the importance of fit

10        testing, which must be done before the

11        supplied air respirator is selected and

12        used.  And so the --

13             JUDGE GRANT:  I've got -- I've got a

14        question about the record relating to

15        this.  From what I saw, none of your

16        experts testified to what amount of oxygen

17        leakage would lead to a vegetative state

18        rather than death, did they?

19             MR. GRASS:  Your Honor, they did not.

20        But I also think it's fair to point out

21        that this is -- no one has that data, and

22        it would be a shame to figure it out next

23        Thursday.  Because this is the first time
```

```
 1        this will ever be attempted.  There is no
 2        data on exactly what's going to happen and
 3        how this will go forward.  And I --
 4             MR. THOMAS:  Counsel, your time has
 5        expired.
 6             JUDGE WILSON:  And so -- yeah, I want
 7        to continue, give you a few more minutes.
 8        So -- so when we look to the -- went to
 9        the record in this case, what does the
10        record reflect with regard to whether or
11        not there is an intention to have an
12        airtight seal on the mask when --
13             MR. GRASS:  So what, Your Honor --
14             JUDGE WILSON:  -- when his mask is
15        placed -- because, you know, we're looking
16        at the -- we're looking at findings of
17        fact by the District Court, and the
18        District Court said it's highly unlikely
19        that the mask would dislodge or that the
20        seal would be broken if it is tightly
21        secured on the condemned inmate's head in
22        a positive pressure environment.  Why --
23        explain to me why -- how you established
```

Page 27

```
 1        that that's a clearly erroneous finding of
 2        fact.
 3             MR. GRASS:  Well, in addition to the
 4        evidence that the District Court did not
 5        address, we think it's clearly erroneous
 6        because the issue that was addressed --
 7        the evidence that the District Court did
 8        rely on does not get where -- does not
 9        support that finding, and the evidence
10        consisted of a few things.  One is
11        personal observations of the District
12        Court and the Assistant Attorney General
13        that themselves tried on the mask and wore
14        it.  And the reason that that is
15        insufficient is because there is no way to
16        tell that the mask was there tight because
17        with the exception of one Assistant
18        Attorney General, no one performed the
19        test needed to established that.
20             In addition, the conditions under
21        which those people wore the mask do not
22        mirror the conditions under which
23        Mr. Smith will.  Those persons were not
```

```
 1      subject to execution, knew that no

 2      nitrogen would ever flow into the mask,

 3      and they were not suffering from PTSD.

 4      Mr. Smith is going to know that nitrogen

 5      is flowing into the mask.  He's going to

 6      know when it's flowing into the mask, and

 7      under those circumstances, the reaction of

 8      someone is likely to be very different.

 9      Someone might hold their breath, for

10      example, which will affect their breathing

11      rate and may result in gulping in air

12      under the mask, and if that air includes

13      oxygen, that --

14          JUDGE GRANT:  Although -- I'm sorry

15      to interrupt you -- but if the standard

16      for testing is it has to tested on someone

17      who is undergoing execution, then

18      obviously, it's impossible to test really

19      any method of execution.  That -- that

20      can't be the standard, can it?

21          MR. GRASS:  Well, I'm not sure

22      that's --

23          JUDGE GRANT:  I mean, I think what
```

1    you're saying they're -- they have tested

2    this effectively because it will be

3    different for someone who knows that

4    nitrogen gas is coming out, but I don't

5    see a way to test that.

6         MR. GRASS:  Well, but they have

7    haven't even tested where nitrogen gas

8    isn't coming out.  They've just offered

9    the --

10        JUDGE GRANT:  Well, that's a

11   different argument than the one you were

12   making, though.  I mean, I guess I would

13   say, what -- what testing --

14        MR. GRASS:  Well, the --

15        JUDGE GRANT:  -- would you say was

16   sufficient?

17        MR. GRASS:  Well, Your Honor, the

18   testing whether nitrogen or breathing air

19   is coming out of the mask is the same.  It

20   involving basically putting your thumb

21   over the hose that is supplying either the

22   breathing air or the nitrogen, and taking

23   a deep breath and the mask should kind of

Page 30

```
 1        collapse on your face.  And that test --
 2        you know, these masks aren't made for the
 3        use that the department is putting them
 4        to.  So that test is normally performed
 5        with breathing air coming out of the mask.
 6        And so no one has really -- you know, even
 7        -- even in the examples that they're
 8        offering, no one, other than one of the
 9        Assistant Attorney General, have done
10        that.  And so, you know, we are kind of
11        relying on an assumption that everything
12        is going to work as it's intended to work,
13        and --
14             JUDGE WILSON:  Is it your argument --
15        is it your argument that a negative
16        pressure test will advise us as to whether
17        or not it is likely that the mask would
18        dislodge or that the seal would be broken?
19             MR. GRASS:  That's what the
20        manufacturer advises, Your Honor.  And so
21        we think that the manufacturer's advice
22        should hold a good amount of weight.
23             JUDGE WILSON:  Okay.
```

Page 31

```
 1          JUDGE GRANT:  So there is -- is
 2     that --
 3          JUDGE PRYOR:  Let me -- this is --
 4          JUDGE GRANT:  Is that what you're
 5     suggesting, then?
 6          MR. GRASS:  I'm sorry.  I didn't hear
 7     the question.
 8          JUDGE GRANT:  I'm sorry.  I'm sorry,
 9     Jill.  I'll just ask a followup and then
10     get to the next thing.  Is that -- is that
11     what you are saying for your client the
12     sufficient amount of testing would be, if
13     it survived that test, would you be
14     satisfied, or would you still seek more?
15          MR. GRASS:  Well, we think that there
16     are ways to avoid all this, and that would
17     get your our feasible and available
18     alternative.  And we've proposed
19     delivering nitrogen through a different
20     mechanism, either hood or a closed
21     chamber, which we --
22          JUDGE GRANT:  That's -- that's why
23     I'm trying -- that's why I'm trying to get
```

Page 32

```
 1        you to be specific, because is the -- is

 2        the assertion this particular mask hasn't

 3        been tested enough, or is it this

 4        particular mask, no matter how thoroughly

 5        it was tested, would not be appropriate?

 6             MR. GRASS:  The assertion is that

 7        there are better ways to do this than

 8        using masks and that --

 9             JUDGE WILSON:  And what are those

10        ways?  It would be a hood?

11             MR. GRASS:  That would be a hood or a

12        closed chamber.  And so the hood is --

13             JUDGE WILSON:  So that's -- that's an

14        alternative that you have to show is

15        available, and I think we've said that

16        that -- you've got to show -- you know, do

17        more than show it's theoretically

18        feasible.  You also have to show that it's

19        readily implemented.  And where are we

20        going to find that in this record?

21             MR. GRASS:  I think you're going to

22        find it in the testimony of Dr. Nitschke.

23        I think not only his declarations --
```

Page 33

```
 1       they're on the record.  He testified
 2       briefly during the live -- during the
 3       hearing, and the defendants deposed
 4       Dr. Nitschke and questioned him
 5       extensively on -- on the use of a hood for
 6       delivering nitrogen for the purpose of
 7       ending life, and that testimony is mostly
 8       in the context of assisted suicide, but
 9       that's where --
10            JUDGE WILSON:  And a hood would avoid
11       the possibility that the inmate, while
12       laying on the gurney would choke in the
13       event that he vomits?
14            MR. GRASS:  I think the hood would
15       reduce -- significantly reduce the risk of
16       that issue because -- for two reasons,
17       one, it's not strapped tightly around your
18       face.  So if an inmate vomits, there's
19       someplace for vomit to go rather than
20       right back into the inmate's mouth and
21       potentially bound -- bound the inmate's
22       airway, and --
23            JUDGE WILSON:  And that's Nitschke's
```

Page 34

1       testimony?  Grass yes.

2            MR. GRASS:  Yes.

3            JUDGE PRYOR:  Judge Wilson, may I ask

4       another question?  This is Judge Pryor.

5            JUDGE WILSON:  Yes.

6            JUDGE PRYOR:  I want to go back to

7       this point because I think it's important.

8       With regard to whether the mask is

9       airtight, is your argument that observing

10      that the mask is tight or that it's not

11      being dislodged with various movement is a

12      different question from whether the mask

13      is airtight and that there was no evidence

14      before the District Court from which it

15      would conclude that the mask is actually

16      airtight?  Is that your argument?

17           MR. GRASS:  Yes, Judge Pryor, that's

18      -- that's our argument.  There is a limit

19      to what anyone can determine by

20      observation alone.  And so, for example,

21      if the mask completely fell off an

22      inmate's face, obviously, corrections

23      officers in the execution chamber would

Page 35

```
 1        see that.  There may be situations where

 2        the mask became obviously askew, but I

 3        think even Dr. Antonini, who is the

 4        plaintiff's -- excuse me.  I'm sorry --

 5        served as the defendant's expert,

 6        testified that observation might detect

 7        large gaps, but it wouldn't necessarily

 8        detect smaller gaps.  And so I think the

 9        notion that execution officials are going

10        to be able to fix anything that happens

11        is, again, maybe a bit of hopeful thinking

12        because I'm not sure that there's no

13        evidence that they're trained do that or

14        that everyone that they're trained that

15        observation can correct everything that

16        might happen there.

17             And in addition, once the nitrogen

18        starts flowing, they're -- the department

19        has asked the -- not asked, they've warned

20        spiritual adviser, if one is in the

21        chamber, to stay three feet -- at least

22        three feet clear of the mask.  And

23        although, Ms. Stewart-Riley said not --
```

1      testified that notwithstanding that,

2      corrections officers would adjust and fix

3      the mask if something happened while

4      nitrogen has flow -- is flowing.  None of

5      those corrections officers testified and

6      none have even been identified, so that

7      remains to be seen.

8           JUDGE WILSON:  Okay.  And I just ask

9      one more question --

10          JUDGE GRANT:  Judge Wilson, may I

11     ask --

12          JUDGE WILSON:  -- more question to --

13     let me just ask one more question.  Would

14     a negative pressure test resolve the

15     concerns that Mr. Smith might have about

16     the mask malfunctioning during the

17     execution?

18          MR. GRASS:  Your Honor, we -- our

19     position is that the better alternative is

20     to use a different means of delivering the

21     nitrogen.  And that would effectively

22     mean, rather than having the tubing run

23     through a mask, having the tubing run

1          through a hood, and we -- we think that's

2          feasible.  We think they can do it.  We

3          think they questioned Dr. Nitschke

4          extensively on it and --

5                JUDGE WILSON:  And it's readily

6          implemented?

7                MR. GRASS:  It's readily

8          implemented --

9                JUDGE WILSON:  It has to be

10         theoretically feasible and readily

11         implemented.  And does the record reflect

12         that it's readily implemented?

13               MR. GRASS:  It's readily implemented

14         by people who wish to end their lives

15         voluntarily.

16               JUDGE WILSON:  Okay.  I got you.  I'm

17         sorry.  Judge Grant, you had some more

18         questions.

19               JUDGE GRANT:  Judge, may I ask one

20         more question.

21               JUDGE WILSON:  Yes.

22               JUDGE GRANT:  Thank you.  It's always

23         challenging on the phone, as I said.  I

Page 38

1          appreciate it.

2               I have a question about the

3          alternative.  Doesn't the record indicate

4          that the hood would have the same

5          possibility of oxygen leakage through the

6          neckband as the mask does?

7               MR. GRASS:  Your Honor, I -- I don't

8          think that's the case.  I think that's, in

9          fact, the reason why masks have been

10         abandoned in the euthanasia context, is

11         because there was leakage from masks, and

12         the hood seemed to solve that problem

13         because the hood has a larger volume to

14         introduce the nitrogen into and because

15         the hood extends below someone's neck, and

16         therefore, the oxygen is not necessarily

17         coming in right near your nose or mouth.

18              JUDGE GRANT:  So what about -- what

19         about the data that some of the experts

20         issued about how -- how long the process

21         would take given -- given various levels

22         of oxygen and nitrogen?  Why don't the --

23         establish that even there were some --

Page 39

1        it's not likely that it would cause a

2        problem they're identifying?

3             MR. GRASS:  Your Honor, the reason we

4        think that evidence doesn't establish and

5        support the District Court's finding is

6        because we think it's circular.  What

7        Dr. Antonini basically said is that with a

8        virtually airtight mask there would be --

9        an inmate would be unconscious within -- I

10       think he said within 30 seconds and dead

11       within minutes, but that begs the question

12       of whether the mask is going to be

13       airtight.

14            And as we indicated in our brief,

15       there really is no -- we are not disputing

16       that a person exposed to pure nitrogen

17       will be rendered unconscious in a fairly

18       short period of time and ultimately die.

19       That's not the issue.  The issue is

20       whether the procedures that the department

21       is proposing to use will accomplish that

22       in the time periods they're claiming.  And

23       Dr. Antonini's evidence on how long it

Page 40

1          would take, we think, assumes the facts in

2          dispute.

3                    JUDGE GRANT:  Okay.  And --

4                    JUDGE WILSON:  All right.

5                    JUDGE GRANT:  -- I wondered also

6          about the -- I'm sorry.  I apologize,

7          Judge Wilson.  If I may, just one more.

8                    I wondered about the closed room

9          option.  I would assume that that would

10         present potentially some Rupala (phonetic)

11         argument about not being able to have a

12         spiritual adviser in the room.  Is that

13         something that's separate and apart from

14         your view of an alternative method, or how

15         do those things interplay?

16                    MR. GRASS:  Well, I think in some

17         ways it's the same -- it would cause the

18         same issue that the department's protocol

19         causes.  Because once the nitrogen starts

20         flowing, the spiritual adviser is advised

21         to be at least three feet away of mask.

22         And you're correct, Your Honor, that you

23         cannot put a spiritual adviser -- and

Page 41

1        certainly can't do it safely, put the

2        spiritual adviser in a closed chamber

3        filled with nitrogen, but you can provide

4        some procedure for the spiritual adviser

5        to communicate and to serve a condemned

6        inmate before the inmate is placed in the

7        closed chamber filled with nitrogen.

8             JUDGE WILSON:  All right.  Thank you,

9        Mr. Grass.  You've reserved three minutes

10        for rebuttal, and you'll keep that time.

11             And we'll hear from Mr. LaCour on

12        behalf of the Commissioner.

13             MR. LACOUR:  Thank you.

14             MR. GRASS:  Thank you, Your Honor.

15             MR. LACKEY:  Thank you, Judge Wilson.

16        May it please the Court?  Edmund LaCour on

17        behalf of the defendants.

18             Alabama has adopted the most painless

19        and humane method of execution known to

20        man.  Dozens of condemned inmates have

21        expressively chosen nitrogen hypoxia, and

22        Smith has been asking for it since 2022.

23        And now challenging nitrogen hypoxia,

Page 42

```
1        Smith had the heavy burden to show that
2        he's sure or very likely to suffer severe
3        pain, pain that a viable alternative would
4        significantly reduce.  Instead, he brought
5        an advocate for nitrogen hypoxia,
6        Dr. Nitschke, as his expert.  And
7        Dr. Nitschke has helped countless people
8        commit suicide using nitrogen hypoxia.
9            And this is all in the record.
10       According to Dr. Nitschke, hypoxia, quote,
11       "Ensures an almost immediately loss of
12       consciousness with death following soon
13       after."  That's documentary 62-53,
14       paragraph 14.1.  He said he's personally
15       observed dozens of suicides by nitrogen.
16       That's at 62-112, page 22.  And he has
17       never observed physical pain in these
18       dozens of suicide.  And keep in mind,
19       these suicides are people who don't have a
20       third party assisting them because that
21       third party could then potentially be
22       criminally liable for assisting in the
23       death.  And despite the do-it-yourself
```

Page 43

1      mechanism, he has never observed physical

2      pain.  He testified that the method

3      provides a peaceful and reliable death.

4           And when Alabama announced it method

5      was available, Dr. Nitschke tweeted that

6      critics were, quote, "Misrepresenting the

7      science."  Nitrogen hypoxia is, quote,

8      "Fast, effective and with no risk to

9      others," close quote.  And you can find

10     that twitted at documentary 62-101.  He

11     also stands by it in his deposition

12     testimony.

13          JUDGE WILSON:  Mr. LaCour?

14          MR. LACOUR:  Yes, Judge Wilson.

15          JUDGE WILSON:  This is Judge Wilson.

16     Doesn't the manual reflect that the mask

17     has to create an airtight seal when placed

18     on the face and tightened?

19          MR. LACOUR:  Your Honor, that is

20     certainly what is recommended by the

21     manufacturer before someone uses the mask

22     to go into an environment for a prolonged

23     amount of time where there's going to be

Page 44

```
 1          nauseous fumes or otherwise dangerous
 2          gases, but it's never been the position
 3          that it must be perfectly airtight.  And
 4          it's somewhat strange for Mr. Smith to be
 5          arguing that must be airtight when his
 6          alternative is a bag over the head that
 7          Dr. Nitschke has said is going to
 8          essentially allow some oxygen in.  There's
 9          no way to allow oxygen to flow into the
10          bag -- or nitrogen, rather, to flow into
11          bag if the bag is, indeed, airtight or the
12          bag is going to explode.  So there is
13          going to be some gap, necessarily.  The
14          difference between the bag method that
15          he's proposing here and Dr. Nitschke has
16          used or watched other people use to effect
17          painless suicide dozens and dozens of
18          times, is that our method with the mask
19          has a one-way valve so oxygen can flow in
20          and it does flow in at a very high rate,
21          the higher flow rate than Dr. Nitschke
22          proposed alternatives.  And as he
23          explained, the high-flow rate makes it
```

Page 45

1          impossible for air to come back in.

2          That's Nitschke at the hearing at page 127

3          of the preliminary injunction hearing

4          transcript.

5                So, and if you look to the Antonini

6          declaration at 62-60, paragraph ten,

7          you'll see that our flow rate is much

8          higher than the one that Dr. Nitschke uses

9          and has found sufficient to keep out any

10         air, or at least too much air, such that

11         the nitrogen hypoxia could potentially

12         create that severe risk of substantial

13         harm.

14                And so he's come up woefully short

15         just even by his own evidence.  And

16         Dr. Nitschke, by his -- again, Smith's own

17         experts rebutted Smith's concerns about

18         the masks.  In his declaration he stated

19         that the problem for suicides is that it

20         requires the cooperation of a third party

21         to intervene to either reposition or apply

22         manual pressure to the mask.  Alabama, of

23         course, doesn't have that problem.  We'll

1     have Department of Corrections officers on

2     hand to ensure that the mask maintains its

3     proper position on his face.  Dr. Nitschke

4     had the opportunity to wear the mask.  And

5     he said it was a fair fit and was not

6     loose, especially after it had been

7     adjusted.  You'll see that in his

8     deposition testimony at pages 41 through

9     42.

10         Just based on Smith's evidence alone,

11    the Court can affirm the well reason of

12    factual finding from the District Court.

13    But, of course, that --

14         JUDGE WILSON:  The District Judge --

15    the District Judge himself didn't --

16    didn't -- he didn't really physically

17    inspect the mask, did he?

18         MR. LACOUR:  Yes, he did, Your Honor.

19    He held it in his hand, and that's

20    reflected in the District Court's

21    decision.  This is a large mask with a

22    rubber seal that goes from the forehead

23    around his face and down to the chin.  It

1      has five sturdy straps that can be pulled

2      tight to lock in a very tight fit, and, I

3      mean, Dr. Nitschke found that as well, and

4      that's why the District Court, upon his

5      personal observation -- and this is the

6      sort of thing that the Court of Appeals

7      would -- should defer when we're dealing

8      with findings of fact like this.  He found

9      it very unlikely that oxygen was going to

10     get in at sufficient levels to cause any

11     problem.

12          And that brings us to another problem

13     that Judge Grant alluded to when my friend

14     on the other side was up, is no one

15     testified about what amount of oxygen

16     getting in would be sufficient to create

17     that substantial risk of severe harm, nor

18     did they testify about what the likelihood

19     is that some amount of oxygen is going to

20     get in and create that substantial

21     likelihood of severe harm.

22          But again, we know from Dr. Nitschke

23     that dozens of people have used his bag

Page 48

1       method where there is not that airtight

2       seal, and he has never seen anyone suffer

3       pain, despite having seen dozens of people

4       use nitrogen hypoxia to end their lives.

5           So he already had a very high burden

6       to surmount when it came to proving his

7       Eighth Amendment claim.  And his claim

8       rises and false with the Eighth amendment

9       claim.  And under the clear error view --

10          JUDGE WILSON:  Let me -- I'm not sure

11      I understand why the Commissioner cannot

12      perform a negative pressure test on the

13      mask that will be used to execute him.

14          MR. LACOUR:  Well, Your Honor, first,

15      I don't think that's Eighth Amendment

16      standard.  The Court -- the Supreme Court

17      has said that Federal Courts, under the

18      Eighth Amendment, are not empowered to be

19      boards of overseers of state execution

20      methods and that some level of deference

21      is entitled to states.  But another reason

22      why one might not want to do that, the

23      negative pressure test requires cutting

Page 49

```
1      off oxygen -- or cutting off any air for a

2      moment while the person's wearing the

3      mask.  Think of a scuba mask, except it's

4      covering your entire face, cutting off

5      oxygen to see if that sucks in on the face

6      or not, and understandably, that that

7      might be disconcerting to an inmate.  And

8      so there are penal logical -- valid penal

9      logical reasons why State might not want

10     to add that particular step into the

11     process.

12          But we have conducted negative

13     pressure tests, just not with Mr. Smith

14     himself.  If you look to the Holst

15     declaration, 62-71, paragraph three, he

16     testifies -- he declares, "I was able to

17     collapse the flange of the face piece onto

18     my face, indicating an effective seal."

19     And you can look at the video at 62-79 to

20     see that and what he's declaring or

21     testifying to.

22          So we've had people do that negative

23     pressure test.  And again, this is a mask
```

Page 50

1          that is approved by the NIOSH, a federal

2          agency, which in order to get that

3          approval needs to have a fit as

4          appropriate to various faces, and these

5          have been tested on people of different

6          sexes and of different sizes and different

7          levels of facial hair.  On top of that --

8          and on top that, we have, again,

9          Dr. Nitschke himself saying that it was

10          not loose.  Even when he was flexing his

11          face to try to make it loosen up, it was

12          still not loose after that, and then when

13          it was adjusted, it fit better.

14              The other factor that weighs against

15          them -- again, coming from Smith's own

16          expert, Dr. Young, being an

17          anesthesiologist, said the way he usually

18          ensures that there's a sufficient fit when

19          he's working as an anesthesiologist and

20          the stakes are relatively high to make

21          sure that sufficient gas is getting

22          provided to his patient, is just putting

23          his hand on the mask and holding it on

Page 51

1       with the hand.  Of course, we're going to

2       have officials in the room who are going

3       to be positioned to be able to do that if

4       necessary or to ensure that the fit is

5       there.

6            And Dr. Nitschke himself -- and I'm

7       trying to find -- he said, "A reliable way

8       to deal with the issue of the sealed face

9       mask is through the cooperation of a third

10      party, like an assistant."  And that comes

11      from his declaration, and you can find

12      that at 62-53 on page.

13           So there is just no way under the

14      clear --

15           JUDGE WILSON:  Does the protocol --

16           MR. LACOUR:  -- error review --

17           JUDGE WILSON:  Does the protocol call

18      for the mask being held in place by

19      someone from the office of the

20      Commissioner?

21           MR. LACOUR:  I don't believe the

22      protocol says that someone will be holding

23      it in place the entire time, but there

1      will be someone there, and the evidence is

2      that someone will available to refit it if

3      necessary.

4           And then keep in mind, again, we have

5      Dr. Nitschke himself saying that, with his

6      bag method, the high-flow rate makes it

7      impossible for the air to come back in.

8      That's at the hearing at page -- the PI

9      hearing at page 127.  And again, that's

10     with a relatively loose fit around the

11     neck.  Here, we have a one-way valve, so

12     we've got a tighter fit than their

13     supposed alternative.  It -- I think

14     Mr. Grass said that it would be airtight.

15     That's just simply not right.  The

16     deposition of Dr. Nitschke, he said it's,

17     quote, "Not a night fit."  That's at page

18     30 of his deposition.  And Dr. Antonini,

19     likewise, testified that oxygen would be

20     able to get in because of gaps through the

21     hood method.  But, again, we -- the

22     evidence is even if there's not an

23     airtight seal, that people are going

Page 53

1        unconscious within matters of seconds.

2              If you look at the Ogden -- I believe

3        it's the Ogden Study -- I don't have the

4        exact cite in front of me right now, but

5        this through the -- a case study that the

6        experts looked at of four people in

7        Switzerland who are using sort of a mask

8        to carry out nitrogen hypoxia on

9        themselves with no assistance whatsoever.

10       And even though the reports said that

11       there were visible gaps that you could see

12       in the video, each of the four people was

13       unconscious within under a minute and was

14       dead, for three of them, within just a few

15       minutes, and one lasted a little bit

16       longer.  But there was no indication of

17       any suffering or pain, much less that

18       substantial likelihood of severe harm.

19             JUDGE WILSON:  All right.

20             MR. LACOUR:  So Mr. Smith had a high

21       burden.  He has come up woefully short.  I

22       think if all we had was his evidence, we

23       would have almost definitively disproven

Page 54

```
 1        his case.
 2             JUDGE WILSON:  Well, Mr. --
 3        Mr. Smith's concern --
 4             JUDGE PRYOR:  Mr. LaCour, this is --
 5        this is Jill -- oh, sorry, Judge Wilson.
 6             JUDGE WILSON:  Go ahead.  Go ahead,
 7        Jill.  You can go ahead.
 8             JUDGE PRYOR:  Oh, no.  I was just --
 9        I have a question about the -- about the
10        record on the point you were making about
11        the airflow.  First of all, there's no --
12        there's nothing addressing the rate of
13        flow of nitrogen into the mask; is that
14        right?
15             MR. LACOUR:  I believe there is, Your
16        Honor, in the redacted copy.  I don't have
17        the exact cite at my fingertips, but I'm
18        -- I may be able to get it for you in just
19        a moment.
20             JUDGE PRYOR:  Okay.  Did the District
21        Court make any -- did the District Court
22        make any factual finding on that, what the
23        flow rate would be?
```

Page 55

1          MR. LACOUR:  I would have to go back

2      and look at that, but if you look at the

3      un-redacted protocol -- it's document 62-3

4      -- you can find the flow rate at paragraph

5      XA2, and it is several times higher than

6      the flow rate of Dr. Nitschke's post-bag

7      method.

8          JUDGE PRYOR:  What does it -- what

9      does it say the flow rate is?

10          MR. LACOUR:  That's -- it's redacted

11      for security purposes.  So since this is a

12      public -- public feed, I'd rather not say,

13      but I can if that's required.  But you

14      will see it there, and --

15          JUDGE PRYOR:  Yeah, I think that -- I

16      think -- I thought -- I thought a witness

17      testified, though, that the nitrogen would

18      flow into the mask at 70 liters per minute

19      regardless of what the protocol says.

20          MR. LACOUR:  Yes.  Well, yeah.

21          JUDGE PRYOR:  Do you agree with that?

22          MR. LACOUR:  70 liters per minute is

23      in the record, yes.  And Dr. Nitschke, I

Page 56

```
 1          think, said he was going at 15 liters per

 2          minute for his bag method and found that

 3          to be sufficient to keep air from coming

 4          back in.  Similar to if you -- if you blow

 5          up a balloon and you let it go, there be

 6          air transfer, but it's going to be from

 7          the balloon to the external environment,

 8          not from the outside into the balloon.  So

 9          it's a similar -- similar principle of

10          physics.

11              JUDGE PRYOR:  Just one more question

12          about that.  So when you did the

13          demonstrations, according to the record, a

14          flow rate of 90 liters per minute was

15          used, and that's what Dr. Antonini said.

16          Can you explain the discrepancy between

17          the 70 liters and the 90 liters per

18          minute?

19              MR. LACOUR:  My understanding, Your

20          Honor, is that -- that the protocol -- and

21          I think this is redacted, but I want to

22          answer your question -- states 70 meters

23          -- 70 liters per minute or flood and that
```

1       the flood function is basically sufficient

2       to take that up to 90.  And citing for

3       Dr. Antonini, he says whether it's 70 or

4       90, it's still several times than

5       Dr. Nitschke -- Dr. Nitschke's proposed

6       flow rate of 15 liters per minute.  And

7       this is a mask that holds about 1.4 liters

8       of air, so we're talking more than a liter

9       of air per minute flowing in the mask,

10      which is why the oxygen levels drop

11      precipitously leading to very swift

12      unconscious and then ultimately death.

13          JUDGE WILSON:  And so execution by

14      nitrogen hypoxia using a hood instead of a

15      mask, could the State carry that out

16      relatively easily and reasonably quickly?

17          MR. LACOUR:  Your Honor, I'm not

18      certain about that.  I don't think this

19      hood approach that they've proposed really

20      meets the Nance and Buckalew standard of

21      the variable blueprint needed.  They

22      haven't -- I'm not aware -- and maybe

23      Mr. Grass can correct me -- but I'm not

Page 58

```
 1          aware that they have proposed --
 2               JUDGE WILSON:  Why doesn't it -- why
 3          doesn't it meet the standard?
 4               MR. LACOUR:  Well, I'm not aware that
 5          they have actually proposed a different
 6          type of bag, so they had an alternative
 7          mask, for example, the Mojo II, which is
 8          essentially a CPAP.  And they abandoned
 9          their mask challenge when they saw that
10          our mask was -- had a tighter fit than the
11          one that they were proposing, but I don't
12          think they have the alternative hood that
13          they've proposed and say if you do this,
14          this will work.
15               And while we're on the subject of the
16          hood, again, it's not airtight, so that
17          was the mistake that my friend made a
18          moment ago.  And Judge Wilson, I think you
19          asked whether the vomit would be reduced
20          by the hood.  Dr. Nitschke did not testify
21          that the hood would substantially reduce
22          the risk of vomit.  Rather, in his
23          declaration, again, 62-53 at page nine, he
```

Page 59

```
 1        said, "The risk of vomiting was still
 2        present with the hood."  So if this
 3        alternative is supposed to substantially
 4        reduce risk, it comes up short.
 5             JUDGE GRANT:  Well, wasn't the idea
 6        -- excuse me.  Wasn't the idea that if he
 7        did vomit, there would be somewhere for it
 8        to go in the hood, whereas, there would
 9        not be somewhere for it to go in the mask?
10             MR. LACOUR:  I certainly don't see
11        that in Dr. Nitschke's declaration.  I saw
12        that in the reply brief, but without any
13        citation to the record.  So maybe there's
14        something in the record I'm not seeing.
15        But if their theory is there's going to be
16        so much vomit that it's going to fill up a
17        1.4 liter mask, there's certainly not
18        evidence to the record -- in the record to
19        substantiate that either.  So then under
20        the first prong, they failed.
21             And second -- and this is, again, why
22        the District Court correctly found that
23        this entire claim is speculative.  There's
```

Page 60

```
 1      no hard testimony as to the substantial

 2      likelihood that he's going to vomit at

 3      all, much less evidence suggesting that he

 4      is substantially likely to vomit at the

 5      very few seconds between when nitrogen

 6      floods the mask and when he is

 7      unconscious, which his own expert said

 8      could happen in just one breath.

 9           And, I mean, evidence of nauseous is

10      not necessarily evidence of vomiting.

11      Dr. Porterfield testified about the nausea

12      that Mr. Smith has been suffering, but

13      said that she was unaware of him suffering

14      from vomiting since she's been seeing him.

15           And then finally, when it comes to

16      the vomiting risk, too, if you look at the

17      video evidence, the inmates are not laid

18      flat on their back.  They're at an

19      incline.  Video documentary 62-73, for

20      example, shows someone who is strapped to

21      the gurney is able to will lift his head

22      up, even off of that incline to agree that

23      would further mitigate risks from
```

Page 61

1      vomiting.  So -- and then finally, risks

2      from vomiting could be minimized if Smith

3      simply opts to have his last meal earlier

4      in the day or the day before the planned

5      execution.

6           And so for all these reasons, he's

7      not established either prong of the

8      basophil of Buckalew test.  And the

9      District Court certainly did not clearly

10     error or abuse its discretion in denying

11     their preliminary injunction here.

12          JUDGE WILSON:  If he were to vomit,

13     is there any criteria in the record for

14     whether or not Commissioner Hamm would

15     stop the execution?

16          MR. LACOUR:  So the -- it breaks

17     down, too, whether or not nitrogen has

18     begun or not.  If nitrogen has not begun

19     or not but the undisputed evidence is that

20     the mask will be removed and he will be --

21     and the vomit will be cleared, and then

22     the mask will be refitted after it's been

23     cleared and cleaned, and then the

Page 62

1      execution will begin at that point.  But

2      -- but then if nitrogen has begun, then

3      the evidence is that the State does not

4      plan to stop the execution if they see

5      vomiting, because, again, there already

6      has potentially been a large amount of

7      nitrogen introduced into the inmate's

8      system.  And so similarly, I mean, with

9      lethal injection, you have inmates who are

10     strapped down to the gurney, and if you've

11     begun to inject the drugs and then there's

12     vomiting --

13          JUDGE WILSON:  Okay.  If he --

14          MR. LACOUR:  -- you wouldn't want to

15     stop at that point.

16          JUDGE WILSON:  So if he vomits during

17     the execution with the mask on, you're

18     telling me that the State will not stop

19     the execution; they will permit him to

20     choke on his vomit?

21          MR. LACOUR:  Your Honor, I don't

22     think there's a substantial risk that he

23     will be -- choke in his vomit,

Page 63

1          particularly, if he's -- and certainly not

2          in a way where he's going to everyone feel

3          any pain.  Because, again, the onset of

4          unconsciousness can be almost

5          instantaneous, if you go by his expert's

6          testimony.  And everyone seems to agree

7          that's going to be a matter of seconds,

8          not minutes.  And so then what we're

9          dealing with is -- as the District Court

10         put it -- an unlikely cascade of events --

11         if everything goes precisely wrong, then,

12         yes, there is some theoretical risk.  But

13         if some theoretical risk were enough to

14         establish an Eighth Amendment violation,

15         then the death penalty would be nullified

16         across the country.  That's not the test.

17         And no method of execution claim has ever

18         prevailed at the U.S. Supreme Court

19         because it takes a whole lot more than

20         what Mr. Smith is bringing in this case.

21              JUDGE WILSON:  All right.

22              MR. LACOUR:  So if we can, I'll turn

23         briefly to equal protection clause issues.

Page 64

1        And Judge Grant, you've made this point.

2        The issue was litigated in front of the

3        Alabama Supreme Court.  He -- the Rule --

4        Rule 8(d) says, "The Alabama Supreme Court

5        shall, at the appropriate time, enter an

6        order authorizing the Commissioner to

7        carry out the inmate's sentence of death."

8        So the issue in front of the Court, is it

9        an appropriate time or not for this

10       execution to move forward.  Mr. Smith came

11       forward and said it is not an appropriate

12       time because of the equal protection

13       clause, that you should wait, but the

14       Alabama Supreme Court rejected that

15       argument necessarily when it entered an

16       order, not just a death warrant, but an

17       order that concluded that it now is an

18       appropriate time to carry out the

19       sentence.

20            So if he wanted to challenge that

21       decision of the Alabama Supreme Court

22       under 28 UFC 1257, he had one option, and

23       that was to take it to the U.S. Supreme

Page 65

```
 1        Court, not to take it to the Middle

 2        District of Alabama or to this Court.

 3        That is a jurisdictional bar on him

 4        raising that claim now.  And it also

 5        explains why this is such a strange

 6        scenario when you've got him suing the

 7        Commissioner and the Warden for

 8        purportedly -- for bias decision making in

 9        terms of when it's appropriate for him to

10        be executed, when they have no relation

11        whatsoever to that decision.  And so we do

12        think the District Court was correct to

13        find that there was a lack of a

14        traceability -- lack of traceability

15        understanding to the challenged conduct,

16        but even if there were traceability --

17             JUDGE GRANT:  What's your response to

18        the due power argument that the -- he's

19        been injured by the actions that they're

20        taking?

21             MR. LACOUR:  Well, Your Honor, I

22        think -- I think if that's enough to

23        warrant standing for him, then I think
```

1    he's jumping from the standing frying pan

2    into habeas fire.  Because if he's suing

3    his jailer for merely holding him, well,

4    that's habeas.  That's when you get to sue

5    your jailer.  So if you have a Batson

6    claim or if you have a selected

7    prosecution claim, you don't sit on your

8    rights and fail to appeal the District

9    Court or the Trial Court's denial of your

10   Batson claim and think, well, good thing

11   I've got 1983 to sue the jailer after I

12   get to prison.  You have to appeal it.

13   You have to take it up to the ever Supreme

14   Court.  So it's either a Rooker-Feldman

15   problem, which we think it is, or his 1983

16   claim is actually a habeas claim, and then

17   that's also -- that's also going to doom

18   his claim.  Because this is second or

19   successive, and if not, there's still

20   going to be exhaustion problems because he

21   hasn't this to State Courts.  If he has

22   presented it to the State Court, he

23   presented it to the Alabama Supreme Court,

Page 67

1          which rejected the claim, and therefore,

2          Rooker-Feldman kicks in, and he should

3          take that up to the Supreme Court, and

4          that's before you even consider the claim

5          preclusion and issue preclusion issues

6          that we've also briefed up, where, again,

7          you've got the issue in front of a Court

8          of competent jurisdiction.  He had a full

9          and fair opportunity to litigate, and he

10         lost.  So he doesn't get to raise it again

11         in a 1983 suit.

12              He suggested before that the Rule 8

13         procedures are unusual and that there's

14         now opportunity for argument or for a fact

15         development.  That's not at all clear

16         based on the text of Rule 8(d), which in

17         addition to saying that the Court shall,

18         at the appropriate time, enter an order

19         authorizing execution, it says that the

20         Supreme Court may make other appropriate

21         orders upon disposition of the appeal or

22         other review.  So that reads quite broadly

23         to me.  I'm not aware of many cases where

Page 68

1        much more has happened beyond this round

2        of briefing like what happened in this

3        case, but I think that also just reflects

4        sort of the oddity and the improper nature

5        of the equal protection claim he's

6        bringing here, which, I mean, again, he's

7        asking a Federal Court to stay his

8        execution so he can pursue State Court

9        proceedings, but he's never asked any of

10       the State Courts to stay his execution so

11       he can pursue his State Court proceedings.

12       So I think it's this sort of run-around

13       he's been trying to execute.  And so it's

14       either a standing problem, a

15       Rooker-Feldman problem, a habeas problem

16       or a preclusion problem, but any way you

17       look at it, like, he's wrong on at least

18       one of those.  We can't be wrong on all of

19       them.

20            But even if you do get to the merits,

21       Smith fails on his equal protection claim

22       on the merits as well.  Of course, his

23       petition is seconds or successive.  I

1      mean, it is literally his second Rule 32

2      petition.  Now, he asserts that we have

3      this policy of not allowing -- of not

4      setting anyone for execution -- for not

5      moving for execution with anyone until all

6      their conventional appeals have run, but

7      we have obviously set people for execution

8      when they have had a second or successive

9      petition pending.  We cite a couple of

10     those cases in our blue brief -- I mean,

11     the red brief, and this Court obviously

12     can take judicial notice of those.  And

13     there's not really any response he has to

14     that.  Like, his Rule 32 petition is not

15     his first Rule 32 petition.  And under

16     Rule of Criminal -- he says, well, maybe

17     it's not really successive in some other

18     sense.  But under Alabama Rule of criminal

19     Procedure 32.2(b), which defines

20     successive petitions, it says, "If the

21     petitioner has previously filed a petition

22     that challenges any judgment, all

23     subsequent petitions by that petitioner

Page 70

1          challenging any judgment arising out of

2          that same trial or guilty plea proceeding

3          shall be treated as to successive

4          petitions under this Rule."

5               So under Alabama law it is

6          successive.  There is no policy of waiting

7          until the second, the third or 30th.  I

8          think habeas petition has run out before

9          we set someone -- or move to authorize

10         someone for execution.  If that were the

11         policy, then any inmate could forever

12         delay his execution by just simply filing

13         petition after petition even on the eve of

14         their execution, and we'd have to wait

15         until the State Court had had time to

16         dismiss the petition and he's gone through

17         a full round of appeal.  That makes zero

18         sense, and we've shown that is not the

19         approach that we take.  And he, again,

20         suggests that --

21              MR. THOMAS:  Counsel?

22              MR. LACOUR:  Yes.

23              MR. THOMAS:  Two minutes.

Page 71

1              MR. LACOUR:   Thank you.

2              Second, he suggests that he is

3        similarly situated to inmates who have

4        elected nitrogen hypoxia, but as he admits

5        in his second amended complaint, he did

6        not elect nitrogen hypoxia, so he is not

7        similarly situated to those inmates.  And

8        it makes to -- that we would treat someone

9        who not elected nitrogen hypoxia

10       differently from someone who did,

11       otherwise, we would be inviting other

12       inmates who opted not to elected nitrogen

13       hypoxia to see what Mr. Smith has with

14       hopes of -- through undoing their failure

15       to elect and them being -- having their

16       execution delayed much longer than

17       otherwise would be.  So that's a rational

18       basis right there, and that's enough.

19             And then returning once more to this

20       notion that his successive petition might

21       be literally successive but not really

22       successive because it has some merit or it

23       arose later and it's based on new facts, I

Page 72

1          would think that would doom his claim

2          under the Supreme Court inquest decision

3          from 2008, which recognizes that any

4          inquiry that buys nature involves

5          discretion decision making based on

6          subjective individualized assessments

7          cannot be subjected to an equal protection

8          class of one claim, yet Smith would have

9          the Commissioner or the Warden conduct an

10         inquiry into the merits of someone's

11         second or successive petition to see

12         whether or not it's one that -- that

13         should delay his execution further.  That

14         is a subjective sort of inquiry, and

15         inquest forecloses that kind of approach.

16              So if there are no further

17         questions --

18              JUDGE GRANT:  I have actually one

19         question on the Rulapa issue.  Why not

20         offer, as a part of the protocol, a

21         reasonable amount of time for an audible

22         religious exercise before the mask is

23         placed on an inmate's face?

1           MR. LACOUR:  Well, Your Honor, the

2       evidence is that he can audibly pray with

3       the mask on, so we think that bears no

4       burden on his religious exercise or

5       desires to audibly pray.

6           And then, of course, the District

7       Court found that through any fear that --

8       any fear was going to be a problem --

9       like, any fear of causing persistent

10      vegetative state or stroke if he were to

11      audibly pray by dislodging the mask merely

12      through speaking was purely speculative,

13      and speculative fears cannot amount to

14      burdens.  And so we think that the -- that

15      fact finding by the District Court was

16      obviously correct and certainly not

17      clearly erroneous.

18          And, I mean, finally, I would just

19      like to close that often coverage of these

20      last-minute challenges to executions, if

21      these proceed on the premise that the only

22      victim in this case is the man who

23      violently ended the life of his innocent

Page 74

1     victim.  But I would just like to remind

2     the Court, it's been 35 years since

3     Kenneth Smith brutally murdered

4     Liz Sennett, 35 years her family's had to

5     wait for justice.  And it was in 2022 that

6     Mr. Smith first assured Federal Courts

7     that he had a readily available and

8     feasible way to face his justly earned

9     sentence, via nitrogen hypoxia.  It's time

10    he receive the sentence that he's asked

11    for and that he has earned.  And for that

12    reason, we think that the clearly and the

13    well-supported factual findings of the

14    District Court in that Court's of all

15    reason in judgment should be affirmed.

16          JUDGE WILSON:  All right.  Thank you,

17    Mr. LaCour.

18          Mr. Grass, you've reserved some time

19    for rebuttal.

20          MR. GRASS:  Thank you, Your Honor,

21    just a few points very quickly.

22          On the issue of asphyxiation, we will

23    be supplementing the record.  Because last

Page 75

1          night Mr. informed -- Mr. Smith informed

2          us that he has been vomiting for about a

3          week, and yesterday, he saw the medical

4          staff at Holman who prescribed Zofran for

5          his symptoms.  This is consistent with

6          what Dr. Porterfield testify, that as he

7          gets closer to his next execution and

8          continues to reexperience what happened to

9          him in November, that his symptoms are

10         likely to worsen.  And ADOC -- or the

11         department will, in fact, do nothing once

12         nitrogen os flowing into the mask to

13         alleviate anything to -- due to vomiting

14         into the mask and that itself, is cruel

15         and unusual punishment.

16              With respect to --

17              JUDGE GRANT:  Mr. Grass, is it --

18         does the State --

19              JUDGE WILSON:  Let me just ask you --

20         let me just ask you quickly about that.

21         Is there a different risk of vomiting if

22         the execution takes place with a hood

23         instead of a mask?

Page 76

```
 1              MR. GRASS:  Your Honor, there's not a
 2         different risk of vomiting.  There's a
 3         different risk of the potential effects of
 4         the vomiting if the evidence takes place
 5         with a hood instead of a mask because the
 6         vomit can leave the hood, as opposed to a
 7         mask, if you're lying prone, there's
 8         really no place else for it to go but back
 9         into your mouth and potentially into your
10         airways.  And so that's the difference in
11         terms of vomiting between and using a mask
12         and a hood.
13              With respect to --
14              JUDGE GRANT:  Mr. Grass, was it --
15         was it -- Mr. Grass, excuse me.  Did you
16         make the State aware of this new
17         information prior to sharing it with us
18         right now?
19              MR. GRASS:  Your Honor, we just
20         learned about this last night.  This
21         morning my cocounsel emailed the Attorney
22         General, or I should say, Assistant
23         Attorney General, who has been primarily
```

Page 77

```
 1        representing the defendants in this case,

 2        informed him about this, and we asked for

 3        the medical records of Mr. Smith's visit

 4        with the medical staff at Holman

 5        yesterday.

 6             JUDGE GRANT:  And that -- so that

 7        information -- that was shared earlier

 8        today prior to the argument?

 9             MR. GRASS:  It was shared earlier

10        today with the Assistant Attorney General

11        who is primarily responsible for

12        representing the defendants in the

13        underlying 1983 action.

14             The -- I also wanted to address the

15        reference to the Ogden study.  If you look

16        at the Ogden study, there was one of the

17        people there -- one of the subjects of the

18        study who it took 40 minutes to become

19        unconscious and die.  And Ogden, in fact,

20        as a conclusion of the study, says that

21        people should not be using masks to -- in

22        the context of assisted suicide because

23        they don't reliably create airtight seals.
```

1    So I don't think the Ogden study supports

2    the defendant's view of what's going to

3    happen here.

4         Finally, there was a lot of

5    discussion about Dr. Nitschke.  I commend

6    the panel to Dr. Nitschke's declarations.

7    There are two in evidence and to his

8    testimony at the hearing and to his

9    deposition.  There's a difference between

10   offering the opinion that nitrogen can, in

11   fact, end life and can do so in a

12   relatively peaceful manner and suggesting

13   that it will do in the context of the

14   protocol that the department is intending

15   to use.

16        MR. THOMAS:  Counsel, your time has

17   expired.

18        MR. GRASS:  Thank you.

19        JUDGE WILSON:  All right.  Well,

20   thank you, counsel.  We appreciate you

21   making yourselves available for this

22   argument this afternoon.  And we will take

23   the matter under advisement, and so the

Page 79

1        Court is now adjourned.

2                    (AUDIO CONCLUDED)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 80

1                C E R T I F I C A T E

2

3    STATE OF ALABAMA:

4

5            I do hereby certify that the above

6    proceedings were taken down in stenotype and

7    transcribed by me using computer-aided

8    transcription from an audio recording and that

9    the foregoing is a true and accurate transcript

10   of said proceedings to the best of my ability

11   as therein set out.

12           I do further certify that I am

13   neither of kin nor of counsel to any of the

14   parties to said cause, nor in any way

15   interested in the results thereof.

16           I further certify that I am duly

17   licensed by the Alabama Board of Court

18   Reporting as a Certified Court Reporter.

19           So certified this 5th day of February

20   2024.

21

22   _____

          Angela D. Richey, ACCR #281

23        Certified Court Reporter

**[1.4 - airtight]**                                      Page 81

**1**

**1.4**   57:7 59:17
**11th**   2:3 15:6
**1257**   64:22
**127**   45:2 52:9
**14.1.**   42:14
**14th**   4:4,19
**15**   56:1 57:6
**18432**   80:22
**1947**   3:11
**1983**   66:11,15
   67:11 77:13

**2**

**20**   4:10
**2008**   72:3
**2022**   41:22 74:5
**2023**   19:15
**2024**   80:20
**22**   42:16
**25th**   19:15 20:2
   20:11 21:8
**28**   64:22
**281**   1:22 80:22

**3**

**3**   5:5
**30**   39:10 52:18
**30th**   70:7
**32**   69:1,14,15
**32.2**   69:19
**35**   74:2,4

**4**

**40**   77:18
**41**   46:8

**42**   46:9

**5**

**5th**   80:19

**6**

**62-101**   43:10
**62-112**   42:16
**62-3**   55:3
**62-53**   42:13
   51:12 58:23
**62-60**   45:6
**62-71**   49:15
**62-73**   60:19
**62-79**   49:19

**7**

**70**   55:18,22
   56:17,22,23
   57:3

**8**

**8**   64:4 67:12,16
**8th**   19:23

**9**

**90**   56:14,17 57:2
   57:4

**a**

**abandoned**
   38:10 58:8
**ability**   80:10
**able**   18:12 22:18
   35:10 40:11
   49:16 51:3
   52:20 54:18
   60:21

**above**   80:5
**absent**   7:1 15:8
**abuse**   61:10
**abused**   4:21
**accompanies**
   24:3
**accomplish**
   39:21
**accomplishing**
   3:21 4:15 20:19
**accr**   1:22 80:22
**accurate**   80:9
**action**   11:13
   13:19 77:13
**actions**   65:19
**actually**   34:15
   58:5 66:16
   72:18
**add**   49:10
**addition**   27:3,20
   35:17 67:17
**address**   23:5
   27:5 77:14
**addressability**
   8:5
**addressed**   7:23
   27:6
**addressing**   19:7
   54:12
**adjourned**   79:1
**adjust**   36:2
**adjusted**   46:7
   50:13
**admits**   71:4

**adoc**   75:10
**adopted**   41:18
**adoption**   20:10
**advice**   30:21
**advise**   2:17,19
   30:16
**advised**   40:20
**advisement**
   78:23
**adviser**   35:20
   40:12,20,23
   41:2,4
**advises**   30:20
**advocate**   42:5
**affect**   28:10
**affirm**   46:11
**affirmed**   74:15
**afternoon**   2:6
   3:4 4:2 78:22
**agency**   50:2
**ago**   58:18
**agree**   55:21
   60:22 63:6
**ahead**   7:19 8:15
   54:6,6,7
**aided**   80:7
**air**   25:8,11
   28:11,12 29:18
   29:22 30:5 45:1
   45:10,10 49:1
   52:7 56:3,6 57:8
   57:9
**airflow**   54:11
**airtight**   23:15
   26:12 34:9,13

34:16 39:8,13
43:17 44:3,5,11
48:1 52:14,23
58:16 77:23
**airway** 33:22
**airways** 76:10
**alabama** 1:7
2:11 3:5 7:9,10
12:15,18 13:7
13:22 15:17
16:15,20 17:1,3
17:11,16 18:19
41:18 43:4
45:22 64:3,4,14
64:21 65:2
66:23 69:18
70:5 80:3,17
**allegation** 10:3
21:2
**alleged** 9:21
10:9 11:7,17
**alleging** 8:23
**alleviate** 75:13
**allow** 44:8,9
**allowing** 69:3
**alluded** 47:13
**alternative**
31:18 32:14
36:19 38:3
40:14 42:3 44:6
52:13 58:6,12
59:3
**alternatives** 4:1
21:16 44:22

**amended** 71:5
**amendment** 4:4
4:13,20,23
15:23 19:5,7
20:15 48:7,8,15
48:18 63:14
**amount** 23:16
25:16 30:22
31:12 43:23
47:15,19 62:6
72:21 73:13
**analogous** 6:16
**analysis** 13:2,3
**anesthesiologist**
50:17,19
**angela** 1:21
80:22
**announced** 43:4
**answer** 56:22
**antonini** 35:3
39:7 45:5 52:18
56:15 57:3
**antonini's** 39:23
**ap1** 12:19
**apart** 40:13
**apologize** 40:6
**apparently** 16:1
**appeal** 3:17
5:20 10:14
11:21 13:14
66:8,12 67:21
70:17
**appeals** 2:2 4:10
47:6 69:6

**appellate** 2:15
12:19
**applies** 10:11
15:10
**apply** 14:2,11
15:3 16:4,5,13
18:23 45:21
**applying** 14:23
15:7
**appreciate** 38:1
78:20
**approach** 57:19
70:19 72:15
**appropriate**
6:14 13:17,20
17:22 32:5 50:4
64:5,9,11,18
65:9 67:18,20
**approval** 50:3
**approved** 50:1
**area** 25:1
**argue** 11:3
17:15
**arguing** 44:5
**argument** 2:9
2:20,22 3:2 14:5
14:13 15:16
21:23 22:5
29:11 30:14,15
34:9,16,18
40:11 64:15
65:18 67:14
77:8 78:22
**arising** 21:13
70:1

**arose** 71:23
**article** 5:4
**aside** 17:7,8
**asked** 16:14,18
35:19,19 58:19
68:9 74:10 77:2
**askew** 35:2
**asking** 16:23
41:22 68:7
**asphyxiation**
74:22
**assert** 9:9
**asserted** 6:11
9:14
**asserting** 6:7
**assertion** 32:2,6
**asserts** 69:2
**assessments**
72:6
**assistance** 10:4
10:10 53:9
**assistant** 27:12
27:17 30:9
51:10 76:22
77:10
**assisted** 33:8
77:22
**assisting** 42:20
42:22
**assume** 40:9
**assumes** 40:1
**assumption**
30:11
**assured** 74:6

**attempt** 3:6,9,13
  3:18 11:15
**attempted** 20:17
  26:1
**attempts** 14:18
**attorney** 7:18
  8:9,11 12:7,13
  27:12,18 30:9
  76:21,23 77:10
**audible** 72:21
**audibly** 73:2,5
  73:11
**audio** 1:9,21
  79:2 80:8
**august** 10:23
  11:6 12:3,5
  19:15 20:11
  21:8
**authority** 10:23
  11:5 19:20
**authorization**
  12:18 15:19
**authorize** 70:9
**authorizing**
  64:6 67:19
**available** 4:1
  21:4,15 31:17
  32:15 43:5 52:2
  74:7 78:21
**avoid** 31:16
  33:10
**aware** 3:10
  57:22 58:1,4
  67:23 76:16

**b**

**b** 69:19
**back** 8:21 13:5
  33:20 34:6 45:1
  52:7 55:1 56:4
  60:18 76:8
**bag** 44:6,10,11
  44:11,12,14
  47:23 52:6 55:6
  56:2 58:6
**balloon** 56:5,7,8
**bar** 65:3
**bare** 14:7 15:15
**based** 7:3 14:6
  46:10 67:16
  71:23 72:5
**basically** 14:6
  29:20 39:7 57:1
**basis** 14:14 15:8
  16:5 20:7 71:18
**basophil** 61:8
**batson** 66:5,10
**bears** 73:3
**begs** 39:11
**begun** 61:18,18
  62:2,11
**behalf** 41:12,17
**believe** 7:11
  15:21 51:21
  53:2 54:15
**benefit** 5:6
**best** 80:10
**better** 32:7
  36:19 50:13

**beyond** 68:1
**bias** 65:8
**bit** 35:11 53:15
**blow** 56:4
**blue** 69:10
**blueprint** 57:21
**board** 80:17
**boards** 48:19
**bound** 33:21,21
**breaks** 61:16
**breath** 28:9
  29:23 60:8
**breathing** 28:10
  29:18,22 30:5
**brief** 15:11 21:1
  39:14 59:12
  69:10,11
**briefed** 67:6
**briefing** 5:6
  68:2
**briefly** 6:14
  33:2 63:23
**bringing** 63:20
  68:6
**brings** 47:12
**britt** 2:8
**broadly** 67:22
**broken** 26:20
  30:18
**brought** 42:4
**brutally** 74:3
**buckalew** 57:20
  61:8
**built** 9:4

**burden** 42:1
  48:5 53:21 73:4
**burdens** 73:14
**buys** 72:4

**c**

**c** 80:1,1
**call** 51:17
**campbell** 14:7
**carried** 22:3
**carry** 7:1 12:21
  53:8 57:15 64:7
  64:18
**carrying** 6:3
  8:12 22:21
**cascade** 63:10
**case** 6:15 11:10
  17:15,20 26:9
  38:8 53:5 54:1
  63:20 68:3
  73:22 77:1
**cases** 67:23
  69:10
**causal** 8:17 9:5
**causally** 9:13
**cause** 22:4
  23:17 39:1
  40:17 47:10
  80:14
**causes** 40:19
**causing** 73:9
**certain** 23:6
  24:13,20 57:18
**certainly** 41:1
  43:20 59:10,17
  61:9 63:1 73:16

**certified** 80:18
80:19,23
**certify** 80:5,12
80:16
**certiorari** 18:6
18:8,11
**challenge** 5:12
20:4 58:9 64:20
**challenged** 9:1
10:19 65:15
**challenges** 21:5
69:22 73:20
**challenging**
3:17 11:14
37:23 41:23
70:1
**chamber** 31:21
32:12 34:23
35:21 41:2,7
**change** 20:16
**characteristics**
24:14
**charles** 2:7
**chin** 46:23
**choke** 33:12
62:20,23
**chose** 7:2 22:9
**chosen** 41:21
**circuit** 2:3 13:17
15:6
**circular** 39:6
**circumstances**
3:8 15:10 16:12
28:7

**citation** 59:13
**cite** 53:4 54:17
69:9
**cited** 15:11
**citing** 57:2
**claim** 4:5,12,13
4:20,23 5:4 9:9
10:2 14:18 16:1
17:17,17 18:12
19:5,8 48:7,7,9
59:23 63:17
65:4 66:6,7,10
66:16,16,18
67:1,4 68:5,21
72:1,8
**claiming** 39:22
**claims** 4:3 6:10
15:1
**class** 72:8
**clause** 63:23
64:13
**cleaned** 61:23
**clear** 14:21 17:2
17:4 20:22
35:22 48:9
51:14 67:15
**cleared** 61:21
61:23
**clearly** 22:23
27:1,5 61:9
73:17 74:12
**client** 31:11
**close** 43:9 73:19
**closed** 31:20
32:12 40:8 41:2

41:7
**closer** 75:7
**cocounsel** 76:21
**collapse** 30:1
49:17
**come** 45:1,14
52:7 53:21
**comes** 51:10
59:4 60:15
**coming** 29:4,8
29:19 30:5
38:17 50:15
56:3
**commend** 78:5
**comments** 2:23
**commissioner**
1:7 2:11,16 5:13
8:6 12:8,12,20
41:12 48:11
51:20 61:14
64:6 65:7 72:9
**commissioner's**
12:16
**commit** 42:8
**committed** 4:18
**communicate**
41:5
**compel** 20:13
**competent** 67:8
**complaint** 71:5
**completely**
34:21
**computer** 80:7
**conception** 7:3

**concern** 16:11
22:17 54:3
**concerns** 36:15
45:17
**conclude** 34:15
**concluded**
64:17 79:2
**conclusion**
77:20
**concur** 16:9
**condemned**
4:10 26:21 41:5
41:20
**conditions**
27:20,22
**conduct** 5:12
9:11,12 10:20
10:22 11:4
65:15 72:9
**conducted**
49:12
**conflated** 6:6
**confusion** 14:22
**connected** 9:11
9:13
**connection** 6:9
9:6
**consciousness**
42:12
**consider** 67:4
**considered**
17:10
**consisted** 27:10
**consistent** 15:14
75:5

**constitute** 4:16
**constitution**
    17:19 22:15
**constitutionali...**
    3:18 9:2,16
**constitutionally**
    9:15
**contaminated**
    25:1
**contempt** 4:6
**contended** 9:3
**contested** 5:9
**context** 19:12
    33:8 38:10
    77:22 78:13
**continue** 26:7
**continues** 75:8
**contrary** 24:1
**contrast** 19:15
**conventional**
    69:6
**conviction** 3:17
    5:21
**cooperation**
    45:20 51:9
**copy** 19:21 21:9
    54:16
**correct** 8:19
    22:11 35:15
    40:22 57:23
    65:12 73:16
**correctional**
    2:13
**corrections** 1:7
    2:12 3:6 12:21

34:22 36:2,5
    46:1
**correctly** 11:3
    59:22
**counsel** 2:17
    10:5 12:7 21:21
    24:8,10 26:4
    70:21 78:16,20
    80:13
**countless** 42:7
**country** 63:16
**couple** 69:9
**course** 18:13
    45:23 46:13
    51:1 68:22 73:6
**court** 1:22 2:2,5
    4:18 5:5,17 6:13
    7:2,10,20 8:1,13
    9:7 11:2 12:15
    13:1,7,17,21,22
    14:3,4,8,19,20
    15:12,16,17
    16:2,20 17:11
    17:16,20,21,23
    18:9,19 20:12
    22:12,19 23:19
    26:17,18 27:4,7
    27:12 34:14
    41:16 46:11,12
    47:4,6 48:16,16
    54:21,21 59:22
    61:9 63:9,18
    64:3,4,8,14,21
    65:1,2,12 66:9
    66:14,22,23

67:3,7,17,20
    68:7,8,11 69:11
    70:15 72:2 73:7
    73:15 74:2,14
    79:1 80:17,18
    80:23
**court's** 5:3,9,15
    6:5 13:18 16:15
    17:1,3 19:8 23:3
    39:5 46:20 66:9
    74:14
**courtroom** 2:18
**courts** 3:5 14:17
    14:23 15:6 16:2
    48:17 66:21
    68:10 74:6
**cover** 18:4
**coverage** 73:19
**covering** 49:4
**cpap** 58:8
**create** 43:17
    45:12 47:16,20
    77:23
**criminal** 69:16
    69:18
**criminally**
    42:22
**criteria** 61:13
**critical** 23:13
**critics** 43:6
**cruel** 4:16 22:2
    22:4,16,22
    75:14
**cutting** 48:23
    49:1,4

**d**

**d** 1:22 64:4
    67:16 80:22
**danger** 23:22
**dangerous** 44:1
**dangerously**
    24:16
**data** 25:21 26:2
    38:19
**date** 20:21
**day** 19:16,19
    61:4,4 80:19
**days** 3:5
**dead** 39:10
    53:14
**deal** 51:8
**dealing** 47:7
    63:9
**death** 7:9 12:22
    13:11 17:5,8
    18:6,16 19:1
    23:17 25:18
    42:12,23 43:3
    57:12 63:15
    64:7,16
**decided** 12:9
**decision** 6:12
    10:22 11:5
    12:12 13:9 14:7
    14:15 15:12,14
    16:15 21:14
    46:21 64:21
    65:8,11 72:2,5
**decisions** 18:19

declaration
45:6,18 49:15
51:11 58:23
59:11
declarations
32:23 78:6
declares 49:16
declaring 49:20
deep 29:23
defendant's
5:12 10:21
20:23 35:5 78:2
defendants 6:1
6:22 8:2,6 10:14
10:19 11:3,4,11
11:12,23 12:4
20:9 23:18,20
33:3 41:17 77:1
77:12
defer 47:7
deference 48:20
deficient 23:8
defined 5:17
defines 69:19
definitely 16:8
definitively
53:23
delay 70:12
72:13
delayed 71:16
delaying 21:19
deliver 21:14
delivering 31:19
33:6 36:20

demonstrate 6:9
demonstrations
56:13
denial 66:9
denied 4:21
denying 18:20
61:10
department 1:7
2:11 3:6,12,15
4:8,13 5:13
11:19 12:1,20
19:13 25:2 30:3
35:18 39:20
46:1 75:11
78:14
department's
3:9,20 11:14
20:18 21:6,13
40:18
deposed 33:3
deposition
43:11 46:8
52:16,18 78:9
deprive 14:16
deputy 2:18
derives 6:11
deserved 20:20
desires 73:5
despite 42:23
48:3
detained 10:7
detect 35:6,8
detention 9:21
10:1

determination
5:10,15 7:12
12:17 19:9
determine 34:19
develop 19:14
development
17:14 67:15
die 39:18 77:19
difference 44:14
76:10 78:9
different 18:21
28:8 29:3,11
31:19 34:12
36:20 50:5,6,6
58:5 75:21 76:2
76:3
differently 4:6
71:10
difficult 6:19
directed 8:9
directly 18:15
24:1
disabused 15:5
disclosure 11:23
disconcerting
49:7
discovery 11:23
20:6,8
discrepancy
56:16
discretion 4:21
7:11,22 61:10
72:5
discuss 6:14

discussion 78:5
dislodge 26:19
30:18
dislodged 34:11
dislodging
73:11
dismiss 12:5
70:16
dismissal 5:3
dismissed 4:19
disposition
67:21
disproven 53:23
dispute 40:2
disputed 11:10
disputing 39:15
distinction
16:21
district 4:18 5:3
5:5,9,15,17 6:5
7:23 11:2 13:1
13:18 14:3,4,8
14:17 15:6,12
17:20 19:8
20:11 22:19
23:2,18 26:17
26:18 27:4,7,11
34:14 39:5
46:12,14,15,20
47:4 54:20,21
59:22 61:9 63:9
65:2,12 66:8
73:6,15 74:14
doctrine 14:2
15:3 16:4,6

**[document - execute]** Page 87

document  55:3
documentary
  42:13 43:10
  60:19
doing  19:22
  21:6
doom  66:17
  72:1
dozens  41:20
  42:15,18 44:17
  44:17 47:23
  48:3
dr  32:22 33:4
  35:3 37:3 39:7
  39:23 42:6,7,10
  43:5 44:7,15,21
  45:8,16 46:3
  47:3,22 50:9,16
  51:6 52:5,16,18
  55:6,23 56:15
  57:3,5,5 58:20
  59:11 60:11
  75:6 78:5,6
drop  57:10
drugs  62:11
due  6:12 8:21
  9:18 65:18
  75:13
duly  80:16

**e**

e  80:1,1
earlier  61:3
  77:7,9
earned  74:8,11

easily  57:16
edmund  2:15
  41:16
effect  44:16
effective  43:8
  49:18
effectively  16:19
  29:2 36:21
effects  76:3
effectuate  12:16
effort  3:13
eighth  4:13,23
  15:23 19:5,7
  20:15 48:7,8,15
  48:18 63:14
either  29:21
  31:20 45:21
  59:19 61:7
  66:14 68:14
elect  71:6,15
elected  71:4,9
  71:12
elements  5:7
emailed  76:21
empowered
  48:18
enactment  9:6
ended  73:23
enjoining  8:2
ensure  24:21
  46:2 51:4
ensures  42:11
  50:18
ensuring  20:2

entails  21:17
enter  25:1 64:5
  67:18
entered  64:15
entire  49:4
  51:23 59:23
entitled  22:14
  48:21
entrainment
  21:18
environment
  23:8 26:22
  43:22 56:7
environmental
  8:23
equal  4:4,20 5:4
  7:3,13 13:12
  16:17 63:23
  64:12 68:5,21
  72:7
equipment  24:3
erroneous  22:23
  27:1,5 73:17
error  4:19 48:9
  51:16 61:10
errors  5:1
especially  46:6
essentially
  16:14 44:8 58:8
establish  19:9
  22:20 38:23
  39:4 63:14
established
  11:18 26:23
  27:19 61:7

establishes  11:8
eugene  1:5 2:10
euthanasia
  38:10
eve  70:13
event  10:20
  33:13
events  63:10
evidence  11:8,9
  27:4,7,9 34:13
  35:13 39:4,23
  45:15 46:10
  52:1,22 53:22
  59:18 60:3,9,10
  60:17 61:19
  62:3 73:2 76:4
  78:7
exact  16:1 53:4
  54:17
exactly  8:4
  17:10 22:6 26:2
example  28:10
  34:20 58:7
  60:20
examples  30:7
except  49:3
exception  27:17
excuse  35:4 59:6
  76:15
execute  3:7,9,19
  4:9 10:23 11:5
  11:15 12:14
  19:20 48:13
  68:13

**executed** 65:10
**execution** 3:14
  4:7,15 5:20,23
  7:1,6,14 8:13
  10:13,16 11:20
  13:23 15:20
  16:16 18:20
  19:17 20:1,6,16
  21:4 22:9,14,15
  22:21 23:14,21
  28:1,17,19
  34:23 35:9
  36:17 41:19
  48:19 57:13
  61:5,15 62:1,4
  62:17,19 63:17
  64:10 67:19
  68:8,10 69:4,5,7
  70:10,12,14
  71:16 72:13
  75:7,22
**executions** 3:22
  73:20
**exercise** 72:22
  73:4
**exhausted** 3:16
  4:9,11
**exhaustion**
  66:20
**expansive** 16:10
**expedited** 20:7
**experience**
  23:10
**expert** 35:5 42:6
  50:16 60:7

**expert's** 63:5
**experts** 25:16
  38:19 45:17
  53:6
**expired** 26:5
  78:17
**explain** 23:5
  26:23 56:16
**explained** 13:3
  44:23
**explains** 9:19
  65:5
**explanation**
  17:9
**explode** 44:12
**expose** 3:22
  21:11
**exposed** 23:8
  39:16
**exposes** 23:22
**expressively**
  25:7 41:21
**extends** 38:15
**extensively** 33:5
  37:4
**external** 56:7

**f**

**f** 80:1
**face** 23:11,13
  24:7,12,15 30:1
  33:18 34:22
  43:18 46:3,23
  49:4,5,17,18
  50:11 51:8
  72:23 74:8

**faces** 50:4
**facial** 50:7
**facility** 2:13
**fact** 17:14 22:18
  26:17 27:2 38:9
  47:8 67:14
  73:15 75:11
  77:19 78:11
**factor** 50:14
**facts** 6:14,16
  23:6 40:1 71:23
**factual** 46:12
  54:22 74:13
**fail** 66:8
**failed** 20:12
  59:20
**fails** 68:21
**failure** 71:14
**fair** 25:20 46:5
  67:9
**fairly** 5:11
  10:18 39:17
**false** 48:8
**family's** 74:4
**far** 3:10
**fast** 43:8
**fear** 73:7,8,9
**fears** 73:13
**feasible** 4:1 21:3
  31:17 32:18
  37:2,10 74:8
**february** 80:19
**federal** 9:2,19
  10:2 14:19
  15:16 48:17

  50:1 68:7 74:6
**feed** 55:12
**feel** 24:7,12,15
  63:2
**feet** 35:21,22
  40:21
**feldman** 13:16
  14:2,10,16 15:3
  15:9 16:3,6,10
  66:14 67:2
  68:15
**fell** 34:21
**figure** 25:22
**file** 18:15
**filed** 12:13
  18:10,18 69:21
**filing** 70:12
**fill** 59:16
**filled** 41:3,7
**finally** 60:15
  61:1 73:18 78:4
**find** 32:20,22
  43:9 51:7,11
  55:4 65:13
**finding** 15:9
  27:1,9 39:5
  46:12 54:22
  73:15
**findings** 22:18
  26:16 47:8
  74:13
**fingertips** 54:17
**fire** 66:2
**first** 3:13 4:3
  5:16 6:20 9:4

19:18 20:5,20
21:17 25:23
48:14 54:11
59:20 69:15
74:6
**fit** 24:5 25:9
46:5 47:2 50:3
50:13,18 51:4
52:10,12,17
58:10
**five** 19:13 47:1
**fix** 35:10 36:2
**flange** 49:17
**flat** 60:18
**flaw** 6:5
**flawed** 5:16
**flexing** 50:10
**flood** 56:23 57:1
**floods** 60:6
**flow** 25:5 28:2
36:4 44:9,10,19
44:20,21,23
45:7 52:6 54:13
54:23 55:4,6,9
55:18 56:14
57:6
**flowing** 28:5,6
35:18 36:4
40:20 57:9
75:12
**following** 42:12
**followup** 31:9
**forecloses** 72:15
**foregoing** 80:9

**forehead** 46:22
**forestall** 7:14
**forever** 70:11
**forward** 7:6,8
10:13 16:16
26:3 64:10,11
**found** 14:4,12
23:4 45:9 47:3,8
56:2 59:22 73:7
**four** 53:6,12
**frame** 12:22
**friend** 47:13
58:17
**front** 13:7 53:4
64:2,8 67:7
**frying** 66:1
**full** 18:13 67:8
70:17
**fumes** 44:1
**function** 57:1
**further** 60:23
72:13,16 80:12
80:16

**g**

**gap** 44:13
**gaps** 35:7,8
52:20 53:11
**gas** 29:4,7 50:21
**gases** 44:2
**general** 7:18
8:10 12:8,13
27:12,18 30:9
76:22,23 77:10
**general's** 8:11

**gerard** 2:15
**getting** 47:16
50:21
**give** 26:7
**given** 16:16
38:21,21
**go** 7:19 8:15
16:16 26:3
33:19 34:6
43:22 54:6,6,7
55:1 56:5 59:8,9
63:5 76:8
**god** 2:4
**goes** 8:5 10:13
46:22 63:11
**going** 7:20 8:21
10:15 24:19
25:4 26:2 28:4,5
30:12 32:20,21
35:9 39:12
43:23 44:7,12
44:13 47:9,19
51:1,2 52:23
56:1,6 59:15,16
60:2 63:2,7
66:17,20 73:8
78:2
**good** 2:6 3:4
30:22 66:10
**governor** 12:23
19:23
**graham** 6:18
**grant** 2:8 6:17
7:15,18 8:14,16
13:5,15 14:13

16:7 17:6 18:1
19:2 25:13
28:14,23 29:10
29:15 31:1,4,8
31:22 36:10
37:17,19,22
38:18 40:3,5
47:13 59:5 64:1
65:17 72:18
75:17 76:14
77:6
**grass** 2:14,21
3:1,3 7:7 8:3,15
8:19 13:10 14:1
14:14 16:23
17:7 18:7 19:3,6
22:6,11 23:1
24:9,11 25:19
26:13 27:3
28:21 29:6,14
29:17 30:19
31:6,15 32:6,11
32:21 33:14
34:1,2,17 36:18
37:7,13 38:7
39:3 40:16 41:9
41:14 52:14
57:23 74:18,20
75:17 76:1,14
76:15,19 77:9
78:18
**ground** 13:11
**guess** 7:15 16:7
22:17 29:12

**guilty** 70:2
**gulping** 28:11
**gurney** 33:12
  60:21 62:10

**h**

**habeas** 9:19
  10:2 18:13 66:2
  66:4,16 68:15
  70:8
**hair** 50:7
**hamm** 12:8,12
  61:14
**hand** 46:2,19
  50:23 51:1
**happen** 26:2
  35:16 60:8 78:3
**happened** 36:3
  68:1,2 75:8
**happens** 35:10
**hard** 60:1
**harm** 3:23
  21:12 45:13
  47:17,21 53:18
**head** 26:21 44:6
  60:21
**hear** 2:1,1,1
  31:6 41:11
**hearing** 33:3
  45:2,3 52:8,9
  78:8
**heavily** 19:21
**heavy** 42:1
**held** 9:8 46:19
  51:18

**helped** 42:7
**high** 44:20,23
  48:5 50:20 52:6
  53:20
**higher** 44:21
  45:8 55:5
**highly** 26:18
**hold** 28:9 30:22
**holding** 5:10
  50:23 51:22
  66:3
**holds** 57:7
**holman** 2:12
  5:14 75:4 77:4
**holst** 49:14
**honor** 3:3 7:7
  8:21 14:1,8,12
  14:21 18:7 19:6
  23:1 25:19
  26:13 29:17
  30:20 36:18
  38:7 39:3 40:22
  41:14 43:19
  46:18 48:14
  54:16 56:20
  57:17 62:21
  65:21 73:1
  74:20 76:1,19
**honor's** 14:6,15
  15:4,14
**honorable** 2:5
**hood** 31:20
  32:10,11,12
  33:5,10,14 37:1
  38:4,12,13,15

52:21 57:14,19
58:12,16,20,21
59:2,8 75:22
76:5,6,12
**hopeful** 35:11
**hopes** 71:14
**hose** 29:21
**humane** 41:19
**hypoxia** 3:13,22
  4:16 11:20
  12:10 19:14,18
  20:5,17 21:3
  22:1,22 41:21
  41:23 42:5,8,10
  43:7 45:11 48:4
  53:8 57:14 71:4
  71:6,9,13 74:9

**i**

**idea** 59:5,6
**identified** 36:6
**identifying** 39:2
**ii** 58:7
**immediately**
  42:11
**imminent** 5:19
  10:12
**implemented**
  32:19 37:6,8,11
  37:12,13
**implicated** 11:4
**importance**
  16:9 25:9
**important** 34:7
**impose** 10:16

**impossible**
  28:18 45:1 52:7
**improper** 68:4
**inadequate**
  15:22
**incline** 60:19,22
**includes** 28:12
**indicate** 38:3
**indicated** 39:14
**indicating** 49:18
**indication** 53:16
**individual** 24:6
**individualized**
  72:6
**individuals** 24:7
  24:13
**ineffective** 10:4
  10:9
**inextricably**
  15:2
**information**
  12:1 20:10,13
  76:17 77:7
**informed** 19:16
  19:18 75:1,1
  77:2
**inject** 62:11
**injection** 11:16
  12:10 62:9
**injunction** 4:22
  8:9 45:3 61:11
**injured** 65:19
**injuries** 5:8
**injury** 5:11,17
  5:19,22 6:6,10

8:1,8,11,23 9:10
10:6,12,16,17
10:18 23:17
**inmate** 10:3
33:11,18 39:9
41:6,6 49:7
70:11
**inmate's** 12:21
26:21 33:20,21
34:22 62:7 64:7
72:23
**inmates** 9:19
41:20 60:17
62:9 71:3,7,12
**innocent** 73:23
**inquest** 72:2,15
**inquiry** 72:4,10
72:14
**inspect** 46:17
**instantaneous**
63:5
**insufficient**
27:15
**intended** 14:16
30:12
**intending** 78:14
**intention** 11:15
25:2 26:11
**interested** 80:15
**interplay** 40:15
**interrupt** 6:18
28:15
**intertwined**
15:2

**intervene** 45:21
**introduce** 38:14
**introduced** 62:7
**inviting** 71:11
**involves** 72:4
**involving** 29:20
**issuance** 13:10
18:23
**issue** 13:6 15:21
18:11 23:2 27:6
33:16 39:19,19
40:18 51:8 64:2
64:8 67:5,7
72:19 74:22
**issued** 7:10 17:5
38:20
**issues** 19:11
63:23 67:5
**ivey** 19:23

**j**

**jailer** 10:6,8
66:3,5,11
**jailers** 9:21,22
**january** 20:2
**jill** 2:8 31:9 54:5
54:7
**joined** 2:7
**jr** 2:16
**judge** 2:6,7,8,8
6:17,18 7:15,17
7:18,19 8:4,14
8:16 13:5,15
14:13 16:7 17:6
18:1 19:2,4
21:21,22 22:7,8

22:12 25:13
26:6,14 28:14
28:23 29:10,15
30:14,23 31:1,3
31:4,8,22 32:9
32:13 33:10,23
34:3,3,4,5,6,17
36:8,10,10,12
37:5,9,16,17,19
37:19,21,22
38:18 40:3,4,5,7
41:8,15 43:13
43:14,15,15
46:14,14,15
47:13 48:10
51:15,17 53:19
54:2,4,5,6,8,20
55:8,15,21
56:11 57:13
58:2,18 59:5
61:12 62:13,16
63:21 64:1
65:17 72:18
74:16 75:17,19
76:14 77:6
78:19
**judgment** 13:18
69:22 70:1
74:15
**judicial** 69:12
**jumping** 66:1
**jurisdiction**
67:8
**jurisdictional**
65:3

**justice** 74:5
**justly** 74:8

**k**

**keep** 14:9 41:10
42:18 45:9 52:4
56:3
**kenneth** 1:5
2:10 74:3
**kenny** 3:7
**kicks** 67:2
**kin** 80:13
**kind** 29:23
30:10 72:15
**knew** 28:1
**know** 6:18 18:3
26:15 28:4,6
30:2,6,10 32:16
47:22
**known** 41:19
**knows** 29:3

**l**

**lack** 5:4 9:15
65:13,14
**lackey** 41:15
**lacour** 41:11,13
41:16 43:13,14
43:19 46:18
48:14 51:16,21
53:20 54:4,15
55:1,10,20,22
56:19 57:17
58:4 59:10
61:16 62:14,21
63:22 65:21

70:22 71:1 73:1
74:17
**laid**   60:17
**large**   35:7 46:21
62:6
**larger**   38:13
**lasted**   53:15
**late**   21:10
**law**   2:4 6:7
14:23 70:5
**laying**   33:12
**lead**   25:17
**leading**   57:11
**leak**   23:21
**leakage**   23:12
24:15 25:17
38:5,11
**learned**   76:20
**leave**   76:6
**lecour**   2:15
**left**   2:19 6:20
23:9
**legal**   4:18 6:23
**legislation**   9:7
9:17
**lethal**   11:16
12:10 62:9
**level**   48:20
**levels**   38:21
47:10 50:7
57:10
**liable**   42:22
**licensed**   80:17
**life**   33:7 73:23
78:11

**lift**   60:21
**light**   7:9
**likelihood**   19:10
47:18,21 53:18
60:2
**likely**   28:8
30:17 39:1 42:2
60:4 75:10
**likewise**   52:19
**limit**   34:18
**limited**   20:6,8
**liter**   57:8 59:17
**literally**   69:1
71:21
**liters**   55:18,22
56:1,14,17,17
56:23 57:6,7
**litigate**   13:6
14:19 67:9
**litigated**   14:20
64:2
**litigation**   11:22
12:6 17:13 21:2
**little**   53:15
**live**   33:2
**lives**   37:14 48:4
**liz**   74:4
**lock**   47:2
**logical**   49:8,9
**long**   38:20
39:23
**longer**   53:16
71:16
**look**   26:8 45:5
49:14,19 53:2

55:2,2 60:16
68:17 77:15
**looked**   53:6
**looking**   26:15
26:16
**loose**   46:6 50:10
50:12 52:10
**loosen**   50:11
**loss**   42:11
**lost**   67:10
**lot**   18:4 63:19
78:4
**lying**   76:7

### m

**made**   5:5 14:21
15:15,17 16:1
30:2 58:17 64:1
**maintains**   46:2
**make**   7:12
20:22 50:11,20
54:21,22 67:20
76:16
**makes**   44:23
52:6 70:17 71:8
**making**   13:8
29:12 54:10
65:8 72:5 78:21
**malfunctioning**
36:16
**man**   41:20
73:22
**manner**   22:3
23:22 78:12
**manual**   24:2
25:7 43:16

45:22
**manufacturer**
24:1,4,18 30:20
43:21
**manufacturer's**
30:21
**mask**   21:14,17
23:16 24:19,21
25:6 26:12,14
26:19 27:13,16
27:21 28:2,5,6
28:12 29:19,23
30:5,17 32:2,4
34:8,10,12,15
34:21 35:2,22
36:3,16,23 38:6
39:8,12 40:21
43:16,21 44:18
45:22 46:2,4,17
46:21 48:13
49:3,3,23 50:23
51:9,18 53:7
54:13 55:18
57:7,9,15 58:7,9
58:10 59:9,17
60:6 61:20,22
62:17 72:22
73:3,11 75:12
75:14,23 76:5,7
76:11
**masks**   23:11,14
23:19 30:2 32:8
38:9,11 45:18
77:21

**matter** 7:21
14:17,19 32:4
63:7 78:23
**matters** 53:1
**meal** 61:3
**mean** 28:23
29:12 36:22
47:3 60:9 62:8
68:6 69:1,10
73:18
**means** 17:3
36:20
**mechanism**
31:20 43:1
**medical** 75:3
77:3,4
**meet** 58:3
**meets** 57:20
**merely** 66:3
73:11
**merit** 71:22
**merits** 19:10
68:20,22 72:10
**meters** 56:22
**method** 3:21
21:4 22:9 28:19
40:14 41:19
43:2,4 44:14,18
48:1 52:6,21
55:7 56:2 63:17
**methods** 48:20
**middle** 65:1
**mind** 14:9 42:18
52:4

**minimized** 61:2
**minute** 53:13
55:18,22 56:2
56:14,18,23
57:6,9 73:20
**minutes** 2:19,21
24:10 26:7
39:11 41:9
53:15 63:8
70:23 77:18
**mirror** 27:22
**misrepresenting**
43:6
**mistake** 58:17
**mitigate** 60:23
**mojo** 58:7
**moment** 13:6
49:2 54:19
58:18
**moot** 10:14
11:21
**morning** 76:21
**motion** 4:22
12:14 15:19
18:20 20:12
**mouth** 33:20
38:17 76:9
**move** 7:5,8
10:23 11:5 18:3
19:4 64:10 70:9
**moved** 12:3,4
**movement**
34:11
**moving** 19:19
69:5

**murdered** 74:3

**n**

**nance** 57:20
**nature** 68:4
72:4
**nausea** 60:11
**nauseous** 44:1
60:9
**near** 38:17
**necessarily**
18:23 35:7
38:16 44:13
60:10 64:15
**necessary** 51:4
52:3
**neck** 38:15
52:11
**neckband** 38:6
**need** 6:8 24:19
**needed** 27:19
57:21
**needs** 50:3
**negative** 24:20
24:23 30:15
36:14 48:12,23
49:12,22
**neither** 80:13
**never** 14:11
20:17 42:17
43:1 44:2 48:2
68:9
**nevertheless** 9:8
10:5
**new** 71:23 76:16

**newly** 20:4
**night** 52:17 75:1
76:20
**nine** 58:23
**niosh** 50:1
**nitrogen** 3:13
3:22 4:7,16
11:20 12:10
19:14,17 20:5
20:16 21:3,14
21:23 22:22
25:5 28:2,4 29:4
29:7,18,22
31:19 33:6
35:17 36:4,21
38:14,22 39:16
40:19 41:3,7,21
41:23 42:5,8,15
43:7 44:10
45:11 48:4 53:8
54:13 55:17
57:14 60:5
61:17,18 62:2,7
71:4,6,9,12 74:9
75:12 78:10
**nitschke** 32:22
33:4 37:3 42:6,7
42:10 43:5 44:7
44:15,21 45:2,8
45:16 46:3 47:3
47:22 50:9 51:6
52:5,16 55:23
57:5 58:20 78:5
**nitschke's** 33:23
55:6 57:5 59:11

78:6

**normally** 30:4

**nose** 38:17

**notice** 69:12

**notion** 35:9
71:20

**notwithstanding**
36:1

**november** 19:23
21:10 75:9

**nozzle** 3:21

**nuclear** 8:22

**nullified** 63:15

**o**

**objected** 13:10

**obligated** 7:5,8

**observation**
34:20 35:6,15
47:5

**observations**
27:11

**observed** 42:15
42:17 43:1

**observing** 34:9

**obtain** 12:17

**obtained** 23:20

**obviously** 16:8
28:18 34:22
35:2 69:7,11
73:16

**occurred** 3:11

**oddity** 68:4

**offer** 72:20

**offered** 29:8

**offering** 30:8
78:10

**office** 51:19

**officers** 34:23
36:2,5 46:1

**officials** 6:3
10:15 35:9 51:2

**ogden** 53:2,3
77:15,16,19
78:1

**oh** 7:20 54:5,8

**okay** 8:14 22:8
30:23 36:8
37:16 40:3
54:20 62:13

**once** 3:11 35:17
40:19 71:19
75:11

**ones** 8:7

**onset** 63:3

**ooo** 1:23

**open** 2:3 18:16

**opinion** 14:21
15:5,5 78:10

**opportunity**
17:14,15 46:4
67:9,14

**opposed** 76:6

**opposition**
15:18

**opted** 71:12

**option** 40:9
64:22

**opts** 61:3

**oral** 2:9

**orally** 17:15

**order** 7:1 13:22
16:20 17:2,3
22:19 50:2 64:6
64:16,17 67:18

**orders** 67:21

**os** 75:12

**outside** 56:8

**overseers** 48:19

**overturn** 16:14

**own** 45:15,16
50:15 60:7

**oxygen** 21:18
23:8,15 25:5,16
28:13 38:5,16
38:22 44:8,9,19
47:9,15,19 49:1
49:5 52:19
57:10

**p**

**page** 42:16 45:2
51:12 52:8,9,17
58:23

**pages** 46:8

**pain** 42:3,3,17
43:2 48:3 53:17
63:3

**painless** 22:14
41:18 44:17

**pan** 66:1

**panel** 78:6

**paragraph**
42:14 45:6
49:15 55:4

**part** 72:20

**particular** 32:2
32:4 49:10

**particularly**
63:1

**parties** 5:7
11:12 80:14

**party** 14:18
42:20,21 45:20
51:10

**past** 18:18

**patient** 50:22

**peaceful** 43:3
78:12

**penal** 49:8,8

**penalty** 63:15

**pending** 5:21
10:14 11:13,21
12:5 13:14 69:9

**penetrate** 23:16
25:6

**people** 4:7,11
27:21 37:14
42:7,19 44:16
47:23 48:3
49:22 50:5
52:23 53:6,12
69:7 77:17,21

**perfectly** 44:3

**perform** 24:23
48:12

**performed**
27:18 30:4

**performing**
25:3

**period** 20:3
  39:18
**periods** 39:22
**permit** 62:19
**permitted** 5:23
  9:3 10:17
**persistent** 21:19
  23:9 73:9
**person** 23:7
  39:16
**person's** 49:2
**personal** 27:11
  47:5
**personally**
  42:14
**persons** 27:23
**perspective**
  13:16
**pervasive** 20:23
**petition** 5:21
  18:9,10,15
  68:23 69:2,9,14
  69:15,21 70:8
  70:13,13,16
  71:20 72:11
**petitioner** 15:15
  69:21,23
**petitions** 18:18
  69:20,23 70:4
**phone** 6:19
  37:23
**phonetic** 40:10
**physical** 24:13
  42:17 43:1

**physically** 46:16
**physics** 56:10
**pi** 52:8
**piece** 49:17
**place** 9:4 51:18
  51:23 75:22
  76:4,8
**placed** 26:15
  41:6 43:17
  72:23
**plaintiff's** 35:4
**plaintiffs** 8:22
  9:8
**plan** 4:2,14 62:4
**planned** 61:4
**planning** 4:8
**plans** 3:6,12,15
**plant** 8:23 9:4,5
  9:12
**plant's** 9:12
**plants** 9:10
**plea** 70:2
**pleading** 12:6
**please** 3:4 41:16
**point** 6:20 22:18
  25:20 34:7
  54:10 62:1,15
  64:1
**points** 74:21
**policy** 69:3 70:6
  70:11
**porterfield**
  60:11 75:6
**portion** 11:9

**position** 36:19
  44:2 46:3
**positioned** 51:3
**positive** 25:8
  26:22
**possibility**
  16:11 33:11
  38:5
**post** 3:17 55:6
**potential** 76:3
**potentially**
  33:21 40:10
  42:21 45:11
  62:6 76:9
**pounds** 14:8
**powell** 15:12
**power** 6:12 8:21
  8:22 9:3,5,10,11
  9:12,18 65:18
**pray** 73:2,5,11
**precipitously**
  57:11
**precisely** 63:11
**preclusion** 67:5
  67:5 68:16
**predating** 20:10
**preliminary**
  4:22 19:11 45:3
  61:11
**premise** 73:21
**prescribed** 75:4
**present** 40:10
  59:2
**presented** 17:19
  66:22,23

**pressure** 24:21
  24:23 25:8
  26:22 30:16
  36:14 45:22
  48:12,23 49:13
  49:23
**prevailed** 63:18
**previous** 21:2
**previously**
  14:20,23 69:21
**primarily** 76:23
  77:11
**principle** 6:11
  9:18 10:10 56:9
**prior** 76:17 77:8
**prison** 66:12
**problem** 23:23
  38:12 39:2
  45:19,23 47:11
  47:12 66:15
  68:14,15,15,16
  73:8
**problems** 66:20
**procedural**
  18:22
**procedure**
  12:19 41:4
  69:19
**procedures** 3:20
  4:14 7:6 21:5,7
  21:9,11 39:20
  67:13
**proceed** 3:1 6:1
  10:17 17:21
  73:21

**proceeding**
17:11 70:2
**proceedings**
9:20 68:9,11
80:6,10
**process** 38:20
49:11
**produce** 20:9
**production**
20:13
**prolonged**
43:22
**prone** 76:7
**prong** 59:20
61:7
**proper** 46:3
**properly** 17:19
24:5
**property** 9:1
**proposed** 31:18
44:22 57:5,19
58:1,5,13
**proposing** 39:21
44:15 58:11
**prosecution**
66:7
**prospective**
5:22
**prospectively**
5:18
**protection** 4:5
4:20 5:4 7:4,13
13:12 16:17
24:17 63:23
64:12 68:5,21

72:7
**protocol** 4:14
15:22 19:14,22
20:4,11,19 21:6
40:18 51:15,17
51:22 55:3,19
56:20 72:20
78:14
**provide** 22:1
24:6,12 41:3
**provided** 19:20
50:22
**provides** 43:3
**proving** 48:6
**pryor** 2:8 7:17
7:19 8:4 31:3
34:3,4,6,17 54:4
54:8,20 55:8,15
55:21 56:11
**ptsd** 28:3
**public** 12:2
55:12,12
**pulled** 47:1
**punishment**
4:17 22:2,4
75:15
**pure** 39:16
**purely** 73:12
**purportedly**
65:8
**purpose** 11:17
33:6
**purposes** 55:11
**pursue** 18:13
68:8,11

**push** 25:5
**put** 40:23 41:1
63:10
**putting** 29:20
30:3 50:22

**q**

**question** 6:21
7:23 8:5,17,20
16:7 18:2,17
25:14 31:7 34:4
34:12 36:9,12
36:13 37:20
38:2 39:11 54:9
56:11,22 72:19
**questioned** 33:4
37:3
**questions** 37:18
72:17
**quickly** 57:16
74:21 75:20
**quite** 67:22
**quote** 12:20
42:10 43:6,7,9
52:17

**r**

**r** 80:1
**raise** 16:22
67:10
**raised** 14:10
**raises** 18:11
**raising** 65:4
**rare** 16:12
**rate** 28:11 44:20
44:21,23 45:7

52:6 54:12,23
55:4,6,9 56:14
57:6
**rather** 5:18
25:18 33:19
36:22 44:10
55:12 58:22
**rational** 71:17
**reaction** 28:7
**readily** 32:19
37:5,7,10,12,13
74:7
**reading** 15:4
**reads** 67:22
**ready** 3:1
**really** 11:10
28:18 30:6
39:15 46:16
57:19 69:13,17
71:21 76:8
**reason** 7:4
14:11 27:14
38:9 39:3 46:11
48:21 74:12,15
**reasonable**
72:21
**reasonably**
57:16
**reasons** 5:16
9:23 13:2 21:13
23:12 33:16
49:9 61:6
**rebuttal** 2:22
41:10 74:19

**rebutted** 45:17
**receive** 21:7,8
 74:10
**received** 10:4
 20:21
**recognizes** 72:3
**recommended**
 43:20
**record** 11:8
 25:14 26:9,10
 32:20 33:1
 37:11 38:3 42:9
 54:10 55:23
 56:13 59:13,14
 59:18,18 61:13
 74:23
**recording** 1:21
 80:8
**records** 77:3
**rectify** 8:1
**red** 69:11
**redacted** 19:21
 21:9 54:16 55:3
 55:10 56:21
**redress** 8:8,10
**reduce** 25:9
 33:15,15 42:4
 58:21 59:4
**reduced** 58:19
**reduces** 24:16
**reexperience**
 75:8
**reference** 77:15
**refit** 52:2

**refitted** 61:22
**reflect** 26:10
 37:11 43:16
**reflected** 46:20
**reflects** 68:3
**refused** 20:9
**regard** 26:10
 34:8
**regarding** 15:18
**regardless**
 55:19
**rejected** 64:14
 67:1
**related** 13:19
**relating** 25:14
**relation** 65:10
**relationship**
 8:18
**relative** 3:23
**relatively** 50:20
 52:10 57:16
 78:12
**released** 20:4
**reliable** 43:3
 51:7
**reliably** 77:23
**religious** 72:22
 73:4
**rely** 25:4 27:8
**relying** 30:11
**remains** 36:7
**remind** 74:1
**removed** 61:20
**rendered** 39:17

**rendering** 10:9
**reply** 59:12
**reporter** 1:22
 80:18,23
**reporting** 80:18
**reports** 53:10
**reposition** 45:21
**represented**
 12:6,11
**representing**
 77:1,12
**require** 5:1
**required** 55:13
**requires** 45:20
 48:23
**reserved** 2:21
 41:9 74:18
**resolve** 20:3
 36:14
**respect** 75:16
 76:13
**respirator** 24:5
 25:8,11
**respiratory**
 24:16
**response** 65:17
 69:13
**responsible** 6:2
 8:12 77:11
**result** 21:18
 28:11
**results** 80:15
**retraceability**
 5:8

**retrospectively**
 5:18 10:22
**returning** 71:19
**reveal** 24:15
**reversal** 5:1
**review** 13:18,21
 16:18,19 17:1
 51:16 67:22
**richey** 1:22
 80:22
**right** 6:7,23 8:4
 8:18 13:7 14:5
 17:6 22:6 33:20
 38:17 40:4 41:8
 52:15 53:4,19
 54:14 63:21
 71:18 74:16
 76:18 78:19
**rights** 6:10 9:14
 13:12 66:8
**riley** 35:23
**rises** 48:8
**risk** 21:12,17
 33:15 43:8
 45:12 47:17
 58:22 59:1,4
 60:16 62:22
 63:12,13 75:21
 76:2,3
**risks** 60:23 61:1
**robert** 2:14
**rocker** 15:3
**rooker** 13:16
 14:2,10,16 15:9
 16:3,6,10 66:14

67:2 68:15
**room** 40:8,12
  51:2
**round** 68:1
  70:17
**rubber** 46:22
**rulapa** 72:19
**rule** 12:18,18
  20:12 64:3,4
  67:12,16 69:1
  69:14,15,16,18
  70:4
**ruling** 23:3
**run** 36:22,23
  68:12 69:6 70:8
**rupala** 40:10

**s**

**safely** 41:1
**satisfactorily**
  24:23
**satisfactory**
  24:7,12
**satisfied** 31:14
**save** 2:4
**saw** 25:15 58:9
  59:11 75:3
**saying** 29:1
  31:11 50:9 52:5
  67:17
**says** 24:2,4,18
  25:4 51:22
  55:19 57:3 64:4
  67:19 69:16,20
  77:20

**scenario** 65:6
**scheduled** 20:1
**science** 43:7
**scrutiny** 12:2
  20:20
**scuba** 49:3
**seal** 24:21 26:12
  26:20 30:18
  43:17 46:22
  48:2 49:18
  52:23
**sealed** 24:22
  51:8
**seals** 77:23
**second** 3:9,18
  4:12 6:5 11:16
  21:20 59:21
  66:18 69:1,8
  70:7 71:2,5
  72:11
**seconds** 39:10
  53:1 60:5 63:7
  68:23
**secured** 26:21
**security** 55:11
**see** 16:21 29:5
  35:1 45:7 46:7
  49:5,20 53:11
  55:14 59:10
  62:4 71:13
  72:11
**seeing** 59:14
  60:14
**seek** 13:20
  31:14

**seeking** 12:14
**seemed** 38:12
**seems** 63:6
**seen** 36:7 48:2,3
**selected** 25:11
  66:6
**selecting** 11:18
**sennett** 74:4
**sense** 17:4,13
  69:18 70:18
**sentence** 12:22
  64:7,19 74:9,10
**separate** 17:17
  40:13
**separately**
  16:18
**serious** 21:12
  23:17
**serve** 41:5
**served** 35:5
**set** 12:22 16:12
  69:7 70:9 80:11
**setting** 13:22
  69:4
**settled** 6:8
**several** 22:13
  55:5 57:4
**severe** 42:2
  45:12 47:17,21
  53:18
**sexes** 50:6
**shame** 25:22
**shared** 77:7,9
**sharing** 76:17

**short** 23:17
  39:18 45:14
  53:21 59:4
**show** 32:14,16
  32:17,18 42:1
**shown** 70:18
**shows** 60:20
**side** 47:14
**signature** 80:22
**significantly**
  33:15 42:4
**similar** 4:6 56:4
  56:9,9
**similarly** 62:8
  71:3,7
**simply** 14:18
  52:15 61:3
  70:12
**sit** 66:7
**situated** 4:6
  71:3,7
**situations** 18:22
  35:1
**six** 3:5
**sizes** 50:6
**smaller** 35:8
**smith** 1:5 2:10
  2:15 3:7,10,16
  3:23 4:9 6:8
  10:20 11:6,7,15
  11:19 12:9,14
  19:16 21:1,11
  21:15 23:22
  27:23 28:4
  36:15 41:22

42:1 44:4 49:13 53:20 60:12 61:2 63:20 64:10 68:21 71:13 72:8 74:3 74:6 75:1

**smith's** 4:3,4,12 4:15,19,22 5:3 5:11,17,19,23 6:6 8:8,10 10:12 10:18 11:13 12:5 13:12 20:1 20:12 23:14,21 45:16,17 46:10 50:15 54:3 77:3

**solve** 38:12

**someone's** 38:15 72:10

**someplace** 33:19

**somewhat** 18:21 44:4

**soon** 42:12

**sorry** 6:18 8:15 8:16 28:14 31:6 31:8,8 35:4 37:17 40:6 54:5

**sort** 47:6 53:7 68:4,12 72:14

**sought** 18:5,8

**spare** 11:22

**speaking** 73:12

**specific** 32:1

**speculative** 59:23 73:12,13

**spiritual** 35:20 40:12,20,23 41:2,4

**staff** 75:4 77:4

**stakes** 50:20

**standard** 15:1,7 15:8 20:15 28:15,20 48:16 57:20 58:3

**standing** 5:5,7 9:9,20 10:21 13:3 65:23 66:1 68:14

**stands** 43:11

**start** 19:11

**starts** 35:18 40:19

**state** 5:21 6:3 10:15 14:20 18:9 19:19 21:20 23:10 25:17 48:19 49:9 57:15 62:3 62:18 66:21,22 68:8,10,11 70:15 73:10 75:18 76:16 80:3

**stated** 11:14 45:18

**states** 2:2,4 6:12 13:21 17:18,22 25:7 48:21 56:22

**statute** 9:2

**stay** 18:20 35:21 68:7,10

**stenotype** 80:6

**step** 49:10

**stewart** 35:23

**stop** 61:15 62:4 62:15,18

**strange** 44:4 65:5

**strapped** 33:17 60:20 62:10

**straps** 47:1

**stroke** 21:20 23:10 73:10

**study** 53:3,5 77:15,16,18,20 78:1

**sturdy** 47:1

**subject** 4:7 12:2 12:9 14:17 19:17 23:11 28:1 58:15

**subjected** 72:7

**subjective** 72:6 72:14

**subjects** 77:17

**submitted** 12:7

**subsequent** 69:23

**substantial** 3:23 21:12 45:12 47:17,20 53:18 60:1 62:22

**substantially** 58:21 59:3 60:4

**substantiate** 59:19

**success** 19:10

**successive** 66:19 68:23 69:8,17 69:20 70:3,6 71:20,21,22 72:11

**sucks** 49:5

**sue** 9:20 10:5 66:4,11

**sued** 6:23

**suffer** 42:2 48:2

**suffering** 28:3 53:17 60:12,13

**sufficient** 22:20 29:16 31:12 45:9 47:10,16 50:18,21 56:3 57:1

**suggest** 20:14 20:18

**suggested** 15:1 67:12

**suggesting** 31:5 60:3 78:12

**suggests** 70:20 71:2

**suicide** 33:8 42:8,18 44:17 77:22

**suicides** 42:15 42:19 45:19

**suing** 8:22 65:6
66:2
**suit** 67:11
**supplementing**
74:23
**supplied** 25:11
**supplying** 29:21
**support** 27:9
39:5
**supported**
74:13
**supports** 78:1
**supposed** 52:13
59:3
**supreme** 6:13
7:10 9:7 12:15
13:7,21,22
15:17 16:15,20
17:1,3,11,16,22
18:19 22:12
48:16 63:18
64:3,4,14,21,23
66:13,23 67:3
67:20 72:2
**sure** 28:21
35:12 42:2
48:10 50:21
**surmount** 48:6
**survived** 31:13
**swift** 57:11
**switzerland**
53:7
**symptoms** 75:5
75:9

**system** 62:8

**t**

**t** 80:1,1
**take** 38:21 40:1
57:2 64:23 65:1
66:13 67:3
69:12 70:19
78:22
**taken** 80:6
**takes** 63:19
75:22 76:4
**talk** 4:2
**talking** 5:2 57:8
**tasked** 6:3
**tell** 27:16
**telling** 62:18
**ten** 45:6
**terms** 17:12
65:9 76:11
**test** 24:20,21
25:1,3 27:19
28:18 29:5 30:1
30:4,16 31:13
36:14 48:12,23
49:23 61:8
63:16
**tested** 28:16
29:1,7 32:3,5
50:5
**testified** 25:16
33:1 35:6 36:1,5
43:2 47:15
52:19 55:17
60:11

**testifies** 49:16
**testify** 47:18
58:20 75:6
**testifying** 49:21
**testimony** 32:22
33:7 34:1 43:12
46:8 60:1 63:6
78:8
**testing** 25:10
28:16 29:13,18
31:12
**tests** 49:13
**text** 67:16
**thank** 3:3 19:2
24:11 37:22
41:8,13,14,15
71:1 74:16,20
78:18,20
**theirs** 4:11
**theme** 20:23
**theoretical**
63:12,13
**theoretically**
32:17 37:10
**theory** 59:15
**thereof** 80:15
**thing** 14:9 31:10
47:6 66:10
**things** 18:4 24:4
27:10 40:15
**think** 2:23 6:13
6:15 7:7 8:3
11:17 13:1 14:4
15:7,13 16:5
17:17 18:1,5,16

18:21 23:1,5
25:20 27:5
28:23 30:21
31:15 32:15,21
32:23 33:14
34:7 35:3,8 37:1
37:2,3 38:8,8
39:4,6,10 40:1
40:16 48:15
49:3 52:13
53:22 55:15,16
56:1,21 57:18
58:12,18 62:22
65:12,22,22,23
66:10,15 68:3
68:12 70:8 72:1
73:3,14 74:12
78:1
**thinking** 35:11
**third** 42:20,21
45:20 51:9 70:7
**thomas** 2:1,17
15:13 24:8,10
26:4 70:21,23
78:16
**thoroughly** 32:4
**thought** 55:16
55:16
**threat** 5:19
**three** 2:21 35:21
35:22 40:21
41:9 49:15
53:14
**thumb** 29:20

**thursday** 25:23
**tight** 27:16
  34:10 47:2,2
**tightened** 43:18
**tighter** 52:12
  58:10
**tightly** 26:20
  33:17
**time** 3:12 11:16
  12:22 13:8
  19:18 20:20
  25:23 26:4
  39:18,22 41:10
  43:23 51:23
  64:5,9,12,18
  67:18 70:15
  72:21 74:9,18
  78:16
**times** 22:13
  44:18 55:5 57:4
**today** 77:8,10
**took** 19:13
  77:18
**top** 50:7,8
**towards** 12:19
**trace** 10:21
**traceability**
  7:22 8:17,20
  65:14,14,16
**traceable** 5:11
  10:19
**trained** 35:13
  35:14
**transcribed**
  80:7

**transcript** 45:4
  80:9
**transcription**
  1:9,21 80:8
**transfer** 56:6
**treat** 71:8
**treated** 4:5 70:3
**trial** 66:9 70:2
**tried** 27:13
**true** 80:9
**truncated** 20:3
**try** 50:11
**trying** 16:21
  31:23,23 51:7
  68:13
**tubing** 36:22,23
**turn** 63:22
**turns** 5:10
**tweeted** 43:5
**twitted** 43:10
**two** 2:19 4:3
  5:16 13:2 16:22
  21:12 24:10
  33:16 70:23
  78:7
**type** 58:6

**u**

**u.s.** 63:18 64:23
**ufc** 64:22
**ultimately** 39:18
  57:12
**un** 21:9 55:3
**unaware** 60:13
**unconscious**
  39:9,17 53:1,13

57:12 60:7
  77:19
**unconsciousn...**
  21:19 63:4
**under** 3:7 12:18
  15:10 27:20,22
  28:7,12 48:9,17
  51:13 53:13
  59:19 64:22
  69:15,18 70:4,5
  72:2 78:23
**undergoing**
  28:17
**underlying** 9:16
  9:23 18:9 77:13
**understand**
  2:20 48:11
**understandably**
  49:6
**understanding**
  21:22 56:19
  65:15
**undisputed** 23:7
  23:7,11 61:19
**undoing** 71:14
**united** 2:2,4
  6:12 13:21
  17:18,22
**unlawful** 9:21
  10:1
**unlawfully** 10:7
**unprecedented**
  3:7
**unsatisfactory**
  24:14

**untested** 3:20
**unusual** 4:17
  17:12 22:2,4,16
  67:13 75:15
**use** 4:14 21:14
  23:20 30:3 33:5
  36:20 39:21
  44:16 48:4
  78:15
**used** 23:14
  25:12 44:16
  47:23 48:13
  56:15
**user's** 24:2 25:7
**uses** 43:21 45:8
**using** 21:17 32:8
  42:8 53:7 57:14
  76:11 77:21
  80:7
**usually** 50:17

**v**

**valid** 49:8
**valve** 44:19
  52:11
**variable** 57:21
**variety** 23:12
**various** 34:11
  38:21 50:4
**vegetative** 21:20
  23:9 25:17
  73:10
**versus** 2:10 14:7
  15:13
**viable** 42:3

**victim** 73:22
74:1
**video** 49:19
53:12 60:17,19
**view** 15:4 16:10
23:3,23 40:14
48:9 78:2
**violated** 13:13
22:15
**violation** 7:4,13
15:23 16:17
17:18 63:14
**violently** 73:23
**virtually** 39:8
**visible** 53:11
**visit** 77:3
**volume** 38:13
**voluntarily**
37:15
**vomit** 33:19
58:19,22 59:7
59:16 60:2,4
61:12,21 62:20
62:23 76:6
**vomiting** 59:1
60:10,14,16
61:1,2 62:5,12
75:2,13,21 76:2
76:4,11
**vomits** 33:13,18
62:16
**vs** 1:6

**w**

**wait** 64:13
70:14 74:5
**waiting** 70:6
**walked** 21:1
**want** 12:2 18:12
19:4 20:22 26:6
34:6 48:22 49:9
56:21 62:14
**wanted** 6:20
64:20 77:14
**ward** 5:14
**warden** 2:12 8:7
65:7 72:9
**warned** 35:19
**warrant** 7:9
13:11 17:5,8
18:6,16 19:1
64:16 65:23
**watched** 44:16
**way** 7:3 27:15
29:5 44:9,19
50:17 51:7,13
52:11 63:2
68:16 74:8
80:14
**ways** 31:16 32:7
32:10 40:17
**we've** 13:3
31:18 32:15
49:22 52:12
67:6 70:18
**wear** 24:19 46:4
**wearing** 49:2

**week** 6:1 75:3
**weighs** 50:14
**weight** 30:22
**went** 26:8
**whatsoever**
53:9 65:11
**wilson** 2:6,7
19:4 21:21,22
22:7,8,12 26:6
26:14 30:14,23
32:9,13 33:10
33:23 34:3,5
36:8,10,12 37:5
37:9,16,21 40:4
40:7 41:8,15
43:13,14,15,15
46:14 48:10
51:15,17 53:19
54:2,5,6 57:13
58:2,18 61:12
62:13,16 63:21
74:16 75:19
78:19
**wish** 37:14
**witness** 55:16
**woefully** 45:14
53:21
**wondered** 40:5
40:8
**wore** 27:13,21
**work** 30:12,12
58:14
**working** 50:19
**worsen** 75:10

**wrong** 13:2,4
63:11 68:17,18

**x**

**xa2** 55:5

**y**

**ye** 2:1,1,2
**yeah** 26:6 55:15
55:20
**years** 19:13 74:2
74:4
**yesterday** 18:10
75:3 77:5
**young** 50:16

**z**

**zero** 70:17
**zofran** 75:4