**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

ALAN EUGENE MILLER,

         *Plaintiff*,         Civil Action: No. 2:24-cv-00197-RAH

   v.

STEVE MARSHALL,
in his official capacity as Attorney
General, State of Alabama,

KAY IVEY,                     **CAPITAL CASE – EXECUTION**
In her official capacity as        **SCHEDULED FOR SEPTEMBER 26,**
Governor of the State of Alabama,   **2024**

JOHN Q. HAMM,
In his official capacity as
Commissioner, Alabama
Department of Corrections,

TERRY RAYBON,
in his official capacity as Warden,
Holman Correctional Facility,

         *Defendants*.

**PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)
<u>OF THE FEDERAL RULES OF CIVIL PROCEDURE</u>**

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

FACTS ...................................................................................................................2

    I.    Procedural Background ..........................................................................2

        A.    Mr. Miller's Conviction and Conventional Appeals. ................2

        B.    The State Moves to Execute Mr. Miller by Lethal Injection......2

        C.    The State Botches The Execution of Mr. Miller by Lethal Injection. ........................................................................................3

        D.    The State Again Attempts to Execute Mr. Miller by Lethal Injection but Later Agrees to Execute Him Only By Nitrogen Hypoxia.......................................................................3

        E.    The Alabama Supreme Court Grants the State's Motion to Execute Mr. Miller by Nitrogen Hypoxia...................................3

    II.    Factual Background..............................................................................4

        A.    The State Emphasizes the Importance of Chronological Order in Executions. ................................................................4

        B.    The State Obtains an Execution Warrant for Mr. Miller After He Criticizes the State. .....................................................6

        C.    The State Selects a Faulty Mask and Makes Undisclosed Alterations to Its Protocol. .........................................................8

        D.    The First-Ever Nitrogen Hypoxia Execution Goes Terribly Awry and State Tries to Cover It Up. ........................................9

LEGAL STANDARD............................................................................................11

ARGUMENT .......................................................................................................11

    I.    Mr. Miller Has Standing to Bring All Three Claims Against All Four Defendants. ................................................................................11

A.    Marshall has authority to redress the injuries under
      Counts I and II..............................................................12

B.    Counts I and II are traceable to and redressable by Ivey,
      Hamm, and Raybon. ......................................................15

C.    Ivey has the authority to redress Mr. Miller's injury under
      Count III. ......................................................................18

II.   Neither *Younger* Abstention Nor the *Rooker-Feldman* Doctrine
      Apply to this Action. ............................................................19

A.    There is no ongoing state judicial proceeding. .........................20

B.    A Rule 8 proceeding in the Alabama Supreme Court does
      not provide an adequate, "full and fair" opportunity to
      litigate federal constitutional claims. ........................................21

C.    The claims do not fall within the narrow confines of
      *Rooker-Feldman*....................................................................23

III.  Sovereign Immunity Does Not Apply to This Lawsuit. ....................25

IV.   Mr. Miller's Claims Against Defendant Marshall Are Based on
      Active and Ongoing Conduct...............................................30

A.    Marshall has a continuing active role in Alabama
      executions..................................................................30

B.    Marshall has a continuing obligation to uphold state and
      federal law and is obligated to file the appropriate motion
      in the Alabama Supreme Court if this court grants
      Mr. Miller relief. ........................................................33

V.    Counts I and II Are Properly Brought Under 42 U.S.C. § 1983.........34

VI.   Mr. Miller Plausibly Alleges His First Amendment Claim
      (Count I). ............................................................................37

VII.  Mr. Miller Plausibly Alleges His Fourteenth Amendment Claim
      (Count II)...............................................................................44

VIII.   Mr. Miller Plausibly Alleges His Eighth Amendment Claim
(Count III) ..................................................................................... 44

    A.   Mr. Miller Plausibly Alleges That Executing Him Under
the Current Protocol Would Cause Superadded Pain. .............. 45

    B.   Mr. Miller Plausibly Alleges An Available Alternative
Method. ..................................................................................... 50

IX.   Rule 19 Does Not Require Dismissal of Any Claims ........................ 53

CONCLUSION .......................................................................................... 56

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ........................................................21

*Am. Builders Ins. Co. v. Southern-Owners Ins. Co.*,
71 F.4th 847 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 423 (2023) ............42, 44

*Ashcroft v. Iqbal*,
556 U.S. 662 ........................................................................11, 47

*Barber v. Governor of Ala.*,
73 F.4th 1306 (11th Cir. 2023), *cert. denied*, 143 S. Ct. 2545 (2023) ...14, 17, 18

*Barwick v. Governor of Fla.*,
66 F.4th 896 (11th Cir. 2023) ................................................35, 36, 37

*Baze v. Rees*,
553 U.S. 35 (2008)................................................................45

*Behr v. Campbell*,
8 F.4th 1206 (11th Cir. 2021) ....................................................23, 24

*Chaparro v. Carnival Corp.*,
693 F.3d 1333 (11th Cir. 2012) ........................................................11

*DeMartini v. Town of Gulf Stream*,
942 F.3d 1277 (11th Cir. 2019) ........................................................43

*Douglas v. Yates*,
535 F.3d 1316 (11th Cir. 2008) ........................................................39

*Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of
Registration & Elections*,
36 F.4th 1100 (11th Cir. 2022) ........................................................16

*Gitlow v. People of State of N.Y.*,
268 U.S. 652 (1925)................................................................41

*Grayson v. Dunn*,
156 F. Supp. 3d 1340 (M.D. Ala. 2015) ................................................14

ii

*Hendrix v. Poonai*,
  662 F.2d 719 (11th Cir. 1981) .............................................................31

*Hoop Culture, Inc. v. GAP Inc.*,
  648 F. App'x 981 (11th Cir. 2016) ......................................................31

*Ins. Co. of Pa. v. City of Long Beach*,
  2005 WL 8160033 (C.D. Cal. Oct. 4, 2005) .......................................31

*Jarrard v. Moats*,
  2021 WL 1192948 (N.D. Ga. Mar. 30, 2021) .............................40, 43

*La Grasta v. First Union Sec., Inc.*,
  358 F.3d 840 (11th Cir. 2004) ............................................................11

*Lacroix v. Lee Cnty., Fla.*,
  2:18-CV-143-FTM-38CM, 2018 WL 3629021 (M.D. Fla. July 30, 2018) .......55

*Melvin v. Troy Univ.*,
  609 F. Supp. 3d 1262 (M.D. Ala. 2022)..........................................16, 17

*Miller v. Dunn*,
  142 S. Ct. 123 (2021)...........................................................................2

*Miller v. Hamm*,
  640 F. Supp. 3d 1220 (M.D. Ala. 2022).........................................19, 25

*Nance v. Ward*,
  597 U.S. 159 (2022).....................................................................*passim*

*Nelson v. Campbell*,
  541 U.S. 637 (2004).............................................................................14

*O'Bryant v. Finch*,
  637 F.3d 1207 (11th Cir. 2011) (per curiam) .....................................42

*Ohio C.R. Comm'n v. Dayton Christian Sch., Inc.*,
  477 U.S. 619 (1986).......................................................................21, 22

*Papasan v. Allain*,
  478 U.S. 265 (1986).......................................................................13, 15

*Pell v. Procunier*,
    417 U.S. 817 (1974) ................................................................41

*Pennhurst State School & Hospital v. Halderman*,
    465 U.S. 89 (1984) ..................................................................28

*Perez v. City of Opa-Locka*,
    629 F. Supp. 3d 1164 (S.D. Fla. 2022) ...................................40

*Powell v. Thomas*,
    784 F. Supp. 2d 1270 (M.D. Ala. 2011), *aff'd*, 641 F.3d 1255
    (11th Cir. 2011) ......................................................................24

*Price v. Comm'r, Ala. Dep't Corr.*,
    920 F.3d 1317 (11th Cir. 2019) .........................................44, 50

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
    390 U.S. 102 (1968) ..........................................................54, 55

*S&M Brands, Inc. v. Georgia ex rel. Carr*,
    925 F.3d 1198 (11th Cir. 2019) .........................................28, 29

*Seminole Tribe of Fla. v. Florida*,
    11 F.3d 1016 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996) .......29

*Smith v. Hamm*,
    No. 2:23-CV-656-RAH, 2024 WL 116303 (M.D. Ala. Jan. 10,
    2024) ..........................................................................48, 49, 52

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ...............................................38

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................12

*St. George v. Pinellas Cnty.*,
    285 F.3d 1334 (11th Cir. 2002) ..............................................47

*Thomas v. Devries*,
    834 F. Supp. 398 (M.D. Ga. 1993) .........................................12

*Turner v. Safley*,
    482 U.S. 78 (1987) ..................................................................41

*Turner v. Williams*,
   65 F.4th 564 (11th Cir. 2023) ...............................................................38

*Walters v. Fast AC, LLC*,
   60 F.4th 642 (11th Cir. 2023) ...............................................................11

*Wexler v. Lepore*,
   385 F.3d 1336 (11th Cir. 2004) ............................................................20

*Williams v. Radford*,
   64 F.4th 1185 (11th Cir. 2023) .............................................37, 38, 39, 43

*Wright v. Newsome*,
   795 F.2d 964 (11th Cir. 1986) ..............................................................38

*Ex parte Young*,
   209 U.S. 123 (1908)..................................................................*passim*

*Younger v. Harris*,
   401 U.S. 37 (1971) ...................................................................*passim*

**Statutes**

28 U.S.C. § 2201(a) ...........................................................................30

42 U.S.C. § 1983 .........................................................................*passim*

Ala. Code § 15-18-82............................................................................18

Ala. Code § 36-15-1(2) ........................................................................34

**Other Authorities**

Ala. Const., art. XVI § 279 ..................................................................34

Ala. R. App. P. 8 .........................................................................*passim*

## **INTRODUCTION**

Defendants are responsible for ensuring that every execution that takes place in the State of Alabama is constitutional and lawful. On September 22, 2022, Defendants failed this responsibility when they subjected Mr. Miller to hours of physical and mental agony by allowing him to be stabbed with needles across his body in hopes of finding a vein. And Defendants are on a collision course to fail this responsibility again when they attempt to execute him a second time on September 26, 2024. Defendants are retaliating against Mr. Miller by improperly seeking his execution ahead of men who exhausted their appeals many years before him, and they are planning to execute Mr. Miller using the same failed procedures that recently proved to superadd pain and suffering in the execution of Kenneth Smith.

Rather than reckon with their responsibilities and undergo judicial scrutiny, Defendants ask this Court to dismiss all claims against them. Each Defendant's motion rests on the same central premise: that they have no ongoing responsibility for, or authority over, Mr. Miller's upcoming execution. This is evasion at its worst. Collectively, the four Defendants named in this lawsuit—the Governor, the Attorney General, the Commissioner of the Alabama Department of Corrections, and the Warden of Holman prison—are the ***only*** state actors with authority to ensure that Mr. Miller's execution does not violate the Constitution. Yet they all seek to disclaim their role in the execution process and shirk responsibility for the well-documented

disaster that occurred just a few months ago during the execution of Mr. Smith. The Court can put an end to all of this. Plaintiff respectfully asks the Court to deny Defendants' motions, as Mr. Miller has plausibly alleged his claims and Defendants' procedural arguments are nothing more than meritless distractions.

## FACTS

### I.      Procedural Background

#### A.      Mr. Miller's Conviction and Conventional Appeals.

In June 2000, Mr. Miller was convicted of capital murder. Mr. Miller exhausted his conventional appeals (criminal appeal, state postconviction, and federal habeas) on October 4, 2021, when the U.S. Supreme Court denied certiorari in his federal habeas corpus proceeding. *Miller v. Dunn*, 142 S. Ct. 123 (2021).

#### B.      The State Moves to Execute Mr. Miller by Lethal Injection.

On April 19, 2022, the State moved the Alabama Supreme Court to set an execution date for Mr. Miller. Dkt. 1 ("Compl.") ¶ 27. The State sought to execute Mr. Miller by lethal injection, even though he had elected nitrogen hypoxia. *Id.* ¶ 26.

Mr. Miller accordingly sought injunctive relief in this Court. *Id.* ¶¶ 28-29. After a day-long evidentiary hearing—during which Mr. Miller gave live testimony—the Court found it was substantially likely that Mr. Miller had timely elected to be executed by nitrogen hypoxia. *Id.* ¶ 29. Accordingly, the Court enjoined the State from executing Mr. Miller by any other method. *Id.* After the Eleventh

Circuit denied the State's motion to stay the preliminary injunction, the U.S. Supreme Court vacated the injunction without explanation in a 5-4 ruling. *Id.* ¶ 32.

### C.     The State Botches The Execution of Mr. Miller by Lethal Injection.

The State tried to execute Mr. Miller by lethal injection on September 22, 2022, but the execution did not go to plan. For nearly 90 minutes, ADOC employees punctured Mr. Miller with needles. *Id.* ¶¶ 37–46. The execution was called off shortly before midnight. *Id.* ¶¶ 49–52. Mr. Miller still suffers from intense psychological symptoms due to the trauma of the experience. *Id.* ¶¶ 53–58.

### D.     The State Again Attempts to Execute Mr. Miller by Lethal Injection but Later Agrees to Execute Him Only By Nitrogen Hypoxia.

Shortly after the attempt, Mr. Miller filed a Second Amended Complaint detailing the events that occurred on the gurney and the State's failure to execute him. *Id.* ¶ 63. Around the same time, the State asked the Alabama Supreme Court to set an expedited date to execute Mr. Miller by lethal injection again. *Id.* ¶ 62. After the Court ordered the State to produce certain discovery, the parties agreed to settle. *Id.* ¶¶ 70–71. As part of the settlement, the State agreed to maintain all physical and written evidence concerning Mr. Miller's litigation, including contemporaneous communications about the State's execution attempt. *Id.* ¶ 73.

### E.     The Alabama Supreme Court Grants the State's Motion to Execute Mr. Miller by Nitrogen Hypoxia.

On February 21, 2024, Marshall moved the Alabama Supreme Court for Mr.

Miller's execution warrant. *Id.* ¶ 142. On March 29, 2024, Mr. Miller filed this action. On May 2, 2024, the Alabama Supreme Court granted Marshall's motion and allowed Mr. Miller's execution to proceed. On May 8, 2024, Ivey set the execution date for September 26, 2024.

## II.   Factual Background

Mr. Miller spoke out against Defendants when he filed his Second Amended Complaint in the previous litigation and detailed the State's failure to execute him by lethal injection. His lawsuit generated waves of negative media for the State, and painted Defendants in an embarrassing light. Defendants are now retaliating against Mr. Miller by deviating from Marshall's pattern and practice of employing a "first in, first out" methodology for selecting the order of executions and carrying out Mr. Miller's execution ahead of sixteen other inmates who are ahead of him in the nitrogen hypoxia line. The only other person the State did this to was Mr. Smith, who also spoke out against Defendants when the State botched his execution as well. Worse yet for Mr. Miller, Defendants also seek to execute him using the same procedures that caused Mr. Smith superadded pain and suffering and which looked nothing like the death that Defendants promised this Court, the Eleventh Circuit, or the U.S. Supreme Court.

### A.   The State Emphasizes the Importance of Chronological Order in Executions.

In determining the order in which inmates on death row are executed,

Marshall has a pattern and practice of employing a "first in, first out" methodology based on the date in which a person's conventional appeals have been exhausted, subject to the availability of the method of execution elected by the inmate. *Id.* ¶ 164. Marshall accordingly moves to execute inmates in chronological order from the date their conventional appeals exhausted. *Id.* As Marshall has publicly stated, "Justice delayed is justice denied." *Id.* ¶ 118.

During Mr. Smith's litigation, the State produced a list of all individuals in Alabama who have been sentenced to death, exhausted their conventional appeals, and elected nitrogen hypoxia as their method of execution. *Id.* ¶ 121. The names on the list are in chronological order according to the date on which each person's conventional appeals were exhausted. *Id.* ¶ 123.

The first person on the nitrogen hypoxia list ("Person A") exhausted his conventional appeals on **October 3, 2011**—almost thirteen years ago, and almost exactly ten years before Mr. Miller exhausted his conventional appeals on October 4, 2021. *Id.* ¶ 125. The Attorney General even moved for, and received from the Alabama Supreme Court, an execution date for Person A: **April 12, 2012**. The execution did not proceed on that date, and the Attorney General never again sought this individual's execution. *See* Ex. 1, *Grayson v. Alabama*, No. 1991310, Petition

for Stay of Execution (Ala. S. Ct. Apr. 6, 2012)[1]; Ex. 2, *Grayson v. Alabama*, No. 1991310, Motion to Vacate Execution Date (Ala. S. Ct. Apr. 3, 2012).

The second and third people on the nitrogen hypoxia list also exhausted their appeals well before Mr. Miller—in both cases, it has been 11 years since they exhausted their conventional appeals. Compl. ¶¶ 126–28. The State previously obtained execution dates for these people but has not renewed its efforts to execute them. Nor has the State attempted to execute anyone else on the list above Mr. Miller and Mr. Smith.

Finding Mr. Miller's exhaustion date requires reading to the bottom of the nitrogen hypoxia list. Indeed, it has been less than three years since Mr. Miller exhausted his conventional appeals on October 4, 2021. *Id.* ¶ 124. In total, **16 people** on the list exhausted their conventional appeals before Mr. Miller. *Id*. ¶¶ 122, 124. Marshall nevertheless moved for Mr. Miller's execution warrant before them. *Id.* ¶ 124.

**B.    The State Obtains an Execution Warrant for Mr. Miller After He Criticizes the State.**

---

[1] A plaintiff may attach exhibits to a response in opposition to a motion to dismiss, without converting such motion to one for summary judgment, when such exhibits are (1) central to the plaintiff's claim; and (2) undisputed. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co*., 2016 WL 3144103, at *1 (M.D. Fla. June 6, 2016), *aff'd*, 945 F.3d 1150 (11th Cir. 2019). Each exhibit filed with this response brief passes the two-part test. *See, e.g*., Compl. ¶¶ 6-7; 125; 148; 160; 175.

On February 21, 2024, Marshall moved the Alabama Supreme Court for a warrant to execute Mr. Miller. As discussed, the Alabama Supreme Court granted that motion, and Ivey set the execution date for September 26, 2024.

Like Mr. Smith, Mr. Miller spoke out against the State. Both Mr. Smith and Mr. Miller gave detailed public accounts of the State's failed attempts to execute them by lethal injection. *Id.* ¶ 144. Both Mr. Smith and Mr. Miller publicly criticized State officials, including the Defendants in this litigation. *Id.* And both Mr. Smith and Mr. Miller sued State officials following their failed execution attempts and sought discovery to expose the State's failures. *Id.* ¶ 145.

Mr. Miller's public statements embarrassed Defendants. *Id.* ¶ 154. The press reported on the State's failures, and on Mr. Miller's subsequent statements and lawsuit, and the media coverage—both local and national—painted Defendants in an unfavorable light. *Id.* ¶ 146. Indeed, because of the failed attempts to execute Mr. Miller and later Mr. Smith, the public pressured Defendants to halt all executions in the State. *Id.* ¶ 147. Ivey even asked Marshall to withdraw his then-pending motion in the Alabama Supreme Court for the execution date of Mr. Miller, and further requested that Marshall not move for any new execution dates. *Id*. ¶ 141. Marshall has gone to great lengths to avoid public disclosure of additional information about the failed execution attempts. For example, Marshall changed his position concerning the availability of nitrogen hypoxia as to Mr. Smith in order to avoid

disclosing information in discovery about ADOC's attempt to execute Mr. Smith by lethal injection. *Id.* ¶ 154.

**C.    The State Selects a Faulty Mask and Makes Undisclosed Alterations to Its Protocol.**

Not long ago, the State claimed that the mask selected for nitrogen hypoxia executions would fit properly on the face of the person to be executed. *Id.* ¶ 74. Yet the mask that the State chose is not designed for executions. Instead, it is an industrial safety air respirator mask made by Allegro Industries. *Id.* ¶ 76. This mask does not have an airtight seal, which is of critical importance because if oxygen leaks in during the execution, the inmate can remain conscious while suffocating to death. *Id.* ¶ 111.

Despite this severe risk, the State does not think an airtight seal is necessary, telling the Eleventh Circuit that the mask does not need an airtight seal even though the manufacturer recommends one. *Id.* ¶ 78. Compounding the issue further, the State has admitted that the mask is "one size fits all," which means that is designed to fit an average sized head. *Id.* ¶ 81. Mr. Miller is not average sized—he is 5' 10" and approximately 350 pounds. *Id.*

The State also keeps revising its execution protocol and has made only a heavily redacted copy available to the public. In litigation involving Mr. Smith, the State admitted to making unwritten alterations and additions to its execution protocol without disclosing them. *Id.* ¶ 82. Some of these unwritten additions were made in

response to ADOC training sessions in the lead up to Mr. Smith's execution, indicating that ADOC is building this plane while flying it. *Id*.

### D. The First-Ever Nitrogen Hypoxia Execution Goes Terribly Awry and State Tries to Cover It Up.

Earlier this year, on January 25, 2024, the State carried out the first-ever execution by nitrogen hypoxia. But the execution did not go according to plan.

Defendants had a clear narrative of what the novel execution would look like, telling this Court that a few breaths of nitrogen via the mask would render Mr. Smith instantly unconscious and dead soon after. *Id*. ¶ 89. Marshall even told the U.S. Supreme Court that it would take a "few seconds between when gas enters the mask and [Smith] loses consciousness." *Id*. ¶ 90.

Defendants' theory hinged on the amount of oxygen inside the mask. According to Defendants, the State would use "a mask tightly sealed by five separate straps" that has "no substantial risk of becoming loose or dislodged." *Id*. ¶ 93. Defendants thus predicted that, "[w]ithin seconds, Smith will have no available oxygen to breathe inside the mask," which "will render him unconscious and cause death." *Id*. ¶ 92. Indeed, Hamm and Raybon ***described as "absurd"*** Mr. Smith's allegation that "the entrapment of any oxygen into the mask would cause 'the painful sensation of suffocation.'" *Id*. ¶ 94. And Defendants reassured the Eleventh Circuit that nitrogen hypoxia would deliver "the most painless and humane method of execution known to man." *Id*. ¶ 96.

What happened to Mr. Smith was far different. Once the State began delivering nitrogen to Mr. Smith, he began to violently shake. *Id.* ¶ 103. His legs locked together, and his entire body shook, convulsing off the gurney. *Id.* Rather than the quick and peaceful death promised by State officials, Mr. Smith's death took nearly 15 minutes. *Id.* For much of that time, he was gasping, visibly struggling to breathe, and retched inside the mask. *Id.*

This account is based on multiple independent journalists and news sources who attended the execution and witnessed it first-hand. Even the victim's son reported that "[a]fter about two or three breaths, that's when the struggling started" and that "[w]ith all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again." *Id.* ¶ 108.

The State desperately sought to undermine all of these accounts. *Id.* ¶ 112. The day after the execution, Marshall claimed that "[w]hat occurred last night was textbook" and that the execution showed "that the dire predictions of activists and the media were as speculative as Smith's claims." *Id.* Marshall made these statements at the same time that the State refused to provide any discovery in Mr. Smith's litigation concerning the development of the nitrogen hypoxia protocol, including whether the State expected Mr. Smith to convulsively shake and violently gasp for air.

## LEGAL STANDARD

When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012) (per curiam) (citing *Cinotto v. Delta Air Lines, Inc.*, 674 F.3d 1285, 1291 (11th Cir. 2012)). Moreover, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard means that the complaint "'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro*, 693 F.2d at 1337 (citing *Twombly*, 550 U.S. at 556)). A plaintiff is "not required to negate an affirmative defense in [his] complaint." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

## ARGUMENT

### I.   Mr. Miller Has Standing to Bring All Three Claims Against All Four Defendants.

A plaintiff has standing to bring his claims if he shows "(1) 'that he suffered an injury in fact that is concrete, particularized, and actual or imminent,' (2) that the injury is traceable to—that is, 'was likely caused by'—the defendant's legal violation, and (3) 'that the injury would likely be redressed by judicial relief.'" *Walters v. Fast AC, LLC*, 60 F.4th 642, 647 (11th Cir. 2023) (quoting *TransUnion*

*LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). To establish injury in fact, "a plaintiff must show that he . . . suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Defendants do not dispute that Mr. Miller has suffered an injury in fact. Instead, Marshall argues Mr. Miller's injuries are not redressable by him, while both Ivey and the ADOC Defendants (Hamm and Raybon) argue that, to varying degrees, his injuries are neither traceable to them nor redressable by them. Not so. Mr. Miller's injuries are both traceable to and redressable by all four defendants.

### A.   Marshall has authority to redress the injuries under Counts I and II.

Marshall concedes that Mr. Miller has satisfied the injury-in-fact and traceability requirements for standing under Counts I and II. He limits his standing argument to redressability, which requires showing that the plaintiff's injuries are "likely to be redressed by a favorable judicial decision." *Walters*, 60 F.4th at 649 (quoting *Spokeo*, 578 U.S. at 338).

Marshall argues his injury to Mr. Miller was a singular past event for which no injunctive relief may be granted. Dkt. 28 ("Marshall Mot.") at 9-10. Marshall supports his argument by analogizing Mr. Miller's injury to that of the plaintiff in *Thomas v. Devries*, 834 F. Supp. 398 (M.D. Ga. 1993), whose employment was

terminated—a single, past violation of law. *Id.* at 10. There, the court applied the principle set forth in *Papasan v. Allain*, that any injunctive remedy imposed upon defendants operating in their official capacity must be "designed to end a continuing violation of federal law." 478 U.S. 265, 278 (1986). According to Marshall, his violation of Mr. Miller's rights is not "ongoing." Marshall Mot. at 10.

While Marshall's discrete act of filing the State's motion to set an execution date is complete, that act set in motion an ongoing violation of Mr. Miller's constitutional rights that, absent an injunction, will culminate in his execution. The issuance of the execution warrant itself, which resulted from Marshall's motion, is an active, *ongoing* threat to Mr. Miller's constitutional rights.

Moreover, Marshall's role in Mr. Miller's execution is not complete. The State's execution procedures provide for the Attorney General to play a role up until the moment the execution begins. *See* Ex. 3, Alabama Execution Protocols (Aug. 2023), at IX(K) ("Prior to the start of the judicial execution procedures . . . [t]he Warden will consult with the ADOC General Counsel and/or the Office of the Attorney General to ascertain whether a stay of execution has been entered or is expected to be entered, or whether the execution has been voluntarily delayed at the request of a court."). Furthermore, the execution procedures expressly acknowledge the State can "agree[] to a voluntary delay" of the execution, a decision that would require input from the Attorney General as the state's chief law enforcement officer.

*See* Compl. ¶¶ 5–7.

Marshall's assertion that he cannot by *any* action "reverse a decision by the Alabama Supreme Court that it is the 'appropriate time' to carry out Miller's sentence" defies logic. Marshall Mot. at 11. The Alabama Supreme Court does not act *sua sponte* to issue execution warrants. The court has a long history of issuing such warrants *only* on motions filed by the Attorney General. *See, e.g.*, *Barber v. Governor of Ala.*, 73 F.4th 1306, 1312 (11th Cir. 2023) ("[T]he State moved the Alabama Supreme Court to set an execution date for Barber."), *cert. denied*, 143 S. Ct. 2545 (2023); *Grayson v. Dunn*, 156 F. Supp. 3d 1340, 1343 (M.D. Ala. 2015) ("[T]he State of Alabama moved the Alabama Supreme Court to set execution dates for several death-row inmates."); *Nelson v. Campbell*, 541 U.S. 637, 640 (2004) ("[T]he Alabama Attorney General's office moved the Alabama Supreme Court to set an execution date."). The Alabama Supreme Court relies on the Attorney General to inform the court that an inmate's appeals are exhausted and that ADOC has the resources necessary to lawfully carry out the execution. *See, e.g.*, Ex. 4, Mot. to Set an Execution Date at 2–3. Just as Marshall moved the Alabama Supreme Court to enter an order authorizing Mr. Miller's execution, he can move that court to vacate the order. Marshall previously exercised that power in November 2022, by withdrawing his own motion for Mr. Miller's second execution date. *See* Ex. 5, *Miller v. Alabama,* No. 1040564, State of Alabama's Withdrawal of Mot. to Set

Execution Date (Ala. Sup. Ct. Nov. 22, 2022). Marshall could also ask this Court for a stay of Mr. Miller's execution.

Until the execution warrant is vacated, Mr. Miller faces imminent, prospective harm to his constitutional rights—precisely the kind of ongoing violation that *Papasan* and *Ex parte Young*, 209 U.S. 123 (1908) recognize as subject to injunctive relief against state officials. The ongoing nature of the constitutional injury is underscored by the fact that, unless halted by an injunction, it will lead to the permanent deprivation of Mr. Miller's life, the most serious and irreparable injury possible.

Lastly, regarding Count III, Marshall argues he has no control over the methods of execution used by ADOC and thus cannot redress the injury under that count. Marshall Mot. at 11. But the same authority Marshall possesses to redress the injuries alleged in Counts I and II can be exercised to redress this one. If the Court holds that executing Mr. Miller by the same method used to execute Mr. Smith would violate the Eighth Amendment, Marshall can move the Alabama Supreme Court to vacate the execution warrant. ADOC would then revise its method of nitrogen hypoxia executions to comply with the Eighth Amendment, and Marshall could move for a new execution warrant at a later date.

### B.    Counts I and II are traceable to and redressable by Ivey, Hamm, and Raybon.

Ivey, Hamm, and Raybon all concede Mr. Miller has satisfied the injury-in-

fact requirement for standing. They assert, however, that his injuries under Counts I and II are neither traceable to them nor redressable by them because they "do[] not set the order in which inmates are executed." Dkt. 29 ("Ivey Mot.") at 6; ADOC Mot. ("ADOC Mot.") at 7.

To satisfy traceability, the plaintiff's "injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1115 (11th Cir. 2022). At the motion to dismiss stage, the Court must accept the plaintiff's allegations as true and construe them most favorably to the plaintiff. *Melvin v. Troy Univ.*, 609 F. Supp. 3d 1262, 1266 (M.D. Ala. 2022).

Mr. Miller alleges that all four defendants "consult with each other about which death row inmate should next be executed, and when." Compl. ¶ 161. This consultation is apparent from Marshall's motion to set an execution date for Mr. Miller, which states "the State of Alabama is prepared to carry out the execution of Miller's sentence by means of nitrogen hypoxia. . . ." Ex. 4, Mot. to Set an Execution Date at 3. Only the ADOC Defendants could provide a basis for Marshall to make that assertion about the availability of a particular method, since they manage the staff and resources available to carry out the executions. *See* Compl. ¶¶ 13-14, 17-20. And Ivey's consultation with Marshall regarding executions is apparent from her

request in 2022 that he withdraw pending motions for execution dates in the Alabama Supreme Court so ADOC could review the state's execution procedures. *See Barber*, 73 F.4th at 1313. These allegations, which demonstrate that Ivey, Raybon, and Hamm are involved in the order and timing of executions, must be accepted as true. *See Melvin*, 609 F. Supp. 3d at 1266.

The Complaint also alleges that all four Defendants are motivated to retaliate against Mr. Miller by executing him out of order in violation of his rights under the First and Fourteenth Amendments. *See* Compl. ¶¶ 146-154. It is certainly  at least plausible that because Mr. Miller's statements brought embarrassment and public pressure onto Marshall, Ivey, Raybon, and Hamm, they discussed how Marshall should move the Alabama Supreme Court to execute Mr. Miller ahead of others. His injuries under Counts I and II are thus traceable not only to Marshall, but also to the three others.[2]

Additionally—just like Marshall—Ivey, Hamm, and Raybon each have the authority to redress Mr. Miller's injuries under Counts I and II. Ivey has the statutory authority to set the timeframe for Mr. Miller's execution. Ala. R. App. P. 8(d)(1). While Alabama law requires Ivey to set a date not "less than 30 days from the date

---

[2] The ADOC Defendants cite this Court's opinion in Mr. Smith's case in which the Court found his equal protection claim—which was similar to Mr. Miller's Count II claim—was not traceable to them. *See* ADOC Mot. at 7–8. But Mr. Smith had not alleged, as Mr. Miller does here, that Marshall conferred with the ADOC Defendants on the order of execution.

of" the Alabama Supreme Court's order, the law is silent on how far into the future the timeframe may be. *See id*. Ivey can thus redress Mr. Miller's injury by changing Mr. Miller's date of execution from September 26, 2024, to a date after the execution dates of the inmates who exhausted their appeals years before Mr. Miller. Moreover, Ivey has previously used her authority as the chief executive to request that Marshall withdraw then-pending motions to set execution dates for inmates—and he complied. *See Barber*, 73 F.4th at 1313. She can use that same authority to request that Marshall move the Alabama Supreme Court to vacate the execution warrant.

Both ADOC Defendants can likewise redress Mr. Miller's injury because they have authority over the execution process. *See* Ala. Code §§ 15-18-82(b), 82.1(c). Should this Court hold that executing Mr. Miller out of order violates his constitutional rights and issue an injunction preventing that out-of-order execution, both ADOC Defendants could redress Mr. Miller's injury by complying with the injunction and refusing to carry out the execution.

### C.    Ivey has the authority to redress Mr. Miller's injury under Count III.

The ADOC Defendants concede that Mr. Miller has satisfied redressability with regard to them under Count III. Ivey, however, makes the same assertion as Marshall—that she has no control over ADOC's methods of execution. Ivey Mot. at 7. Though she does not control the state's *methods* of execution, she does control the *timing*, including controlling whether or not the execution is allowed to go forward

on the evening of September 26, 2024. *See* Ala. R. App. P. 8(d)(1). Should this Court hold that the State's current method of nitrogen hypoxia executions violates the Eighth Amendment, Ivey has the authority and obligation to change Mr. Miller's date of execution to a date far enough in the future that ADOC has time to revise the protocol. And just as Marshall has authority to redress the Count III injury by moving the Alabama Supreme Court to vacate the execution warrant, Ivey has the authority as chief executive to request that Marshall make that motion. *See* Compl. ¶ 148. Finally, as explained above, the State's execution procedures acknowledge the State's power to voluntarily delay an execution, a decision that would require input from the State's chief executive. *See* Ex. 3 at IX(K).

## II.   Neither *Younger* Abstention Nor the *Rooker-Feldman* Doctrine Apply to this Action.

This is not the first time Defendants have brought failed *Younger* abstention arguments against Mr. Miller's federal litigation.  This Court previously found that *Younger* abstention did not apply to Mr. Miller's previous claim to enjoin Defendants from making a second attempt to execute him by lethal injection in violation of his constitutional right to due process. *See Miller v. Hamm*, 640 F. Supp. 3d 1220, 1236 (M.D. Ala. 2022). The Court explained it would only consider a *Younger* abstention argument from Defendants in the context of a motion to stay Alabama Supreme Court proceedings. *See id*. As Mr. Miller has not moved to stay Alabama Supreme Court proceedings, *Younger* does not apply here under the

Court's prior analysis. Nevertheless, Mr. Miller addresses Defendants' *Younger* argument below.

Defendants argue that *Younger* abstention applies because (1) there is an ongoing state judicial proceeding, (2) that proceeding implicates important state interests, and (3) Mr. Miller has an adequate opportunity to raise his constitutional challenges in the state forum.  Marshall Mot. at 15–16; Ivey Mot. at 21–22; ADOC Mot. at 21–22 (citing *Watson v. Fla. Jud. Qualifications Comm'n*, 618 F. App'x 487, 490 (11th Cir. 2015)). Regardless of any interest the state may have in Mr. Miller's execution, the first and third elements of *Younger* are not satisfied here.

As a threshold matter, *Younger* is merely a doctrine of comity which prevents "federal courts from being the grand overseers of state courts and court-like administration." *Wexler v. Lepore*, 385 F.3d 1336, 1341 (11th Cir. 2004). It is not a doctrine that can be employed to allow states to violate citizens' fundamental constitutional rights with impunity. *Younger* itself acknowledged that its doctrine would *not* apply "where the danger of irreparable loss is both great and immediate." *Younger v. Harris*, 401 U.S. 37, 45 (1971). No loss is more irreparable than the loss of one's life and here, that danger is immediate. *Younger* does not apply to Mr. Miller's constitutional challenge.

### A.    There is no ongoing state judicial proceeding.

Should this Court nevertheless proceed to an analysis of *Younger's* elements,

it should find there is no ongoing state judicial proceeding. An "essential part" of the *Younger* analysis "is whether the federal proceeding will interfere with an *ongoing* state court proceeding." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003) (emphasis added). There must be a state proceeding still underway in which the plaintiff's federal claims can be adjudicated, *see id.*, which is not the case here. Mr. Miller's criminal case is over. He has exhausted his direct appeals and post-conviction remedies, his death sentence is final, his Rule 8 proceeding concluded, and the Alabama Supreme Court entered its order issuing the execution warrant. The judicial process is thus complete and the governor has set his execution date. This Court is the final venue for Mr. Miller's constitutional claims.

> **B.     A Rule 8 proceeding in the Alabama Supreme Court does not provide an adequate, "full and fair" opportunity to litigate federal constitutional claims.**

Even if this Court finds there is an ongoing state judicial proceeding (and there is not), the unique nature of Alabama's Rule of Appellate Procedure 8 does not afford Mr. Miller a full and fair opportunity to litigate his First Amendment and Equal Protection claims. A court may only abstain under *Younger* if the plaintiff has an adequate, "full, and fair opportunity to litigate his constitutional claim[s]" in a state proceeding. *Ohio C.R. Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627 (1986). Alabama's Rule 8 proceedings fall short of this standard.

*First*, the Alabama Supreme Court's role under Rule 8 is ministerial. The court

enters "an order authorizing the Commissioner of the Department of Corrections to carry out the inmate's sentence of death within a time frame set by the governor," and issues a short order allowing the execution to proceed.

*Second*, and relatedly, Rule 8 does not provide the procedural safeguards for Mr. Miller to fully and fairly litigate his constitutional claims under *Younger*. Indeed, the rule does not expressly contemplate a mechanism for conducting discovery, developing an evidentiary record, subpoenaing witnesses, or holding hearings. *See generally* Ala. R. App. P. 8.

*Third*, Rule 8 does not require the Alabama Supreme Court to issue any kind of reasoned decision addressing the inmate's constitutional arguments. The court can summarily grant the Attorney General's motion to set an execution date without analyzing or ruling on the merits of any constitutional issues the inmate may raise in opposition (as it did here). *See* Ala. R. App. P. 8(d)(1). This lack of a written opinion leaves Mr. Miller with no way to discern the basis for the court's ruling or to obtain meaningful appellate review.

Ultimately, the ministerial nature of Rule 8 proceedings makes them an inadequate forum for adjudicating the type of constitutional challenges Mr. Miller raises. To relegate Mr. Miller to asserting his claims solely as a defense to the State's Rule 8 motion would deprive him of the full and fair opportunity to litigate them that *Younger* requires. *See Ohio C.R. Comm'n*, 477 U.S. at 627. Because Rule 8 is not

designed or equipped to provide a meaningful hearing on Mr. Miller's constitutional claims, and in practice the Alabama Supreme Court does not provide meaningful hearings on arguments raised in opposition to Rule 8 motions, this Court should find *Younger* abstention inappropriate and allow Mr. Miller's § 1983 case to proceed.

### C.   The claims do not fall within the narrow confines of *Rooker-Feldman.*

As the Eleventh Circuit has cautioned, "district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply." *Behr v. Campbell*, 8 F.4th 1206, 1212 (11th Cir. 2021). The court explained that the *Rooker-Feldman* doctrine "occupies 'narrow ground' and is 'confined to cases of the kind from which the doctrine acquired its name.'" *Id.* at 1209 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). "Only when a losing state court litigant calls on a district court to modify or 'overturn an injurious state-court judgment' should a claim be dismissed under *Rooker-Feldman*; district courts do not lose subject matter jurisdiction over a claim 'simply because a party attempts to litigate in federal court a matter previously litigated in state court.'" *Id.* at 1210 (quoting *Exxon Mobil*, 544 U.S. at 292–93). Also, the Supreme Court explained in *Exxon Mobil*, "*Rooker-Feldman* did not prevent the District Court from exercising jurisdiction when ExxonMobil filed the federal action, and it did not emerge to vanquish jurisdiction after ExxonMobil prevailed in the Delaware courts." 544 U.S. at 294.

Here, Mr. Miller initiated his federal lawsuit before the Alabama Supreme Court entered its order issuing the execution warrant. Because the federal action was filed prior to the state court judgment—as a matter of law—*Rooker-Feldman* cannot apply. The doctrine does not "vanquish jurisdiction" when a plaintiff litigating in state court also files suit in federal court to vindicate federal rights. *Id*. *Rooker-Feldman* applies only when "the plaintiff's claim directly challenge[s] a state court loss." *Id.* at 1211. Mr. Miller's First and Fourteenth Amendment claims do not.

The decision in *Powell v. Thomas*, 784 F. Supp. 2d 1270 (M.D. Ala. 2011), *aff'd*, 641 F.3d 1255 (11th Cir. 2011)) is instructive. There, the plaintiff brought a method-of-execution challenge to Alabama's lethal injection protocol in federal court after he unsuccessfully sought a stay of his scheduled execution on the same grounds in the Alabama Supreme Court. The court "decline[d] to apply the narrow *Rooker-Feldman* doctrine because Williams does not identify or complain of an injury caused by the Alabama Supreme Court's decision, but rather complains of the future conduct of the ADOC officials in implementing the lethal injection procedure." *Id.* at 1276 n.1.

Here, as in *Powell*, Mr. Miller's First and Fourteenth Amendment claims do not complain of any injury caused by the Alabama Supreme Court, but rather complain about the determination that Defendants made to retaliate against his public criticism of their botched execution attempt and to seek Mr. Miller's

24

execution despite the existence of sixteen other condemned people who elected nitrogen hypoxia and whose conventional appeals were exhausted before Mr. Miller's.  Accordingly, the *Rooker-Feldman* doctrine does not apply.

## III.  Sovereign Immunity Does Not Apply to This Lawsuit.

Sovereign immunity does not bar Mr. Miller's claims against any of the Defendants, because Mr. Miller seeks prospective equitable relief related to ongoing violations of his rights under the U.S. Constitution. *See Miller v. Hamm*, 640 F. Supp. 3d 1220, 1235 (M.D. Ala. 2022) (citing *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336–37 (11th Cir. 1999)) ("In *Ex parte Young*, the Supreme Court established an exception to this prohibition for suits against state officials seeking prospective equitable relief to end ongoing and continuing violations of federal law."). On this point Defendants argue, as they do ad nauseam throughout their motions, that **no Defendant** has any ongoing role or responsibility in carrying out Mr. Miller's execution. Ivey specifically claims she has no "responsibility" or "authority" over Mr. Miller's execution because she will not personally serve as Mr. Miller's executioner. Similarly, Marshall claims he cannot possibly be violating federal law because his role is "essentially over." And the ADOC Defendants claim they have no ongoing role in the unconstitutional retaliation against Mr. Miller because they do not move the Alabama Supreme Court for the execution warrant or select the execution date. *See* Marshall Mot. at 14; Ivey Mot. at 9-10; ADOC Mot.

at 14. As identified *supra* at 12-19 and *infra* at 30-34, and as alleged in Complaint ¶¶ 10, 13-14, 17-21, these arguments are specious. Mr. Miller has clearly alleged that all four Defendants continue to play a role in the unconstitutional retaliation against him, and all four Defendants have a role in either personally carrying out, or allowing to proceed, an unconstitutional execution.

Defendants next argue that they enjoy sovereign immunity from Mr. Miller's claims because he is alleging a violation of Alabama state law. Facially this is of course false, as Mr. Miller has alleged violations of the First, Eighth, and Fourteenth Amendment to the U.S. Constitution. But, Defendants argue, the Court must look past the legal claims and find that the "gravamen" of Mr. Miller's Complaint is not federal constitutional law, but rather a single state rule of appellate procedure— specifically, Alabama Rule of Appellate Procedure 8(d). *See* Ivey Mot. at 11-14; Marshall Mot. at 29-31; ADOC Mot. at 11-13. Alabama Rule of Appellate Procedure 8(d)(1) states, in full:

> When pronouncing a sentence of death, the trial court shall not set an execution date, but it may make such orders concerning the transfer of the inmate to the prison system as are necessary and proper. The supreme court shall at the appropriate time enter an order authorizing the Commissioner of the Department of Corrections to carry out the inmate's sentence of death within a time frame set by the governor, which time frame shall not begin less than 30 days from the date of the order, and it may make other appropriate orders upon disposition of the appeal or other review. The supreme court's order authorizing the Commissioner of the Department of Corrections to carry out the inmate's sentence of death shall constitute the execution warrant.

Defendants point to four words from this rule of appellate procedure—"at the appropriate time"—as the basis for their argument that Mr. Miller's claims under the First and Fourteenth Amendments to the U.S. Constitution are "premised entirely on" Rule 8(d).

Not only is a state appellate rule not the "gravamen" of Mr. Miller's Complaint, it is essentially irrelevant to the Complaint and the legal claims contained therein. Mr. Miller's 50-page Complaint mentions Alabama Rule of Appellate Procedure 8 once, in passing. In the factual background section of the Complaint, while describing the turbulent past several years of Alabama's capital program, Mr. Miller noted that in December 2022, Ivey wrote a letter to the Alabama Supreme Court asking it to amend Rule 8(d)(1) to no longer limit execution warrants to a single 24-hour period. Implementing that request, the Alabama Supreme Court amended Rule 8(d)(1) to give the Governor the power to set the "time frame" under which an inmate's sentence of death shall be carried out by the Commissioner of ADOC. *See* Compl. ¶ 9. None of Mr. Miller's legal claims raise any issue with this change. And nowhere in the Complaint does Mr. Miller allege that any Defendant violated State law, let alone Ala. R. App. P. 8(d). Rather, Counts I and II are clearly premised on ongoing violations of U.S. constitutional law: retaliation against Mr. Miller for engaging in protected speech, and disparate treatment from other similarly

situated death row inmates.[3] Defendants' claim that Mr. Miller "seeks an order for the Defendants to follow [his interpretation of] state law" is plainly false. *See, e.g.,* Ivey Mot. at 15.

Defendants' argument also has no support in the case law. *Pennhurst State School & Hospital v. Halderman*, held that the *Ex parte Young* exception to sovereign immunity does not apply "when a plaintiff alleges that a state official has violated *state* law"—as the *Pennhurst* plaintiff alleged violations of state law in his complaint, and the district and appeals courts granted the requested relief on the basis of those state law claims. 465 U.S. 89, 106 (1984). And the factual context in *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198 (11th Cir. 2019) is far removed from this case. In *S&M Brands*, a plaintiff tobacco producer brought a mix of federal and state law claims against the State of Georgia. *Id*. at 1201. The plaintiff took issue with a Georgia regulatory regime under which certain tobacco producers were

---

[3] Strangely, Defendants assert Mr. Miller "does not allege that he was treated differently from inmates that are similarly situated." *See, e.g.*, ADOC Mot. at 14. This is incorrect. Mr. Miller alleges that he is similarly situated to the sixteen people who elected nitrogen hypoxia and whose conventional appeals were exhausted before Mr. Miller's appeals were exhausted, and that Defendants are treating him disparately than the people with whom he is similarly situated, for no rational reason related to a legitimate government interest. Compl. ¶¶ 174, 181-82. To the extent Defendants are suggesting that none of the sixteen people who exhausted their appeals previously had execution dates, *see, e.g*., ADOC Mot. at 14, that is untrue. As Mr. Miller alleged, the Alabama Supreme Court previously scheduled execution dates for the first three people on the Attorney General's list of individuals who elected nitrogen hypoxia and exhausted their appeals. Compl. ¶¶ 125-27.

required to self-insure by placing money into an escrow fund, using a form of escrow agreement provided by the state attorney general. *Id.* at 1201-02. The plaintiff contended that a state law required Georgia to release escrow funds back to tobacco producers once the account reaches certain excess levels. *Id.* at 1205. One of plaintiff's claims was that the state's refusal to return excess escrow funds was an unconstitutional taking under the Fifth Amendment to the U.S. Constitution. Only in this context—with the federal claim at issue so deeply intertwined with a state law regime—did the court find plaintiff's federal law claims to be "based on" an argument that defendants had violated state law. *Id.* at 1204.

Marshall also argues he has sovereign immunity because Mr. Miller's claims implicate Marshall's "executive discretion" to decide who should next be executed in Alabama, and in what order, via his motions in the Alabama Supreme Court. *See* Marshall Mot. at 28. This is false. *Ex parte Young* doctrine holds that state actors can be sued when the plaintiff seeks prospective declaratory or injunctive relief—unless the plaintiff seeks to "compel an executive official to undertake a discretionary task." *Seminole Tribe of Fla. v. Florida*, 11 F.3d 1016, 1028 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996); *Ex parte Young*, 209 U.S. 123, 158 (1908). Mr. Miller does not ask this Court to compel Marshall to undertake a discretionary task. Rather, Mr. Miller asks this Court to restrain Marshall from committing an unconstitutional act, which requires no affirmative action. This is precisely the type

of suit the *Young* court permitted:

> The general discretion regarding the enforcement of the laws when and
> as he deems appropriate is not interfered with by an injunction which
> restrains the state officer from taking any steps towards the enforcement
> of an unconstitutional enactment, to the injury of complainant. In such
> case no affirmative action of any nature is directed, and the officer is
> simply prohibited from doing an act which he had no legal right to do.
> An injunction to prevent him from doing that which he has no legal
> right to do is not an interference with the discretion of an officer.

*Ex parte Young*, 209 U.S. at 159. *Ex Parte Young* allows Mr. Miller's claims.

## IV.   Mr. Miller's Claims Against Defendant Marshall Are Based on Active and Ongoing Conduct.

Marshall incorrectly argues that declaratory or injunctive relief is improper against him, because he only allegedly violated Mr. Miller's rights in the past. Marshall Mot. at 7. As discussed above, this ignores Marshall's active role in executions in Alabama and Marshall's continuing violation of Mr. Miller's rights up until the time of execution. Further, it ignores the fact that Marshall's motion in the Alabama Supreme Court resulted in the issuance of a death warrant for Mr. Miller—and Marshall has the power at any point to petition the Alabama Supreme Court to vacate or stay that warrant.

### A.   Marshall has a continuing active role in Alabama executions.

Declaratory relief is appropriate where there is an "actual controversy" between parties. *See* 28 U.S.C. § 2201(a). An "actual controversy" exists where "'there is a substantial controversy, between parties having adverse legal interests,

of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Hendrix v. Poonai*, 662 F.2d 719, 721 (11th Cir. 1981) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). "The district court has wide discretion in determining whether declaratory relief is appropriate." *Ins. Co. of Pa. v. City of Long Beach*, 2005 WL 8160033, at *1 (C.D. Cal. Oct. 4, 2005). Additionally, a court will consider granting or denying injunctive relief "consistent with traditional principles of equity based on the facts of a particular case." *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 984 (11th Cir. 2016) (internal quotations omitted).

There is an "actual controversy" involving Marshall. Marshall and Mr. Miller have adverse legal interests—Marshall's interest is in having Mr. Miller executed under the current unconstitutional circumstances, while Mr. Miller's interest is in having a constitutional execution. Mr. Miller is engaged in the present lawsuit against Marshall to challenge the constitutionality of the methods by which Marshall and the State of Alabama seek to execute him. This amounts to a substantial controversy. The controversy is immediate because the Alabama Supreme Court granted Marshall's motion to set an execution date for Mr. Miller, and Ivey scheduled Mr. Miller's execution for September 26, 2024.

Marshall's assertions that he only played a part in violating Mr. Miller's constitutional rights "in the past" (Marshall Mot. at 7) is misleading and incorrect.

Although it is true that Marshall moved for an execution warrant for Mr. Miller on February 21, 2024, and that the Alabama Supreme Court granted that motion on May 2, 2024, Marshall's role in the execution process is not complete, as he continues to actively affect the deprivation of Mr. Miller's rights all the way up until the time Mr. Miller is executed.

Indeed, as Mr. Miller has pleaded, "Defendant Marshall has the obligation and responsibility to withdraw motions to set an execution date that are unconstitutional, including when the conditions of the proposed execution are unconstitutional." Compl. ¶ 7. This obligation and responsibility is ongoing, and does not cease after the motion is filed. Further, Marshall remains involved in the execution process until the execution is carried out. Any contention that Marshall's authority or duty is discharged after this motion is filed or granted is incorrect and contradicts Alabama's procedures. According to Alabama Execution Procedures (the "Procedures"), there must be an open telephone line to Ivey and Marshall before and during each execution. Compl. ¶ 18; Ex. 3 at IX(K), Alabama Execution Procedures at 15. The Procedures state that Hamm or Marshall's office must be consulted regarding whether a stay of execution has or is expected to be entered. Ex. 3 at IX(K). Critically, this paragraph also acknowledges that the State can agree to a voluntary delay of execution. *Id.* ("In the event a temporary stay of execution has been entered (or the State has agreed to a voluntary delay), the Warden may adjust the times for

actions required by this procedure in his/her discretion.").) This is again referenced later in the Procedures, explaining that the curtains to the witness rooms will be opened only "[a]fter verifying that there are no stays of execution, injunctions, or ***voluntary agreements by the State to delay execution of sentence***." *Id.* at X(A)(vii) (emphasis added). Marshall's constant consultation throughout the execution process and continuing ability to voluntarily agree to delay executions evidence his continuing active role in executions.

Additionally, according to his own statement released after the execution of Mr. Smith, Marshall "***cleared*** [Smith's] execution to commence at 7:56 pm. Kenneth Smith's officially pronounced time of death was 8:25 p.m." Marshall, *Alabama Attorney General Steve Marshall Statement on the Execution of Murderer Kenneth Smith by Nitrogen Hypoxia* (Jan. 25, 2024), https://www.alabamaag.gov/alabama-attorney-general-steve-marshall-statement-on-the-execution-of-murderer-kenneth-smith-by-nitrogen-hypoxia/ (emphasis added). Marshall's own statements thus show that he is actively involved in carrying out the execution—from the initial motion to set the execution date through final clearance, just moments before the condemned is put to death.

**B.    Marshall has a continuing obligation to uphold state and federal law and is obligated to file the appropriate motion in the Alabama Supreme Court if this court grants Mr. Miller relief.**

As the Attorney General of Alabama, Marshall is "a constitutional officer."

*Roles of the Attorney General*, https://www.alabamaag.gov/roles/. He has a continuing, active obligation and responsibility to attend to "all criminal cases pending in the Supreme Court," and to do so by upholding "the Constitution of the United States, and the Constitution of the State of Alabama[.]" Ala. Code § 36-15-1(2); *see* Ala. Const., art. XVI § 279 (Oath of Office); *see also* Compl. ¶¶ 6-7. If the Court determines that Mr. Miller's execution is unconstitutional, Marshall will be duty bound to comply with the Court's order. That means ensuring that the appropriate motion is filed in the Alabama Supreme Court so that the execution warrant against Mr. Miller does not remain active. Marshall's duty and obligations are therefore ongoing, and are properly the subject of injunctive or declaratory relief.

## V.      Counts I and II Are Properly Brought Under 42 U.S.C. § 1983.

Defendants' habeas arguments—which apply to Counts I and II only—rest on misrepresentations of the case law and the allegations in the Complaint. *See, e.g.*, Marshall Mot. at 24-25. As a preliminary matter, Defendants' have failed to cite a *single* case that accepted their position. Indeed, Defendants have not identified *any instance* in which a court held that a habeas claim was improperly brought under § 1983. *See id.* That alone warrants dismissal of their arguments.

In any event, it is well established that an inmate "must proceed in habeas when the relief he seeks would necessarily imply the invalidity of his conviction or sentence," *Nance v. Ward*, 597 U.S. 159, 167-68 (2022) (internal quotation marks

omitted). For that to occur, the relief requested must "foreclose the State from implementing the death sentence." *Id.* at 170 (cleaned up). A claim therefore proceeds through habeas "only if granting the prisoner relief would *necessarily* prevent the State from carrying out its execution." *Barwick v. Governor of Fla.*, 66 F.4th 896, 901 (11th Cir. 2023) (per curiam) (citing *Nance*, 597 U.S. at 168), *cert. denied*, 143 S. Ct. 2452 (2023). By contrast, when an inmate brings a claim "ask[ing] only for a change in implementing the death penalty," the claim "proceed[s] under § 1983." *Nance*, 597 U.S. at 168-69. So long as the requested "relief still places [the] execution in [Alabama's] control," then the claim is not jurisdictionally barred. *Id.* at 170.

That is the case here. Mr. Miller's requested relief is one of timing and method. He is "not challenging the death sentence itself," *id.* at 169, but rather asking that Defendants execute him in the "same chronological order they use for other inmates who elected" nitrogen hypoxia, and via a method of nitrogen hypoxia that will not cause him superadded pain and suffering, Compl. ¶ 196. *See also id.* ¶¶ 197(a)-(b) (requesting declarations stating that executing Miller "next" is a violation of his constitution rights). Such relief "provid[es] the State with a veritable blueprint for carrying the death sentence out" and gives Defendants "a pathway forward." *Nance*, 597 U.S. at 169.

Defendants' arguments to the contrary are meritless. Mr. Miller does not challenge "the validity" of his sentence, and he does not seek an "immediate or speedier release from prison." *See, e.g.*, Marshall Mot. at 24. Additionally, the Supreme Court rejected Defendants' arguments regarding a so-called "delay," *id.*, stating that an "incidental delay" of an execution "is not relevant to the vehicle question." *Nance*, 597 U.S. at 170. Instead, and as stated above, the question is whether the requested relief would "foreclose the State from implementing the death sentence." *Id.* (cleaned up). Miller's requested relief does not do so. Nor did the relief requested in *Nance*, even though it "necessitat[ed] a change in state law," which requires substantial "time and effort." *Id.* And in any event, granting relief to Miller would not "delay" his execution, but rather put Miller in the same place in line that he would otherwise be in if Defendants did not violate his constitutional rights by retaliating against him.

In addition to *Nance*, Defendants' arguments also fail under *Barwick*, directly relevant Eleventh Circuit precedent that Defendants failed to identify for the Court. There, an inmate filed claims under § 1983 seeking an injunction barring Florida from executing him until the state reformed its clemency process in order to comport with the Due Process Clause. *Barwick*, 66 F.4th at 901. Finding § 1983 to be the correct vehicle for the claims, the Eleventh Circuit explained that the inmate did not seek to prevent Florida from carrying out the execution, but rather sought an order

requiring the State to cure the defect in its clemency process before proceeding with the execution. *Id.* at 901-02. The same is true here. As stated, Miller does not challenge the "ultimate validity of his death sentence," *id.* at 901; instead, he is asking that Defendants cure their constitutional violations by executing him in the same order that Defendants use for other nitrogen hypoxia inmates. His claims are therefore proper under § 1983, and this Court has jurisdiction over them.

## VI.   Mr. Miller Plausibly Alleges His First Amendment Claim (Count I).

To state a First Amendment retaliation claim, Mr. Miller must plausibly allege that (1) he engaged in constitutionally protected speech, (2) Defendants retaliated against him in a way that adversely affected his protected speech, and (3) a causal connection exists between the retaliatory conduct and the adverse effect on his speech. *Williams v. Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023). Conduct adversely affects an individual's protected speech if it would "deter a person of ordinary firmness" from engaging in that speech. *Id.* Mr. Miller has plausibly alleged all three elements.

First, Mr. Miller plausibly alleges, and Defendants do not argue otherwise, that he engaged in constitutionally protected speech by publicly criticizing Defendants in his lawsuits against State officials before and after the execution attempt. Compl. ¶ 63. In particular, Mr. Miller alleges that he made detailed public statements criticizing Defendants' failed attempt to execute him and that the press

reproduced those statements, which painted Defendants in an unfavorable and "embarrassing" light, and put pressure on them to halt all executions in the State. *Id.* ¶¶ 144–46, 154. Filing a lawsuit is a form of protected speech. *See Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (per curiam) (concluding that retaliation for filing lawsuits implicates an "inmate's First Amendment rights"). And when a prisoner "complains to the prison's administrators about the conditions of his confinement, he is exercising his First Amendment right of freedom of speech." *Radford*, 64 F.4th at 1192. Mr. Miller went a step further and openly criticized political officials. His statements thus fall into the heart of First Amendment protection, which is at its "zenith" when an individual engages in "core political speech." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022) (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999)).

Second, Mr. Miller plausibly alleges that Defendants have engaged in retaliatory conduct that adversely affected his protected speech. Namely, he alleges that Defendants are attempting to *execute* him out of order in retaliation for his public criticisms and lawsuit. Compl. ¶¶ 160–69. A person of "ordinary firmness" would of course be deterred from speaking if state officials were seeking to execute him. *See Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023) (citation omitted) (concluding that "[t]he threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment

rights"); *see also Radford*, 64 F.4th at 1192 (concluding that segregated confinement would deter an ordinary prisoner from making complaints).

Third, Mr. Miller plausibly alleges a causal connection between his protected speech and Defendants' retaliatory actions. Mr. Miller alleges that after he made his statements, Defendants deviated from a settled pattern and practice by moving for his execution before 16 others who elected nitrogen hypoxia and exhausted their conventional appeals before him. Compl. ¶¶ 124, 164–65. Mr. Miller also alleges that the sole other person Defendants have moved to execute via nitrogen hypoxia out of order—Mr. Smith—was also the only other person who spoke out about a failed execution attempt by Defendants. *Id.* ¶ 155. Mr. Miller further alleges that Defendants consult with each other over who to execute next, that Defendants knew of his public criticisms and lawsuit, that his protected speech motivated Marshall's decision to pluck him from the near bottom of the list and place him at the head of the line, and that his protected speech—in which he publicly criticized Defendants for their handling of the previous execution attempt and shined an unfavorable light on them—motivated the decisions of Marshall, Ivey, Hamm, and Raybon to carry out the execution process out of order this time around. Compl. ¶¶ 160–69.

These allegations "allow a reasonable inference" that Defendants are engaged in retaliatory conduct and clear the low bar of plausibly alleging a causal relationship between Defendants' actions and Mr. Miller's speech. *See Douglas v. Yates*, 535

F.3d 1316, 1321 (11th Cir. 2008) (concluding that prisoner plausibly alleged First Amendment retaliation claim when he alleged that he was abused after filing a grievance); *Wright*, 795 F.2d at 968 (concluding that prisoner plausibly alleged First Amendment retaliation claim when he alleged that guards searched and confiscated his materials after he filed lawsuits against prison officials); *Perez v. City of Opa-Locka*, 629 F. Supp. 3d 1164, 1183, 1185 (S.D. Fla. 2022) (concluding that police officer plausibly alleged First Amendment retaliation claim when he alleged that city decreased his pay, demoted him, and placed him on administrative leave after he criticized city); *Jarrard v. Moats*, 2021 WL 1192948, at *13 (N.D. Ga. Mar. 30, 2021) (concluding that individual plausibly alleged First Amendment retaliation claim when he alleged that officials expelled him from jail after he spoke up in support of baptisms at the jail).

Defendants' motions ignore this straightforward analysis. Nowhere in their motions are the elements of a First Amendment retaliation claim even listed. Instead, Defendants focus on details that have no bearing on the claim. For example, Defendants make much of the fact that Mr. Miller was given "direct, in-person access" to his counsel and "a smartphone . . . to secure photographic evidence" after the State botched his execution. Marshall Mot. at 35; Ivey Mot. at 32; ADOC Mot. at 35. Mr. Miller's access to counsel and his counsel's use of a smartphone have

nothing to do with whether Defendants are retaliating against him by trying to execute him again, out of order, after he spoke out against them.[4]

In a similar vein, Defendants point to authority establishing that—in general— they may execute inmates or regulate speech. Marshall Mot. at 36–38; Ivey Mot. at 33–35; ADOC Mot. at 35–37. They invoke, for instance, Rule 8(d) of Appellate Procedure, which allows the Alabama Supreme Court to authorize the Commissioner of the Department of Corrections to carry out a sentence of death within a time frame set by the Governor. Defendants also rely on case law permitting prisons to enforce restrictions on speech that are "neutral" and "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *Pell v. Procunier*, 417 U.S. 817, 828 (1974).

Again, these arguments are unrelated to Mr. Miller's allegations. Mr. Miller does not dispute that Defendants *ordinarily* have authority to carry out executions or an interest in doing so. Nor does he dispute that prisons may regulate speech under certain circumstances. These concepts are beside the point. Mr. Miller's claim is that, no matter what authority Defendants generally possess, they do not have authority to violate his First Amendment rights. *See Gitlow v. People of State of N.Y.*,

---

[4] Not to mention, Defendants gave Mr. Miller access to in-person counsel and a smartphone to photograph his injuries because this Court *required* them to do so. *See Miller v. Hamm, et al.*, No. 22-cv-506-RAH, Dkt. 74 at 2 (M.D. Ala. Sept. 23, 2022).

268 U.S. 652, 666 (1925) (incorporating First Amendment against the states). Under Defendants' logic, state officials could execute death-row inmates in whatever manner and for whatever reason, all because the Alabama Rules of Appellate Procedure contemplate Defendants' involvement in executions. The fact remains that Defendants must stay within the bounds of the Constitution while following those procedures. *See O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) ("The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.") (per curiam) (citation omitted). And Mr. Miller has alleged that Defendants are attempting to silence him by executing him out of order, which violates the First Amendment, regardless of whether Defendants may generally carry out executions or regulate certain speech in prisons.

Ivey and Marshall alternatively theorize that Mr. Miller's claim should be analyzed under the framework that courts use for retaliatory prosecution.[5] Marshall Mot. at 38; Ivey Mot. at 35. They suggest that the existence of some kind of "probable cause" test bars Mr. Miller's claim. At no point do Defendants cite any case—or any authority—in support of the idea that the retaliatory-prosecution framework applies to a death-row inmate's claim of unlawful retaliation under the

---

[5] Defendants Hamm and Raybon have not made this argument and have therefore waived it. *Am. Builders Ins. Co. v. Southern-Owners Ins. Co.*, 71 F.4th 847, 860 (11th Cir. 2023) (arguments raised for first time in reply brief are waived), *cert. denied*, 144 S. Ct. 423 (2023).

First Amendment.[6] Nor could they. That is not the law. Under Eleventh Circuit precedent, "[t]o establish a retaliation claim, a prisoner must demonstrate that … there is a causal relationship between the retaliatory action and the protected speech," not that state officials lacked probable cause for the action in question. *Radford*, 64 F.4th at 1192 (cleaned up). Indeed, "the fact that Defendants articulated a legitimate reason—and disclaimed illegitimate reasons—for their decision is not dispositive" because "[i]f it were, a government employee would have a free pass to engage in unconstitutional retaliation so long as he or she typed up a fake explanation for the decision." *Jarrard*, 2021 WL 1192948, at *13. Here too, Defendants ask this Court to adopt a rule under which they would never lose. This Court should decline their invitation because it lacks any justification and well-settled Eleventh Circuit case law requires otherwise.

Finally, Defendants suggest that the proper form of "relief would be only an order that . . . unlawful restrictions on [Mr. Miller's] ability to speak end, without regard to the lawful execution of his sentence pursuant to a valid state court order." ADOC Mot. at 37; *see also* Marshall Mot. at 37–38; Ivey Mot. at 34–35. This request does not square with Mr. Miller's allegations. Mr. Miller is alleging that Defendants

---

[6] The sole case that Defendants rely on anywhere in this argument is a case about an employee of a real-estate company who alleged that a town had unlawfully retaliated against her by suing her over public-records requests. *See DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1282–88 (11th Cir. 2019). That case has no application here.

retaliated against him by choosing to execute him before other inmates who were ahead of him in line. The only relief that could remedy this harm would be an order that Defendants not to execute Mr. Miller out of order, as requested in the Complaint. Compl. ¶ 196.

In sum, Mr. Miller plausibly alleged his claim of First Amendment Retaliation in Count I.

## VII.  Mr. Miller Plausibly Alleges His Fourteenth Amendment Claim (Count II).

Defendants do not contest the sufficiency of Mr. Miller's allegations in Count II and have thus waived any argument to dismiss that claim for failure to plead a claim upon which relief can be granted. *See Am. Builders Ins. Co. v. S.-Owners Ins. Co.*, 71 F.4th 847, 860 (11th Cir.) (arguments not raised in an opening brief are waived). This Court should accordingly find that Mr. Miller has plausibly alleged Count II.

## VIII.  Mr. Miller Plausibly Alleges His Eighth Amendment Claim (Count III).

In order to establish a plausible method-of-execution claim, Mr. Miller must allege (1) that the method of execution poses "a substantial risk of serious harm," and (2) identify an "alternative" method of execution that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Price v. Comm'r, Ala. Dep't Corr.*, 920 F.3d 1317, 1326 (11th Cir. 2019) (per curiam) (cleaned up). Mr. Miller plausibly alleges these two elements.

A.   **Mr. Miller Plausibly Alleges That Executing Him Under the Current Protocol Would Cause Superadded Pain.**

A method of execution can present a "substantial risk of serious harm" where it involves a "lingering death," *Baze v. Rees*, 553 U.S. 35, 49-50 (2008), or the "super[adding] of terror, pain, or disgrace," *Bucklew*, 139 S. Ct. at 1124. Mr. Miller plausibly alleges that the manner in which the State will execute him via nitrogen hypoxia protocol will do both.

Indeed, in the months and weeks leading up to the execution of Mr. Smith, Defendants repeatedly represented to this Court, the Eleventh Circuit, and the U.S. Supreme Court that a person executed under the State's first-ever nitrogen hypoxia protocol "would be unconscious in a matter of seconds, not minutes." *See* Compl. ¶ 77; *see also id.* ¶ 90 (The Attorney General represented to the U.S. Supreme Court that it would take a "few seconds between when gas enters the mask and [Smith] loses consciousness."); ¶ 92 (Defendants represented to this Court that "ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask" and "cause unconsciousness within seconds").

Yet, by all public accounts (and there are many), that did not happen. *See id.* ¶¶ 104-10. Instead, Mr. Smith shook violently for several minutes and remained conscious well after the flow of nitrogen began. *See id*. ¶¶ 103, 107; *see also id.* ¶ 106 (Journalist who witnessed the execution remarked: "I've never seen such a violent execution or such a violent reaction to the means of execution"). Specifically,

45

Mr. Smith's "entire body—including his head—convulsed and seized violently, heaving against the straps with enough force to move the gurney." *See id.* ¶ 188. That was followed by several minutes of gasping for air. *Id.* One of the several witnesses who saw the execution firsthand said that Mr. Smith retched inside the mask. *Id.* Others who were also there and in close proximity to Mr. Smith said, "Kenny's muscles went from tensed up to looking like they were going to combust. Veins spider webbed in every direction." *Id.* ¶ 110. What's more, "[s]aliva, mucus, and other substances shot out of [Kenny's] mouth. The concoction of body fluids all started drizzling down the inside of the mask." *Id.* Again, this lasted "for several minutes," *id.* ¶ 104, and it was not until ten minutes after Mr. Smith's first reaction to the nitrogen gas that he made "his last visible effort to breathe," *id.* ¶ 105. There can be little question that these allegations—which are based on several eyewitness accounts provided by individuals who were near Mr. Smith during the execution—plausibly demonstrate that the current nitrogen hypoxia protocol would "superadd… terror, pain, or disgrace" to Mr. Miller's execution and cause a "lingering death."

Rather than accept these well-reported allegations as true, which Defendants must at this stage in the proceedings, Defendants try to fight them instead. First, Defendants claim that the allegations rely on "laywitness accounts" and are not proven by "expert testimony." Marshall Mot. at 40. That is of no moment—Defendants do not cite any case that requires Mr. Miller to include expert testimony

in his allegations. That is because they cannot—no such requirement exists. Moreover, all five journalists who were permitted in the viewing room of Mr. Smith's execution reported seeing Mr. Smith shake violently and experience serious harm. Compl. ¶ 107. So too did the other witnesses. *Id.* ¶¶ 109-10.

Next, Defendants theorize that "Smith's movements *may* have been wholly voluntary, conscious behavior," or they "*could* have been the result of holding his breath." Marshall Mot. at 42 (emphasis added). Defendants then import, in an act of desperation, statements from Philip Nitschke that appear nowhere in the Complaint. *See id.* at 43-44. As a threshold matter, these statements cannot be considered on a motion to dismiss, as it is black letter law that courts may not consider material outside of the pleadings under Rule 12(b)(6) absent circumstances not present here. *See, e.g.*, *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("The scope of the review [on a motion to dismiss] must be limited to the four corners of the complaint."). Furthermore, this Court cannot consider the statements for the purpose that Defendants suggest (*see* Marshall Mot. at 43 n.4), because no matter how Defendants frame the statements, they are based on materials *outside of the pleadings*, and *Iqbal* does not state that a court may consider extraneous materials in weighing the plausibility of a plaintiff's claims.

In any event, the statements do not undermine Mr. Miller's allegations of what happened to Mr. Smith because the allegations are based on the accounts of *nearly*

*every independent witness* who was actually present at the execution (unlike Philip Nitschke). And those accounts are corroborated by a report *produced by Defendants* and commissioned by the State of Oklahoma on the dangers of an ill-fitting mask in a nitrogen hypoxia execution. *See* Compl. ¶ 111. As Defendants know well, the report states that "problems have occurred" when a nitrogen hypoxia mask is placed over a face due to the "small amount of oxygen being inhaled," which "extends the time to become unconscious," and "extends the time to death," and "may result in purposeless movements by the decedent." *Id.* This report, combined with the independent accounts of what Mr. Smith experienced, and the allegations that a member of execution team had to check on Mr. Smith's mask well after the flow of nitrogen began (*id.* ¶ 103), make clear that Mr. Miller has at least plausibly alleged that the current nitrogen hypoxia protocol will cause him superadded pain. *See Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *10 (M.D. Ala. Jan. 10, 2024) (finding that Mr. Smith plausibly alleged that "the Protocol could and will increase the time to unconsciousness and will present imminent dangers and superadd pain"). And even if this Court credited Defendants' free-floating suggestions otherwise, Defendants' theories of what happened to Mr. Smith amount to a factual dispute that cannot be resolved at this stage of the proceedings.

Finally, Defendants claim that Mr. Miller's allegations only "mean that another inmate suffered some pain" and that the Complaint fails to allege that the

same would happen to Mr. Miller. Marshall Mot. at 45. That borders on the absurd. As stated, Defendants promised this Court time and again that Mr. Smith would be unconscious in a matter of seconds. That did not happen and Mr. Smith is the only person in Alabama (and the country) to be executed via nitrogen hypoxia. In fact, before Mr. Smith's execution, the Court noted, "The novelty of the Protocol and that Smith is to be the first condemned inmate executed under it are undisputed facts." *Smith*, 2024 WL 116303 at *8. Defendants have not changed the novel protocol since Mr. Smith's execution went awry (Compl. ¶ 83), and they intend to carry out the same problematic procedures that caused Mr. Smith's execution to go off the rails just months ago. Furthermore, Defendants know from their production of the Oklahoma report that there are problems associated with the mask, and they also know that a member of the execution team had to inspect the mask on Mr. Smith's face after Mr. Smith showed visible signs of suffering from superadded pain.

These problems are exacerbated for Mr. Miller by the fact that the mask is one-size-fits-all, and Mr. Miller is significantly larger than average—as alleged, he weighs approximately 350 pounds and is 5'10", which significantly increases the risk that the mask will not fit correctly and that outside air will leak into the mask during the execution, just as the Oklahoma report discusses. Defendants' meritless argument thus fails.

B.      Mr. Miller Plausibly Alleges An Available Alternative Method.

Defendants arguments regarding the second element rest on a misunderstanding of the case law.

As the Supreme Court and Eleventh Circuit have explained, in identifying an alternative method, Mr. Miller is "not limited to choosing among those presently authorized by a particular State's law." *Nance*, 597 U.S. at 164. As long as the alternative is "sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and reasonably quickly,'" the proposed alternative will suffice at the pleading stage. *See Price*, 920 F.3d at 1327. Here, Mr. Miller proposes several alternatives that the State could carry out "relatively easily and reasonably quickly": (i) using a mask that fits Mr. Miller's face and creates an airtight seal; (ii) having a medical professional place and hold the mask on Mr. Miller's face; (iii) having a medical professional supervise the nitrogen flow rate during the execution; (iv) having a medical professional present during the execution attempt; (v) using medical grade nitrogen; and (vi) using a sedative or tranquilizer medication in pill form to reduce thrashing movements that could further dislodge the mask. *See* Compl. ¶ 193. The Court need not find every alternative to be adequately alleged. As long as one alternative method is sufficiently pled, Defendants' motion should be denied. And notably, Defendants do not contest the first and last alternatives in the Complaint—namely, they do not object to Mr. Miller's allegations that using a

mask that fits his face and creates an airtight seal is a feasible and readily implemented alternative, nor do they contest the same regarding the use of a sedative or tranquilizer medication.

Defendants focus instead on the use of a medical professional and medical grade nitrogen. *See, e.g.*, Marshall Mot. at 46-48. First, Defendants argue that the Complaint does not allege how using a trained medical professional to administer the nitrogen and hold the mask against Mr. Miller's face would reduce the risk of serious harm. *Id.* at 46. This argument ignores the allegations in the Complaint. As alleged, Defendants refuse to check the size of the mask against the person being executed to see if a tight seal can be achieved based on that person's physical characteristics. Compl. ¶ 75. In fact, the previous warden at Holman has testified that "[w]e do not have to have an airtight seal," and Defendant Hamm has admitted that he is not "aware that the mask need[s] to be airtight." *Id.* ¶ 78.

During Mr. Smith's execution, the lack of an airtight seal proved deeply problematic as oxygen seemingly seeped into the mask over an extended period of time, which caused superadded pain and violent shaking (as alleged *supra*), and necessitated a member of the execution team to inspect the mask well after the gas began to flow. *Id.* ¶ 103. If Defendants insist on not using an airtight mask on Mr. Miller, a trained medical professional holding the mask against Mr. Miller's face would significantly reduce the risk of the same severe pain that Mr. Smith suffered.

This alternative procedure is consistent with both the Oklahoma report, which warns on the dangers of an ill-fitting mask not tightly sealed to the face (*id.* ¶ 111), and the recommendation of the manufacturer of the State's mask, which recommends using an airtight seal (*id.* ¶ 78).

Next, Defendants claim that an alternative procedure involving the participation of a medical professional cannot suffice because the State may have a "legitimate reason" not to implement such a procedure. *See* Marshall Mot. at 46. This argument fails. The Complaint alleges in painstaking detail how Mr. Smith was subject to a horrific and unconstitutional experience as the State tried its novel method of execution for the very first time. The execution did not reflect the promises that that Defendants made to this Court and others, and resulted in nearly independent eyewitness describing the terror they saw as each minute of the execution stretched on. The State thus has every incentive to correct the problems associated with the first-of-its kind execution to ensure it does not happen again. Additionally, this Court previously found that Mr. Smith's proposed alternatives involving a "licensed medical provider" were plausibly alleged, *see Smith*, 2024 WL 116303, at \*10 (citing paragraph 102 of Mr. Smith's Second Amended Complaint), thereby foreclosing Defendants' argument here that the involvement or availability of such a professional cannot suffice.

Defendants also take issue with Mr. Miller's proposal regarding medical grade nitrogen. *See, e.g.*, Marshall Mot. at 47. First, Defendants claim that Mr. Miller does not link the well-documented accounts of Mr. Smith's execution with the difference between medical grade nitrogen and other form of nitrogen gas. *Id.* at 47-48. But Mr. Miller's allegations make a different point—that the use of non-medical grade gas can have a significant and negative impact on a person, like Mr. Miller, with a reactive airway disease such as asthma. *See* Compl. ¶¶ 84-85. Medical professionals accordingly do not use industrial grade gases on humans. *Id.* ¶ 85. Defendants also claim that Mr. Miller fails to plead that "medical grade nitrogen gas" is "readily available to the State." Marshall Mot. at 47. Yet Defendants ignore the obvious fact that they just recently carried out a nitrogen hypoxia execution, which allows for the reasonable inference that medical-grade gas is specifically available.

Because Mr. Miller plausibly alleged a severe risk of superadded pain, and alternative procedures that are feasible and readily available, and would significantly reduce the risk, the Court should deny Defendants' motion to dismiss.

## IX.    Rule 19 Does Not Require Dismissal of Any Claims

Finally, all Defendants argue that Federal Rule of Civil Procedure 19 requires the joinder of ***every other Alabama death row inmate*** before this matter can proceed. *See* Ivey Mot. at 18-19; Marshall Mot. at 33; ADOC Mot. at 18-19. Defendants posit that because two of Mr. Miller's three claims implicate the "sequence of executions,"

every other death row inmate is an "indispensable party" under Rule 19, and Defendants are subject to the "substantial risk" of double or inconsistent judgments. *See id.* This is nonsense and is based on a deliberate misconstruction of the Complaint. Mr. Miller does not ask this Court to issue any declaratory or injunctive relief that mandates which death row inmate is executed next. Nor does Mr. Miller ask this Court to announce a rule that mandates by what criteria the State can select inmates for executions going forward. Rather, Mr. Miller seeks a narrow declaration that Defendants' actions towards *Mr. Miller* are unconstitutional—and that unconstitutional retaliation is not a proper criteria by which Defendants can select the next inmate for execution. *See* Compl. ¶¶ 196–97. Mr. Miller's claims do not fall under Rule 19(a)(1)(A) because the Court can accord complete relief among existing parties: Defendants can be required to cease their retaliation against and disparate treatment of Mr. Miller and remove him from the top of the execution list, regardless of who else is on that list. Mr. Miller's claims also do not fall under Rule 19(a)(1)(B) because disposing of his claims—even if that means he is placed in his proper order in the nitrogen hypoxia list—does not leave any of the other individuals on that list without the ability to protect their interests. Defendants do not even attempt to identify how Mr. Miller's claims could subject them to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.

The only case Defendants cite in support of their Rule 19 argument is

inapposite. *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102 (1968), *rejected* an argument that a declaratory judgment action should be dismissed for failure to join an indispensable party. *Provident* held that the Rule 19 inquiry is a practical, and context-specific one, noting, "[w]hether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation. . . . based on factors varying with [] different cases." *Id.* at 118-19. The court specifically rejected Defendants' rigid approach to joinder, writing that it is "misplaced" to conclude that "in any case where an outsider 'may be affected' it is necessarily unjust to proceed." *Id*. at 123.

Although Defendants do not specify whether they think the other men on the nitrogen hypoxia list should be joined as plaintiffs or defendants, both options are ridiculous. These men cannot be joined as plaintiffs, as they cannot be forced to bring legal claims they have not asserted. And they cannot be joined as defendants because Mr. Miller has no claims against them. *See, e.g., Lacroix v. Lee Cnty., Fla*., 2:18-CV-143-FTM-38CM, 2018 WL 3629021, at *3 (M.D. Fla. July 30, 2018) ("Lastly, Lee County's joinder argument omits consideration of one key aspect: Lacroix has not made any claims against the Non-Parties. Nor, as the claims are currently alleged, could he because the Non-Parties cannot write, interpret, or enforce the Laws. Joining them here would merely add parties without operative

claims. That is impermissible."). Nor do Defendants account for the fact that Count III is an Eighth Amendment claim, and joining every other death row inmate would force them to adopt Mr. Miller's claims about the State's nitrogen hypoxia method, unfairly foreclosing their rights to bring their own method of execution challenge.

Perhaps not coincidentally, if Defendants' argument is credited, it would facilitate a slippery slope that would complicate and extend all litigation by men on death row with upcoming execution dates. Any time an inmate challenges his execution for any reason, all other death row inmates would be necessary parties, because a ruling on one inmate's execution could affect the timing of everyone else's. In short, the Court should reject Defendants' attempt to avoid judicial review by demanding something procedurally and substantively unworkable. This legal dispute is between Mr. Miller and Defendants.

## **CONCLUSION**

For all these reasons, Mr. Miller respectfully requests that this Court deny the Defendants' Motions to Dismiss.

Dated: May 14, 2024                          Respectfully submitted,

                                             /s/ *J. Bradley Robertson*
                                             J. Bradley Robertson
                                             Danner Kline
                                             Bradley Arant Boult Cummings LLP
                                             One Federal Plaza
                                             1819 5th Ave. N.,
                                             Birmingham, AL 35203
                                             Tel: (205) 521-8188

Fax: (205) 488-6188
Email: brobertson@bradley.com
Email: dkline@bradley.com

Rachel C. Bramblett
Bradley Arant Boult Cummings LLP
Promenade Tower, 20th Floor
1230 Peachtree St. NE
Atlanta, Georgia 30309
Tel: (404) 868-2100
Email: rbramblett@bradley.com

Daniel J. Neppl
Kelly Huggins
Mara E. Klebaner
Stephen Spector
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email: dneppl@sidley.com
Email: khuggins@sidley.com
Email: mklebaner@sidley.com
Email: sspector@sidley.com

*Attorneys for Plaintiff Alan Eugene Miller*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 14, 2024, I served a copy of the foregoing via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to all counsel of record.

<u>/s/ *J. Bradley Robertson*</u>
J. Bradley Robertson