# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ALAN EUGENE MILLER, | |
| *Plaintiff*, | Civil Action: 2:24-cv-197 |
| v. | **CAPITAL CASE – EXECUTION SCHEDULED FOR SEPTEMBER 26, 2024** |
| STEVE MARSHALL, in his official capacity as Attorney General, State of Alabama, | |
| KAY IVEY, Governor of the State of Alabama, | |
| JOHN Q. HAMM, In his official capacity as Commissioner, Alabama Department of Corrections, | |
| TERRY RAYBON, in his official capacity as Warden, Holman Correctional Facility, | |
| *Defendants*. | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR IN THE ALTERNATIVE STAY OF EXECUTION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I.    Procedural Background ..............................................................................2

    A.    Previous Litigation Involving Plaintiff and Nitrogen Hypoxia ............2

    B.    The State Botches its Attempt to Execute Mr. Miller by Lethal Injection. ..............................................................................................3

    C.    The State Again Attempts to Execute Mr. Miller by Lethal Injection but Later Agrees to Execute Him Only By Nitrogen Hypoxia. ............4

    D.    The Alabama Supreme Court Grants the State's Motion to Execute Mr. Miller by Nitrogen Hypoxia. .........................................................4

II.    Factual Background. ..................................................................................6

    A.    The State Selects a Faulty Mask and an Insufficient Grade of Nitrogen for Nitrogen Hypoxia Executions. .........................................6

    B.    The State Botches the Nitrogen Hypoxia Execution of Mr. Smith and Tries to Cover It Up. .......................................................................9

LEGAL STANDARD ...........................................................................................12

ARGUMENT .......................................................................................................13

I.    Mr. Miller is Likely to Succeed on the Merits of His Eighth Amendment Claim. ......................................................................................................14

    A.    The Current Nitrogen Hypoxia Protocol Poses a "Substantial Risk of Serious Harm." ...................................................................................14

    B.    Alternative Procedures to the Nitrogen Hypoxia Protocol Are Available. ...........................................................................................17

    C.    Mr. Miller Will Suffer Irreparable Harm if a Preliminary Injunction is Not Granted. ..................................................................................20

II.    A Preliminary Injunction Will Not Substantially Harm Defendants or Be
       Adverse to the Public Interest..........................................................................20

CONCLUSION ........................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                             **Page(s)**

*Arthur v. Myers*,
   2015 WL 668007 (M.D. Ala. Feb. 17, 2015) .....................................................21

*Baze v. Rees*,
   553 U.S. 35 (2008)...........................................................................................14

*Bucklew v. Precythe*,
   587 U.S. 119 (2008)..........................................................................................14

*Glossip v. Gross*,
   576 U.S. 863 (2015)..........................................................................................14

*Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*,
   966 F.2d 460 (9th Cir. 1992) ...............................................................................20

*Hamm v. Miller*,
   143 S. Ct. 50 (2022)............................................................................................3

*Miller v. Hamm*,
   No. 2:22-CV-506-RAH, 2022 WL 4348724 (M.D. Ala. Sept. 19, 2022)..........20

*Miller v. Hamm*,
   No. 22-cv-00506-RAH (M.D. Ala. Aug. 22, 2022) ...................................*passim*

*Price v. Comm'r, Ala. Dep't of Corr.*,
   920 F.3d 1317 (11th Cir. 2019) ...................................................................13, 17

*Ray v. Comm'r, Ala. Dep't of Corr.*,
   915 F.3d 689 (11th Cir. 2019) ...........................................................................21

*Reeves v. Comm'r, Ala. Dep't of Corr.*,
   23 F.4th 1308 (11th Cir.), *application granted sub nom. Hamm v. Reeves*,
   142 S. Ct. 743 (2022)........................................................................................12

*Scott v. Roberts*,
   612 F.3d 1279 (11th Cir. 2010) .........................................................................20

*Smith v. Hamm*,
   No. 2:23-cv-00656-RAH (M.D. Ala. Dec. 20, 2023)....................................9, 10

## **INTRODUCTION**

A year and a half ago, Alan Miller sued various officers of the State of Alabama to ensure that the State honored his election to be executed by nitrogen hypoxia. Mr. Miller's desire to enforce his election remains unchanged. What has changed is that, in the past year and a half, the State developed and implemented a nitrogen hypoxia protocol, and it did not go well. The State has executed only one person, Mr. Kenneth Smith, using this protocol. The execution was a disaster. Multiple eyewitnesses reported a horrific scene, where Mr. Smith writhed on the gurney and foamed at the mouth. Instead of examining potential deficiencies with their protocol, the State has shrouded it in secrecy. And instead of acknowledging their mistakes, the State now seeks to execute Mr. Miller using the exact same method.

Because Defendants are presently unable to carry out a nitrogen hypoxia execution without prolonging death and cruelly superadding pain and disgrace, a nitrogen hypoxia execution under the current protocol would violate Mr. Miller's Eighth Amendment right to be free from cruel and unusual punishments.

Given the likelihood that Mr. Miller will prevail on his Eighth Amendment claim, the significant life interests at stake, and Defendants' minimal interest in moving forward with a constitutionally deficient execution, this Court should grant Mr. Miller's motion for a preliminary injunction and allow for resolution of his

Eighth Amendment claim. Specifically, Mr. Miller seeks a preliminary injunction that prohibits the State's execution of Mr. Miller without implementing the six alternative procedures to the State's current method of nitrogen hypoxia executions, namely: (1) using a mask that fits Mr. Miller's larger-than-average face and head, and creates an airtight seal; (2) using a qualified medical or scientific professional, rather than correctional officers, to place the mask on Mr. Miller's face, and hold it in place if it becomes dislodged in any way; (3) using a qualified medical or scientific professional, rather than correctional officers, to supervise the nitrogen flow rate during the execution; (4) having a medical professional present in the execution chamber during the execution attempt, who can respond if the execution goes awry as Mr. Smith's did; (5) using medical grade nitrogen; and (6) using a sedative or tranquilizing medication in pill form before administering the nitrogen gas, to reduce thrashing movements that could further dislodge the mask. Alternatively, this Court should stay Mr. Miller's execution date until Defendants' constitutional violations have been resolved and/or this litigation has been fully resolved.

## **BACKGROUND**

### I.    **Procedural Background**

#### A.    **Previous Litigation Involving Plaintiff and Nitrogen Hypoxia**

On April 19, 2022, the State of Alabama moved the Alabama Supreme Court to set an execution date for Mr. Miller. The State sought to execute Mr. Miller by lethal injection, even though he had elected to be executed by nitrogen hypoxia.

Mr. Miller sought injunctive relief in the U.S. District Court for the Middle District of Alabama. *See* Dkt. 1, Compl., *Miller v. Hamm*, No. 22-cv-00506-RAH (M.D. Ala. Aug. 22, 2022). After conducting a day-long evidentiary hearing—during which Mr. Miller gave live testimony—this Court found it was substantially likely that Mr. Miller had timely elected to be executed by nitrogen hypoxia. Accordingly, the Court enjoined the State from executing Mr. Miller by any other method. *See* Mem. Op., Dkt. 62, *Miller*, No. 22-cv-00506-RAH (M.D. Ala. Sept. 19, 2022). After the Eleventh Circuit denied the State's motion to stay the preliminary injunction, the U.S. Supreme Court vacated the injunction without explanation in a 5-4 ruling. *Hamm v. Miller*, 143 S. Ct. 50, 50 (2022).

## B. The State Botches its Attempt to Execute Mr. Miller by Lethal Injection.

The State tried to execute Mr. Miller by lethal injection on September 22, 2022, but the execution did not go to plan. For roughly 90 minutes, ADOC employees punctured Mr. Miller with needles as they tried to find a vein. Dkt. 1 ("Compl.") ¶¶ 37–46. Mr. Miller's execution was called off shortly before midnight, as Mr. Miller's death warrant expired before the State could establish sufficient veinous access. *Id.* at ¶¶ 49–52. Mr. Miller still suffers from intense psychological symptoms, due to the trauma of this botched execution. *Id.* at ¶¶ 53–58.

**C.    The State Again Attempts to Execute Mr. Miller by Lethal Injection but Later Agrees to Execute Him Only By Nitrogen Hypoxia.**

Less than two weeks after the failed execution, Defendant Marshall asked the Alabama Supreme Court to set an expedited second date to execute Mr. Miller by lethal injection. *Id.* ¶ 62. Mr. Miller filed a Second Amended Complaint around this time. *See* Dkt. 85, *Miller v. Hamm*, No. 22-cv-00506-RAH (M.D. Ala. Oct. 12, 2022). After this Court ordered the State to produce the names of lethal injection team members to Mr. Miller and its unredacted lethal injection protocol to the Court, among other information requested in discovery, the parties agreed to settle. *See Miller v. Hamm*, Order, Dkts. 99, 124, Case No. 2:22-cv-00506-RAH. As part of that settlement, the State agreed not to execute Mr. Miller by any means other than nitrogen hypoxia.

**D.    The Alabama Supreme Court Grants the State's Motion to Execute Mr. Miller by Nitrogen Hypoxia.**

On February 21, 2024, Defendant Marshall moved the Alabama Supreme Court for Mr. Miller's execution warrant. On March 29, 2024, Mr. Miller filed his Complaint in this Court. Shortly thereafter, on April 5, 2024, Mr. Miller filed his opposition to Defendant Marshall's motion in the Alabama Supreme Court, pointing that court to this litigation, and arguing that executing Mr. Miller at this time would violate his rights under the First and Fourteenth Amendments, and that the State's protocol for carrying out executions by nitrogen hypoxia violates his right to be free

from cruel and unusual punishment under the Eighth Amendment. On May 2, 2024, the Alabama Supreme Court authorized Commissioner Hamm to carry out Mr. Miller's death warrant within a time frame set by Governor Ivey and did not rule on or otherwise consider any of the arguments that Mr. Miller put forth in his opposition brief. *See* Ex. 1 at 1–2. On May 8, 2024, Governor Ivey set Mr. Miller's execution date for September 26, 2024. Dkt. 32-1.

On June 11, 2024, the Court dismissed without prejudice Mr. Miller's Counts I and II on jurisdictional grounds. *See* Dkt. 41. Mr. Miller has moved for a Rule 54(b) final judgment on those counts, so that he may appeal this Court's order to the Eleventh Circuit. *See* Dkt. 43. The Court denied Defendants' motion to dismiss Mr. Miller's Count III challenge to the constitutionality of Defendants' method of nitrogen hypoxia execution. *See* Dkt. 41 at 9-15. The scheduling order in the case required Mr. Miller to file his motion for preliminary injunction by June 21, 2024— before he will receive any discovery in this case, and before Defendants are required to file an answer in this litigation. *See* Dkt. 42 (setting a noon June 21 deadline for Mr. Miller's preliminary injunction, a June 21 deadline for Defendant's Answer, and a June 28 deadline a Rule 26(f) discovery plan). Mr. Miller moved for expedited discovery on two occasions, but both motions were denied. *See* Dkts. 20, 32.

## II.    Factual Background.

The State's nitrogen hypoxia protocol is the first of its kind and remains undeveloped. As a result, when the State carried out the first-ever execution a little less than six months ago, Mr. Smith was supposed to be unconscious within seconds but instead violently seized and gasped for air for minutes. Defendants now seek to execute Mr. Miller using the same protocol, despite Mr. Smith's widely-reported, horrific experience, and despite making no meaningful changes to the protocol to address what went wrong.

### A.    The State Selects a Faulty Mask and an Insufficient Grade of Nitrogen for Nitrogen Hypoxia Executions.

In the lead up to Mr. Smith's execution, the State made several representations to this Court about its novel method of execution. Specifically, the State claimed among other things that it would ensure that the mask it selected for nitrogen hypoxia executions fit properly on the face of the person to be executed. *See* Ex. 2 at 192:10–20. The State also represented that the configuration of the mask and the flow rate of nitrogen through the mask meant that the execution will result in Mr. Smith experiencing "very swift unconsciousness and then ultimately death." Ex. 3 at 55:16–57:12; *see also id.* at 63:6-8 (arguing that Mr. Smith would be unconscious in "a matter of seconds, not minutes").

But that turned out not to be true, which is not surprising because the mask that the State chose is not designed for executions. Instead, the mask is an industrial

safety air respirator mask made by Allegro Industries. *See* Ex. 4 at 2. This Allegro mask does not inherently produce an airtight seal. That is of critical importance because when oxygen leaks into the mask during the execution, the condemned can remain conscious while he is suffocated to death. The State knew this ahead of Mr. Smith's execution, because the State produced a report in Mr. Smith's litigation commissioned by the State of Oklahoma which explains that when masks are not "seal[ed] tightly to the face," "problems have occurred" due to the "small amount of oxygen being inhaled by the individual." *See* Ex. 5 at 7, Copeland, M., et al., *Nitrogen Induced Hypoxia as a Form of Capital Punishment*. Such problems include "extending the time to unconsciousness and extending the time to death," as well as "purposeless movements by the decedent." *Id.* at 7 (cleaned up).

Allegro's product manual also put the State on alert about this issue, stating that "[t]his respirator must be properly fitted to the individual to obtain effective respiratory protection" because ***"[a]n unsatisfactory face seal may result in leakage***, which dangerously reduces respiratory protection." Ex. 6 at 5 (emphasis added). The mere fact that there will be "positive pressure of air in the respirator does not reduce the importance of fit testing." *Id.* In addition, the respirator "may not provide a satisfactory face seal for individuals who have certain physical characteristics (such as facial hair or deformities.)" *Id.* For these reasons, Allegro

provides instructions for a "negative pressure user-seal check" to test whether "the facemask is sealing correctly." *Id*. at 8.

Despite the explicit recommendation of the manufacturer, the State has taken the position that an airtight mask is unnecessary. *See* Ex. 3 at 43:15–44:3. The State also refuses to perform a negative pressure test on the person to be executed, to check if the mask allows in oxygen. *See id.* at 48:10–21. The State refuses to do these things despite telling the spiritual advisors who attend nitrogen hypoxia executions that nitrogen may leak from the mask. *See* Dkt. 1-7.

Relatedly, the State admits the mask it uses for its nitrogen hypoxia executions is "one size fits all." *See* Ex. 3 at 49:23–50:7 (the State argues that its nitrogen hypoxia mask can fit "various faces … people of different sexes and of different sizes"). In other words, the State does not use different masks for different sized faces and heads, but instead relies on a mask that is designed to fit an average sized face and head. Similarly, the Allegro website describes its respirator masks as "one size fits most." *See* Ex. 7 at 2. Mr. Miller is not average sized. He is 5' 11" and approximately 350 pounds. *See* Ex. 8. And his head is significantly larger than average. *See* Compl. at p. 15.

Even when putting the mask problem aside, several other problems plague the State's nitrogen hypoxia protocol. First, and as this Court has acknowledged, the State keeps its execution protocol shrouded in secrecy, and has made unwritten

alterations and additions to the protocol on the fly in the lead up to Mr. Smith's execution. *See* Dkt. 1-5, Hr'g Tr. at 177:8–178:14, *Smith v. Hamm*, No. 2:23-cv-00656-RAH (M.D. Ala. Dec. 20, 2023) (Warden Stewart-Riley states ADOC has "some things . . . that's not in the protocol . . . some things are not mentioned," and confirms that ADOC has not "written any of this down anywhere"). Some of these unwritten additions were made in response to ADOC's training ahead of Mr. Smith's execution, *see id.*, indicating that ADOC is building this plane while flying it.

Second, the State refuses to disclose whether it uses medical grade or a lesser, industrial grade nitrogen in its executions. Nitrogen gas has different purity grades for different uses. *See* Ex. 9, https://nigen.com/nitrogen-gas-purity-grade-specification-industrial-medical-food/. There can be significant differences in purity between medical- and industrial-grade nitrogen gas. Industrial-grade gas may contain toxins (such as carbon monoxide) and other impurities (such as oxygen or carbon dioxide). For this reason, medical professionals only use medical-grade nitrogen gas on humans. *See* Ex. 10, Affidavit of Philip E. Bickler, M.D., Ph.D. ("Bickler Affidavit") ¶ 21.

### B. The State Botches the Nitrogen Hypoxia Execution of Mr. Smith and Tries to Cover It Up.

Despite making several representations to this Court about the effectiveness of its protocol, the State's execution of Mr. Smith looked nothing like what had been promised.

As stated, Defendants had a clear narrative of how the novel execution would go: a few breaths of nitrogen via the mask would render Mr. Smith instantly unconscious and dead soon after. *See* Dkt. 1-5 at 29:23–30:1. In oral arguments, the State represented that Mr. Smith could be unconscious "in just one breath." Ex. 3 at 60:8. Defendant Marshall even told the U.S. Supreme Court that it would take a "few seconds between when gas enters the mask and [Smith] loses consciousness." Ex. 11 at 4.

The State's theory hinged on the amount of oxygen available in the mask. According to the State, it would use "a mask tightly sealed by five separate straps" that has "no substantial risk of becoming loose or dislodged." Ex. 12 at 58.

The State thus predicted that, "[w]ithin seconds, Smith will have no available oxygen to breathe inside the mask," which "will render him unconscious and cause death."[1] Ex. 13, Dkt. 66, Defs.' Post-Hearing Br. in Opp'n to Pl. Mot. For Preliminary Inj., at 13, *Smith v. Hamm*, No. 2:23-cv-00656-RAH (M.D. Ala. Dec. 20, 2023). Indeed, the State described as "absurd" Mr. Smith's allegation that "the entrapment of any oxygen into the mask will cause 'the painful sensation of suffocation.'" Ex. 14 at 9. And the State reassured the Eleventh Circuit that the

---

[1] The State recognized that "[i]t is possible that an insignificant amount of nitrogen . . . could escape despite the mask's tight seal," but claimed that "it does not follow that there is a substantial risk that the outside air would infiltrate the mask in a meaningful quantity." *Id.* at 60.

nitrogen hypoxia method would deliver "the most painless and humane method of execution known to man." Ex. 3 at 41:18–20.

What happened to Mr. Smith proved Defendants wrong. Once the State began delivering nitrogen to Mr. Smith, he began to jerk violently. Ex. 15. His legs locked together, and his entire body shook, convulsing off the gurney. *Id.* Rather than the quick and peaceful death predicted by the State, Mr. Smith's death took more than 10 minutes. Ex. 16. For much of that time, he was gasping and visibly struggling to breathe. *Id.*

This account is based on the multiple independent journalists and observers who witnessed the execution personally.[2] Even the victim's son reported that "[a]fter about two or three breaths, that's when the struggling started" and that "[w]ith all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again." *See* Ex. 15 at 7.

---

[2] Ex. 15, New York Times, *A Select Few Witnessed Alabama's Nitrogen Execution. This is What They Saw* (Feb. 1, 2024); Ex. 17, NBC, *Alabama AG calls first nitrogen gas execution 'textbook,' but witnesses say inmate thrashed in final moments* (Jan. 26, 2024) (a journalist, who had seen four other executions in Alabama, stated, "I've never seen such a violent execution or such a violent reaction to the means of execution); Ex. 18, Reuters, *Alabama will help bring nitrogen asphyxiation executions to other states* (Jan. 26, 2024) (five journalists who served as media witnesses to Mr. Smith's execution "said he remained conscious for several minutes after the nitrogen flowed, and then began shaking and writhing on the gurney for about two minutes"); Ex. 19, Unilad, *Disturbing final words of inmate put to death by new controversial Death Row execution* (Jan. 26, 2024); Ex. 20, Tread, *'Never Alone': The suffocation of Kenneth Eugene Smith* (Jan. 26, 2024).

Mr. Smith's spiritual advisor, Reverend Jeff Hood, was in the execution chamber throughout the execution and offered a first-hand account. He described the process as "[no]thing short of torture":

> His chest moved up and down with gusto. He was clearly trying to breathe … Kenny was shaking the entire gurney. I had never seen something so violent. Kenny's muscles went from tensed up to looking like they were going to combust. Veins spider-webbed in every direction . . . Saliva, mucus and other substances shot out of his mouth. The concoction of body fluids all started drizzling down the inside of the mask. Back and forth … back and forth … back and forth Kenny kept heaving. We had been told by Alabama officials that the gas would kill Kenny in seconds, but the execution was now going on for minutes. Kenny was very much still conscious. I could see the horror in his eyes.

Ex. 21.

The State sought to undermine all these accounts. Indeed, the day after the execution, Defendant Marshall said that "[w]hat occurred last night was textbook." Ex. 22. The State has made no changes to its execution protocol since the execution of Mr. Smith and intends to use the same protocol for the execution of Mr. Miller.

## <u>LEGAL STANDARD</u>

A court may grant a preliminary injunction if the movant establishes "(1) a substantial likelihood of success on the merits; (2) that irreparable injury would result unless the injunction were issued; (3) that the threatened injury to him outweighs whatever damage the proposed injunction might cause the defendants; and (4) that, if issued, the injunction would not be adverse to the public interest."

*Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308, 1319 (11th Cir.), *application granted sub nom. Hamm v. Reeves*, 142 S. Ct. 743 (2022).

The standard for a stay of execution is the same. A stay is appropriate when the plaintiff can demonstrate that "(1) he has a substantial likelihood of success on the merits [of his claim]; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." *Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1323 (11th Cir. 2019) (per curiam).

## ARGUMENT

Mr. Miller's request satisfies each of the four factors governing the issuance of preliminary injunctions. First, Mr. Miller is substantially likely to prevail on the merits of his claim. Second, without an injunction, he will suffer irreparable harm— a painful, prolonged, and unconstitutional execution. Third, a preliminary injunction would not substantially injure Defendants because they will still be able to execute Mr. Miller after establishing constitutionally sufficient procedures. Fourth, the public interest counsels in favor of a preliminary injunction because it would allow the Court to resolve Mr. Miller's important and timely constitutional challenges while having minimal, if any, impact on Defendants' interests. The public also has an interest in ensuring that the second-ever nitrogen hypoxia execution does not result again in a well-documented disaster.

I.      **Mr. Miller is Likely to Succeed on the Merits of His Eighth Amendment Claim.**

To succeed on his Eighth Amendment claim, Mr. Miller must show (1) that the method of execution poses "a substantial risk of serious harm," and (2) identify an "alternative" method of execution that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Price*, 920 F.3d at 1326 (cleaned up).

A.      **The Current Nitrogen Hypoxia Protocol Poses a "Substantial Risk of Serious Harm."**

For the first element to be met, the challenged method of execution must present "a risk that is *sure or very likely* to cause serious illness and needless suffering, and gives rise to sufficiently *imminent* dangers." *Glossip v. Gross*, 576 U.S. 863, 877 (2015). This "substantial risk of serious harm" may occur when the method of execution involves a "lingering death," *Baze v. Rees*, 553 U.S. 35, 49-50 (2008), or the "super[adding] of terror, pain, or disgrace," *Bucklew v. Precythe*, 587 U.S. 119, 133 (2008).

The very recent and well-documented execution of Mr. Smith demonstrates the needless suffering and superadding of pain that Mr. Miller will experience. The State refuses to use a mask with an airtight seal, and also refuses to perform a negative pressure test on the person to be executed to see whether oxygen infiltrates the mask. Defendants refuse to do these basic things despite the manufacturer stating

that its mask should not be used *unless* a negative pressure test is performed to ensure that the seal is airtight, Ex. 6 at 5 & 8, and despite knowing that "problems . . . occur[]" when a mask is not sufficiently "seal[ed] tightly to the face," which results in "small amount of oxygen being inhaled" that "extends the time to become unconscious" and "extends the time to death," Ex. 5 at 7.

Unsurprisingly, Mr. Smith did not lose consciousness after a few breaths—as the State repeatedly promised this Court—and instead withered in violent pain for several excruciating minutes. As independent observers reported, Mr. Smith's entire body—including his head—convulsed and jerked violently, heaving against the straps with enough force to move the gurney. *See* Ex. 21 at 2. That was followed by several minutes of gasping for air. *Id.* One witness said that "Kenny's muscles went from tensed up to looking like they were going to combust. Veins spider-webbed in every direction." *Id*. at 2. At some point while Mr. Smith was gasping for air, a member of the State's execution team moved towards Mr. Smith's head to inspect the mask. *See* Ex. 23. While all of this occurred, "[s]aliva, mucus, and other substances shot out of [Kenny's] mouth. The concoction of body fluids all started drizzling down the inside of the mask." *See* Ex. 21. Again, this lasted for several minutes, *see* Ex. 24, and it was not until ten minutes after Mr. Smith's first reaction to the nitrogen gas that he made "his last visible effort to breathe," Ex. 20 at 10.

Medical experts who have reviewed the circumstances surrounding Mr. Smith's execution have concluded that the "available evidence" "strongly suggests" that Mr. Smith "consciously experienced extreme distress." Ex. 10, Bickler Decl., Ex. 3, Philip Bickler and Michael Lipnick, *Evidence Against Use of Nitrogen for Death Penalty,* JAMA E1-2 (May 29, 2024). Dr. Bickler, the author of this article, Chief of Neuroanesthesia at the University of California San Francisco ("UCSF"), the Director of the Hypoxia Research Laboratory at UCSF, and Mr. Miller's retained expert in this case, has concluded that "what happened during Mr. Smith's execution is the best prediction of whether people are likely to suffer under the State of Alabama's nitrogen hypoxia execution method, and that the next person executed via this method in Alabama will likely suffer as Mr. Smith did." *See* Bickler Affidavit ¶ 12.

Defendants now seek to execute Mr. Miller using the exact same method by which they executed Mr. Smith. To make matters worse, Mr. Miller has asthma, and unlike Mr. Smith, is 5'11" and approximately 350 pounds, with a head that is significantly bigger than average. *See* Ex. 8. This means that the State's one-size-fits-all mask meant for the average head and face is likely to fit Mr. Miller *even worse* that it fit Mr. Smith, which will likely result in even more oxygen seeping in, and prolonging Mr. Miller's suffering. *See* Ex. Bickler Affidavit ¶¶ 14, 18; Ex. 6 at 5 (mask manual stating that the mask "may not provide a satisfactory seal for

individuals with certain physical characteristics"). All of this leads to one conclusion: Mr. Miller faces a "substantial risk of serious harm" during his forthcoming execution.

### B. Alternative Procedures to the Nitrogen Hypoxia Protocol Are Available.

For Mr. Miller to meet the second element, he must present sufficiently detailed alternatives "to permit a finding that the State could carry . . . out [the alternatives] relatively easily and reasonably quickly." *Price*, 920 F.3d at 1327 (quotation marks omitted). Mr. Miller has done so.

The alternatives Mr. Miller has presented consist of: (1) using a mask that fits Mr. Miller's face and creates an airtight seal; (2) using a medical professional, rather than unqualified correctional officers, to place the mask on Mr. Miller's face, and hold it in place if necessary; (3) using a medical professional, rather than unqualified correctional officers, to supervise the nitrogen flow rate during the execution; (4) having a medical professional, rather than unqualified correctional officers, present during the execution attempt, who can respond if the execution goes awry as Mr. Smith's did; (5) using medical grade nitrogen; and (6) using a sedative or tranquilizing medication in pill form before administering the nitrogen gas, to reduce thrashing movements that could further dislodge the mask.

The first alternative will ensure that oxygen is less likely to infiltrate the mask, enabling a steady flow of nitrogen. "Using an ill-fitted and/or 'one-size-fits-all' mask

that enables the entry of outside breathing air (including oxygen) into the mask is highly likely to delay the onset of hypoxia, and prolong the suffering inherent in death by nitrogen hypoxia." *See* Bickler Affidavit ¶ 18. "Conversely, using a mask that is well-fitted to Mr. Miller's face will likely speed up the hypoxia process, and reduce the amount of time during which Mr. Miller is suffering." *Id.* And as noted in the Oklahoma report, when a "small amount of oxygen [is] inhaled" the time to reach unconsciousness and death can be extended. *See* Ex. 5 at 7. A mask that fits Mr. Miller's face would reduce the likelihood that he inhales unnecessary amounts of oxygen, which would reduce the likelihood of prolonged suffering. Alternate options for masks are readily available. In Mr. Miller's previous litigation, Assistant Attorney General James Houts said that the State will "fit the mask." *See* Ex. 2 at 192:18-19.

Additionally, using medical or scientific professionals—rather than an unqualified correctional officer—to hold the mask to Mr. Miller's face as necessary would significantly reduce the risk of oxygen leaking into the mask, whether due to poor fit of the mask, or due to the mask becoming dislodged from the violent jerking and convulsions caused by the suffocation process, because a medical or scientific professional is significantly more likely to know how to maintain the fit of the mask on Mr. Miller's face. *See* Bickler Affidavit ¶ 19. In Mr. Smith's litigation, the State acknowledged that it may be necessary to have "officials in the room who are going

to be positioned to be able to [use a hand to hold the mask to the person's face] if necessary." Ex. 3 at 50:22–51:5. Yet there is no mention of such a person in the protocol.

Having a medical professional present in the execution chamber enables ADOC to make an informed decision about when to halt a nitrogen hypoxia execution that has gone awry and is leading to a slow and painful suffocation. *See* Bickler Affidavit ¶ 19.

Using medical or scientific professionals, rather than correctional officers who are likely not trained in medicine and science, to monitor the flow of nitrogen gas into Mr. Miller's mask is likely to significantly reduce the risk that the nitrogen gas flow rate is inadvertently set too low, which in turn will reduce the risk that Mr. Miller's suffering is prolonged by a slow suffocation. *See* Bickler Affidavit ¶ 20. Utilizing a sedative would also significantly reduce the risk of severe harm since such sedatives promote calming effects, which in turn are likely to reduce the chances that involuntary jerking movements from the nitrogen will dislodge the mask and prolong the suffering. An oral sedative such as Valium is readily available to the State, and would significantly reduce Mr. Miller's risk of severe pain.

Finally, there are significant differences in purity between medical- and industrial-grade nitrogen gas. Industrial-grade gas may contain toxins (such as carbon monoxide) and other impurities (such as oxygen or carbon dioxide). For this

reason, medical professionals only use medical-grade nitrogen gas on humans. *See* Bickler Affidavit ¶ 21.

### C.   Mr. Miller Will Suffer Irreparable Harm if a Preliminary Injunction is Not Granted.

Mr. Miller will suffer irreparable harm if this Court does not enter the requested injunction. Harm is irreparable "if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). Money will "not remedy Miller's [harm] because his [harm] is not monetary." *Miller v. Hamm*, No. 2:22-CV-506-RAH, 2022 WL 4348724, at *21 (M.D. Ala. Sept. 19, 2022). Instead, Mr. Miller's harm is the superadded pain that he will suffer during his execution. Because this harm is irreparable, this factor weighs in favor of granting an injunction.

## II.   A Preliminary Injunction Will Not Substantially Harm Defendants or Be Adverse to the Public Interest.

Compared to the irreversible harm that Mr. Miller will suffer if his request is denied, the harm to Defendants is slight. Defendants have an interest in the execution of the State's judgments, but a minimal delay (if any) resulting from granting temporary relief sought here will have little adverse effect upon that interest. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to [violate the Eighth Amendment], they suffer injury that can never be undone, and the Constitution suffers an injury

that can be never be repaired."). As discussed, Mr. Miller agrees that the State may execute him by nitrogen hypoxia. He simply seeks to ensure that Defendants do not violate his constitutional rights in the process.

Defendants—all of whom are state actors—and the public both have an interest in conducting executions in a manner that does not violate Mr. Miller's constitutional rights. *See Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 702 (11th Cir. 2019) ("[N]either Alabama nor the public has any interest in carrying out an execution in a manner that violates . . . the laws of the United States."); *Arthur v. Myers*, 2015 WL 668007, at \*5 (M.D. Ala. Feb. 17, 2015) (the State has an interest in "carrying out criminal judgments, particularly executions, in a constitutionally acceptable manner"). It is also in the public's interest to ensure that the State's execution does not result in the same public spectacle that was Mr. Smith's execution.

\*       \*       \*       \*       \*

As stated above, the standard for a stay of execution is the same as the preliminary injunction standard. Mr. Miller seeks a preliminary injunction for all the reasons stated above. In the alternative, Mr. Miller seeks a stay of execution, which should be granted for the same reasons stated above and to the extent the Court denies Mr. Miller's request for a preliminary injunction.

21

## <u>CONCLUSION</u>

The Court should grant Mr. Miller's motion and enter a preliminary injunction that prohibits the State's execution of Mr. Miller without implementing the six alternative procedures to the State's current method of nitrogen hypoxia executions, namely:  (1) using a mask that fits Mr. Miller's larger-than-average face and head, and creates an airtight seal; (2) using a qualified medical or scientific professional, rather than correctional officers, to place the mask on Mr. Miller's face, and hold it in place if it becomes dislodged in any way; (3) using a qualified medical or scientific professional, rather than correctional officers, to supervise the nitrogen flow rate during the execution; (4) having a medical professional present in the execution chamber during the execution attempt, who can respond if the execution goes awry as Mr. Smith's did; (5) using medical grade nitrogen; and (6) using a sedative or tranquilizing medication in pill form before administering the nitrogen gas, to reduce thrashing movements that could further dislodge the mask. In the alternative, this Court should stay Mr. Miller's execution date until Defendants' constitutional violations have been resolved and/or this litigation has been fully resolved.

Dated: June 21, 2024                           Respectfully submitted,

                                               /s/ *J. Bradley Robertson*
                                               J. Bradley Robertson
                                               Danner Kline
                                               Bradley Arant Boult Cummings LLP
                                               One Federal Plaza

1819 5th Ave. N.,
Birmingham, AL 35203
Tel: (205) 521-8188
Fax: (205) 488-6188
Email: brobertson@bradley.com
Email: dkline@bradley.com

Rachel C. Bramblett (*Pro Hac Vice*
pending)
Bradley Arant Boult Cummings LLP
Promenade Tower, 20th Floor
1230 Peachtree St. NE
Atlanta, Georgia 30309
Tel: (404) 868-2100
Email: rbramblett@bradley.com

Daniel J. Neppl
Kelly Huggins
Mara E. Klebaner
Stephen Spector
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email: dneppl@sidley.com
Email: khuggins@sidley.com
Email: mklebaner@sidley.com
Email: sspector@sidley.com

*Attorneys for Plaintiff Alan Eugene
Miller*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 21, 2024, I served a copy of the foregoing via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to all counsel of record.

/s/ *J. Bradley Robertson*
J. Bradley Robertson