# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ALAN EUGENE MILLER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-00197-RAH |
| | ) | |
| STEVE MARSHALL, | ) | |
| Attorney General, | ) | |
| KAY IVEY, Governor, | ) | |
| JOHN Q. HAMM, Commissioner, | ) | |
| And TERRY RAYBON, Warden. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## BASED ON THE EIGHTH AMENDMENT

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

LEGAL STANDARDS .........................................................................................4

ARGUMENT ........................................................................................................6

    I.     Miller lacks standing with respect to his Eighth Amendment claim against Governor Ivey and Attorney General Marshall...........................................6

    II.    Miller's Eighth Amendment claim is barred because he previously raised it in the Alabama Supreme Court. .............................................................9

    III.   Miller's Eighth Amendment claim is likely to fail. .................................13

        A.     Miller cannot show that Kenneth Smith suffered any pain, much less superadded pain.............................................................................14

        B.     Miller cannot show this method of execution poses unconstitutional risks as applied to him.................................................................21

        C.     There are no feasible and readily available alternatives that significantly reduce the alleged risks of severe pain. ....................25

        D.     The State's method is constitutional under the Eighth Amendment because it is not deliberately designed to inflict unnecessary pain. ...................................................................................................29

    IV.   The equities weigh against the motion. ..................................................31

        A.     Miller's delay forecloses equitable relief. ....................................31

        B.     Miller has unclean hands because he challenges the method of execution he litigated to procure. .................................................33

        C.     Miller faces no substantial likelihood of irreparable harm; execution is the fulfillment of the public's moral judgment. .......34

CONCLUSION ...................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Alabama v. U.S. Army Corps of Eng'rs*,
424 F.3d 1117 (11th Cir. 2005) ..........................................................................26

*Alvarez v. Att'y Gen. for Fla.*,
679 F.3d 1257 (11th Cir. 2012) ..........................................................................10

*Barber v. Governor of Alabama*,
73 F.4th 1306 (11th Cir.), *cert. denied*, 143 S. Ct. 2545 (2023) .........................4

*Baze v. Rees*,
553 U.S. 35 (2008).....................................................................8, 14, 26, 29, 30

*Benisek v. Lamone*,
585 U.S. 155 (2018)..............................................................................................32

*Bigby v. Awe*,
2019 WL 5068543 (S.D. Ga. Aug. 5, 2019),
*report and recommendation adopted*,
2019 WL 4262060 (S.D. Ga. Sept. 9, 2019) ......................................................34

*Bucklew v. Precythe*,
587 U.S. 119 (2019)................................... 1, 24, 25, 29, 30, 32, 33, 35

*Calderon v. Thompson*,
523 U.S. 538 (1998)..............................................................................................34

*City of Grants Pass v. Johnson*,
603 U.S. ____ (2024)............................................................................................30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..............................................................................................20

*CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*,
327 F.3d 1309 (11th Cir. 2003) ................................................................. 12, 13

*Equity Res. Mgmt., Inc. v. Vinson*,
723 So. 2d 634 (Ala. 1998)..................................................................................12

*Estelle v. Gamble*,
429 U.S. 97 (1976)................................................................................................29

*Ex parte Smith*,
No. SC-2023-0934, 2024 WL 133084 (Ala. Jan. 12, 2024)...............................11

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005)....................................................................................11

*Glossip v. Gross*,
    576 U.S. 863 (2015)........................................................ 1, 14, 20, 25, 30

*Gomez v. U.S. Dist. Court for N. Dist. of Cal.*,
    503 U.S. 653 (1992)....................................................................................33

*Green v. Jefferson Cnty. Comm'n*,
    563 F.3d 1243 (11th Cir. 2009) ................................................................12

*Hill v. McDonough*,
    547 U.S. 573 (2006)...............................................................................4, 32

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
    973 F.3d 1263 (11th Cir. 2020) ..................................................................5

*I.A. Durbin, Inc. v. Jefferson Nat. Bank*,
    793 F.2d 1541 (11th Cir. 1986) ................................................................11

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
    980 F.3d 123 (D.C. Cir. 2020)..................................................................34

*In re Kemmler*,
    136 U.S. 436 (1890)..................................................................................30

*King v. Nat'l Spa & Pool Inst.*,
    607 So. 2d 1241 (Ala. 1992).....................................................................34

*Lambert v. Buss*,
    498 F.3d 446 (7th Cir. 2007) ....................................................................36

*Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*,
    51 F.3d 982 (11th Cir. 1995) ....................................................................15

*Middlebrooks v. Parker*,
    22 F.4th 621 (6th Cir. 2022) ................................................................ 33-34

*Mills v. Hamm*,
    102 F.4th 1245 (11th Cir. 2024), *cert. denied*, No. 23A1065,
    (U.S. May 30, 2024) ..................................................................................32

*Murthy v. Missouri*,
    2024 WL 3165801 (U.S. June 26, 2024) ................................... 3, 6-9, 20

*Nance v. Ward,*
597 U.S. 159 (2022)......................................................................... 5, 14, 25, 33

*Nelson v. Campbell,*
541 U.S. 637 (2004)...............................................................................33

*New Hampshire v. Maine,*
532 U.S. 742 (2001)...............................................................................34

*Nnadi v. Richter,*
976 F.2d 682 (11th Cir. 1992) ..............................................................4

*Ramirez v. Collier,*
595 U.S. 411 (2022)...............................................................................33

*S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta,*
833 F.2d 1477 (11th Cir. 1987) ...........................................................12

*Sampson v. Murray,*
415 U.S. 61 (1974).................................................................................13

*Second City Music v. City of Chicago,*
333 F.3d 846 (7th Cir. 2003) ...............................................................20

*Siegel v. LePore,*
234 F.3d 1163 (11th Cir. 2000) ...........................................................34

*Smith v. Hamm,*
No. 2:23-CV-656-RAH, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024)..... 4, 5, 22

*Swain v. Junior,*
961 F.3d 1276 (11th Cir. 2020) .............................................................5

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021).................................................................................6

*Tuttamore v. Lappin,*
429 F. App'x 687 (10th Cir. 2011) .......................................................34

*Wall v. CDC,*
588 F. Supp. 3d 1301 (M.D. Fla. 2022)...............................................34

*Wilkerson v. Utah,*
99 U.S. 130 (1879).................................................................................29

*Will v. Michigan Dep't of State Police,*
491 U.S. 58 (1989).................................................................................12

*Woods v. Comm'r, Ala. Dep't of Corr.*,
    951 F.3d 1288 (11th Cir. 2020) ..........................................................................33

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ...................................................................5, 32

## Statutes & Rules

18 U.S.C. § 3626..............................................................................................5

Ala. R. App. P. 8(d) .............................................................................................11

## Other Authorities

Dr. Philip Nitschke, *The Facts about Nitrogen Hypoxia 101*,
    The Peaceful Pill Handbook (Jan. 27, 2024),
    www.peacefulpillhandbook.com/the-facts-about-nitrogen-hypoxia-101/ ...........2

Taylor Mitchell et al., *News 19's Lauren Layton's account of the nation's first
    nitrogen hypoxia execution*, News 19 (Jan. 26, 2024),
    https://whnt.com/news/alabama-news/kenneth-eugene-smith/news-19s-lauren-
    laytons-account-of-the-nations-first-nitrogen-hypoxia-execution// ...................17

## **INTRODUCTION**

In 2022, Miller sued to ensure that his method of execution would be nitrogen hypoxia. Now that the State has a nitrogen hypoxia protocol in place, Miller asks the Court to force the State to change its protocol once again. But his Eighth Amendment claim barely survived the motion-to-dismiss stage, and his likelihood of success has only plummeted as discovery has progressed. Miller must show that the State adopted a "form[] of punishment that intensified the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019) (cleaned up). And he must show (1) a "substantial risk of serious harm" that is "sure or very likely to occur" and (2) "an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877-78 (2015). Miller will not meet that standard.

Miller's argument boils down to news reporting and the accounts of two advocates that Kenneth Smith appeared to be in discomfort during his execution last January. But Miller has no real explanation for those reports. The State does: Smith held his breath, and after he began inhaling the nitrogen gas, he soon lost consciousness and died in minutes. The State's account is corroborated by, among other things, (1) the testimony of Captain McKenzie, who watched Smith's oxygen levels remain constant until they dropped suddenly after he exhaled; ████ ██████████████████████████████████████████████████ (3) studies of

inert-gas hypoxia as a means of peaceful suicide; (4) OSHA reports of sudden fatalities involving exposure to inert gas; and (5) Smith's own expert witness, Dr. Philip Nitschke, who wrote after the fact that Smith was "fighting against his execution in every way possible."[1] The State agrees with Dr. Nitschke's assessment that if Smith had "taken deep breaths …, he would, almost certainly, have lost consciousness and died much sooner" than he did. *Id.*

In contrast, Miller has no physiological explanation for how Smith could have suffered due to the State's nitrogen hypoxia protocol. And Miller offers no serious alternative method. Not once in his complaint, motion, or discovery does Miller identify an alternative mask, medication, or form of nitrogen the State can use for the execution. Nor does he identify a potential supplier the State can use to procure those alternatives, or a "medical or scientific professional" to assist in the execution.

All that assumes the Court reaches the merits of Miller's Eighth Amendment claim, which it need not do. The Court can dismiss the claim on the same ground that it dismissed Miller's other two claims (Doc. 41 at 6-9) because he already raised his Eighth Amendment argument in the Alabama Supreme Court, and that court rejected it. He could have but has not sought federal review in the U.S. Supreme Court. His claim is thus an appeal from a state-court judgment that is barred by

---

[1] Dr. Philip Nitschke, *The Facts about Nitrogen Hypoxia 101*, The Peaceful Pill Handbook (Jan. 27, 2024), www.peacefulpillhandbook.com/the-facts-about-nitrogen-hypoxia-101/.

*Rooker-Feldman* and/or principles of claim and issue preclusion. Further, as to Defendants Ivey and Marshall, Miller lacks standing—an issue the Court should revisit in light of *Murthy v. Missouri*, 2024 WL 3165801 (U.S. June 26, 2024).

Finally, the equities weigh strongly against Miller. The interests of the State, the public, the victims, and justice demand expedient execution of Miller's lawful criminal conviction. Miller had ample opportunity to clarify and specify his method of execution. After receiving the method of his choosing, he then waited until the eleventh hour not only to bring this suit but also to move for injunctive relief.

Miller's motion for preliminary injunctive relief should be denied.

## BACKGROUND

Though the Court declined to dismiss Count Three of Plaintiff's Complaint, it poured cold water on Miller's contentions, which remain "noticeably lean on factual detail" and "barely … plausible." (Doc. 41 at 13-14.) The Court identified only a few allegations as candidates for a viable Eighth Amendment claim: "improper fit of the mask due to [Miller's] body type and unique characteristics; the introduction of outside air into the mask; and the possible use of less than medical-grade nitrogen gas." (Doc. 41 at 14.) According to Miller, these "problems" would "increase the time to unconsciousness and would expose him to 'unnecessary pain and suffering, superadded disgrace, and a prolonged death.'" (*Id.*)

3

The Court acknowledged Plaintiff's six proposed alternatives to the protocol for addressing the alleged risk associated with mask fit, oxygen entrainment, and any use of non-medical nitrogen gas. These are: (1) using a mask that fits Miller's face and creates an airtight seal; (2) using a medical professional to place the mask on Plaintiff's face (and hold it in place if necessary); (3) using a medical professional to supervise the nitrogen flow rate during the execution; (4) having a medical professional present during the execution attempt to respond if "the execution goes awry"; (5) using medical grade nitrogen; and (6) "using 'a sedative or tranquilizing medication in pill form before administering the nitrogen gas.'" (*Id.*)

## LEGAL STANDARDS

Miller has the burden of proof and persuasion. *See, e.g.*, *Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992). "Even when life or death interests are at stake, a preliminary injunction or a stay of execution is an extraordinary remedy 'not available as a matter of right.'" *Barber v. Governor of Alabama*, 73 F.4th 1306, 1317 (11th Cir.), *cert. denied*, 143 S. Ct. 2545 (2023) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).

To receive preliminary injunctive relief, Miller must show "(1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the State; and (4) that the injunction would not be adverse to

the public interest." *Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *16 (M.D. Ala. Jan. 10, 2024). Miller must carry the "burden of persuasion for each prong of the analysis … by a clear showing." *Id.* (cleaned up). As to the first element, "[h]ighly disputed factual issues may cast doubt on the plaintiff's substantial likelihood of success." *Id.* As to the second, unexcused delay can invalidate a showing of irreparable harm. *E.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Finally, the last two preliminary injunction factors merge because the State is opposing the preliminary injunction. *E.g.*, *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020).

The Prison Litigation Reform Act permits injunctive relief only if it can be "narrowly drawn, extend[ing] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means to correct that harm." 18 U.S.C. § 3626(a). "[I]f a district court's injunction grants 15 separate forms of relief, the court must make—and explain—15 separate PLRA-related findings." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020). The PLRA's "substantive and procedural limitations" work "to streamline 1983 actions and protect 'the timely enforcement of a sentence.'" *Nance v. Ward*, 597 U.S. 159, 174 (2022). The Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would attend prospective relief. 18 U.S.C. § 3626.

## ARGUMENT

**I.      Miller lacks standing with respect to his Eighth Amendment claim against Governor Ivey and Attorney General Marshall.**

As the plaintiff and movant, Miller bears the burden of demonstrating that he has standing to sue Defendants Ivey and Marshall. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021). Although the Court addressed standing in its order dismissing Counts One and Two of the Complaint, the Supreme Court's recent decision in *Murthy v. Missouri*, 2024 WL 3165801 (U.S. June 26, 2024), warrants revisiting that order and reasoning.

In *Murthy*, the Supreme Court reiterated that "standing is not dispensed in gross." 2024 WL 3165801 at *9. Plaintiffs must show all three elements "for *each claim* that they press against *each defendant*, and for *each form of relief* that they seek." *Id*. (cleaned up; emphasis added). Thus, "the legal availability of the relief the court might order" should be relevant to Miller's standing. (*Contra* Doc. 41 at 11.) If "the relief Miller seeks from the Governor and Attorney General is barred," *id.*, then he cannot "establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them," *Murthy*, 2024 WL 3165801 at *13. Defendants Ivey and Marshall ask the Court to reconsider whether Miller's method-of-execution claim alleges an injury-in-fact that is traceable to them and redressable by an injunction "that prohibits the State's execution," (Doc. 45 at 22).

6

This Court previously reasoned that Miller alleged an injury-in-fact traceable to Defendant Marshall's motion to authorize an execution date and to Defendant Ivey's decision to set the date for the execution. (Doc. 41 at 10.) Solely based on these actions, the Court traced Miller's alleged "future harm" to Defendants Ivey and Marshall, while acknowledging that only a "slim[] thread connects their acts to Miller's claimed injury." (*Id.* at 10-11.) But *Murthy* made clear that the Miller's burden is to show "that *each* Government defendant *continues* to engage in the challenged conduct," 2024 WL 3165801, *14 (emphasis added), which cannot apply to either Defendant Marshall or Ivey, whose roles in the execution process are complete. If Miller fails to demonstrate "likely future injury at the hands of [Governor Ivey] or [Attorney General Marshall]—[] the injunction against those entities cannot survive." *Id*.

Additionally, moving for an execution warrant and setting the date for execution did not create injuries-in-fact redressable by Miller's method claim. Those actions are the consequences of a conviction for capital murder and a sentence of death (neither of which Miller contests). Can Miller sue the local prosecutor who secured conviction? Members of the jury, the judge, or the court clerk? No. He can sue only the persons who he claims will carry out an unconstitutional execution because his *only* Eighth Amendment claim is that the execution of his sentence *according to ADOC's protocol* will cause him *future* injury. Any Eighth Amendment

claim requires an allegation of a *future* injury based on a showing of severe pain compared to pleaded alternatives. *Baze v. Rees*, 553 U.S. 35, 61 (2008). The Attorney General certainly could not have "injured" Miller in that sense by moving for his execution date before Miller ever alleged, let alone demonstrated, a risk of severe pain or feasible alternatives, especially when capital punishment is constitutional and nitrogen hypoxia has never been deemed unconstitutional by any court. Miller was not harmed by the Attorney General's motion or by the Governor's choice of date.

Further, under *Murthy*, whatever Defendants Marshall and Ivey may have done in the past is not enough to create a justiciable claim for prospective relief. *See* 2024 WL 3165801, *8 (noting that "past injuries are relevant only for their predictive value"). The Attorney General's motion and the Governor's calendaring say nothing about their future involvement in Miller's execution—involvement he has not alleged. The Court's prior redressability analysis (Doc. 41 at 11-12) did not suggest any concrete ways either of these defendants could cure the alleged constitutional defects in the method. Miller must prove he has a justiciable cause of action for *preliminary injunctive relief* against each defendant individually. This Court's duty is to determine whether the Governor or Attorney General's "allegedly wrongful behavior w[ill] likely occur or continue" in the future. *Murthy*, 2024 WL 3165801,

*15. As to Governor Ivey and Attorney General Marshall, Miller cannot make this showing.

## II. Miller's Eighth Amendment claim is barred because he previously raised it in the Alabama Supreme Court.

The State previously moved to dismiss Miller's Counts One and Two based on, *inter alia*, the *Rooker-Feldman* doctrine and claim preclusion. The Court ultimately dismissed those counts, reasoning that "[i]f error, whether constitutional or otherwise, lies in the Alabama Supreme Court's decision as to the appropriate time for the execution, the remedy is an appeal to the United States Supreme Court," not to this Court. (Doc. 41 at 8). Miller's Counts One and Two "ask[ed] this court to do precisely what [Miller] asked the Alabama Supreme Court to do—conclude that because he allegedly suffered, and continues to suffer, some constitutional harm, now is not the 'appropriate time' to execute him." *Id.*

The Court should apply its reasoning to Miller's remaining claim, which Miller also already raised in the Alabama Supreme Court (ASC) in his brief opposing the Attorney General's motion. (Doc. 28-2 at 16-18.) Miller argued that "execution by nitrogen hypoxia at this time would violate [his] Eighth Amendment right to be free from cruel and unusual punishments." *Id.* at 16 (capitalization altered). He argued that "Alabama … is incapable of executing someone via nitrogen hypoxia without superadding unnecessary pain, suffering, and disgrace, in violation of the Eighth Amendment." *Id.* at 17. And he argued that the State must "execute

him via a nitrogen hypoxia protocol that will not lead to superadded pain and disgrace" by adopting "a specific alternative method of nitrogen hypoxia execution that would avoid the significant unnecessary suffering that Mr. Smith [allegedly] experienced." *Id.* at 18. Miller even incorporated by reference Paragraph 193 of his Complaint in this suit, inviting the ASC to pass upon the constitutionality of ADOC's protocol in light of his six proposed alternatives. *Id.*

If Miller's brief in the Alabama Supreme Court sounds familiar, it is. He "asks this court to do precisely what he asked the Alabama Supreme Court to do" (Doc. 41 at 8)—decide that his execution under the protocol would violate the Eighth Amendment and forestall his execution. How can he get two bites at the apple? He can't. If he was dissatisfied with the ASC's resolution of his claim, his option was to seek certiorari from the U.S. Supreme Court.

The Court has many tools for rejecting Miller's improper parallel litigation strategy. ***First***, *Rooker-Feldman* doctrine "is a jurisdictional rule that precludes the lower federal courts from reviewing state court judgments." *Alvarez v. Att'y Gen. for Fla.*, 679 F.3d 1257, 1262 (11th Cir. 2012). This Court lacks jurisdiction over the Eighth Amendment claim as it was "inextricably intertwined with the state court judgment so that (1) the success of the federal claim would effectively nullify the state court judgment, or that (2) the federal claim would succeed only to the extent that the state court wrongly decided the issues." *Id.* at 1262-63 (cleaned up). Miller's

assertion that his execution would violate the Eighth Amendment cannot be squared with the ASC's order rejecting that very argument. We know that the ASC considers Eighth Amendment issues when deciding to authorize executions. *See, e.g.*, *Ex parte Smith,* No. SC-2023-0934, 2024 WL 133084, at *2 & n.2 (Ala. Jan. 12, 2024) (Cook, J., concurring specially). It would beggar belief if that court thought Miller had a plausible Eighth Amendment claim, yet it authorized his execution anyway. Because the Alabama Supreme Court saw no Eighth Amendment problem with the contemplated execution, and its order was a prerequisite to the execution, Miller is a "state-court loser[] complaining of injuries caused by [a] state-court judgment[]." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

**Second**, claim preclusion bars this claim. Claim preclusion or *res judicata* "refers to the preclusive effect of a judgment in foreclosing relitigation of matters that were litigated or could have been litigated in an earlier suit." *I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986). Under Alabama law, the elements of claim preclusion are satisfied here because (1) the ASC's order was a judgment on the merits of Miller's Eighth Amendment claim (*see* Doc. 41 at 6 (noting that the Alabama Supreme Court rejected Miller's arguments)); (2) the ASC had jurisdiction (*see* Ala. R. App. P. 8(d)(1)); (3) the parties there were substantially the same or in privity with those here; and (4) the causes of action are effectively the

same. *See, e.g.*, *Green v. Jefferson Cnty. Comm'n*, 563 F.3d 1243, 1252 (11th Cir. 2009) (citing *Equity Res. Mgmt., Inc. v. Vinson*, 723 So. 2d 634, 636 (Ala. 1998)).

To "determine[e] whether the causes of action are the same, a court must compare the substance of the two actions, not their form," focusing on "whether the primary right and duty are the same in each case." *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1481 (11th Cir. 1987). This §1983 suit to prevent officers in their official capacity from enforcing an allegedly unconstitutional execution is "no different" from the prior action in the ASC in which Miller argued the State of Alabama "itself" must be judicially barred from such actions. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Miller plainly is raising the same Eighth Amendment claim here as he did there. (*Compare* Doc. 1, ¶¶ 88–117, 185–194 *with* Doc. 28-2 at 7–9, 16–18.)

**Third**, issue preclusion bars Miller's claim. "Collateral estoppel or issue preclusion forecloses relitigation of an issue of fact or law that has been litigated and decided in a prior suit." *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003). For the doctrine to apply, "(1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full

and fair opportunity to litigate the issue in the earlier proceeding." *Id.* Collateral estoppel "protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy and … promot[es] judicial economy by preventing needless litigation." *Id.* And collateral estoppel applies here, where Miller raised his Eighth Amendment claim against the State in the Alabama Supreme Court, it was litigated when that court rejected his claim and authorized his execution, and Miller had a full and fair opportunity to press his argument.

*Fourth*, at a minimum, it should count against Miller when the Court considers equitable relief that (1) he pressed the same claim in the Alabama Supreme Court and (2) he has thus far declined to seek review from that decision in the U.S. Supreme Court. Duplicative litigation is a burden on the courts, a violation of comity and federalism, and suggestive of gamesmanship. Miller had and has an adequate remedy at law—a certiorari petition seeking review of his claim—so he cannot show an irreparable harm and is not entitled to any injunctive relief. *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

## III.  Miller's Eighth Amendment claim is likely to fail.

Even if this Court has jurisdiction, and even if this suit is not barred, Miller is not likely to show that the State's nitrogen hypoxia protocol violates the Eighth Amendment. Miller must prove that he faces (1) a "'substantial risk of serious harm'—severe pain over and above death itself" from nitrogen hypoxia and (2) "an

alternative [method] that is feasible, readily implemented, and in fact significantly reduce[s]' the risk of harm." *Nance*, 597 U.S. at 164 (quoting *Glossip*, 576 U.S. at 877). What the Eighth Amendment "prohibits is wanton exposure to 'objectively intolerable risk,' not simply the possibility of pain." *Baze*, 553 U.S. at 35.

This Section proceeds as follows: (A) Miller's claim is premised on false speculation about the Kenneth Smith execution; (B) Miller faces no substantial risk of severe pain; (C) Miller has no feasible and available alternatives; (D) Miller must show that nitrogen hypoxia is *deliberately designed* to superadd pain, and he cannot.

### A.      Miller cannot show that Kenneth Smith suffered any pain, much less superadded pain.

The Court identified two "barely … plausible" theories in the Complaint for how Miller could face an unconstitutional punishment: (1) "the introduction of outside air into the mask" and (2) "the possible use of less than medical-grade nitrogen gas" would "increase the time to unconsciousness and would expose him to 'unnecessary pain and suffering, superadded disgrace, and a prolonged death." (Doc. 41 at 14.) Miller infers (1) and/or (2) not from direct evidence but almost entirely from observations about the Kenneth Smith execution. There are many hurdles to his theory and application of the Smith execution:

1.      Miller must prove that Kenneth Smith experienced pain due to nitrogen hypoxia (*i.e.*, pain due to nitrogen better explains the evidence than conscious, willful resistance to ADOC's execution of his sentence);

14

2. If Miller proves that Smith experienced pain, then he must prove the pain was severe and superadded beyond the process of death by nitrogen hypoxia;[2]

3. If Miller proves that Smith suffered severe and superadded pain, then he must prove the pain was caused by the use of ultra-high purity nitrogen, an improper mask fit, and/or oxygen entrainment; and

4. If Miller proves that Smith suffered superadded pain because of the use of ultra-high purity nitrogen, an improper mask fit, and/or oxygen entrainment, then he must prove he will suffer the same fate.

Miller cannot make any of these required showings. His complaint and motion for preliminary injunction spend inordinate space describing witness accounts of the Smith execution, including a statement from one of Smith's attorneys and nine newspaper articles containing the observations of journalists who were in the viewing room and of Smith's spiritual advisor, Jeff Hood, who is also a political activist against capital punishment. (Docs. 45-15 to 45-24.) These accounts are conflicting, unreliable, and inadmissible hearsay. Although the Court may rely on inadmissible hearsay materials at the preliminary-injunction stage "if the evidence is 'appropriate given the character and objectives of the injunctive proceeding,'" *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995), such evidence is neither appropriate nor probative here.

---

[2] Importantly, Miller's expert Dr. Bickler has opined that "any form of execution by nitrogen hypoxia" will inflict some "panic and distress." (Doc. 45-10, ¶ 17.) But Miller cannot rely on any "panic and distress" inherent to nitrogen hypoxia— the method he chose and does not challenge.

It would be inappropriate to give much weight to Miller's hearsay evidence when he has had nearly six months from the central event to produce a witness and where the State offers significant nonhearsay evidence—the deposition and written testimony of Captain Brandon McKenzie, who served as the execution team captain for the Smith execution. *See* Ex. 1 & 2. Captain McKenzie stated under oath that after the nitrogen began to flow, Smith tensed up, raised his upper body against the restraints, and closed his hands. Ex. 1 at ¶4. The newspapers generally described these movements, but necessarily absent from their reports was what Captain McKenzie recounted next: While Smith was moving on the gurney, the pulse oximeter still showed a blood oxygen saturation of around 97%. *Id.* at ¶¶4-5. ██████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

The best explanation of the testimony is that Smith held his breath and lost consciousness when he breathed nitrogen gas—not that the mask did not fit or that the nitrogen was impure. The latter theories cannot explain the sudden drop in oxygen levels followed by unconsciousness. And Miller's news reports rely on tremendous speculation, including about facts like when the nitrogen gas was administered to Smith; Miller still has not explained how lay witnesses could have known when the nitrogen (an odorless, tasteless, and colorless gas) began to flow. Multiple newspaper accounts support the State's view that Smith began to breathe deeply only "several minutes" into the execution.[3]

Notice too what is *not* said in any of the hearsay evidence Miller offers the Court: Not one article describes Smith as screaming, yelling, or even grunting in agony. *Accord* Ex. 1 at ¶4 ("He did not scream, cry, moan, or say anything to indicate he was in any pain."). Smith said nothing about any pain to his spiritual advisor, to

---

[3] *See, e.g.*, Taylor Mitchell et al., *News 19's Lauren Layton's account of the nation's first nitrogen hypoxia execution*, News 19 (Jan. 26, 2024), https://whnt.com/news/alabama-news/kenneth-eugene-smith/news-19s-lauren-laytons-account-of-the-nations-first-nitrogen-hypoxia-execution/; Doc. 45-24 (AP News) (describing how Smith "fell back" and then "began to take a series of deep gasping breaths, his chest rising noticeably").

whom he was speaking moments prior. It would be quite odd for a person to remain completely silent during agonizing pain for several minutes, but it is not odd for a person who is holding his breath to refrain from speaking or yelling.

Breath holding makes perfect sense of the data, as the State will continue to show and as Smith's own expert witness, Dr. Philip Nitschke, stated immediately following the execution. Dr. Nitschke opined that Smith's movements "were almost certainly accentuated by his obvious (and understandable) non-cooperation with the execution process." *See supra* n.1. By "breath-holding," Smith "increased the level of carbon dioxide in his body, acidifying his blood and increasing discomfort and distress." *Id.* Had Smith "taken deep breaths …, he would, almost certainly, have lost consciousness and died much sooner." *Id.* Indeed, Dr. Nitschke would know: He had witnessed dozens of suicides using inert gas supplied to a hood (not an airtight device) and never observed *any* pain. (Doc. 45-13 at 20 (citing deposition)). Dr. Nitschke concluded his evaluation of the Smith execution: "The spectacle [was] *all* due to [Smith] having a face mask non-voluntarily strapped on his head and him fighting against his execution in every way possible." *Id.* (emphasis added).

Miller's own expert, Dr. Bickler, hardly undermines the State's account and even bolsters it. In his article on the Smith execution (based on the news reports), Dr. Bickler writes that nitrogen hypoxia executions are different from other exposures to nitrogen gas because "[w]hen faced with an impending, forced

18

withdrawal of oxygen, humans are likely to breathe irregularly or breath hold, 2 of many factors that will likely cause prolonged, significant shortness of breath, anxiety, increased heart rate, sweating, visual loss, muscle twitching, seizures, and a feeling of impending doom." Doc. 45-10 at 76. In short, Dr. Bickler must believe that Smith "likely" held his breath or breathed irregularly, which "likely" caused him to become distressed and move in unnatural ways. But breath holding and resistance do not prove pain traceable to any aspect of the protocol Miller challenges.

Further, assuming Smith experienced discomfort due to his breath holding and resistance, if such discomfort would occur in any execution by nitrogen hypoxia—the view of Miller's expert[4]—that fact would be irrelevant here because Miller does not raise a wholesale challenge to the method. Miller "does not contest execution by nitrogen hypoxia generally," and he cannot do so consistent with principles of estoppel because nitrogen hypoxia is the method he "sued to enforce." (Doc. 28-2 at 15-16.) And to the extent that holding one's breath can cause pain, Miller stated at his deposition that he does not intend to hold his breath or attempt to hold his breath

---

[4] Miller relies on an expert declaration that "any form of execution by nitrogen hypoxia is cruel and inhumane, due to the panic and physical distress that very low oxygen environments inflict." Doc. 45-10, ¶ 17. Dr. Bickler's real problem with the method is not predicated on any aspect of ADOC's protocol—and certainly not those identified by Miller—but on the process itself, no matter how it is administered.

during his execution. Ex. 4 at 22:11-20. And if he does nonetheless, he cannot by his own actions create an Eighth Amendment violation.[5]

Symptoms cited by Dr. Bickler like "anxiety" and a "feeling of impending doom" sound like the type of inevitable consequences of any judicial execution. But the Constitution does not "demand[] the elimination of essentially all risk of pain," which "would effectively outlaw the death penalty." *Glossip*, 576 U.S. at 869.

In Dr. Bickler's expert report, he seems to suggest that Smith "jerked," "convulsed" and experienced "physical distress" in ways that could not be attributed to Smith holding his breath. Ex. 5 at ¶11. His basis for that opinion is unclear, but he apparently thinks that Smith could hold his breath for only "well less than one minute." *Id.* at ¶11. Despite reviewing Captain McKenzie's deposition, Dr. Bickler did not explain how Smith had steady oxygen levels followed by a rapid decline.

Miller still has no persuasive explanation for how he believes that Smith could have suffered severe pain during his execution. Yet Smith's execution, the focal point of Miller's complaint and motion, "is relevant only insofar as it is a launching pad for a showing of imminent future injury." *Murthy*, 2024 WL 3165801, at *8. Absent a more definite theory as to what medical condition or symptom Miller

---

[5] Nor could he receive equitable relief based on his own future actions. *See, e.g.*, *Second City Music v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury"); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm….").

alleges caused pain during the execution of Kenneth Smith, Miller has done nothing to make the past relevant to his future. For example, Miller claims that Smith "convulsed and jerked violently, heaving against the straps with enough force to move the gurney." (Doc. 45 at 20.) But why? What does the allegation have to do with ADOC's protocol? Miller must identify specific ways that mask fit, the use of ultra-high purity nitrogen, or general oxygen entrainment could cause unconstitutional pain; instead, he makes little effort to explain the alleged pain at all. And finally, even if Miller could show that Kenneth Smith's execution involved unconstitutional pain, he would need to show that the cause will persist and was not unique to Smith.

### B.    Miller cannot show this method of execution poses unconstitutional risks as applied to him.

For his Eighth Amendment claim to succeed, Miller must make a clear showing of several disputed facts pleaded in his complaint, including that the type-C supplied air respirator used by ADOC will not fit Miller's face well enough and that the oxygen entrainment into the mask, owing to its allegedly poor fit or some other reason, would result in painful stimuli. Miller will fail to make this showing, and the State will show that wearing a supplied air respirator connected to an inert gas supply *will* result in fatality absent outside intervention. Supplied air respirators connected to inert gas supplies are so deadly that OSHA published a safety and health information bulletin on the subject. Ex. 10. OSHA inspection detail reports

document fatalities caused by individuals with supplied air respirators connected to inert gas supplies, with loss of consciousness and death occurring swiftly. Ex. 11. The State also offers a significant number of studies and medical literature detailing accidental deaths and suicides by use of inert gases, which suggest the absence of any serious risks associated with mask fit or oxygen entrainment. Exs. 9, 12-22.

Miller's contrary allegations about mask fit rely wholly on speculation. Captain McKenzie testified that he has been involved in testing the mask "on more than ten individuals of differing body types and sizes, including individuals with and without facial hair and one individual who was obese." Ex. 1 at ¶3. He has "not encountered any person for whom the mask did not fit securely and effectively." *Id.* This is unsurprising given that the mask is a

> NIOSH-approved, industrial grade, continuous flow supplied-air respirator mask with an adjustable five point harness system and a pliable, double flange rubber seal that would tightly fit and hold the mask over the entirety of the wearer's face—including eyes, nose, mouth, and chin—that also contained a one-way valve near the mouth and nose allowing for the exit of exhaled gases, including carbon dioxide.

*Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *4 n.3 (M.D. Ala. Jan. 10, 2024). Miller cannot show that this mask will not fit him. He has never tried on the mask. He stated in his deposition that he will not try on the mask as he believes it to be "immoral" to do so. Ex. 4 at 28-31. In response to an interrogatory asking Miller to identify any mask known to "fit[] Miller's face and create an airtight

seal"—*i.e.* a mask with the characteristics he demand the State use—Miller wrote that the "mask used by Defendants … might fit Mr. Miller and create an airtight seal … if … the mask is 'properly fitted' on him and a 'negative pressure user-seal check' occurs." Ex. 6 at 3. In other words, he cannot show evidence that an alternative mask would fit him, and he never will. Given that Miller's entire case hinges on whether the mask will fit—because his entire theory of pain is dependent on oxygen entrainment—this is a glaring omission. Miller fails to carry his burden of proof.

There is no Eighth Amendment violation from the absence of a "negative pressure user-seal check" in ADOC's protocol. As Captain McKenzie explained in his deposition and in his affidavit, "a negative pressure check requires the mask wearer's active cooperation," Ex. 1 at ¶3, which Miller will not provide. Captain McKenzie's testimony is corroborated by, for example, the description of a "negative pressure user-seal check" in a manual for a certain model of supplied-air respirator that Miller attaches to his motion:

> [A] negative pressure user-seal check … is performed … by placing your finger or thumb over the opening of the male quick-connect plug and inhaling slightly and holding your breath for a few seconds to see if the mask has a good seal. For [another model,] you need to stick your finger or a rubber plug into the opening…

(Doc. 45-6 at 9 ¶4.) The State obviously cannot rely on Miller or any inmate to inhale and hold his breath at just the right time during a testing or during the execution. Nor

would Miller do such a thing since he believes it "immoral" to try on the mask. So Miller's proposed alternative fails.

Miller's allegations that he suffers from asthma do not appear to play a role in his request for preliminary injunctive relief. As Miller's own expert notes, asthma "would likely prolong the death process" in *any* "[d]eath by inhalation of nitrogen." (Doc. 45-10, ¶ 13.)

As to oxygen entrainment, Miller does not allege or explain how and at what level excess oxygen could be painful. That, too, is a glaring omission. Although a mere showing of pain is never sufficient to demonstrate a method of execution is unconstitutional, Miller cannot show "a (cruel) superaddition of terror, pain, or disgrace," *Bucklew*, 587 U.S. at 133, without first showing that he would suffer pain in the first place. And even if he shows a likelihood of pain, under the first element of the Eighth Amendment test, such pain must be so severe that it exceeds those of other methods that have been deemed constitutional. *See, e.g.*, *Bucklew*, 139 S. Ct. at 1124 (describing common risks of hanging); Stuart Banner, The Death Penalty: An American History 170 (2002) ("[P]erhaps most hangings were evidently painful … because they caused death slowly."); *Bucklew*, 139 S. Ct. at 1138-39 (Breyer, J., dissenting) (describing alleged risk that lethal injection would cause prisoner to "choke and suffocate on his own blood" and "experience excruciating pain" for "up

to several minutes"). The Supreme Court has not found any method of execution to be unconstitutionally painful.

> **C.      There are no feasible and readily available alternatives that significantly reduce the alleged risks of severe pain.**

"[I]t is settled that capital punishment is constitutional," so "there must be a constitutional means of carrying it out." *Glossip*, 576 U.S. at 869 (cleaned up). Otherwise, a death row inmate would exercise a veto over his execution by forcing the State to use an infeasible or unavailable method. As to the second prong, the Court found that Miller had plausibly pleaded the existence of six possible alternatives: (1) the use of a mask that fits Miller's face and creates an airtight seal; (2) the use of a medical professional to place the mask on Plaintiff's face (and hold it in place if necessary); (3) the use of a medical professional to supervise the nitrogen flow rate during the execution; (4) the presence of a medical professional during the execution attempt to respond if "the execution goes awry"; (5) the use of medical grade nitrogen; and (6) the administration of a sedative or tranquilizing medication in pill form before exposing Miller to the nitrogen gas. (Doc. 41 at 14.)

Miller spends little-to-no space in his motion explaining how the State will be able to implement these changes. *Glossip* and its progeny were clear that the method of execution must give "the State a pathway forward," such as "a veritable blueprint for carrying the death sentence out." *Nance*, 597 U.S. at 169. And Miller must show

"that the State has refused to adopt [his proposal] without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125.

**1. Miller has not identified a better mask for his execution.**

Miller can win only if he shows there is a supplied-air respirator mask that (1) will fit Miller's face better than the one ADOC uses, (2) is available from a supplier willing to provide masks for executions, and (3) will substantially reduce the likelihood of any pain Miller is sure or very likely to face. Miller fails.

Miller has yet to identify any mask that he represents fits his face properly or, at a minimum, substantially better than the mask used by ADOC. As described above, Miller did not identify an alternative in his complaint and refused a direct interrogatory on this point. Without an alternative, he cannot "show that the risk [of severe pain attributed to ADOC's mask] is substantial when compared to the *known* and *available* alternatives." *Baze*, 553 U.S. at 35 (emphasis added). Further, the Court cannot accept mere speculation about the existence of such a mask, because (1) the same factors Miller relies on to speculate that ADOC's mask will not fit his face properly would apply to every other mask in existence, and (2) "prisoners 'cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative.'" *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 51).

**2. Miller does not show there are medical professionals willing to participate in an execution.**

26

Three of Plaintiff's six pleaded alternative methods of carrying out a nitrogen hypoxia execution involve the use of medical professionals.[6] Opinion 9.7.3 of the American Medical Association's Code of Medical Ethics states that "a physician must not participate in a legally authorized execution." *See* Ex. 7. This includes actions that "[w]ould directly cause the death of the condemned," "[w]ould assist, *supervise*, *or contribute to the ability* of another individual to directly cause the death of the condemned," "[p]rescribing or administering tranquilizers and other psychotropic agents and medications that are part of the execution procedure," "[m]onitoring vital signs on site or remotely (including monitoring electrocardiograms)," "attending or observing an execution as a physician," and "[r]endering of technical advice regarding execution." *Id*. Similarly, the American Nurses Association has adopted policy statements and a Code of Ethics that prohibits nurse involvement with lawful judicial executions. *See, e.g.*, Ex. 8.

It is noteworthy that the affidavit of Dr. Philip Bickler, admits that "[m]edical ethics prohibit [him] from advocating in favor of any particular method of execution" and that he refuses to "provide an opinion on the possible effects of Mr.

---

[6] Miller's complaint pleads the alternative of employing "medical professionals," while his motion for preliminary injunction introduces the broader phrase "medical or scientific professionals" (Doc. 45 at 7.) Miller, however, is limited to his complaint's allegation that medical professionals be used. *See, e.g.*, *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005) (noting a request for preliminary injunction must be based upon a cause of action).

Miller's requested sedative" due to "reasons of medical ethics." (Doc. 45-10, ¶¶ 17, 22.) If Plaintiff Miller cannot prove the feasibility and availability of a "medical professional" willing to participate in a judicial execution, he will be unable to prove an Eighth Amendment violation in this matter.

### 3. Plaintiff cannot establish the existence of a supplier of medical-grade nitrogen or sedative medication willing to sell their product to ADOC for use in an execution.

The final alternatives Miller proposes are to use medical-grade nitrogen (rather than ultra-high purity nitrogen) and/or to administer a sedative medication to avoid feeling any pain. Of course, no one has a constitutional right to a painless execution, but that does not matter in any event because Miller cannot demonstrate that either alternative is reasonably available.

Miller's own complaint pleads that medical-grade nitrogen is unavailable to ADOC from the top three suppliers in the United States. (Doc. 1, ¶ 86.) Nor is "medical" grade nitrogen mentioned in the sole exhibit pertaining to nitrogen purity submitted with Miller's Motion for Preliminary Injunction. (Doc. 45-9.) If Miller cannot prove that medical-grade nitrogen can feasibly be obtained from a supplier willing to provide the gas for use in a judicial execution, he will be unable prove that the use of medical-grade nitrogen is feasible and readily available and, thus, unable to prove an Eighth Amendment violation. In that case, it would be irrelevant as to whether Miller can prove the first element of an Eighth Amendment claim: that the

use of ultra-high purity nitrogen, rather than medical nitrogen, creates a substantial risk of significant pain or harm.

Nor does Miller even try to make this showing as to the sedative medication he wants the State to use. Indeed, Miller does not even say which medication he wants ADOC to give him prior to the execution. And even if he did, he would still have to show (1) that the State can procure the medication and (2) that a doctor would be willing and able to prescribe the drug if required. The second prong is highly unlikely for the same reasons that Miller cannot show a medical professional would be available to carry out the execution. Additionally, Miller has never even tried to show how the State would be able to get the medication he wants ADOC to use to carry out this execution.

### D. The State's method is constitutional under the Eighth Amendment because it is not deliberately designed to inflict unnecessary pain.

The "primary concern of the drafters [of the Eighth Amendment] was to proscribe tortures and other barbarous methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (cleaned up). To that end, the Eighth Amendment prohibits "unnecessary cruelty" where "circumstances of terror, pain, or disgrace were … superadded." *Wilkerson v. Utah*, 99 U.S. 130, 135–36 (1879) (citing "atrocities" such as being "embowelled alive, beheaded, and quartered," "public dissection," or "burning alive"). "What each of the forbidden punishments had in common was the

*deliberate infliction of pain for the sake of pain*—'superadd[ing]' pain to the death sentence through torture and the like." *Baze*, 553 U.S. at 48 (emphasis added). Never faced with a truly torturous method of execution, the Supreme Court has "never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Id.*; *see, e.g.*, *Bucklew*, 139 S. Ct. 112; *Wilkerson*, 99 U.S. at 134–35 (permitting firing squad); *In re Kemmler*, 136 U.S. 436, 446 (1890) (permitting electrocution).

The Eighth Amendment claim here is unlikely to succeed because the State's nitrogen hypoxia method does not "qualif[y] as cruel" if it was not "*designed* to superadd terror, pain, or disgrace." *City of Grants Pass v. Johnson*, 603 U.S. ____ (2024) (cleaned up; emphasis added). Plaintiff does not allege that the State's protocol was designed to cause him to suffer. To the contrary, the State's evidence suggests that nitrogen hypoxia is a method designed to alleviate suffering. *See, e.g.*, Ex. 9 at 49 (describing how individuals use nitrogen gas to facilitate a "painless suicide).

The Eighth Amendment requires a showing of subjective cruelty and unreasonableness on behalf of the State. The "standard that governs 'all Eighth Amendment method-of-execution claims'" is "whether the State's chosen method of execution *cruelly superadds pain* to the death sentence," which "a prisoner must show" by way of an alternative method "that the State has refused to adopt *without*

*a legitimate penological reason*." *Bucklew*, 139 S. Ct. at 1125. The mere fact that the State has legitimate penological reasons for its method puts it beyond the Eighth Amendment's reach. The complaint does not identify any aspect of the State's nitrogen hypoxia method that involves pain for the sake of pain, as opposed to any other justification. This claim should fail because the protocol does not "cruelly superadd[] pain" "without … reason." *Id.*; *see also id.* at 1124 (noting that the constitutionality of hanging was unquestioned because it "wasn't '*intended* to be painful'"); *Glossip*, 576 U.S. at 877 (plaintiff must show risk that would "prevent[] prison officials from pleading that they were 'subjectively blameless…'" (quoting *Baze*, 553 U.S. at 50)).

## IV.    The equities weigh against the motion.

### A.    Miller's delay forecloses equitable relief.

Miller's delay in seeking this preliminary injunction heavily weighs against finding irreparable harm. Miller's claim is based on the facts surrounding Kenneth Smith's execution, which took place on January 25, 2024. (Doc. 1, ¶ 98.) The State sought Miller's execution warrant on February 21, 2024, and Miller's execution warrant issued on May 2, 2024. (Doc. 45-1 at 2.) Despite this, Miller waited until June 21, 2024, to seek a preliminary injunction. There was no reason to wait to seek emergency injunctive relief until nearly *five months* after the Smith execution, four months after the State put Miller on notice that his execution was imminent, and

nearly seven weeks after the warrant issued. In a published opinion, the Eleventh

Circuit recently found that an even shorter delay was enough to make a finding of

inequitable conduct and deny injunctive relief:

> Mills could have sought a stay in January 2024, when the State moved
> to set his execution date, or on March 27, 2024, when the State set his
> execution schedule. Mills instead waited a month, until April 26, to file
> this action—and then waited another week, until May 3, to seek
> injunctive relief or a stay. He might have waited longer had the district
> court not ordered him to file any motions by that deadline.

*Mills v. Hamm*, 102 F.4th 1245, 1251 (11th Cir. 2024), *cert. denied*, No. 23A1065,

(U.S. May 30, 2024); *accord Wreal, LLC*, 840 F.3d at 1248. Likewise, Miller did

not act as a "reasonably diligent plaintiff," and this Court may find his "inequitable

conduct" to be an independent reason to deny the motion. *Mills*, 102 F.4th at 1251.

Miller's delay is even more egregious in light of the content of his motion,

which contains sparse legal research (*see* Doc. 45 at iii) and comes with little

evidentiary support (*see* Doc. 45-25). A substantial number of Miller's exhibits are

news reports about the Smith execution. Another five are filings from the *Smith* case.

The only piece of evidence that may have required time to produce was the five-

page affidavit from Dr. Bickler, although it too is based on facts that were known to

Miller at least by the Smith execution in January 2024. All told, there is no good

reason Miller could not have filed his 22-page motion for a preliminary injunction

much sooner than he did. What is more, Miller briefed all the issues in this case—

including the Eighth Amendment claim—in the Alabama Supreme Court nearly two months before he filed the instant motion. (*See* Doc. 28-2 at 12-18.)

Miller has no excuse for his delay, which is enough on its own to deny the motion. "Equity strongly disfavors inexcusable delay," *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020), so "last-minute claims arising from long-known facts" may justify "denying equitable relief," *Ramirez v. Collier*, 595 U.S. 411, 434 (2022). That "well-worn principle[] of equity" holds true even "in capital cases," *id.*, and applies equally to preliminary injunctions and stays of executions, *see id.* (preliminary injunction); *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (stay). Undue delay, whether for "a few months," *Wreal*, 840 F. 3d at 1248, or "years," *Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam), is strongly disfavored. The reason is plain: Failure to act with "urgency" suggests that instead of needing an "extraordinary and drastic remedy," *Wreal*, 840 F. 3d at 1247-48, a plaintiff is engaged in "manipulation," *Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam); *accord Nelson v. Campbell*, 541 U.S. 637, 649 (2004). "Last-minute stays should be the extreme exception, not the norm," *Bucklew* 587 U.S. at 150, and this case is not exceptional.

## B.   Miller has unclean hands because he challenges the method of execution he litigated to procure.

The Court's equitable analysis may be informed by the doctrine of judicial estoppel, which is a "useful tool for identifying inmates who are more interested in

delaying their executions than in avoiding unnecessary pain." *Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022) (Thapar, J., statement). If the Court countenances Miller's request for injunctive relief—despite that Miller litigated to ensure his method would be nitrogen hypoxia—it could create "the perception that either the first or second court was misled." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Is Miller's unfounded suspicion that the State uses impure nitrogen gas an honest attempt to prevent an unconstitutional execution? Or is it the kind of claim used to delay, manipulate, and deny the State a "pathway forward"? *Nance*, 597 U.S. at 169. Applying the logic of estoppel—recognizing the contradiction between an inmate's election of a method and his flurry of unresearched and unsupported challenges to that very method—would be appropriate in weighing the equities against Miller here.

### C.   Miller faces no substantial likelihood of irreparable harm; execution is the fulfillment of the public's moral judgment.

The State inflicts no harm, let alone irreparable harm, when it carries out a lawful and just sentence. To the contrary, punishing the guilty is the fulfillment of the public's "moral judgment." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Meanwhile, [b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149; *see also id.* at 168 ("I agree with the majority that these delays are excessive.") (Breyer, J., dissenting). Delay "frustrate[s]" the interests of justice and finality. *Id.* at 149 (majority op.).

Not all alleged constitutional violations are irreparable. Even if Miller were likely to succeed, he would not automatically satisfy the harm factor. A constitutional violation is not "synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000); *Wall v. CDC*, 588 F. Supp. 3d 1301, 1305 (M.D. Fla. 2022). In *Ramirez v. Collier*, for example, this Court emphasized that the inmate faced a "spiritual" harm, not a "pecuniary" one, so the threatened violation of the inmate's religious rights was irreparable. 595 U.S. at 433. There is no comparable allegation here. Miller only alleges that he might be in pain when he passes. But the standard remedy for pain is damages. *See, e.g.*, *King v. Nat'l Spa & Pool Inst.*, 607 So. 2d 1241, 1244 (Ala. 1992). And courts have routinely recognized "that claims of ongoing pain, without more, do not constitute sufficient allegation of irreparable injury to obtain a preliminary injunction." *Bigby v. Awe*, 2019 WL 5068543, at *2 (S.D. Ga. Aug. 5, 2019), *report and recommendation adopted,* 2019 WL 4262060 (S.D. Ga. Sept. 9, 2019) (collecting examples); *cf. Tuttamore v. Lappin*, 429 F. App'x 687, 692 (10th Cir. 2011) (no irreparable harm where ongoing pain would be "resolve[d]"). Courts have found that plaintiffs could not establish irreparable harm despite allegations of "flash pulmonary edema while still conscious." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020). As the Seventh Circuit has put it, a plaintiff cannot "show[] the existence of irreparable harm

through the mere possibility that some unforeseen complication will result in a lingering death." *Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007). Indeed, pain, without more, is not even a cognizable harm under the Eighth Amendment. *See Bucklew*, 587 U.S. at 132-33. If pain cannot be considered a harm, then surely it cannot be considered *irreparable* harm in every case.

## **CONCLUSION**

The motion for a preliminary injunction should be denied.


Respectfully submitted,

Steve Marshall
*Attorney General*


/s/ Richard D. Anderson
Richard D. Anderson
*Assistant Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Office (334) 242-7300
Fax (334) 353-8400
Richard.Anderson@aAlabamaAG.gov

36

## **CERTIFICATE OF SERVICE**

I hereby certify that I have, on this 15th day of July, 2024, electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will serve all counsel of record.

/s/ Richard D. Anderson
Richard D. Anderson
*Assistant Attorney General*