**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| ALAN EUGENE MILLER, | |
| *Plaintiff*, | Civil Action: 2:24-cv-197 |
| v. | **CAPITAL CASE – EXECUTION SCHEDULED FOR SEPTEMBER 26, 2024** |
| STEVE MARSHALL, in his official capacity as Attorney General, State of Alabama, | |
| KAY IVEY, Governor of the State of Alabama, | |
| JOHN Q. HAMM, In his official capacity as Commissioner, Alabama Department of Corrections, | |
| TERRY RAYBON, in his official capacity as Warden, Holman Correctional Facility, | |
| *Defendants*. | |

**PLAINTIFF'S REPLY IN SUPPORT OF HIS
MOTION FOR PRELIMINARY INJUNCTION
OR IN THE ALTERNATIVE STAY OF EXECUTION**

## <u>Table of Contents</u>

<u>Page</u>

Introduction ...................................................................................................1

Background ....................................................................................................1

Argument.......................................................................................................9

I.      Mr. Miller Has Standing to Bring Count III Against Defendants Marshall
        and Ivey.............................................................................................9

II.     Neither *Rooker-Feldman* Nor Preclusion Bar Count III. ..............13

III.    Mr. Miller Is Likely to Succeed on the Merits of Count III..........18

        A.      The Current Nitrogen Hypoxia Protocol Poses a "Substantial Risk
                of Serious Harm."..............................................................19

        B.      Mr. Miller's Proposed Alternatives Are Feasible and Readily
                Implemented. .....................................................................27

IV.     The Equities Weigh in Mr. Miller's Favor...................................30

        A.      Mr. Miller Did Not Delay in Filing His Motion. ...............30

        B.      Mr. Miller's Current Litigation is Not Inconsistent with His 2022
                Litigation ...........................................................................32

        C.      Mr. Miller Will Suffer Irreparable Harm if a Preliminary Injunction is
                Not Granted. ......................................................................33

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Behr v. Campbell,*
   8 F.4th 1206 (11th Cir. 2021) ...............................................................14

*Bigby v. Awe,*
   2019 WL 5068543 (S.D. Ga. Aug. 5, 2019) ......................................35

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
   544 U.S. 280 (2005) ............................................................................14

*In re Fed. Bureau of Prisons' Execution Protocol Cases,*
   980 F.3d 123 (D.C. Cir. 2020) ...........................................................35

*Haring v. Prosise,*
   462 U.S. 306 (1983) ..........................................................16, 17, 18

*Jones v. Governor of Fla.,*
   950 F.3d 795 (11th Cir. 2020) .....................................................33, 34

*Lee L. Saad Const. Co. v. DPF Architects, P.C.,*
   851 So. 2d 507 (Ala. 2002) ................................................................16

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................10

*Miller v. Hamm,*
   2022 WL 4348724 (M.D. Ala. Sept. 19, 2022) ................................. 34

*Montana v. United States,*
   440 U.S. 147 (1979) ............................................................................16

*Morris v. May,*
   570 F. App'x 903 (11th Cir. 2014) .....................................................16

*Murthy v. Missouri,*
   144 S. Ct. 1972 (2024) ........................................................................10

*Nance v. Ward,*
   597 U.S. 159 (2022) ............................................................................27

*Powell v. Thomas*,
784 F. Supp. 2d 1270 (M.D. Ala. 2011), *aff'd*, 641 F.3d 1255 (11th
Cir. 2011) .................................................................................................15

*Price v. Comm'r, Ala. Dep't of Corr.*,
920 F.3d 1317 (11th Cir. 2019) ..........................................................18

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ..........................................................35

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ..........................................................35

*Tuttamore v. Lappin*,
429 F. App'x 687 (10th Cir. 2011) .......................................................35

*Zedner v. United States*,
547 U.S. 489 (2006) .............................................................................32

## Other Authorities

Ala. R. App. P. 8(d)(1) ..............................................................................13

## **Introduction**

Defendants' main argument in their opposition brief is that Kenneth Smith held his breath during the State's first-ever, novel nitrogen hypoxia execution. But Defendants do not support this argument with a single piece of documentary evidence. Instead, Defendants hang their hat almost exclusively on the self-serving testimony of a witness who claims to have remembered Mr. Smith's oxygen levels nearly seven months after the execution. That same witness never wrote down the levels during the execution, nor did he tell anyone about them the night of the execution. In fact, the evidence in the record suggests that the witness could not even see the levels from his position in the execution chamber, and the execution log from Mr. Smith's execution that Defendants have produced in this litigation undercuts their entire argument. Neither do Defendants reckon with the medical and scientific fact that breath holding may be an involuntary and insuppressible human reaction to the process of asphyxiation, and the implications this has for their nitrogen hypoxia method.

Because Mr. Miller has shown that he is likely to succeed on the merits of Count III, the Court should grant his motion for preliminary injunction.

## **Background**

Since the filing of Mr. Miller's opening brief, Mr. Miller's counsel has taken the depositions of Execution Team Member Brandon McKenzie, Execution Team

Member ████████████,[1] and ADOC Commissioner John Hamm.[2] Additionally, Mr. Miller has testified in his own deposition, has served the expert report of Dr. Phillip Bickler, and Dr. Bickler has been deposed. Based on these updates, Mr. Miller provides the following background information as a supplement to his motion.

***ADOC's Execution Team and Training***. Captain McKenzie is the Execution Team Captain for nitrogen hypoxia executions. In that capacity, McKenzie has many responsibilities, including: (i) ██████████████████ (Ex. 1, McKenzie Tr. 77:4-14); (ii) fitting the execution mask on the inmate (Dkt. 1-3 at 17)[3], and (iii)

---

[1] Mr. Miller is filing both a public and redacted, and sealed and unredacted, version of this briefing. Defendants have greatly over-designated discovery information—including the entire deposition transcripts of all of Defendants' witnesses, and documents reflecting information that is already public—as Confidential and Highly Confidential (attorneys' eyes only). And Defendants themselves have publicly disclosed several of the facts that they contend must be kept Highly Confidential. *See* Dkt. 70-3 (Defendants publicly filed an expert report that contains information Defendants claimed needed to be kept Highly Confidential, including the name of the guard present in the execution chamber with McKenzie, and information from documents they designated Highly Confidential, such as Kenneth Smith's autopsy report). In the meantime, Mr. Miller is conservatively redacting this filings until the dispute over the scope of confidentiality designations is heard by this Court.

[2] Fact discovery is still underway in this case. Mr. Miller has noticed four additional depositions over the next two weeks, all of people who were either eye witnesses to Kenneth Smith's execution, or key players in the formation of Alabama's nitrogen hypoxia execution method. Therefore, there will likely be significant factual updates to provide the Court at the August 6, 2024 preliminary injunction hearing.

[3] Other than citations to Defendants' opposition brief filed under seal, citations to page numbers refer to the ECF page number at the top-right side of the page.

█████████████████████████████████████████████████ (Ex. 1,

McKenzie Tr. 16:12-20). McKenzie has a high school degree, but no medical or

scientific training. Ex. 1 at 12:16-24. During an execution, the only other

correctional officer in the chamber with McKenzie is ████████████████. Like

McKenzie, ██████ also has a high school degree, but no medical or scientific

training. Ex. 2, ████████ 9:25-10:8. ██████ assists McKenzie in ████████████

█████████. Ex. 2 at 16:22-25.

Despite McKenzie being responsible for fitting the mask, he has never read

the █████████████████████████████████ which provides instructions

on the proper fit. Ex. 1 at 115:9-19. Neither has ██████ Ex. 2 at 54:9-17. In fact,

McKenzie's deposition was the first time he ever saw the ██████ Ex. 1 at 115:16-

19. The ██████ states the mask █████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ Dkt. 45-6 at 6. The

mere fact that there will be █████████████████████████████████

████████████████████ *Id.* For this reason, the ██████ provides instructions

for a █████████████████████ to test whether █████████████████

██████████ *Id.* at 9. McKenzie admitted at his deposition that although ADOC

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████, ADOC ███████████████████████████████

████ Ex. 1 at 32:15-22, 38:6-20.[4]

As Execution Team Captain, McKenzie was not trained by a medical or scientific professional experienced in (i) ██████████████, (ii) fitting gas-fitted masks, (iii) ████████████████████████████

████ Instead, a lawyer from the Alabama Attorney General's office—James Houts—████████████████ *See* Ex. 1 at 34:24-35:11, 36:20-25, 38:21-39:1, 57:3-9. According to McKenzie, Mr. Houts is ██████████████

████ from. *Id.* 57:7-9, 78:14-17 ████████████████████

████████████████████████████████████

████. Mr. Houts has admitted he is not an expert in nitrogen hypoxia protocols, but nevertheless believes he is qualified to ███████████████ the State's nitrogen hypoxia system because he is a "private pilot," "a master scuba diver," and served in the military. *See* Dkt. 1-5 at 192:18-193:3. Even though McKenzie is primarily responsible for ensuring that the mask fits the inmate, ██████████████

████████████████████ from Mr. Houts related to ████████

Ex. 1 at 39:18-22. Relatedly, neither McKenzie ████████████████

████████████████████████████████████

---

[4] Furthermore, ████ admitted at his deposition that even though he shares responsibility for the ████████ McKenzie, ████████████████████ ████ Ex. 2 at 21:18-22:1.

████████████████████████████████████████████ Ex. 2 at

52:22-23 ██████████████████████████████ Ex. 1 at McKenzie

Tr. 100:1-2 ████████████████████████████

████████ has never seen or reviewed the ████████████████████

████████████. Ex. 2 at 17:24-18:22. Those are the same ████████ that direct

████████ on what to do during an execution. *See* Dkt. 1-3. ████████ has also never

watched any ██████████████████████████████████████

████████████████. Ex. 2 at 32:24-33:4. No one ever instructed ████████ on how to

████████████████████ (*id.* 30:8-10), nor has ████████ ever received any

feedback on ████████████████ (*id.* 30:11-13, 26:7-16.) And even though he

is in the execution chamber during the execution, ████████ has never received any

████████████████████████████. *Id.* 83:15-18.

    ***Mr. Smith's Execution.*** As part of the protocol for nitrogen hypoxia

executions, a "pulse oximeter" is "placed and secured on the condemned inmate."

Dkt. 1-3 at 16. Specifically, McKenzie places ████████████████████████████

████████ Ex. 1 at 54:3-21. Mr. Houts is the only person who talked to McKenzie

about ████████████████████. *Id.* 55:1-5. The ████████ for the

████████ are ██████████████████████████████████ Ex. 2 at 42:7-

19. The ████████ are not visible to the witnesses during an execution. *Id.* 42:20-22.

According to ████ the ████ are located ████████████████

████████████████ *Id.* 42:23-43:2.

During the execution of Mr. Smith, ████████████████████

████████████████████ *Id.* 59:25-60:14. When the nitrogen

began to flow, ████████████████████████ *Id.* 61:25-62:11. So

did McKenzie. *Id.* 62:12-14. McKenzie ████████████████

████████████ *Id.* 63:12-14. ████████████████████

████████████████ *Id.* 64:13-15.

McKenzie, however, claims ████████████████████

████████████████████████████████

████████████████████████ He believes ██

████████████████ Ex. 1 at 143:20-23. ████████████

████████████████████████████████

████████████████████ *Id.* 137:22-138:3, 144:12-18. Further,

despite claiming to be surprised by the ████ and the ████████████

████████████████████████████████

████████████████ *Id.* 187:1-5. The ████████████████ to

Mr. Smith during the execution—████ and McKenzie—████████████

████████████████ *Id.* 203:18-22 ████████████████

████████████████████████████████████████ Ex. 2 at 71:5-7

████████████████████████████████████████

In this litigation, Defendants have produced ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ McKenzie testified that ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

***Mask Fit on Mr. Miller***. ███████ saw Mr. Miller the day before his deposition

and said ██████████████████████████████████ Ex. 2 at

57:3-15. McKenzie admitted ██████████████████████████

██████████████████ Ex. 1 at 122:4-8. During Mr. Miller's deposition,

Mr. Miller testified that various masks have not fit his face in the past. Ex. 3, Miller

Tr. 39:7-9. Specifically, Mr. Miller used to work at a company that dealt with powder

coating, and could not get the mask he wore on the job to seal even after tying it

down. *Id.* 39:7-15. Miller tried so hard to get the mask to seal that it left "a ring

around my face." *Id.* 40:13-17. More recently, Miller had trouble sealing the mask

that Holman provided him during COVID-19. *Id.* 41:11-42:1; *see also id.* 42:2-4

("Q. Okay. And how did that COVID surgical mask fit your face? A. It didn't.").
Mr. Miller is also unable to wear "one-size-fits all" style hats, sold to prisoners at
Holman, because they are too small for his head. *Id.* at 42:19-43:2.

Mr. Miller has no intention of resisting any aspect of his execution, or of
holding his breath. *See id.* 45:16-18 ("Q. Do you have any intention of resisting any
aspect of your execution. A. No."); *id.* at 44:5-8 (Q. "[I]s it correct that you have no
intention to hold your breath in a nitrogen hypoxia execution? A. No. I'm not going
to do anything to cause me to hurt myself. No."). Mr. Miller has also agreed to have
the execution mask fitted on him before the execution if the fitting is performed by
a neutral doctor or third party—particularly one that was ordered by this Court. *Id.*
38:24-39:2 (Q. "Alan, if Judge Huffaker ordered or appointed some sort of neutral
doctor or a third party to do your mask fitting, would you sit for that fitting? A.
Yes."). When the State offered to have Miller fitted for the mask at his deposition,
Mr. Miller said "not right now," (*id.* 35:25-36:3), and later explained his belief that
Mr. Smith's execution shows that the team responsible for fitting the mask is
"incompetent" to carry out a mask fitting (*id.* 38:10-16).

**_Dr. Bickler's Expert Report_**. Dr. Bickler's expert report builds on the
affidavit he submitted in support of Mr. Miller's motion for preliminary injunction.
Among other things, Dr. Bickler opines in his report that:

- As observed in his professional studies at the UCSF Hypoxia Research Lab,
  "a typical length of time that a person would be able to hold their breath is

well less than one minute. A small percentage of the population such as trained free-divers may be able to hold their breath for longer than one minute." Dkt. 70-3 ¶ 11.

- The unredacted nitrogen hypoxia protocol "does not contain any provisions that ensure the mask placed on a condemned inmate's face contains an airtight seal." *Id.* ¶ 22.

- A correctional officer in the execution chamber "will almost certainly be unable to determine whether oxygen is leaking into the mask via visual observation alone . . . Prison guards are not equipped to make medical judgments about the cause and significance of physical movements in the context of a death by nitrogen hypoxia." *Id.* ¶ 23.

- Certain slideshows that individuals associated with ADOC received in connection with nitrogen hypoxia executions "lack the type of information that a medical or scientific professional would possess when handling gas-fitted masks and nitrogen." *Id.* ¶ 23.

## Argument

Mr. Miller has standing against Defendants Marshall and Ivey, his claim is not precluded by doctrines that this Court has already rejected, and he is likely to succeed on the merits of Count III. The Court should grant Mr. Miller's motion for preliminary injunction.

## I.   Mr. Miller Has Standing to Bring Count III Against Defendants Marshall and Ivey.

Defendants Marshall and Ivey argue that Mr. Miller lacks standing to assert Count III against them. Dkt. 70 ("Opp.") at 6. The Court rejected this argument in its decision denying in part Defendants' motion to dismiss and should do so again here. *See* Dkt. 41 at 9-12.

Standing requires proof of three elements: (i) an injury in fact, that (ii) is fairly traceable to the defendant's actions, and is (iii) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Mr. Miller has satisfied all three.

As a threshold matter, nothing in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024) changed the fundamental principles of standing. The Supreme Court's decision discussed the same principles that this Court applied when it concluded that Mr. Miller has standing against all four defendants. *See* Dkt. 41 ("Order") at 9-12. In fact, Defendants essentially concede that *Murthy* did not introduce any new principles, admitting that *Murthy* merely "reiterated" what is already known about the Article III requirement. *See* Opp. at 6. If anything, Defendants' opposition suffers from the same fatal problem this Court previously identified in that it conflates justiciability with the merits of Mr. Miller's claim. *See* Order at 12.

**Defendant Marshall**. First, Marshall argues that "moving for an execution warrant" did not create an injury-in-fact. Opp. at 13. That is incorrect. Mr. Miller's injury is the superadded pain he will experience under the nitrogen hypoxia protocol. *See* Order at 10. Marshall's motion initiated the injury by asking the Alabama Supreme Court to authorize Miller's execution using the protocol. *Id.* To escape this obvious conclusion, Marshall resorts to misdirection, claiming that his motion was merely "the consequence[] of a conviction for capital murder and a sentence of

death." Opp. at 13. That does not mean Marshall's motion did not *injure* Mr. Miller. Under Marshall's argument, Mr. Miller could not bring a claim against him—no matter how egregious or unjustified the conduct—simply because Miller was previously convicted and sentenced for his crime. That is not how standing works. And Marshall does not cite a single case in support of his far-reaching argument.

Marshall is also wrong on traceability and redressability. Opp. at 13. Regarding traceability, Marshall's act set in motion a violation of Mr. Miller's constitutional rights that, absent relief, will culminate in his execution. *See* Order at 10. Regarding redressability, the Court can issue a declaration that the "current Protocol violates the Eighth Amendment" and order an injunction "enjoining the State from executing [Mr. Miller] using the current Protocol." *See id.* at 11. Both forms of relief would redress the injury caused by Marshall's motion by preventing Mr. Miller from being executed under the current version of the protocol. And Marshall can move the Alabama Supreme Court to vacate the execution warrant until ADOC revises its nitrogen hypoxia protocol to comply with the Eighth Amendment. *See* Dkt. 34 at 23.

Marshall tries to avoid all of this by claiming that his "role[] in the execution process" is over and that his challenged conduct no longer "continues." Opp. at 13. That is far from true. To the contrary, Marshall has chosen to deeply involve his office in the ongoing training and implementation of the State's nitrogen hypoxia

execution method. As explained above, Marshall's office—specifically, one of his attorneys, James Houts—is responsible for training the execution team on how to carry out a nitrogen hypoxia execution. As Commissioner Hamm himself testified,



Ex. 1 at 78:14-17

*See id.*

206:13-17. To the extent the Court grants Mr. Miller injunctive or declaratory relief, Marshall would presumably carry out that order by having ██████████████ ████████ so that Mr. Miller's proposed alternatives are implemented.

In addition to the training, the State's execution procedures separately provide for the Attorney General to play a role up until the moment the execution begins. *See* Dkt. 1-3 at 15. ("Prior to the start of the judicial execution procedures . . . [t]he Warden will consult with the ADOC General Counsel and/or the Office of the Attorney General to ascertain whether a stay of execution has been entered or is expected to be entered.") Further, the execution procedures expressly acknowledge the State can "agree[] to a voluntary delay" of the execution, a decision that would require input from the Attorney General as the state's chief law enforcement officer. *See* Dkt. 1 ¶¶ 5-7.

**Defendant Ivey**. Defendant Ivey's arguments fail for largely the same reasons. Mr. Miller's "injury is fairly traceable to . . . [t]he Governor's decision to set his execution using the Protocol for a thirty-hour time frame between September 26 and 27, 2024." Order at 10. Without such a decision, Mr. Miller would not be currently subject to the unconstitutional protocol. Ivey's conduct is also ongoing because her order setting the execution time frame is still in force. As long as that order remains active, Mr. Miller's injury continues to be imminent. Additionally, and as stated above, Mr. Miller's injury is redressable because this Court can hold that the State's current method of nitrogen hypoxia executions violates the Eighth Amendment. In turn, Ivey has the authority and obligation to change Mr. Miller's date of execution to a date far enough in the future that ADOC has time to revise the protocol. *See* Ala. R. App. P. 8(d)(1) (providing no limit on how far into the future the governor can set a time frame for an authorized execution). Moreover, "Ivey has previously used her authority as the chief executive to request that Marshall withdraw then-pending motions to set execution dates for inmates." *See* Dkt. 34 at 26. She can use that same authority to request that Marshall move the Alabama Supreme Court to vacate the execution warrant.

## II. Neither *Rooker-Feldman* Nor Preclusion Bar Count III.

The Court has already rejected Defendants' *Rooker-Feldman* and preclusion arguments at the motion-to-dismiss stage. *See* Order at 12 n.5 (finding Count III to

be a "distinct" and "independent" federal method-of-execution claim). Defendants offer no new reason for why the Court should accept their arguments now.

First, *Rooker-Feldman* does not bar Mr. Miller's Eighth Amendment claim. As the Eleventh Circuit has cautioned, "district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply." *Behr v. Campbell*, 8 F.4th 1206, 1212 (11th Cir. 2021). Indeed, *Rooker-Feldman* "occupies 'narrow ground' and is 'confined to cases of the kind from which the doctrine acquired its name.'" *Id*. at 1209 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). "Only when a losing state court litigant calls on a district court to modify or 'overturn an injurious state-court judgment' should a claim be dismissed under *Rooker-Feldman*; district courts do not lose subject matter jurisdiction over a claim 'simply because a party attempts to litigate in federal court a matter previously litigated in state court.'" *Id*. at 1210 (quoting *Exxon Mobil*, 544 U.S. at 292–93). Also, the Supreme Court explained in *Exxon Mobil* that "*Rooker-Feldman* did not prevent the District Court from exercising jurisdiction when ExxonMobil filed the federal action, and it did not emerge to vanquish jurisdiction after *ExxonMobil* prevailed in the Delaware courts." 544 U.S. at 294.

Here, Mr. Miller initiated his federal lawsuit before the Alabama Supreme Court entered its order issuing the execution warrant. Because the federal action was

filed prior to the state court judgment—as a matter of law—*Rooker-Feldman* cannot apply.

The decision in *Powell v. Thomas*, 784 F. Supp. 2d 1270 (M.D. Ala. 2011), *aff'd*, 641 F.3d 1255 (11th Cir. 2011)) is instructive. There, the plaintiff brought a method-of-execution challenge to Alabama's lethal injection protocol in federal court after he unsuccessfully sought a stay of his scheduled execution on the same grounds in the Alabama Supreme Court. The court "decline[d] to apply the narrow *Rooker-Feldman* doctrine because Williams does not identify or complain of an injury caused by the Alabama Supreme Court's decision, but rather complains of the future conduct of the ADOC officials in implementing the lethal injection procedure." *Id*. at 1276 n.1.

Here, as in *Powell*, Mr. Miller's Eighth Amendment claim does not complain of any injury caused by the Alabama Supreme Court. Instead, Mr. Miller "complains of the future conduct of the ADOC officials in implementing the [execution] procedure." *Id*. Mr. Miller challenges the constitutionality of the nitrogen hypoxia protocol as applied to him. Accordingly, the *Rooker-Feldman* doctrine does not apply.

Second, neither claim nor issue preclusion bars Mr. Miller's Eighth Amendment claim. The U.S. Supreme Court has made clear that both claim preclusion and issue preclusion share a fundamental prerequisite: "a full and fair

opportunity to litigate." *Montana v. United States*, 440 U.S. 147, 153–54 (1979). As the Court explained, these preclusion doctrines are "founded on the principle that a '*full and fair opportunity to litigat*e protects [a party's] adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Id.* (emphasis added); *see also Morris v. May*, 570 F. App'x 903, 905 (11th Cir. 2014) (per curiam) ("[C]laim preclusion only applies when a party has had a 'full and fair opportunity to litigate' the claims and issues settled in a previous suit."). The burden is on the party asserting preclusion "to prove that the issue it is seeking to bar was determined in the prior adjudication." *Lee L. Saad Const. Co. v. DPF Architects, P.C.*, 851 So. 2d 507, 520 (Ala. 2002).

Defendants cannot meet their burden to prove the claims and issues were fully and fairly litigated in the Alabama Supreme Court. As explained in Mr. Miller's response to Defendants' motions to dismiss, Alabama's cursory execution warrant proceedings did not provide such a full and fair opportunity. *See* Dkt. 34 at 28–31.

The Supreme Court's opinion in *Haring v. Prosise* articulated several principles that are highly relevant here.[5] 462 U.S. 306 (1983). The Court emphasized

---

[5] While the *Haring* opinion analyses collateral estoppel under Virginia law, the doctrine as applied by Alabama courts consists of the same elements. *See*, *e.g.*, *Lee L. Saad Const. Co.*, 851 So. 2d at 520 ("For the doctrine of collateral estoppel to apply, the following elements must be established: (1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually

that an issue must have been *actually litigated* and determined in the prior proceeding to be given preclusive effect. *Id*. at 316. And the Court noted that "collateral estoppel precludes the litigation of only those issues necessary to support the judgment entered in the first action." *Id*. at 315.

Here, the constitutionality of the method of Mr. Miller's execution was not "actually litigated" before the Alabama Supreme Court. That court issued a summary order granting the motion to set an execution date, without any analysis of the merits of Mr. Miller's constitutional arguments. The Alabama Supreme Court did not issue any reasoned decision addressing—let alone deciding—the specific constitutional questions presented in this case. *See* Dkt. 32-2. The court's silence cannot be treated as an adjudication of issues it never reached.

Moreover, a determination on Mr. Miller's constitutional claims was not *necessary* to the Alabama Supreme Court's judgment. All that was necessary to support its order was a finding that Mr. Miller's criminal judgment was final and that the State was ready to proceed with the execution under state law. A ruling on the constitutionality of the method of execution was not essential to the state court's directive that the execution could move forward.

---

litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.") (citation omitted).

Additionally, *Haring* stressed that *even if* an issue was raised, argued, and decided in a prior proceeding—which did not happen here—"[r]edetermination of the issues [may nevertheless be] warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." 462 U.S. at 318-19. Here, the Alabama Supreme Court's warrant proceedings fell far short of the procedural safeguards needed for a full and fair adjudication of constitutional rights. The state court engaged in no factfinding, conducted no adversarial hearing, issued no reasoned decision, and failed to address any issues raised Mr. Miller's written opposition to the state's motion. Such a cursory and non-substantive process does not gain preclusive effect in a later § 1983 action.

In sum, the Alabama Supreme Court did not actually litigate or necessarily decide Mr. Miller's constitutional claims through a full and fair procedure. Accordingly, this Court should address the merits without regard to the order for an execution warrant. Any other result would improperly strip Mr. Miller of his right to be heard on critical issues impacting his constitutional right and indeed his life.

III.    **Mr. Miller Is Likely to Succeed on the Merits of Count III.**

To succeed on his Eighth Amendment claim, Mr. Miller must show (1) that the method of execution poses "a substantial risk of serious harm," and (2) identify an "alternative" method of execution that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Price v. Comm'r, Ala.*

*Dep't of Corr.*, 920 F.3d 1317, 1326 (11th Cir. 2019) (per curiam). Mr. Miller has

shown that both elements are satisfied.

    A.    The Current Nitrogen Hypoxia Protocol Poses a "Substantial Risk of Serious Harm."

Mr. Miller's opening brief explains how the very recent execution of Mr.

Smith (which was described in a very consistent manner by all independent eye-

witnesses who are *not* employees of the State of Alabama) demonstrates the needless

suffering and superadding of pain that Mr. Miller will experience. The State refuses

to use a mask with an inherent airtight seal, refuses to perform a negative pressure

test on the person to be executed to see whether oxygen infiltrates the mask, and

refuses to give a sedative that would reduce the needless suffering that occurs during

asphyxiation. The State refuses to do these basic things despite the manufacturer

stating that its mask should not be used unless a negative pressure test is performed

to ensure that the seal is airtight, Dkt. 45-6 at 9 and despite knowing that "problems

. . . occur[]" when a mask is not sufficiently "seal[ed] tightly to the face," which

results in "small amount of oxygen being inhaled" that "extends the time to become

unconscious and extends the time to death," Dkt. 45-5 at 8. Since the filing of Mr.

Miller's opening brief, Defendants have produced a medical article that only

confirms the importance of a well-fitted mask. *See* Ex. 5 at ADOCHypoxia000738.

That article states that a "critical necessity" of hypoxia by inert gas "is a perfect fit

of the mask to the face so that room air will not enter the system." *Id.* at ADOC

19

Hypoxia000739. The article warns: "This is an important matter—maintaining such a good fit often requires considerable expertise." *Id.*

Mr. Houts is no expert. He is an attorney for the State with no medical or scientific training.[6] He did not provide McKenzie or ████████████████ ████████████████ nor did he likely give them ████████████████ ████████████████ Ex. 1 at 39:8-22. Yet Mr. Houts ████████████ ████████████████ *Id.* 57:7-9; *see also id.* 78:14-17 ████████ ████████████████████████████████████ ████████████████████████████ Equally problematic is that ████ shares responsibility for the mask with McKenzie but has never ████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████

It should therefore not be surprising that Mr. Smith did not lose consciousness after a few breaths—as the State repeatedly promised this Court. Instead, Mr. Smith's entire body—including his head—convulsed and jerked violently, heaving against the straps with enough force to move the gurney. *See* Dkt. 45-21. That was

---

[6] Mr. Houts will be deposed on July 30, 2024.

followed by several minutes of gasping for air as his veins "spider-webbed in every direction." *Id.* at 3.

Despite the public reporting of Mr. Smith's unnecessarily painful experience, Defendants attempt to explain away Mr. Smith's execution by claiming that he held his breath because his oxygen levels were up for a period of time and then dropped. Opp. at 23. Defendants do not support this theory with any documents from Mr. Smith's execution, or any medical records following the execution. Instead, Defendants' theory hinges on McKenzie claiming **seven months after** the execution that he saw and remembers Mr. Smith's very specific oxygen levels that momentarily showed on the pulse oximeters during the execution. *See* Dkt. 70-1 (McKenzie Affidavit).

There are several problems with Defendants' breath-holding theory. First, and as alluded to above, Defendants have no documentary proof of Mr. Smith's supposed oxygen levels. Indeed, McKenzie ████████████████, and Defendants have no records showing the alleged levels. Nor have Defendants produced any contemporaneous communications immediately after Mr. Smith's execution related to the levels. Yet McKenzie's affidavit suggests he miraculously remembers the specific levels more than half-a-year after the execution despite routinely not remembering other information related to the execution during his deposition, including how—*before* his affidavit was executed—he could not remember the time

periods involved. Ex. 1 at 137:22-139:3 ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

     In fact, it is questionable whether McKenzie could even see the levels during

Mr. Smith's execution. ████████ testified that the ████████████████████

████████████████████████████████████████ Ex.

2 at 42:7-8, 43:1-2. ████████████████████████████

████████ during the execution (*id.* 62:12-14), and ████████ could not see the

████████ from where he was standing (*id.* 64:13-15). ████████ also said that

McKenzie did not ████████████████████████████. *Id.*

63:12-14. McKenzie has never provided an explanation for how he could see ████

████████████████ when his own partner could not.

     Thus, despite Defendants claiming that breath-holding is the "best

explanation" for what happened during Mr. Smith's execution, Defendants do not

provide any documentary evidence to support their theory. In fact, the evidence in

the record strongly suggests that it would not have been physically possible for Mr.

Smith to hold his breath for any meaningful amount of time. Dr. Bickler has opined

that the "typical length of time that a person would be able to hold their breath is

well less than one minute." Dkt. 70-3 ¶ 11. According to Dr. Bickler, there is only

"[a] small percentage of the population such as trained free-divers" who may be able to hold their breath for longer than one minute. *Id.* Defendants' execution log from Mr. Smith's execution corroborates this point—according to the log, ███████ ████████████████████████████████████████ McKenzie ██████████████████████. *See* Ex. 6 at AMILLER_RFP_2_F_0010 ██ ████████████████████████████████████████████ And McKenzie testified that ███████████████████████████████ ██████████████████████. *See* Ex. 1 at 156:19-158:10. At that time, Mr. Smith ██████████████. *See id.* 159:8-11. Applying Defendants' theory to their own documents, then, Mr. Smith ████████████████ ████████████████████. That is simply not supported by common sense, eye witness accounts, or Dr. Bickler's expert experience with breath holding and hypoxia.

Dr. Bickler's expert opinion and the log also directly undercut ██████████ speculation[7] that Mr. Smith ████████████████████," (Opp. at 22-23), which again, is not supported by any documentary evidence. ██████████ belief that Mr. Smith's ████████████████████████████████ (*id.*) is similarly undercut by the several accounts published by independent journalists who witnessed Mr. Smith's execution and never reported a similar observation. Those

---

[7] ██████ will be deposed on July 26, 2024.

independent reporters said Mr. Smith's breathing appeared to stop being "visible at 8:08 p.m."—which was after the consciousness check, not some point in the middle of the execution. *See* Dkt. 45-15 at 8. And ████ admits that he was not ████████

████████████████████████████████████████████████████████████████

████████████ Dkt. 72-3 ¶ 3.

Defendants' other arguments are equally lacking. For example, Defendants claim Mr. Miller "has not explained how lay witnesses could have known when the nitrogen (an odorless, tasteless, and colorless gas) began to flow." Opp. at 23. Yet it is Defendants who have not explained how Mr. Smith could have known when to start holding his breath if the nitrogen is odorless, tasteless, and colorless. Additionally, the independent observers understandably knew that the execution began because, as the longtime reporter for *The Montgomery Advertiser* explained, they all saw Mr. Smith "gasping for air" for "four minutes," during which time he was "convulsing," "writhing" and "the gurney was shaking noticeably." *See* Dkt. 45-15 at 7.

Defendants also point to Dr. Philip Nitschke's[8] statements following the execution. Opp. at 24. As an initial matter, Defendants do not (and cannot) explain how Dr. Nitschke's statements are not the same supposed hearsay that they object to

---

[8] Dr. Nitschke is a proponent of medically assisted suicides, including nitrogen-based suicides, who was a former expert witness for Kenneth Smith. Dr. Nitschke did not attend Mr. Smith's execution.

elsewhere in their opposition. Opp. at 21. In any event, Dr. Nitschke's statements do not bolster the State's account. Dr. Nitschke never claimed to witness Mr. Smith's execution or review documentary evidence related to the execution. Contrast that with the testimony of McKenzie, ██████████████ with Mr. Smith yet ████ ████████████████████ *See* Ex. 1 at 203:18-22 ███████████ ████████████████████████████████████████████ ██████ Neither does ██████ *See* Ex. 2 at 71:5-7 ███████████████ ████████████████████████

Regarding Dr. Bickler, Defendants tie themselves into knots attempting to undermine his expert report and the article he published following Mr. Smith's execution. Opp. at 25. Dr. Bickler's article explained that "[w]hen faced with an impending, forced withdrawal of oxygen, humans are likely to breath irregularly or breath hold, 2 of many factors that will likely cause prolonged, significant shortness of breath . . ." Dkt. 45-10 at 76. In other words, humans will continue to breathe when faced with a withdrawal of oxygen; their "breath," however, will merely "short[en]." That is consistent with the other opinions in Dr. Bickler's expert report, in which he opines that the "typical length of time that a person would be able to hold their breath is well less than one minute." Dkt. 70-3 ¶ 11. Furthermore, Dr. Bickler is clear: breath holding can be an *involuntary* response to suddenly entering an oxygen-deficient environment. It is not a form of "resisting" an execution, but

rather an insuppressible human response to hypoxia. Ex. 7, Bickler Rough Tr. at 233:6-235:5.

Finally, Defendants claim Mr. Miller cannot show that he will experience the same unnecessary pain as Mr. Smith. That is wrong. Defendants have admitted that since the time of Mr. Smith's execution, ADOC has "taken no steps to amend the protocol for executing a condemned person by nitrogen hypoxia." *See* Ex. 8, ADOC Defendants' ROGs at 1. Nor has the execution team received any additional ███ ████████████████████ Ex. 2 at 80:10-14. The same improper mask fitting that occurred in Mr. Smith's execution will therefore occur for Mr. Miller. In fact, it will likely be worse as Mr. Miller is far larger than Mr. Smith—Mr. Miller is ███ and probably weighs "██ pounds." *Id.* 57:3-15. And Mr. Miller has testified that various masks have not fit his face in the past. Ex. 3 at 39:7-9. Despite Mr. Miller's uncontested size, and his previous experiences with masks, Defendants still refuse to have anyone but the unqualified McKenzie test the fit of the mask on Mr. Miller's face. And Defendants refuse follow the mask manufacturer's instructions to perform a "negative pressure user-seal check" to test whether "the facemask is sealing correctly." Dkt. 45-6 at 9. That McKenzie has previously tested the mask "on more than ten individuals of differing body types and sizes" (Opp. at 28) makes no difference given that the one execution attempt under McKenzie's watch resulted in a well-documented disaster.

26

Defendants are also wrong that Mr. Miller said that he will not "try on" the mask. *Id.* Mr. Miller agreed to have the mask fitted on him before the execution if the fitting is performed by a qualified person, such as a doctor or someone appointed by this Court. Ex. 3 at 38:24-39:2. He also testified that he has no intention of resisting any aspect of his execution. *See id.* 45:16-18.

B.    Mr. Miller's Proposed Alternatives Are Feasible and Readily Implemented.

For the second element to be met, Mr. Miller must present sufficiently detailed alternatives that are "feasible" and "readily implemented," and that "significantly reduce the risk of harm involved." *Nance v. Ward*, 597 U.S. 159, 164 (2022) (cleaned up). He has done so.

*First*, using a mask with an airtight seal around Mr. Miller's face will ensure that oxygen is less likely to infiltrate the mask and delay the time to death. Notably, Defendants do not meaningfully dispute that this alternative will significantly reduce the risk of harm to Mr. Miller. *See* Opp. at 32. Nor can they. Defendants' own documents confirm that when a "small amount of oxygen [is] inhaled," the time to reach unconsciousness and death can be extended. *See* Dkt. 45-5 at 8. Indeed, "a perfect fit of the mask" is "critical" so that the "room air will not enter the system." Ex. 5 at ADOCHypoxia000739. Defendants' only dispute is that Mr. Miller "has not identified a better mask for his execution." Opp. at 32. But that is of no moment because Mr. Miller's alternative is not necessarily a *new* mask but rather a mask that

fits his head and creates an airtight seal. Dkt. 45 at 12. And Mr. Miller has explained

that the current ███ mask used by the State may fit his head and create an airtight

seal if, consistent with the mask manual, the mask is "properly fitted" on him and a

"negative pressure user-seal check" occurs to determine whether the "facemask is

sealing correctly." Ex. 9 at 3 (Miller Responses and Objections to ROGs). Mr. Miller

has also stated that he will participate in a mask fitting prior to his execution if

handled by a neutral doctor or third party. Ex. 3 at 38:24-39:2.

*Second*, having qualified medical or scientific professionals, rather than

correctional officers, place and hold the mask if it becomes dislodged, supervise the

flow of nitrogen, and respond during the execution if something goes awry, will

reduce the risk of the same unnecessary pain that Mr. Smith endured. Notably again,

Defendants do not dispute this. Opp. at 33-34. That is because they cannot. Neither

McKenzie nor ███ have any medical or scientific training. *See* Ex. 1 at 12:16-

24; Ex. 2 at 10:5-8. ███ admitted that ██████████████████

█████████████████████████████ Ex. 2 at 83:15-18 ██████

███████████████████████████████████

██████████████████

All that Defendants can muster is pointing to ethical codes issued by the

American Medical Association and American Nurses Association. Opp. at 33. Those

codes are irrelevant. The State has medical professionals available to participate in

executions because Defendants' documents say so. Specifically, the State's execution protocol expressly refers to the involvement of "medical personnel" and "trained medical professionals". *See* Dkt. 1-3 at 18, 29. Additionally, Defendant Hamm recently wrote in a public letter that as a result of the "top-to-bottom" review of ADOC's execution processes last year, ADOC has "add[ed] to its pool of available medical personnel for executions." Ex. 10 at Miller_NH_000068-69. And the execution log from Mr. Smith's execution clearly shows that ███████ participated in the execution by ██████████████████████ *See* Ex. 6 at AMILLER_RFP 2_F 0010.

*Third*, regarding medical-grade nitrogen, Defendants claim that Mr. Miller "cannot prove that medical-grade nitrogen can feasibly be obtained from a supplier." Opp. at 34. Yet Defendants ignore the obvious fact that the State *already has* a supplier of nitrogen. It is reasonable to infer that the same supplier can provide the State with medical-grade nitrogen. Mr. Miller is not required to identify a specific supplier or the name of a particular company.

*Finally*, the use of a sedative will significantly reduce the risk of severe harm since a sedative promotes calming effects, which in turn will reduce the chances that involuntary movements from the nitrogen dislodge the mask and prolong suffering. As Dr. Bickler has opined, "Alabama seems to be operating under the misapprehension that hypoxia produces no distress and therefore requires no

29

sedatives." Dkt. 70-3 ¶ 30. According to Dr. Bickler, "asphyxiation is a very unpleasant way to die," and it is "unjustified that ADOC provides people executed by lethal injection with sedatives (in the form of the first drug in ADOC's three-drug protocol) while ADOC does not provide people executed by nitrogen hypoxia with sedatives." *Id.* Sedatives are presumably available to ADOC because the execution protocols expressly state that "[h]ealth care personnel" are required to bring any required "medication" to the inmate once he is moved to his holding cell before the execution. *See* Dkt. 1-3 at 11. Moreover, a sedative would reduce the possibility of involuntary breath holding in a nitrogen hypoxia execution. Ex. 7 at 208:19-211:6, 235:-336:7.

Mr. Miller has shown that he is likely to prove that the current nitrogen hypoxia protocol poses a substantial risk of serious harm in light of the well-documented problems that occurred during Mr. Smith's execution, and that his proposed alternatives will substantially reduce the risk and are feasible and readily available.

## IV. The Equities Weigh in Mr. Miller's Favor.

### A. Mr. Miller Did Not Delay in Filing His Motion.

From the start, Mr. Miller has expeditiously moved to prosecute his claim. The State sought Mr. Miller's execution warrant on February 21, 2024. Dkt. 1 ¶ 142. Shortly thereafter, Mr. Miller filed the instant action, asserting his claim that he faces

a risk of substantial harm from the State's nitrogen hypoxia protocol. *See generally id.* Around the same time, he also filed his opposition to the State's motion in the Alabama Supreme Court. Seeking to move this proceeding with deliberate speed, Mr. Miller then sought expedited discovery on April 12, 2024, asking, among other things, for information related to Mr. Smith's execution. *See* Dkt. 20. The Court denied the request, but Mr. Miller—again seeking to move expeditiously—sought discovery again after the Alabama Supreme Court issued Mr. Miller's execution warrant. *See* Dkt. 32. In that motion, Mr. Miller reiterated how expedited discovery was warranted to aid the parties and the Court in properly evaluating Mr. Miller's motion for preliminary injunction. *Id.* at 5. The Court denied the request as moot when it denied Defendants' motion to dismiss Count III and set a deadline for Mr. Miller to file his motion for preliminary injunction, which he filed on time. *See* Dkts. 41-42. Defendants' ignore this entire procedural history and the fact that Mr. Miller has actively sought to litigate his claim shortly after the State moved for an execution warrant.

Defendants are also wrong about the contents of Mr. Miller's motion. Most notably, Defendants refuse to acknowledge that Mr. Miller acquired and filed with his motion the ███████ mask manual, which provides explicit instructions about mask fit that Defendants have ignored and continue to ignore. That manual, which Mr. Miller attempted to obtain through expedited discovery, corroborates the

independent accounts of what happened during Mr. Smith's execution, and demonstrates Defendants' refusal to ensure that the mask they use on inmates creates an airtight seal.

Additionally, the Court set the deadline for Mr. Miller's motion for preliminary injunction a week before the parties' deadline to file their Rule 26(f) discovery report. Dkt. 42. Thus, Mr. Miller could not file with his motion any information learned through discovery. Since discovery has begun, Mr. Miller has taken three depositions, with at least four more scheduled.

### B.   Mr. Miller's Current Litigation is Not Inconsistent with His 2022 Litigation

Defendants next claim that Mr. Miller has unclean hands because he previously litigated to ensure that the State would honor his election of nitrogen hypoxia. This too is incorrect.

Judicial estoppel applies when a party takes inconsistent positions. *See Zedner v. United States*, 547 U.S. 489, 504 (2006). Mr. Miller has not taken inconsistent positions. Mr. Miller stands by his election of nitrogen hypoxia. But that does not mean he agreed to be executed unconstitutionally. Indeed, in his confidential settlement agreement in this 2022 litigation, the State agreed that Mr. Miller did not waive his right to later challenge whatever nitrogen hypoxia method the State eventually devised. *See* Ex. 11, Miller Settlement ¶ 7. When Mr. Miller settled his previous litigation in exchange for the State honoring his election, the State had not

yet released its nitrogen hypoxia execution protocol. And Mr. Miller did not know then that there was any basis to challenge the protocol until the State carried out Mr. Smith's execution in January 2024. For example, Mr. Miller did not previously know that the State would use a "one-size-fits-most" mask, or that the State would not use any sedative medications.[9] At that point, Defendants proved—in front of numerous independent observers—that they are presently incapable of carrying out the nitrogen hypoxia protocol in a constitutional manner. The doctrine of judicial estoppel does not apply.

C.   <u>Mr. Miller Will Suffer Irreparable Harm if a Preliminary Injunction is Not Granted.</u>

It should go without saying that Mr. Miller will suffer irreparable harm if Defendants inflict cruel and unusual punishment while executing him. Yet Defendants argue otherwise. In doing so, Defendants misrepresent the irreparable harm doctrine and decisions interpreting it.

To start, Defendants tellingly never define irreparable harm. A harm is irreparable if it "cannot be undone through monetary remedies." *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (citation omitted). The harm that Defendants will impose on Mr. Miller—superadded pain during his execution—

---

[9] To the contrary Mr. Miller had every reason to believe the State *would* use sedative medications in his nitrogen hypoxia executions, because the State uses a strong sedative as the first drug in its three-drug lethal injection protocol.

cannot be "undone" with money. *Id.* At the risk of stating the obvious, Defendants will not be able to compensate Mr. Miller for an unconstitutional execution with a monetary remedy because they will have already executed him. Just as this Court concluded in prior litigation, "[a]n execution is final; there are no do-overs or give-backs." *Miller v. Hamm*, 2022 WL 4348724, at *20 (M.D. Ala. Sept. 19, 2022). "Compensation to Miller's estate also would not be an adequate remedy, as the harm is not monetary in nature." *Id.*

Defendants nevertheless suggest that, even if Mr. Miller is likely to succeed, he would not face irreparable harm because he "might be in pain when he passes" and "claims of ongoing pain, without more," do not amount to irreparable harm. Opp. at 41.

This argument is wrong for three reasons. *First*, Defendants' argument is internally inconsistent. If Mr. Miller is likely to succeed on the merits of his claim— as Defendants purported to concede for purposes of argument—then he has shown that he is *likely* to suffer superadded pain during his execution, not that he *might* suffer pain. *Second*, Defendants' argument is redundant. By contending that Mr. Miller has not proven that he is likely to suffer superadded pain, Defendants simply rehash their earlier argument that Mr. Miller is unlikely to succeed on the merits. Defendants thus fail to offer any independent reason why Mr. Miller would not

suffer irreparable harm. *Third*, and similarly, Defendants misrepresent precedent.[10]
According to Defendants, the case law says that "claims of ongoing pain, without
more" do not constitute an irreparable injury. Opp. at 41. Notice, however, that these
cases held only that an *unsupported* claim of harm fails to establish an irreparable
injury. *See, e.g.*, *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (per curiam)
("[R]ecord . . . did not support Plaintiffs' claims of harm."); *Bigby v. Awe*, 2019 WL
5068543, at *2 (S.D. Ga. Aug. 5, 2019) (report and recommendation) (same). These
cases did not hold that that pain itself never causes an irreparable harm.

The upshot is that a *supported* claim of harm can amount to an irreparable
harm, if it cannot be "undone" by monetary remedies. *Scott v. Roberts*, 612 F.3d

---

[10] One of the most egregious examples is Defendants quoting a D.C. Circuit case for
the proposition that "[c]ourts have found that plaintiffs could not establish
irreparable harm despite allegations of 'flash pulmonary edema while still
conscious.'" Opp. at 41 (quoting *In re Fed. Bureau of Prisons' Execution Protocol
Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020)). Nowhere did the D.C. Circuit conclude
that a pulmonary edema is not an irreparable harm. It held that "*the record does not
support Plaintiffs' contention that they are likely to suffer flash pulmonary edema*"
in the first place. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d
at 137 (emphasis added). Or consider Defendants citing a Tenth Circuit case for the
proposition that there is "no irreparable harm where ongoing pain would be
'resolve[d].'" Opp. at 41 (citing *Tuttamore v. Lappin*, 429 F. App'x 687, 692 (10th
Cir. 2011)). Not only are Defendants suggesting that they can "resolve" an Eighth
Amendment violation by executing the plaintiff after committing the violation, but
they are selectively quoting a case that—again—does not say what they hold it out
to say. *See Tuttamore*, 429 F. App'x at 692 (concluding that plaintiff failed to show
irreparable harm because the record showed that "he was seen many times by
medical personnel and it was their professional and considered opinion that his
condition was not serious, was improving, and would resolve itself").

1279, 1295 (11th Cir. 2010). This is precisely what Mr. Miller has shown, so his injury is irreparable, and the equities weigh in favor of granting a preliminary injunction.

Dated: July 22, 2024                        Respectfully submitted,

/s/ *J. Bradley Robertson*
J. Bradley Robertson
Danner Kline
Bradley Arant Boult Cummings LLP
One Federal Plaza
1819 5th Ave. N.,
Birmingham, AL 35203
Tel: (205) 521-8188
Fax: (205) 488-6188
Email: brobertson@bradley.com
Email: dkline@bradley.com

Rachel C. Bramblett (*Pro Hac Vice* pending)
Bradley Arant Boult Cummings LLP
Promenade Tower, 20th Floor
1230 Peachtree St. NE
Atlanta, Georgia 30309
Tel: (404) 868-2100
Email: rbramblett@bradley.com

Daniel J. Neppl
Kelly Huggins
Mara E. Klebaner
Stephen Spector
Harry Dodsworth
Lauren M. Stapleton
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603

36

Tel: (312) 853-7000
Fax: (312) 853-7036
Email: dneppl@sidley.com
Email: khuggins@sidley.com
Email: mklebaner@sidley.com
Email: sspector@sidley.com

*Attorneys for Plaintiff Alan Eugene Miller*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 22, 2024, I served a copy of the foregoing via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to all counsel of record.

/s/ *J. Bradley Robertson*
J. Bradley Robertson